# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| United States of America, <br><br>         Plaintiff; <br><br>     v. <br><br> Terry S. Johnson, in his official capacity as Alamance County Sheriff, <br><br>         Defendant. | No. _____ <br><br><br> **COMPLAINT** |

## I.  INTRODUCTION

1.  From at least January 2007 to the present, Defendant Sheriff Terry S. Johnson, through the deputies under his control and at his direction, has engaged in a pattern or practice of discriminatory law enforcement activities directed against Latinos in Alamance County.  This discriminatory conduct deprives Latinos of their rights under the Fourth and Fourteenth Amendments of the United States Constitution.  To prevent Defendant Johnson from continuing these unconstitutional activities, this action seeks declaratory and injunctive relief under Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141.

2.  Defendant Johnson acts individually and through the deputies he appoints to assist him in the performance of his official duties.  N.C. Gen. Stat. § 162-24.   The Sheriff and these deputies operate collectively as the Alamance County Sheriff's

Office ("ACSO").

3. ACSO, at the direction of Defendant Johnson, intentionally discriminates against Latino persons in Alamance County by targeting Latinos for investigation, detention, and arrest, and conducting unreasonable seizures and other unlawful law enforcement actions in violation of the United States Constitution and federal law.

4. ACSO deputies implement their office's unlawful policy of targeting Latinos in a number of ways. For instance, ACSO deputies routinely target Latinos for stops during roving traffic enforcement operations. A 2012 statistical study commissioned by the United States Department of Justice ("DOJ") illustrates this discriminatory practice. The study indicates, for example, that a Latino driver in Alamance County is as much as ten times more likely than a similarly situated non-Latino driver to be stopped by an ACSO deputy for committing a traffic infraction.

5. Other discriminatory practices by ACSO against Latinos include: disproportionately subjecting Latinos to unreasonable seizures; arresting Latinos for minor infractions, such as the failure to have a valid driver's license, while only warning or issuing citations to similarly situated non-Latinos; stopping Latinos at vehicle checkpoints while allowing similarly situated non-Latino drivers to proceed; disproportionately locating vehicle checkpoints in predominantly Latino neighborhoods; and automatically referring Latino arrestees

2

booked at the Alamance County Jail to investigators at United States Immigration and Customs Enforcement ("ICE").

6.  These discriminatory activities are the product of a culture of disregard for Latinos cultivated by Defendant Johnson and other ACSO leaders.  ACSO leadership has repeatedly directed its deputies to target Latinos during enforcement actions and used derogatory comments and racial epithets to describe Latinos.  For instance, while at a vehicle checkpoint, Defendant Johnson issued instructions to his subordinates to "go out there and get me some of those taco eaters," which his subordinates understood as a directive to target Latinos for arrest.

7.  ACSO's deficient policies and virtually non-existent oversight of its biased policing activities further underscore its intent to discriminate against Latinos. ACSO consciously ignores the discriminatory effects of its practices, as is demonstrated by its ineffective training, virtually non-existent data collection, analysis, and accountability measures, poor supervision, and other departures from standard law enforcement practices.

## II.    DEFENDANT

8.  Defendant Terry S. Johnson is sued in his official capacity as the Sheriff of Alamance County.  Defendant Johnson has served as Sheriff of ACSO since January 2003, and has been ACSO's ultimate decision-maker at all times relevant to this Complaint.

9.  ACSO is the largest law enforcement agency in Alamance County, North

3

Carolina. ACSO has approximately 123 full-time sworn officers and an additional 147 civil employees.

10. Under North Carolina law, the Sheriff is the final authority for all duties assigned to his office. N.C. Gen. Stat. § 162-24. Defendant Johnson is responsible for all of ACSO's law enforcement activities, including ACSO's enforcement policies, priorities, and tactics, and the hiring, training, promotion, supervision, and discipline of deputies and other ACSO personnel. Defendant has the authority to terminate ACSO deputies and command staff at any time. He is ultimately responsible for the actions and omissions of ACSO deputies and command staff.

### III.    BACKGROUND

11. Alamance County is home to roughly 151,000 residents. The County's population is approximately 71.1% white, 18.8% African American, and 11.0% Latino or Hispanic.

12. The Latino population in Alamance County has grown considerably in the last two decades. According to Census data, the County had fewer than 800 Latino residents in 1990, comprising less than 1% of the total population. By 2010, the Latino population had grown to 16,624 – 11% of the total population.

13. In January 2007, ACSO entered into a Memorandum of Agreement ("MOA") with ICE pursuant to Section 287(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1357(g).

14. ACSO's first MOA with ICE became effective on January 10, 2007. The MOA

4

followed the "detention enforcement model," whereby ACSO personnel who completed mandatory training could investigate potential immigration violations committed by individuals detained at the Alamance County Jail. Certified officers could interrogate detainees and complete criminal alien processing procedures, including fingerprinting, photographing, and interviewing. The MOA did not authorize ACSO officers to enforce federal immigration laws outside the County Jail.

15. On September 18, 2012, ICE terminated its MOA with ACSO, eliminating ACSO officers' ability to investigate potential immigration violations by individuals detained in the County Jail.

16. Also on September 18, 2012, the United States notified Defendant that, based on its investigation, the United States found reasonable cause to believe that Defendant Johnson and ACSO were in violation of 42 U.S.C. § 14141 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and that this lawsuit would follow unless Defendant entered into a court enforceable agreement remedying the violations of the Constitution and federal law.

17. On September 26, 2012, counsel for Defendant Johnson declined the United States' invitation to enter into meaningful settlement discussions, asserting that the United States' legal conclusions were "meaningless" and that "no remedial measures are needed."

18. The United States thereafter determined that securing Defendant's compliance

could not be achieved through voluntary means.

## IV.    JURISDICTION AND VENUE

19. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and
1345.

20. The United States is authorized to initiate this action against Defendant Johnson
under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C.
§ 14141 ("Section 14141").

21. The declaratory and injunctive relief sought by the United States is authorized by
42 U.S.C. § 14141(b) and 28 U.S.C. §§ 2201 and 2202.

22. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C.
§ 1391(b).  ACSO is located in the Middle District of North Carolina, and
Defendant Johnson conducts nearly all of his official business within the District.
In addition, virtually all of the events, actions, or omissions giving rise to this
claim occurred in the Middle District of North Carolina.

## V.    FACTUAL ALLEGATIONS

23. From at least January 2007 to the present, ACSO has engaged in a pattern or
practice of intentionally discriminatory policing activities against Latinos that
stems directly from the statements, directives, and actions of Defendant Johnson
and other ACSO leadership.

24. Defendant Johnson directs ACSO deputies to target Latinos when conducting
enforcement activities.  He has explicitly instructed his staff to "go out there and

6

catch me some Mexicans," and directed deputies to "arrest Hispanics" – but not others – for minor infractions. Further, Defendant Johnson fosters a culture of bias against Latinos at ACSO through these explicitly discriminatory commands and his use of racial epithets. As a result, deputies understand that ACSO leadership not only tolerates, but encourages, their discriminatory conduct.

25. ACSO's discriminatory conduct includes targeting Latinos for traffic stops; stopping Latino drivers without reasonable suspicion; arresting Latinos for minor infractions while letting others go with a citation or warning; disproportionately locating vehicle checkpoints in Latino neighborhoods; stopping Latinos at checkpoints while letting others pass unhindered; and disproportionately referring Latinos for immigration investigations at the Alamance County Jail.

26. ACSO's discriminatory activities violate the constitutional and statutory rights of Latinos in Alamance County and erode the trust in law enforcement that is central to effective policing.

### A. Defendant Johnson Orders Law Enforcement Activities Targeting Latinos

27. Defendant Johnson has repeatedly urged ACSO deputies to target Latinos. For example:

   a. In a staff meeting after the implementation of the 287(g) MOA in January 2007, Defendant Johnson yelled "bring me some Mexicans!" while banging his fists on the table.

7

b.  Defendant separately instructed two members of ACSO's command staff to "go out there and catch me some Mexicans."

c.  When Defendant speaks to traffic and patrol deputies he frequently asks them, "You all getting Hispanics for driver's license revoked, NOL [no operator's license]"?

d.  In December 2008, Defendant instructed his deputies to "put heat on" predominantly Latino neighborhoods by conducting vehicle checkpoints, "knock and talk" operations, and heightened traffic enforcement.

28. In addition to encouraging ACSO deputies to target Latinos generally, Defendant Johnson has also instructed deputies to target Latinos in the context of discussing specific enforcement operations.  For example:

a.  After ACSO gained 287(g) authority, Defendant instructed the deputies in charge of selecting checkpoint locations to focus on Alamance County's Latino population.

b.  During a December 2008 meeting discussing an upcoming operation at the overwhelmingly Latino Calloway Drive mobile home park, Defendant encouraged his subordinates to get tough on the park's Latino residents, saying, "Hell comes to these places and the devil gonna come with him. And you folks gonna be the devil."

29. Defendant Johnson also directs his deputies to arrest Latinos – but not non-Latinos – for minor infractions during vehicle checkpoints and traffic stops.  For example:

8

a. Defendant directed ACSO's traffic enforcement unit to "arrest Hispanics" during checkpoints that he ordered at the Seamstress mobile home park. Defendant further instructed participating deputies that "if anybody stopped is Hispanic, don't write a citation, bring them to jail."

b. At a checkpoint in Green Level on or about June 2011, Defendant instructed the deputies conducting the checkpoint to "arrest any Mexicans if they don't have licenses."

c. During a 2008 ACSO staff meeting, Defendant likewise directed the assembled supervisors to tell their officers, "If you stop a Mexican, don't write a citation, arrest him."

30. Defendant Johnson likewise directs his deputies to target predominantly Latino neighborhoods for increased enforcement. Defendant Johnson often voices his assumption that Latinos are responsible for Alamance County's drug trade despite evidence that ACSO's rate of arrests for drug crimes has declined as the County's Latino population has increased. Defendant Johnson orders checkpoints and other enforcement activities in predominantly Latino areas under the pretext of drug interdiction. At a December 2008 staff meeting Defendant Johnson stated, "We've had a big drop in the Hispanic population, but we still got a lot dealing dope and we still got a lot of citizens in this country dealing dope with them."

9

## B. Defendant Johnson and Other ACSO Personnel Make and Tolerate Statements Evidencing Bias

31. Defendant Johnson fosters ACSO's culture of disregard for Latinos by making derogatory remarks about Latinos, including:

   a. On or about April 2007, while describing Latino immigrants to a reporter, Defendant asserted that, "[t]heir values are a lot different – their morals – than what we have here.  In Mexico, there's nothing wrong with having sex with a 12-, 13-year old girl . . . .  They do a lot of drinking down in Mexico."

   b. While participating in a vehicle checkpoint on or about June or July 2011, Defendant implored two deputies to "go out there and get me some of those taco eaters."

   c. On several occasions, Defendant has instructed deputies to "arrest Mexicans" or "bring me Mexicans."

   d. Defendant's remarks frequently assume, without any factual basis, that all Latinos in North Carolina arrived illegally.

   e. Defendant complained about Latino migration to North Carolina during a speech at a national security conference on or about January 2009.  In the speech, Defendant lamented the increased Latino presence in North Carolina's workforce and public schools and various increases in public expenditures to Latinos, including health services, corrections, and the need

for "Hispanic interpreters."  He concluded that "taxpayers are losing."

32. In addition, Defendant Johnson tolerates racially insensitive remarks by other members of ACSO's command staff, deputies, and correctional officers.  For example, Defendant Johnson did not discipline ACSO Chief Deputy Tim Britt for wearing a shirt to ACSO's office that stated, "it's a White thing, you wouldn't understand."

33. The anti-Latino sentiments expressed by ACSO leadership encourage discrimination by other ACSO personnel.  Indeed, racially or ethnically insensitive comments are commonly made by ACSO deputies.  For example:

   a.  During a traffic stop on or about April 2010, an ACSO deputy told a Latina passenger, "Mexican go home!"

   b.  On or about May 2010, after a Latina driver provided her valid North Carolina driver's license to an ACSO deputy during a traffic stop, the deputy retorted, "you stole it—the woman in the picture is pretty and you're ugly.  We're going to deport you."

   c.  While responding to a call for service in the predominantly Latino Rocky Top mobile home park during the summer of 2011, an ACSO deputy threatened to deport the parents of children who had broken a neighbor's window, asserting that the parents had until the following day to figure out who would pay to fix the window, "or we're going to come back and deport you all."  When the deputy returned a few days later and encountered one

11

of the parents, the deputy told him, "it's a good thing you fixed the window, or you'd be in Mexico."

    d. ACSO detention officers use the terms "wetback" and "spic" to refer to Latino individuals in their custody.

### C. ACSO Deputies Target Latinos for Traffic Stops

34. ACSO deputies routinely target Latinos for traffic stops. As a result, Latino drivers are significantly more likely to be subjected to traffic stops than similarly situated non-Latino drivers.

35. A 2012 statistical analysis commissioned by DOJ establishes that ACSO deputies routinely treat Latino drivers differently from similarly situated non-Latino drivers. The study assessed the incidence of traffic violations by Latino and non-Latino drivers and compared those data to the rates at which ACSO deputies stop Latino and non-Latino traffic violators.

36. For instance, the study analyzed traffic patterns along three major Alamance County highways, selected based on the high number of citations ACSO issued on those roads. The study found that ACSO deputies disproportionately stopped Latino drivers on all three roads:

    a. Along one highway, ACSO deputies were approximately four times more likely to stop Latino drivers as similarly situated non-Latino drivers.

    b. Along a second highway, ACSO deputies were approximately nine times more likely to stop Latino drivers than similarly situated non-Latino

12

drivers.

    c.  Along a third highway, ACSO deputies were approximately ten times more likely to stop Latino drivers than similarly situated non-Latino drivers.

### D. ACSO's Deliberate Targeting of Latinos for Traffic Stops Frequently Results in Deputies Stopping Latinos Without Reasonable Suspicion

37. Individual incidents also speak to ACSO's deliberate targeting of Latino drivers for traffic stops, and indicate that ACSO's focus on stopping Latino drivers results in stops lacking reasonable suspicion.  Examples of such incidents include:

    a.  On or about August 2011, an ACSO deputy followed a Latino man on Highway 70 for four to five minutes before activating his lights and pulling him over.  The deputy provided no reason for the stop, cited the man for driving without a license – but no violation observable prior to the stop – and arrested him.

    b.  On or about August 2011, an ACSO deputy followed a Latino man for five minutes along Highway 54 before pulling him over.  The officer provided no reason for the stop, cited the driver for driving without a license – but no previously observable violation – and arrested him.

    c.  On or about July 2011, an ACSO deputy followed a Latino man for roughly one mile until the man pulled into a gas station to wait for his wife to meet him after she got off work.  When the wife arrived and began to drive the couple home, the deputy pulled them over.  The deputy approached the

13

passenger side window and asked the husband for his driver's license. The deputy stated that the husband had been speeding and conducted a breathalyzer test. The deputy arrested the husband for driving without a license and driving under the influence, although his blood alcohol level was below the North Carolina legal limit. When the wife protested that her husband had not been driving when they were pulled over, the deputy arrested her and charged her with driving without a license and resisting an officer. The prosecutors ultimately dismissed the charges for driving under the influence and resisting an officer.

d.  On or about July 2010, an ACSO deputy followed two Mexican women visiting Alamance County on vacation. The women were following a car driven by friends of theirs who were white. After the deputy followed the Mexican women for eight to ten minutes, he turned on his lights and pulled them over for "driving too slowly." When the driver provided the deputy with her Mexican driver's license and passport, the deputy told her they "looked fake," and asked if she had a North Carolina license. After speaking with the white driver of the car the women had been following, the officer eventually let the women go without giving them any type of citation.

e.  On or about April 2009, an ACSO deputy stopped a Latino man driving in Green Level without probable cause or reasonable suspicion. When the

14

man showed the deputy his driver's license, the deputy asked for "his documents," meaning his immigration documents. When the driver asked why he had been stopped, the deputy refused to answer. The deputy also refused to provide his name or badge number. The Latino man was lawfully present in the United States.

### E. ACSO Deputies Arrest Latinos for Committing Minor Traffic Infractions, While Issuing Citations or Warnings to Similarly Situated Non-Latinos

38. ACSO officers treat Latinos differently than similarly situated non-Latinos when determining the appropriate response to minor traffic offenses.

39. ACSO deputies are far more likely to arrest Latino drivers than non-Latino drivers for minor traffic violations. Conversely, non-Latino drivers are far more likely than Latino drivers to receive citations or warnings for such violations.

40. For instance, ACSO deputies are more likely to arrest Latinos than non-Latinos for being unable to produce a valid driver's license.

### F. ACSO Deputies Stop Latinos at Vehicle Checkpoints While Allowing Similarly Situated Non-Latino Drivers To Pass Through

41. ACSO's selection of vehicles to stop at checkpoints discriminates against Latinos. ACSO deputies frequently wave non-Latino drivers through checkpoints while stopping cars driven by Latinos.

42. On several occasions, drivers have observed ACSO deputies waving white drivers through checkpoints while stopping Latino drivers and asking them to provide

15

identification.

43. For example, during a 2009 checkpoint outside the Rocky Top mobile home park, an ACSO officer waved a white man through a checkpoint. When the man started to show his driver's license, the ACSO deputy indicated that it was unnecessary, saying, "no, I'm here to get us some." The driver understood the deputy to be referring to the Latino residents of Rocky Top.

### G. ACSO Deputies Disproportionately Locate Vehicle Checkpoints in Predominantly Latino Neighborhoods

44. For at least the past five years, ACSO deputies have disproportionately clustered checkpoint activity around predominantly Latino neighborhoods. An analysis of documented checkpoints illustrates this pattern. Further, this analysis understates the magnitude of the checkpoints' discriminatory focus and effect because ACSO deputies routinely fail to record checkpoints located near Latino neighborhoods.

45. ACSO deputies frequently locate checkpoints at the entrance of mobile home parks populated overwhelmingly by Latino residents, such as Rocky Top, Seamstress, Oliver Rent, Calloway Drive, and Clover Creek.

46. During these checkpoints, residents of the affected mobile home parks are forced to endure police checks whenever leaving or entering their residential neighborhood.

16

### H. ACSO Officers Automatically Refer Latino Arrestees to ICE Investigators at the Alamance County Jail, While Not Referring Similarly Situated Non-Latinos

47. For at least the last five years, ACSO officers have targeted Latinos booked into the Alamance County Jail for heightened immigration enforcement.

48. Shortly after entering into the 287(g) MOA in 2007, ACSO changed its booking procedures to target Latinos for immigration questioning.

49. After entering the MOA, ACSO officers began asking arrestees about their place of birth and citizenship. After questioning, if an ACSO officer suspects that an arrestee is not a citizen, the officer escorts the arrestee to a 287(g) or ICE officer at the Jail to verify the arrestee's immigration status, even if the arrestee has posted bail.

50. ACSO officers typically base their decisions on whether to refer arrestees to 287(g) or ICE officers on their assumptions about the nationality or ethnicity of the arrestees. ACSO officers refer for ICE questioning all arrestees who "appear" Latino, regardless of how the arrestees respond to the citizenship question on the property form. A former correctional officer explained that "if you [a]re Mexican or look[] Mexican or even if you [a]re Puerto Rican, you[] go to ICE."

51. Conversely, arrestees who appear "American" are not referred to ICE, even if they fail to present identification.

17

## I. ACSO's Deficient Policies, Training, and Oversight Procedures Facilitate Discriminatory Enforcement Activities Against Latinos

52. ACSO has knowingly failed to implement adequate policies, procedures, training, and accountability mechanisms to prevent unlawful discrimination against Latinos, and has affirmatively changed certain policies to facilitate its discriminatory policing activities.

53. ACSO has failed to collect and/or analyze data necessary to identify and correct discriminatory practices. ACSO lacks an effective system to track and analyze its enforcement operations, including vehicle checkpoints, traffic stops, citations, and arrests. These data are collected and analyzed by many other law enforcement agencies as a means of preventing discriminatory policing.

54. ACSO is fully aware of the risk of discriminatory policing created by its practices of targeting Latinos, but has failed to take measures to prevent discriminatory treatment of Latinos.

### Inadequate Oversight and Analysis of Policing Activities

55. ACSO's lack of analysis of its policing activities evidences its intent to discriminate against Latinos.

56. Despite focusing its enforcement operations heavily on Alamance County's Latino population, ACSO does almost nothing to monitor or analyze its own policing operations to prevent discriminatory policing practices.

57. Even after DOJ informed ACSO in June 2010 that it was investigating ACSO's

18

discriminatory policing practices, ACSO took no steps to train, assess, or monitor its deputies to ensure that they were not engaging in discriminatory activities.

58. ACSO deputies who depart from or ignore ACSO's limited reporting requirements for conducting vehicle checkpoints suffer no repercussions. As a result, ACSO deputies seeking to gain favor with Defendant Johnson by targeting Latinos establish their own checkpoints in Latino neighborhoods without receiving prior approval from a supervisor and without creating any record of the checkpoint.

59. ACSO likewise does not consistently gather and analyze traffic stop data, even though North Carolina law requires such collection. Indeed, ACSO has admitted that at least for several years it "grossly underreport[ed]" the number of traffic stops its deputies made.

60. The lack of vehicle checkpoint and traffic stop data and analysis ensures that ACSO is unable to properly monitor its deputies' traffic enforcement activity or identify deputies or units engaged in profiling Latinos.

<u>Lack of Training and Oversight for the Vice Unit</u>

61. The lack of guidance and oversight of the activities of ACSO's Vice Unit – formerly known as the "Special Operations" unit – likewise shows ACSO's intent to discriminate against Latinos.

62. The Vice Unit consists of roughly a half dozen officers loyal to Defendant Johnson who carry out operations he prioritizes, often focusing on traffic stops and drug enforcement operations in predominantly Latino neighborhoods. At

19

Defendant Johnson's direction, the Vice Unit frequently targets predominately Latino mobile home parks such as Rocky Top, Seamstress, Calloway Drive, and Oliver Rent with road blocks, vehicle stops, raids, and increased patrols.

63. The Vice Unit's specialized drug enforcement activities, its focus on minority communities, and its frequent use of pretextual traffic stops place it at high risk of engaging in discriminatory conduct.

64. A law enforcement agency would ordinarily require that a unit engaged in activities with these risks receive more supervision and meaningful policy guidance. Instead, Vice Unit officers operate with less oversight than other ACSO officers, and without specific written guidance.

65. Defendant Johnson typically selects Vice Unit officers based on personal loyalty and without an open interview process.

66. The officers receive no formal training specific to their responsibilities as Vice Unit members. Nor are Vice Unit officers provided with any guidance regarding biased policing other than a general prohibition against discrimination.

67. These deficiencies demonstrate that Defendant Johnson and ACSO leadership consciously ignore the risk of biased policing by Vice Unit members.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### DEFENDANT'S LAW ENFORCEMENT ACTIVITIES VIOLATE SECTION 14141 AND THE FOURTEENTH AMENDMENT

68. The United States re-alleges and incorporates by reference the allegations set forth

in paragraphs 1 - 67 above.

69. The United States is authorized under 42 U.S.C. § 14141(b) to seek declaratory and equitable relief to eliminate a pattern or practice of law enforcement officer conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

70. Here, Defendant and his agents, including ACSO deputies, have utilized a variety of law enforcement practices to intentionally discriminate against Latino persons in Alamance County on the basis of their ethnicity.

71. Defendant's discriminatory law enforcement practices and those of his agents constitute a pattern or practice of depriving persons of rights protected by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, in violation of 42 U.S.C. § 14141(a).

## SECOND CLAIM FOR RELIEF
## DEFENDANT'S LAW ENFORCEMENT ACTIVITIES VIOLATE
## SECTION 14141 AND THE FOURTH AMENDMENT

73. The United States re-alleges and incorporates by reference the allegations set forth in paragraphs 1 - 67 above.

74. The United States is authorized under 42 U.S.C. § 14141(b) to seek declaratory and equitable relief to eliminate a pattern or practice of law enforcement officer conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

75. Defendant and his agents, including ACSO deputies, have unreasonably seized

numerous persons in Alamance County. These unreasonable seizures include seizures made without probable cause or reasonable suspicion.

76. Moreover, Defendant and his agents engage in a pattern of making pretextual traffic stops motivated by the ethnicity of the driver rather than a traffic infraction.

77. The unreasonable seizures made by Defendant and his agents constitute a pattern or practice by law enforcement officers that deprives persons of their rights under the Fourth and Fourteenth Amendments, in violation of 42 U.S.C. § 14141(a).

## PRAYER FOR RELIEF

78. WHEREFORE, the United States prays that the Court:

79. Declare that Defendant, his deputies, agents, and employees have engaged in a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, in violation of 42 U.S.C. § 14141(a);

80. Order Defendant, his deputies, agents, and employees to refrain from engaging in any of the predicate acts forming the basis of the pattern or practice of unlawful conduct described herein;

81. Order Defendant, his deputies, agents, and employees to adopt and implement policies and procedures to remedy the pattern or practice of unlawful conduct described herein;

82. Order Defendant to adopt systems that identify and correct conduct that deprives persons of rights, privileges, or immunities secured or protected by the

22

Constitution or laws of the United States; and

83. Order such other relief as the interests of justice may require.


DATED:  December 20, 2012


THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

ROY L. AUSTIN, JR.
Deputy Assistant Attorney General
Civil Rights Division

JONATHAN M. SMITH
Chief
Special Litigation Section
Civil Rights Division

AVNER M. SHAPIRO
DC Bar Number: 452475
Special Counsel
Special Litigation Section
Civil Rights Division

/s/ Samantha K. Trepel
SAMANTHA K. TREPEL
DC Bar Number: 992377

/s/ Michael J. Songer
MICHAEL J. SONGER
DC Bar Number: 975029
Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
Tel: (202) 514-6255

Fax: (202) 514-4883
samantha.trepel@usdoj.gov
michael.songer@usdoj.gov

Attorneys for the United States