IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil No. 1:12CV1349

UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
       vs.                         )
                                   )
TERRY S. JOHNSON, in his           )
official capacity as ALAMANCE      )
COUNTY SHERIFF,                    )
                                   )
              Defendant.           )

DEFENDANT'S
EXHIBIT
E

---

DEPOSITION
OF
TIMOTHY JEROME BRITT

---

Greensboro, North Carolina
October 3, 2013
9:23 a.m.

Reported by:
Rebecca P. Scott

Timothy Jerome Britt

1           Ben, there is you a set.

2  Q.  Other than this letter that you just read part of,

3       did you bring any other documents with you today?

4  A.  Yes, I did.  I brought one other set of documents,

5       which is a copy of an informational flyer

6       regarding the National Sheriff's Border School and

7       Border Tour, and I brought copies of that as well.

8       Would you like to see that?

9  Q.  Would you give me a copy of that, please.

10 A.  Yes, sir.

11 Q.  Thank you.

12           THE WITNESS:  I'm sorry.  Do you need

13       one, too?

14           MR. FLEISHER:  Thank you.

15 Q.  Thank you.  Those are the only documents you

16       brought with you today?

17 A.  Yes, sir.

18 Q.  Do you understand that this deposition is being

19       taken under oath subject to the penalty of

20       perjury?

21 A.  I do.

22 Q.  Do you understand that that's the same oath that's

23       taken by witnesses who testify at trial?

24 A.  Yes, sir.

25 Q.  Okay.  Have you ever worn a T-shirt to the

Margaret M. Powell, CVR-M - (919)779-0322

Timothy Jerome Britt                         10/3/2013

```
1         Sheriff's Office that said, "It's a white thing.

2         You wouldn't understand"?

3    A.  Absolutely not.

4    Q.  Have you ever worn a T-shirt that read anything

5         similar to that?

6    A.  No.  I've never wore a T-shirt to work.

7    Q.  You've never worn - have you ever worn a T-shirt

8         under your Sheriff's Office uniform?

9    A.  When I was on the line, I wore a vest.  Since

10        then, no.  Now a vest, you know, looks like a

11        T-shirt.  You know, it's - to clarify, you know,

12        your vest panels go in - it looks like a shirt.  I

13        wore that when I was on the line 25 years ago.

14   Q.  Have you ever worn any article of clothing that

15        had printed on it the message, "It's a white

16        thing.  You wouldn't understand"?

17   A.  No.

18   Q.  Do you know Officer Brian Allen?

19   A.  I do.

20   Q.  Have you ever hung out with Officer Allen socially

21        outside of work?

22   A.  Yeah.  He and I were partners in the '90s in the

23        Detective Division and worked there - my entire

24        career he's been there.

25   Q.  Have you ever gone to the beach with Mr. Allen?
```

Margaret M. Powell, CVR-M - (919)779-0322

Timothy Jerome Britt                           10/3/2013

1   A.  Yes.

2   Q.  Not any statistical analysis?

3   A.  I did not do any statistical analysis, no.

4   Q.  Have you ever done any analysis of the ethnicity

5       of people who are arrested versus the ethnicity of

6       people who are cited for not having a driver's

7       license?

8   A.  No.

9   Q.  At a staff meeting did Sheriff Johnson instruct

10      officers to arrest drivers when they did not have

11      a license?

12  A.  Did the sheriff instruct officers to arrest people

13      who did not have licenses?  No.

14  Q.  You don't remember at a staff meeting the sheriff

15      saying something along the lines of if someone

16      does not have a license, they should be arrested?

17  A.  Along the lines, I remember the sheriff making a

18      comment that if people didn't have licenses and

19      you couldn't identify them and know who they were,

20      then they should arrest them, and he didn't care

21      who they were.  Because, there again, part of that

22      is when these people don't go to court, we get

23      warrants.  We have to go out and hunt for folks on

24      fail-to-appear warrants because they didn't appear

25      on their citation, but not just for not having a

Margaret M. Powell, CVR-M - (919)779-0322

Timothy Jerome Britt                          10/3/2013

1        license.

2   Q.   What do you remember the sheriff saying exactly?

3   A.   I don't remember exactly.  You asked me along

4        those lines, and my recollection was that he had

5        spoke to the fact that people that were no

6        operator's license - NOL would be the term that

7        cops use - and they don't have - you're not able

8        to identify who they are, then they should be

9        arrested, or something along those lines, that it

10       was creating an issue, but not just not having a

11       license, and just something along those lines.  I

12       can't give you a direct quote.

13  Q.   So is it fair to say that officers at the

14       Sheriff's Office know that the sheriff wants them

15       to arrest some - wants them to arrest drivers for

16       NOL if the officers can't identify who the driver

17       is?

18  A.   Well, I don't know that it's fair to say that at

19       all.  I don't know what the officers know.  I

20       remember there being a conversation about that,

21       but I don't think so and I don't think that's the

22       case.

23  Q.   Well, the sheriff said at a staff meeting that if

24       a driver didn't have a license and could not be

25       identified, then the driver should be arrested,

Margaret M. Powell, CVR-M - (919)779-0322

1      right?

2  A.  You asked me - let's help - maybe I'm parsing this

3      too much.  You asked me had the sheriff ever told

4      people at the staff meeting to arrest people

5      without licenses.  I said I didn't know.  Then you

6      said well, something along those lines.

7          I said what I recall - and it's been sometime

8      ago - there was a conversation by the sheriff

9      about people not having licenses, not being able

10     to identify them, and the problem it created in

11     the court system and also created for people who

12     may have been erroneously - the same example I

13     gave of you two awhile ago.  One give the other's

14     name creates a problem.  I remember that being

15     discussed in a staff meeting.

16          I do not remember that being a directive or

17     being something that he ordered officers to do or

18     that officers - you asked me would that be - they

19     would know that that was his wishes.  That's me

20     trying to get in their head and his head.

21 Q.  Okay.  But the sheriff said at a staff meeting

22     that it was a problem that people did not have

23     licenses and could not be identified?

24 A.  I said that I remember there being a discussion

25     where the sheriff mentioned that people not being

Case 1:12-cv-01349-TDS-JLW   Document 86-5   Filed 03/02/14   Page 6 of 27

1       licensed and having ID that they should - you

2       know, there should be an arrest, but I don't

3       remember the exact quote, and I'm not going to sit

4       here and say he said this.

5   Q.  Okay.  When the sheriff says something in a staff

6       meeting, are the supervisors at that meeting

7       expected to pass that along to the officers who

8       work under them?

9   A.  Sure.  If he gives a directive, sure.

10  Q.  What should officers do if they encounter someone

11      without a license who they believe is not a US

12      citizen?

13  A.  Well, I don't know that US citizen has anything to

14      do with it.  It's about being able to determine

15      who they are, and they should treat it just like

16      any other violation.  If he doesn't have a

17      license, you go through the same four - you have

18      the same four options, and the officer should

19      build on those options.

20  Q.  Okay.  And does it - again, thinking about what

21      we've been talking about here, you know, when

22      officers should arrest someone who doesn't have a

23      license and can't be identified, is that true even

24      if the driver isn't suspected of any other crimes?

25  A.  Well, once again, that analogy we did was what I

Margaret M. Powell, CVR-M - (919)779-0322

1    would do.

2  Q.  Okay.

3  A.  And so driving without a license is a crime and is

4      a real crime with real consequences.  So you said

5      in light of any other charge, so the officer

6      followed those same good practices.  It's his

7      decision.  But, yes, people can be arrested for

8      driving without a license.

9  Q.  And it doesn't matter to you what they're - if the

10     driver is suspected of other criminal activity in

11     addition to the---

12 A.  Well, other criminal activity just simply ups the

13     ante a little bit, so to speak, and may influence

14     more.

15 Q.  But even if there is no suspicion of other

16     criminal activity, they can still be arrested -

17     they still would be arrested, at least by you, if

18     there is no other way to identify them, is that

19     right?

20 A.  Probably so, yes.

21 Q.  I just handed you what the court reporter has

22     marked Exhibit Number 2.  This is an e-mail that

23     Alan Miles sent to you in September of 2012, is

24     that right?

25              (Deposition Exhibit Number 2 was marked

Margaret M. Powell, CVR-M - (919)779-0322

1   A.  Yes.

2   Q.  Was the new program that you described of checking

3       CAD for the possible missing citations or traffic

4       stops - was that partly in response to the

5       publicity from Laura Roselle?

6   A.  I would say part of the publicity created us to

7       look at a better way of capturing our data or

8       another round, but the public criticism or the

9       report from her was on citations, not stops.

10      There are many citations issued that are not

11      affiliated with stops.

12           And we had - at that same time frame in '09,

13      had changed - was in the process of changing our

14      records - actually in '08 - our records management

15      system and had identified some reporting issues

16      with the State  and were already talking with the

17      State about ways to make our traffic stop data

18      better.

19  Q.  Okay.  So do you know whether officers, prior to

20      March of 2009, consistently turned in stop reports

21      when they made a stop?

22  A.  I don't know.  I wasn't charged with that task

23      prior to me getting involved about this time with

24      it.

25  Q.  In what - you also mentioned citations.  Well, I'm

1       sorry.  Strike that.  Let me back up.

2            Does anyone - when Kim Wilson or one of the

3       other captains at the Sheriff's Office reviews

4       traffic stop reports, what does she look for?

5  A.   She's reviewing that there is a stop, that the

6       stop form is completed, and that it matches the

7       CAD to show that we are fully documenting all of

8       our stops appropriately.

9  Q.   Okay.  And after she finishes her review, is there

10      any additional review by anyone above Captain

11      Wilson in the chain?

12 A.   I generally look every month at the report that

13      goes - well, actually after - well, yes, and there

14      is also review by the public because since then -

15      and the biggest - when I said part in response to

16      Laura Roselle earlier - what we did do in part to

17      Laura Roselle's public - was we started posting -

18      and I think we're one of the few in the state -

19      started posting our traffic stop data on our Web

20      page and have been doing so ever since so that the

21      public could see for themselves the total number

22      of stops - all the data that is on the stop form

23      is posted on our public Web site.  That's what we

24      did in response to Ms. Roselle.

25 Q.   Okay.

Margaret M. Powell, CVR-M - (919)779-0322

1   A.   And I look at that report every month.

2   Q.   When you review the traffic stop reports after

3        Captain Wilson does, what do you look for?

4   A.   I just look at the entire report.

5   Q.   What are you checking on the reports?  What are

6        you looking at?

7   A.   I look at the entire report.  I look at the number

8        of stops, the purpose codes.  I just - it's a

9        general report just like it's posted, and I just

10       look at it.

11  Q.   Okay.  Do you look at any of the individual stop

12       reports?

13  A.   Very rarely.  No.

14  Q.   Other than Captain Wilson and you, does anyone

15       else in the command staff review the traffic stop

16       reports?

17  A.   I don't know.

18  Q.   Are you aware of anyone who does?

19  A.   I don't know.

20  Q.   Okay.  So you're not aware of anyone else who

21       reviews them?

22  A.   Yeah, that would be fair.  I don't know.  I'm not

23       aware.

24  Q.   Okay.  So does anyone at the Sheriff's Office

25       review traffic stops - conduct any review to see

Case 1:12-cv-01349-TDS-JLW   Document 86-5   Filed 03/02/14   Page 11 of 27

```
 1        the federal ICE officers.  That's how they

 2        classified somebody's status.  Either they were

 3        here legally or illegally.

 4   Q.   Do you think illegals is an appropriate way to

 5        refer to people who are not in the United States

 6        lawfully?

 7   A.   What I just spoke about was the status of persons

 8        that ICE had encountered - federal ICE officers.

 9        They set the policy on that.  That's how they

10        determine---

11   Q.   But I'm asking you, do you think the term

12        "illegals" is an appropriate way to refer to

13        individuals who are not lawfully in the United

14        States?

15   A.   If they're not lawfully in the United States,

16        either you are legally here or you're illegally

17        here.  If you're here illegally, then you're here

18        illegally.

19   Q.   So the term illegal is appropriate to use to

20        describe those people?

21   A.   If someone is here illegally - if their status has

22        been determined to be here illegally, sure.

23        Federal government - that's your - that's the

24        federal government's terms.

25   Q.   Have you ever heard anyone in the Sheriff's Office
```

Case 1:12-cv-01349-TDS-JLW   Document 86-5   Filed 03/02/14   Page 12 of 27

1        use the term "wetback" to describe a Hispanic

2        person?

3   A.   Any one of the officers?

4   Q.   Anyone who works at the Sheriff's Office.

5   A.   No, not employees.  I mean I'm 45 years old.  I've

6        heard that term before, but I've not heard anybody

7        in the office.

8   Q.   Have you ever heard anyone in the Sheriff's Office

9        use the term "spic" to describe Hispanic people?

10  A.   No, not that I recall.

11  Q.   How about the term "beaners"?

12  A.   Not that I recall.

13  Q.   Would you recall if you heard someone use the term

14       "spic" to describe Hispanics?

15  A.   I think if I remembered a case of that - I do

16       think I'd remember it.  I think it would be

17       inappropriate.  I don't remember ever hearing that

18       term.

19  Q.   Have you heard the term "taco eaters"?

20  A.   Have I ever heard the term?  I've heard it quite a

21       bit since you filed your complaint.  I read it in

22       your complaint.

23  Q.   Have you heard it used by anyone at the Sheriff's

24       Office?

25  A.   No.

1  Q.  Have you ever heard Sheriff Johnson say at a staff

2      meeting if officers stop a Hispanic person for a

3      traffic offense, they should bring that person to

4      jail?

5  A.  If someone stopped somebody for a traffic offense,

6      they should bring them to jail?  No, I have never

7      heard that statement.

8  Q.  Have you ever heard Sheriff Johnson say anything

9      similar to that?

10 A.  No.  You couldn't bring somebody to jail for a

11     traffic offense anyway.  They'd have to be only

12     certain offenses, but no, I've not heard anything

13     like that.

14 Q.  Have you ever heard Sheriff Johnson say that he

15     wanted officers to bring him Mexican meat at a

16     staff meeting?

17 A.  Never heard that.

18 Q.  Have you ever heard Sheriff Johnson say that he

19     wanted officers to "bring me Mexicans" at a staff

20     meeting?

21 A.  I've never heard him say that.

22 Q.  Have you heard anyone at the Sheriff's Office

23     talking about Sheriff Johnson saying that?

24 A.  No.  In your complaint - I've heard one of those

25     in your complaint, but I've never heard - I've

Margaret M. Powell, CVR-M - (919)779-0322

1        you have a corporal, sergeant, and lieutenant.

2   Q.   So then all of your patrol - there would be - what

3        is that, then?  24 patrol officers total?

4   A.   36.

5   Q.   Okay.  Not counting supervisors, just actually

6        patrol officers that are actually out there.

7   A.   Well, currently staffing those - we've got some in

8        school.  Right now there are nine on a shift.  We

9        are set up for ten per shift.  When we're full and

10       everybody is out of school, we're ten per shift.

11  Q.   So how many patrol officers would you have?

12       Seven?

13  A.   It would be seven.  Be 28.

14  Q.   Okay.  Are you familiar with a checking station

15       operation in Green Level in 2011?

16  A.   I am.

17  Q.   I direct your attention to what's been marked as

18       Exhibit 23, and ask if you can identify it?

19            (Deposition Exhibit Number 23 was marked

20            for identification.)

21  A.   This is an operations plan for a checking station

22       to be conducted on June 15th, 2011.

23  Q.   And looking at page 2 of this, are these the

24       officers that were assigned?

25  A.   Yes, sir.

Margaret M. Powell, CVR-M - (919)779-0322

1  Q.  And you have Location 1 and 2, what does that

2      designate?

3  A.  This was a two-point checking station, so there

4      were two locations being run simultaneously as

5      part of the same operation plan.

6  Q.  And if you look back on page 1, it indicates the

7      coordinating officer as Corporal Sam Ray.  What

8      does that indicate to you?

9  A.  Special Ops.

10 Q.  And what is a coordinating officer?

11 A.  That's who is in charge of getting the plan done,

12     following - getting the necessary folks out.  He's

13     in charge of the operation.

14             MR. KITCHEN:  I actually - let's go off

15         the record for just a second.

16             (Discussion off the record.)

17             MR. KITCHEN:  Let's go back on the

18         record.

19 Q.  (By Mr. Kitchen)  Looking at the last two pages of

20     this exhibit---

21 A.  Yes, sir.  I'm getting there.  My fingers are

22     stuck.  Sorry.  Okay.

23 Q.  ---there are certain names in orange.  What do

24     these - what does that indicate?

25 A.  Those are the arrests that were made at this

Case 1:12-cv-01349-TDS-JLW   Document 86-5   Filed 03/02/14   Page 16 of 27

1          it's 19 - it's the transcript of the Vice/Special

2          Ops meeting.  It's 20, the court reporter tells

3          me.

4    A.    This?

5    Q.    Yes.

6                    MR. SONGER:   Thanks, Becky.

7    A.    Okay.

8    Q.    A moment ago, I think you indicated that prior to

9          this operation on Calloway Drive that's discussed

10         in this document that there had been some

11         information given to the Sheriff's Office by DEA

12         about Calloway Drive, is that right?

13   A.    No.  We were familiar with intelligence reports,

14         not just given to the Sheriff's Office.  Part of

15         it was an OCEDEF case that had resolved.  Part of

16         it was through our normal intelligence briefings

17         with them as part - through our task force

18         officer.  One of the pictures in this PowerPoint

19         is the stash house down there at Calloway Drive.

20   Q.    Do you have any record of any of the information

21         that was provided by DEA about Calloway Drive in

22         advance of this operation?

23   A.    I don't have it with me, no.

24   Q.    Does the Sheriff's Office have records of that

25         information anywhere?

Margaret M. Powell, CVR-M - (919)779-0322

1   A.   There were some of those OCEDEF cases turned over

2        to you that contained intelligence.  Some of the

3        incident reports that have already been turned

4        over to you and our database contains a lot of

5        that information.  These photographs are from one

6        of the stash houses at that location.  You've

7        already got that stuff.

8   Q.   Okay.  Is there anything else besides the incident

9        reports and the OCEDEF cases that were - that may

10       be related to that area?

11  A.   I don't have anything else, no.

12  Q.   Are you aware of anything else that exists?

13  A.   I'm not.

14  Q.   If you'd look, please, at the second page of that

15       exhibit.  It's Bates Number 179320.

16  A.   Okay.

17  Q.   And if you'd look at the last line of the first

18       paragraph.  This is - and you can look over on the

19       bottom of the prior page.  It indicates that

20       Sheriff Johnson is speaking here, is that correct?

21       Is that right?

22  A.   Yes, sir.

23  Q.   Okay.  And if you look at the last line of that

24       first paragraph, Sheriff Johnson says, "How long

25       have you heard me raise Cain about Calloway

Margaret M. Powell, CVR-M - (919)779-0322

1       Drive?"  Do you see that?

2   A.  Yes, sir.

3   Q.  So was Calloway Drive a place that Sheriff Johnson

4       raised Cain about on multiple occasions?

5   A.  I don't know.  This is 2008.  I mean I don't have

6       any specific recollection other than reading it

7       here.

8   Q.  But do you agree that Sheriff Johnson is

9       indicating here that he's brought up Calloway

10      Drive a number of different times?

11  A.  I'm sure.  I would agree that's what that says.

12  Q.  Do you have any reason to doubt that Sheriff

13      Johnson has mentioned Calloway Drive a number of

14      times?

15  A.  No.

16  Q.  And then if you'd look at the long paragraph of

17      the sheriff speaking about two-thirds of the way

18      down the page.  Do you see that?

19  A.  Yes, sir.

20  Q.  And the fifth line of that paragraph, the first

21      full sentence says, "From Darrell Drive, Rocky

22      Top, Calloway Drive, and Seamsters Mobile Home

23      Park, I have caught enough heck from citizens in

24      this county over the last two years for those four

25      places."  Do you see that?

Case 1:12-cv-01349-TDS-JLW   Document 86-5   Filed 03/02/14   Page 19 of 27

1    A.   Yes, sir.

2    Q.   So were the four places identified here frequent

3         locations--- Let me ask that a better way.

4              Was it common for the Sheriff's Office to get

5         complaints about these four places?

6    A.   See, once again, I'm captain in CID just going to

7         major at this time, but I mean that's what it

8         says.  I will agree with you that's what it says.

9         I don't remember the conversations then.

10   Q.   Okay.  And are these the type of complaints that

11        you and I talked about a little bit earlier from

12        your command staff meetings where if the sheriff

13        brought up areas that had received a number of

14        complaints like he's doing here that officers

15        would be expected to do something about those

16        complaints?

17   A.   Well, certainly if the sheriff had a complaint and

18        wanted it addressed, he would expect the officers

19        to address it.  I just don't have any specific

20        recollection.  This is '08.  This is five years

21        ago.

22   Q.   And here the sheriff is talking about Rocky Top

23        and Calloway Drive and Seamsters Mobile Home Park,

24        and he indicates that he's got a number of

25        complaints over the last couple of years about

Margaret M. Powell, CVR-M - (919)779-0322

1          those places, is that right?

2    A.   That's what it says, yes, sir.

3    Q.   Okay.  So in response to this information,

4         officers would be expected to do something at

5         Rocky Top and Calloway Drive and Seamsters to

6         respond to these complaints?

7    A.   Yeah.  That's what he's saying, yes.

8    Q.   Now if you'd look at the page that's

9         Bates-numbered 179322.  Are you there?

10   A.   Yes, sir.  I'm sorry.

11   Q.   No.  I'm sorry.  I just wanted to make sure.  If

12        you look at the top of this page, it looks like

13        the sheriff is having a back-and-forth with

14        Officer Alan Balog, is that right?

15   A.   Yes, sir.

16   Q.   And was Officer Balog the DEA task force officer

17        at this time?

18   A.   Yes, sir, he was.

19   Q.   Okay.  Now if you look at the first paragraph, the

20        sheriff, as part of this back-and-forth with

21        Officer Balog says, "I am tired of getting call

22        after call after call on these places.  Now you

23        helped me last time, and the reason you are here,

24        too - and I am just telling you - you tell me

25        you-all don't have nothing going on in any of

Case 1:12-cv-01349-TDS-JLW   Document 86-5   Filed 03/02/14   Page 21 of 27

```
 1        those places, correct?"
 2             And then Alan Balog responds, "Correct."  Do
 3        you see that?
 4   A.   Yes, sir.
 5   Q.   And then the sheriff continues, "Then you tell DEA
 6        they can hop on with us if they want to or leave
 7        us alone.  We're going to do what we're going to
 8        do - what we've got to do."  Do you see that?
 9   A.   Yes, sir, I do.
10   Q.   Okay.  So the sheriff is saying that even though
11        Alan Balog and DEA doesn't have anything going on
12        at these places, that the Sheriff's Office is
13        still going to do what they've got to do?
14   A.   He's saying that now, but I think earlier on in
15        this conversation they had just completed an
16        investigation down there - an OCEDEF case and some
17        cases involving the stash house.  So those cases
18        were closed out and finished.  He even says, "Now
19        you helped me last time and the reason you're here
20        too---"
21   Q.   Right.
22   A.   But at the point this is going on that those
23        operations had just concluded.  I think they talk
24        about it on the second page.
25   Q.   Okay.  So at the point this is - the point that,
```

```
 1        you know, this part of the conversation is going
 2        on, the sheriff is saying those DEA operations had
 3        already concluded, DEA didn't have anything else
 4        going on in these places, but the Sheriff's Office
 5        was still going to go in and do what we've got to
 6        do, right?
 7   A.   Or that current OCEDEF had ended, yes.  The
 8        OCEDEF, meaning that we don't interfere with their
 9        case.
10   Q.   Right.  Okay.  Just to be clear, the federal cases
11        had wrapped up and there weren't any federal
12        actions going on in these places anymore, but the
13        Sheriff's Office was still going to go in and take
14        action in these areas, right?
15   A.   I don't - he's - Balog saying there is nothing
16        current.  That's what it says.  I don't know what
17        federal was or wasn't going on.  That's what it
18        says on that line, yes.
19   Q.   And the sheriff's response to Balog saying there
20        is nothing current is that "You can come with us
21        if you want, but we're going to do what we've got
22        to do"?
23   A.   Yes.
24   Q.   Okay.  And these places that he's talking about -
25        these are the four - are these the four areas that
```

1       have been mentioned earlier in this meeting?

2       Seamsters and Rocky Top and Calloway Drive?

3  A.   I don't know.  I would have to look back and see.

4       The context can change pretty quick.

5  Q.   Okay.

6  A.   He says these places and I don't see a reference

7       immediately in front of it.  It would probably

8       be - you would have to assume what he's talking

9       about there.

10 Q.   But you would assume the places he's talking about

11      are the places mentioned - I think it's two pages

12      back - Darrell Drive, Rocky Top, Calloway Drive,

13      and Seamsters Mobile Home Park?

14 A.   Sure.

15 Q.   And then if you would look, please, at Bates

16      Number 179324.

17 A.   Okay.

18 Q.   It's the fifth paragraph down, the first lengthy

19      paragraph from the sheriff.  Do you see that?

20 A.   Yes, sir.

21 Q.   The sheriff says, "I have said a lot, but that's

22      why you're here and it will start January 1.  Hell

23      will come to these places and the devil is going

24      to come with them, and you folks are going to be

25      the devil.  Do you understand what I'm saying?"

1        What did you understand him to be saying?

2   A.   That he said that statement.

3   Q.   What did that mean to you?

4   A.   What he said.

5   Q.   That Hell is coming to the places that are being

6        discussed at this meeting?

7   A.   That's an old adage from a cowboy movie.  That's

8        just something he said.  I think it just means get

9        out and do our job.  I didn't take it to mean

10       anything other than what it is.

11  Q.   Have you ever heard the sheriff use that

12       expression to describe an operation any other

13       place?

14  A.   Sure.  That's a common statement.  That's his

15       one-liner.  People are speeding in Altamahaw.

16       Heck is coming to those places and the devil is

17       coming with them.  Drug problem over here, drug

18       problem over there, armed robberies over here.

19       That's just an expression he uses.

20  Q.   That's just the general tone that the sheriff sets

21       at the Sheriff's Office?  When there is something

22       to be addressed, he says hell is coming to these

23       places?

24  A.   I didn't say that was the tone he sets.  You asked

25       me is that a term he's used before, and I said

Margaret M. Powell, CVR-M - (919)779-0322

```
 1        I've heard him use it several times in regards to
 2        specific problems.
 3   Q.  How many times do you think you've heard him use
 4        it?
 5   A.  Several to a dozen maybe.
 6   Q.  And then the next sentence says, "Vice, I want you
 7        to knock-and-talk, if you have to, every mobile
 8        home, every house in Calloway Drive, and I want to
 9        know who is living there, what's going on."  Do
10        you see that?
11   A.  I do see that.
12   Q.  Is that statement indicating that the sheriff
13        wants the Vice Unit to knock-and-talk every mobile
14        home and every house in Calloway Drive?
15   A.  I think it's an expression.  It says "if you have
16        to," and it goes on to say, "Ever how you-all
17        devise a plan of action, I don't care, but I want
18        us to follow the constitution."  So I think it was
19        just one of those - as we talked way, way earlier
20        today, my recollection of it was, is that he says
21        "if you have to."
22            In other words, "I want you to do what you
23        need to do to resolve the issue there.  However, I
24        want us to follow the constitution."  He makes
25        that clear, and he left the plan up to them on how
```

Margaret M. Powell, CVR-M - (919)779-0322

1        they do it, if you read on in that sentence.

2  Q.   Okay.  But there was a problem in Calloway Drive,

3        and he wanted it addressed and he wanted the

4        officers to do whatever it took?

5  A.   He wanted them to do what it took within the laws.

6  Q.   And I think you said earlier you've never heard

7        him talk about sort of possibly doing a large

8        scale knock-and-talk like this at any other area,

9        right?

10 A.   Huh-uh.  And not even here.  I think it was more

11       of a phrase "if you have to, if that's what it

12       takes, let's go do -" he didn't order them to go

13       out and do a large-scale knock-and-talk.

14 Q.   I'm sorry.  So the record is clear, is it correct

15       that you've never heard the sheriff, you know,

16       talk about possibly doing a large-scale

17       knock-and-talk in any other area?

18 A.   That's correct.  He didn't in this area either.

19       Let me clarify that.  I think you just left me

20       confused there.  He didn't order one in this area

21       either.

22 Q.   What he said to Vice - "I want you to

23       knock-and-talk, if you have to, every mobile home,

24       every house in Calloway Drive," correct?  That's

25       the language that he used?