UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
File No. 1:12-CV-1349

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | BRIEF IN SUPPORT OF |
| v. | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| TERRY S. JOHNSON, in his official | ) | |
| capacity as Alamance County Sheriff, | ) | |
| Defendant. | ) | |

_____

Defendant, Terry S. Johnson, in his official capacity as Alamance County Sheriff, has moved for a Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and files this Brief in support thereof.

<u>STATEMENT OF THE NATURE OF THE MATTER</u>

This is an action brought by the United States of America seeking declaratory and injunctive relief under Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, filed on December 20, 2012. (Doc. 1, ¶ 1). The Complaint alleges two causes of action; one for alleged violation of the Equal Protection Clause of the Fourteenth Amendment, and a second cause of action based on the Fourth Amendment. (Doc. 1, ¶'s 68-77).

The Defendant has filed an Answer denying the allegations. He has also pled the four-year statute of limitations for those acts occurring more than four years prior to the filing of the lawsuit. (Doc. 6).

Discovery has now been completed, and both parties have filed Notices of Intent to File a Dispositive Motion. (Docs. 80, 82). The Defendant has filed a Motion for Summary Judgment, and files this brief in support thereof.

STATEMENT OF THE FACTS

The facts of each allegation are stated with the argument for clarity.

QUESTION PRESENTED

I.      SHOULD THE DEFENDANT'S SUMMARY JUDGMENT MOTION BE
        GRANTED ON PLAINTIFF'S CLAIM ALLEGING A VIOLATION OF 42
        U.S.C. § 14141 AND THE FOURTEENTH AMENDMENT?

II.     SHOULD THE DEFENDANT'S SUMMARY JUDGMENT MOTION BE
        GRANTED ON PLAINTIFF'S CLAIM ALLEGING A VIOLATION OF 42
        U.S.C. § 14141 AND THE FOURTH AMENDMENT?

ARGUMENT

I.      THE DEFENDANT'S SUMMARY JUDGMENT MOTION SHOULD BE
GRANTED ON PLAINTIFF'S CLAIM ALLEGING A VIOLATION OF 42 U.S.C. §
14141 AND THE FOURTEENTH AMENDMENT.

A. ELEMENTS OF CAUSE OF ACTION.

The United States has brought this action pursuant to 42 U.S.C. § 14141. As stated in *U.S. v. Maricopa County*, 915 F.Supp.2d 1073, 1079 (Ariz. 2012), this section prohibits law enforcement officers from "engaging in a pattern or practice 'that deprives persons of rights, privileges, or immunities secured or protected by the Constitution'..." In order to show a "pattern or practice", the United States must show "the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or

-2-

of a generalized nature..." *U.S. v. State of North Carolina*, 914 F.Supp. 1257 (E.D.N.C. 1996), *quoting*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S. Ct. 1843 n. 16, 1855, 52 L. Ed. 2d 396 (1977).

The First Cause of Action for the United States is for an alleged violation of the equal protection clause of the Fourteenth Amendment. This Court has stated the requirements for succeeding on an equal protection claim as follows:

> Instead, "[t]o succeed on an equal protection claim, [Plaintiff] must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001); *accord Equity in Athletics, Inc. v. Department of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011).

As will be shown below, Sheriff Johnson and his office have not engaged in a pattern or practice of intentionally treating Latinos differently due to their ethnicity.

B.  SHERIFF JOHNSON ORDERS LAW ENFORCEMENT ACTIVITIES TARGETING LATINOS.

As noted *supra*, the Plaintiff makes certain specific allegations in its Complaint. While these allegations are denied, the appellation given to each set of allegations is kept in order to make a direct comparison with the Complaint.

In paragraphs 24 and 27(b) of the Complaint, the Plaintiff alleges that Sheriff Johnson instructed his staff to "go out there and catch me some Mexicans", to "'arrest Hispanics' – but not others – for minor infractions". As shown by Exhibit A, "United States Response to Defendant's First Set of Interrogatories", the Plaintiff has identified

-3-

Lt. Brian Allen and Butch Harrison as the two officers involved with these allegations. As shown by Exhibits B and C, excerpts of the depositions Brian Allen and Butch Harrison, respectively, both officers testified that the Sheriff did not make these statements. (Allen Tr.p. 50, ln. 4-14; p. 98, ln. 18 – p. 99, ln. 12; Harrison Tr.p. 110, ln. 12 – p. 111, ln. 11). Lt. Allen further testified that neither the Sheriff nor anyone in the command staff had indicted that they would prefer Hispanic drivers be arrested for traffic violations. Sheriff Johnson confirmed the testimony of the two officers in his deposition. (Ex. D, Johnson Tr.p. 265, ln. 5 – p. 266, ln. 3).

In paragraph 27(a) of the Complaint, the Plaintiff accuses the Defendant of banging his fist on a table in January 2007 in a staff meeting and yelling "bring me some Mexicans". It is noted that this alleged action occurred almost six years prior to the filing of this action. The Plaintiff lists the individuals who "may include" Sheriff Johnson, Tim Britt, and Brian Allen among others. (Ex. A, Response to Interrogatory No. 3). Sheriff Johnson specifically testified that the allegation in Paragraph 27(a) is false. (Johnson, Tr.p. 260, ln. 21 – p. 261, ln. 11). Timothy Britt testified that the alleged events at the staff meeting did not occur. (Ex. E, Britt Tr.p. 281, ln. 14 – 21). Further, as shown above, Lt. Allen testified that he was never instructed to single out Latinos. ( Allen, Tr.p. 50, ln. 8 – 22).

In paragraph 27(c) and paragraph 29(c), the Plaintiff makes allegations that the Defendant instructs his officers to arrest Latinos for not having an operator's license.

-4-

This is untrue. The Sheriff explained in his deposition that his position is:

> If they don't have a driver's license, if they don't have any form of ID, if there's no way of you knowing who they are, you're to arrest them and bring them to the Alamance County Detention Center for processing.

(Johnson, Tr.p. 147, ln. 10-14). This position applies to everyone, not just Latinos. Chief Deputy Britt confirmed that position in his testimony as well. (Britt, Tr.p. 68, ln. 9 – p. 69, ln. 12). Officer Harrison testified this was done when they stopped someone who didn't have a driver's license. (Harrison, Tr.p. 42, ln. 16 – p. 45, ln. 25).

In paragraph 28(a) of the Complaint, alleges that the Defendant has instructed deputies to focus on the Latino population in selecting checkpoints. These are the same allegations contained in subsection G of the Complaint, and will be addressed there.

The allegations contained in paragraphs 27(d), 28(b), and 30 of the Complaint deal with the same operation concerning a mobile home park located on Calloway Drive. U.S. DEA had an ongoing operation on Calloway Drive. The Sheriff and deputies patrolling the area were getting constant complaints about the mobile home park. However due to the DEA operation, the Sheriff had to "stay out" of the area to avoid "burning" the operation. The DEA arrested between 23 and 24 suspects from the Calloway Drive area in its operation. (Johnson, Tr.p. 171, ln. 3 – 21). After the DEA operation was concluded, the Sheriff received information that there was still a stash house for drugs operating in the mobile home park. The Sheriff had a joint meeting with the Vice and Special Operations units in his department. A transcript of the meeting is filed as Exhibit

-5-

F.  It was at this meeting that the Sheriff made the statement referenced in paragraph 28(b) of the Complaint that "Hell comes to these places and the devil comes with him. And you folks gonna be the devil."  This quote is from an old cowboy movie.  (Johnson, Tr.p. 184, ln. 15 – 21).  The Sheriff used it to indicate to his people that "Hey, this is serious business, and I expect you to catch the people."  (Johnson, Tr.p. 186, ln. 18 – 22; Britt, Tr.p. 334, ln. 5 – 10). The stash house was located and 1200 pounds of drugs and a gun were recovered, along with one arrest.  (Johnson, Tr.p. 172, ln. 20 – 22).

Drug Trafficking is a major problem in Alamance County as alleged in paragraph 30 of the Complaint.  Alamance County has been designated as a High Intensity Drug Trafficking Area by the Office of National Drug Control Policy, Office of the President. (Ex. G, Serniak, Tr.p. 53, ln. 19 – p. 55, ln. 7).  The DEA resident agent in charge, Walter R. Serniak, Jr., has previously made a presentation to the Alamance County Board of Commissioners.  (Serniak, Tr.p. 9, ln. 7 – 25).  A copy of the PowerPoint is filed as Exhibit H.  According to DEA agent Serniak, the County is a major hub for drugs coming out of Mexico and being delivered to the northeastern part of the United States.  (Serniak, Tr.p. 10, ln. 5 – 21).  It has stash houses for drugs and for money returning from the northeast to Mexico.  Ninety percent of the drugs coming to Alamance County come out of Mexico, and are brought to Alamance County by Drug Trafficking Organizations (DTO).  Serniak, Tr.p. 13, ln. 6 – 9).  A majority of these DTO's are either Mexican or Latino.  (Serniak, Tr.p. 17, ln. 8 – 13).  One of these organizations is the Sinaloa Cartel

DTO.  (Serniak, Tr.p. 44, ln. 25 – p. 45, ln. 24).  These drug traffickers are Mexicans or people of Mexican descent who still have families in Mexico.  (Serniak, Tr.p. 65, ln. 20 – p. 66, ln. 11.)

Immigration and Customs Enforcement also investigates drug trafficking.  The ICE resident agent in charge put the number of drug and money couriers at 100% illegal aliens from Mexico.  (Ex. I, Fichou, Tr.p. 39, ln. 4 – p. 40, ln. 6).

So to the extent the Sheriff believes that Latinos are involved with drug trafficking in Alamance County, this belief is confirmed by U.S. DEA and the U.S. ICE.  As the Sheriff has stated, he does not object to Latinos legally coming to America to live.  He does intend to protect all the people in Alamance County from drug traffickers, home invasions, and criminals in general.  (Johnson, Tr.p. 178, ln. 13 – 20).

Lastly, the Plaintiff alleges that the Defendant ordered his deputies to "arrest Hispanics" during a checkpoint at Seamstress (sic.) Mobile Home Park.  This park is located in Green Level.  According to the Plaintiff's answers to Defendant's Interrogatories, number 8, the allegations contain in paragraph 29(a) of the Complaint reference a checkpoint in 2008.  The allegation in paragraph 29(b) of the Complaint alleges that the Sheriff instructed deputies over the radio to "arrest any Mexicans if they don't have licenses".  As also stated in the Complaint, this allegation relates to a checkpoint in June 2011.  The response to Defendant's interrogatories, number 9, indicates that the instructions were given in 2011 over the radio by the Sheriff.

-7-

The Sheriff was not present at the checkpoint in Green Level in 2008. The only regulatory checkpoint where the Sheriff was present was the Green Level checkpoint in 2011. (Johnson, Tr.p. 144, ln. 9 – p. 146, ln. 1). As indicated in the Plaintiff's response to Interrogatory number 13, one of the officers participating in the 2008 Green Level checkpoint was Bobby Culler. Officer Culler was the First Sergeant for the Highway Patrol in Alamance County at that time. He testified that he has never heard Sheriff Johnson direct that Hispanics should be arrested instead of being given citations. Further, he indicated that he was the individual who would give the briefing for a checkpoint. (Ex. J, Culler, Tr.p. 17, ln. 22 – p. 18, ln. 2). He also testified that he had never known Sheriff Johnson to racially discriminate or racially profile anyone, and he found the suggestion to be offensive. (Culler, Tr.p. 15, ln. 17- p. 18, ln. 2).

In response to the allegation in paragraph 29(b) of the Complaint, Sheriff Johnson denied ever making the statement over the radio as alleged. He further explained that officers know that the radio is recorded, and would not use it for improper purposes. (Johnson, Tr.p. 263, ln. 15 – p. 265, ln. 7).

While the Plaintiff has made several highly charged accusations about Sheriff Johnson ordering the arrest of Latinos, there is no basis for these accusations.

C. DEFENDANT JOHNSON AND OTHER ACSO PERSONNEL MAKE AND TOLERATE STATEMENTS EVIDENCING BIAS.

In paragraph 31(a) of the Complaint, Sheriff Johnson is accused of making

generalized statements about people living in Mexico. These statements were allegedly given to a newspaper reporter, not to a disclosed witness. Sheriff Johnson testified that he did not make those statements about the Latino population in general, but about "drug traffickers and the criminal element". Further, the statement about having sex with a 13-year old girl relates to a particular case in which a father traded his 13-year old daughter to drug traffickers. (Johnson, Tr.p. 250, ln. 13 – p. 252, ln. 15).

The allegations in paragraph 31(b) and (c), are regarding essentially the same allegations contained in subsection A above. Subparagraph (b) is again making allegations regarding the checkpoint at Green Level, and subparagraph (c) are the same allegations about arresting Mexicans. Sheriff Johnson has denied in his testimony that he ever made these statements. (Johnson, Tr.p. 253, ln. 10 – 16; Tr.p. 263, ln. 1 – 14).

In subparagraph 31(e), the Plaintiff alleges that Sheriff Johnson's remarks concerning the costs of Latino immigration evidences bias. As indicated by Sheriff Johnson's testimony, the School of Government at the University of North Carolina has done a study which documents the associated costs of immigrants. Sheriff Johnson based his remarks in part on the findings of the University of North Carolina. (Johnson, Tr.p. 249, ln. 21 – p. 250, ln. 12; Tr.p. 294, ln. 6 – 15). A copy of this report is filed as Exhibit M. Here the Plaintiff alleges that if the Sheriff does not agree with the political views of the Plaintiff, then he must be biased against Latinos.

In paragraph 32 of the Complaint, Plaintiff accuses the Chief Deputy of wearing a

-9-

shirt to work which stated "it's a White thing, you wouldn't understand." In the deposition, the Plaintiff clarified that it was a T-shirt. The Chief Deputy, Tim Britt denied ever wearing such a T-shirt, and further stated that he never wore a T-shirt to work. When in uniform, prior to 2002 when Sheiff Johnson took office, he wore a vest under his shirt for protection, but never a T-shirt. (Britt, Tr.p. 16, ln. 25 – p. 17, ln. 17).

In paragraph 33 of the Complaint, the Plaintiff alleges that deputies make "ethnically insensitive comments." The Defendant has requested information regarding the identity of the individuals about whom subparagraphs (a) and (c) are referring. Plaintiff has refused to disclose their identities, but indicated they would be disclosed if they were going to be used as witnesses. Therefore, since the identities have not been disclosed, it is presumed that the Plaintiff is abandoning these two allegations.

The allegations in paragraph 33(b) involve Suyapa Mejia Guevara. Ms. Guevara was stopped at a checkpoint on Hwy. 70 in Burlington. (Ex. K, Guevara, Tr.p. 17, ln.7 – 12). The officer told her that she had stolen the driver's license, and he was going to put her on an "Immigration bus". She was unable to describe the uniform of the officer, describe the shape of the badge, or determine if the officer was wearing a name tag. (Guevara, Tr.p. 21, ln. 3 – p. 23, ln. 21). She prepared a complaint which is filed herewith as Exhibit L. The complaint is titled "PUBLIC REPORT BURLINGTON POLICE DEPARTMENT". She attempted to file the complaint with the Burlington Police Department, but she did not as she states she was treated badly. (Guevara, Tr.p.

24, ln. 4 – p. 26, ln. 8). She believed that it was a Sheriff's officer that threatened her, because she believed that the Sheriff had an "Immigration bus". (Guevara, Tr.p. 31, ln. 2 – 10). None of the officers identified themselves as sheriff's deputies. (Guevara, Tr.p. 35, ln. 16 – 24). When Ms. Guevara was shown a document from the U.S. Immigration and Customs Enforcement indicating that the Sheriff's deputies could not exercise immigration authority outside of the jail, she indicated that she did not know if the person that stopped her could have been an officer from Immigration and Customs Enforcement. (Ex. M). She stated that the person did not identify himself, and left running when she asked to see his identification. (Guevara, Tr.p. 53, ln. 5 – p. 56, ln. 11). This allegation by the Plaintiff is without any foundation as the person complaining cannot identify the officer involved as a deputy sheriff, and she only believed it was a deputy because she thought the Sheriff ran an "Immigration bus".

The last allegation in this section, paragraph 33(d), alleges that detention officers from the Alamance County Sheriff's Office use the terms "wetback" and "spic" to refer to Latinos. One of the former court officers, David Wayne Cobb, testified that he had heard detention officers call inmates "wetback" and "spic". However, he was unable to identify any officer who had used these terms, and he stated that he had not used the terms. More important, he never reported that detention officers were using "wetback" and "spic", and did not know if anyone else had ever reported the use of these terms to the Sheriff or the Sheriff's administration. (Ex. N, Cobb, Tr.p. 8, ln. 22 – p. 9, ln. 22; Tr.p. 11, ln. 19-22).

-11-

When asked by the Plaintiff "how many times a day you heard the term spic or wetback", Mr. Cobb replied that "[i]t wasn't like a day. It was over the course of several weeks and years." (Cobb, Tr.p. 18, ln. 17-21). Both the Sheriff and the Chief Deputy testified that they had not heard the terms "wetback" and "spic" used by personnel at the Sheriff's Office. The Sheriff further testified that anyone who used those terms would be disciplined. (Johnson, Tr.p. 289, ln. 4-6; Britt, Tr.p. 279, ln. 25 – p. 280, ln. 10). It appears these derogatory terms were used very infrequently, and their use was not reported to the Sheriff or his administration. As such, it cannot be said that the Sheriff tolerates their use.

D.     ACSO DEPUTIES TARGET LATINOS FOR TRAFFIC STOPS

The Plaintiff in paragraphs 34 - 36 of the Complaint alleges that deputies of the Defendant stop Latino drivers at extremely high numbers compared to non-Latino drivers. The Defendant retained the services of Dr. David Banks of Duke University to do a statistical analysis of actions of the Alamance County Sheriff's Office to determine if there was in fact discriminatory policing, otherwise known as racial profiling, occurring in the Sheriff's Office. Dr. Banks CV is filed herewith as Exhibit O. Dr. Banks did an examination of the issue of whether or not deputies "target" Latinos for traffic stops. His analysis covered the entire county, not just parts of three roads which were deliberately selected for comparison. Dr. Banks' report is filed herewith as Exhibit P. He found that Latinos in Alamance County make up 11.6% of the population according to the 2010

-12-

census, and that 11.5% of non-checkpoint traffic stops were of Latinos. (Banks' Report, p. 12). Dr. Banks discusses the appropriateness of using unadjusted census numbers as a benchmark in his report. (Banks' Report, pp. 11-12). Even though Latinos are stopped at numbers less than their population would indicate, Dr. Banks went further and compared Alamance County to other counties in the Piedmont. As shown by Table 2 and Figure 2 in the Report, Latinos are less likely to be stopped in Alamance County than all of its adjoining counties. Latinos are much more likely to be stopped in Orange County, which had the highest disparity rate of all counties tested. (Banks' Report, pp. 13-14). Dr. Banks concludes that "I am confident that there is no evidence that Hispanic drivers are more likely to be stopped than non-Hispanic drivers". (Banks' Report, p. 2).

E.  ACSO'S DELIBERATE TARGETING OF LATINOS FOR TRAFFIC STOPS FREQUENTLY RESULT IN DEPUTIES STOPPING LATINOS WITHOUT REASONABLE SUSPICION.

In paragraph 37 of the Complaint, the Plaintiff lists five stops in which they allege Alamance County deputies stopped individuals without reasonable suspicion solely because they were Latino. Each of the stops will be addressed *seriatim*.

The Plaintiff identified the individual in subparagraph 37(a) as Sidonio Higido Miranda Fuentes. The Complaint alleges that a deputy stopped Mr. Fuentes in August 2011 without any violation being observable and arrested him for no operator's license. In fact, Mr. Fuentes was not stopped by a deputy sheriff. He was in fact stopped by Sergeant Charles Eric Crisp of the Haw River Police Department. Sgt. Crisp stopped him

-13-

for speeding 45 in a 35 zone. When it was determined that Mr. Fuentes did not have a driver's license, and had conflicting identification, he was arrested for no operator's license by Sgt. Crisp. (Ex. Q, Crisp, Tr.p. 12, ln. 11 - p. 14, ln. 16; Ex. R, Dec. of Dockery, Ex. 4). This arrest had nothing to do with the Defendant or his office.

In subparagraph 37(b) of the Complaint, the Plaintiff alleges that a person identified by Plaintiff as Juan Reyes Montoya was stopped on Hwy. 54 without a visible violation and arrested for not having an operator's license. In fact, Mr. Montoya was driving in a neighborhood which had experienced several break-ins. The car was registered to an out of state driver with a revoked license. On stopping the car, the officer found that the driver of the car was not the registered owner, but was Juan Carlos Reyes Montoya, who had no driver's license and no other identification. Further, he stated that he was from New Jersey. Mr. Montoya was arrested and taken to the magistrate's office where the magistrate found probable cause to arrest. (Ex. S, Dec. of Anthony).

In subparagraph 37(c) of the Complaint, the Plaintiff alleges that a man, identified by Plaintiff as Jose Guadalupe Ramirez Ambriz, was followed by a deputy to a gas station to wait for his wife. The other person was identified by the Plaintiff as Jessica Flores Rosales. Based on the testimony of Ms. Rosales, she and Mr. Ambriz were not married, but living together. Ms. Rosales got into the vehicle and started to drive off when she was stopped by the deputy. As alleged in the complaint, the stop of the vehicle was for speeding by Mr. Ambriz. Mr. Ambriz was arrested by the deputy for DWI and no

-14-

operator's license.  Mr. Ambriz refused the intoxilyzer test, and his blood alcohol level

was unknown.  The charges against Mr. Ambriz were dismissed as "The defendant is now

in ICE custody in Atlanta, GA, under deportation proceedings..."  Ms. Rosales was

interviewed by a different officer than Mr. Ambriz.  Initially, she told the officer she had

a driver's license, but she refused to show it to him.  At this point, she was arrested and

charged with no operator's license and resist, delay, and obstructing an officer.  Ms.

Rosales pled guilty to no operator's license as part of a plea deal which resulted in the

charge of resist, delay and obstruct being dismissed.  (Ex. T, Anthony, Tr.p. 84, ln. 6 – p.

95, ln. 4; Ex. U, Rosales, Tr.p. 8, ln. 15 – p. 28, ln. 20; Dec. of Dockery, Ex. 2 and Ex. 3).

There was reasonable suspicion to make the initial stop based on speeding as admitted in

the Complaint.  The other charges were then proper based on the facts stated above.

In subparagraph 37(d), the Plaintiff alleges that two Mexican women were stopped

for "driving too slowly" by a deputy sheriff.  Deputy Jason Coleman is a former deputy

who stopped the two women.  He stopped them as they were driving down Hwy. 49 and

would stop in the travel lane.  They then would drive a short distance and stop again.

Officer Coleman testified that he knew from his experience that "something was going on

with that vehicle".  He was not sure if it was a drunk driver, someone lost, or someone

looking to break into a house.  He thus had reasonable suspicion to stop the vehicle.  (Ex.

V, Coleman, Tr.p. 11, ln. 17 – p. 12, ln. 20).  Once he determined that the women were

lost, and the car they were following came back.  He had someone with a driver's license

-15-

drive the car, and he ended the stop. (Coleman, Tr.p. 13, ln. 20 – p. 16, ln. 12).

In subparagraph 37(e), the Plaintiff alleges that a Latino man was stopped by a deputy. The individual has been identified by the Plaintiff as Jose Luis Arzola. Mr. Arzola indicates that he was stopped by a deputy in a marked car. He also alleges that the officer asked him if he had papers. When he stated he was in the United States legally, the officer said, "Okay. Just go home." Mr. Arzola did not make a complaint at the time. Mr. Arzola did not ask the deputy his name or his badge number as alleged in the Complaint. Mr. Arzola cannot give a date for the stop. (Ex. W, Arzola Tr.p. 12, ln. 13 – p. 16, ln. 2). As no complaint was made at the time, and as there was no citation given, the Defendant has been unable to determine who the deputy might have been, or the reason for the stop. The stop does appear to have been an investigatory stop, as opposed to a regulatory stop, and Mr. Arzola was not the person the deputy was seeking. However, Mr. Arzola and the Plaintiff are simply unable to provide enough information to make any kind of determination as to the deputy involved or why the stop was made.

F. ACSO DEPUTIES ARREST LATINOS FOR COMMITTING MINOR TRAFFIC INFRACTIONS, WHILE ISSUING CITATIONS OR WARNINGS TO SIMILARLY SITUATED NON-LATINOS.

The Plaintiff gives no specific facts to back up the allegations made in this section of the Complaint. Dr. Banks on page 9 of his report, Exhibit P, indicated that his assistant had drawn a sample of the stops at checkpoints. Based on the sample, he found that Latinos were arrested at a rate of 15% of the time instead of being given a citation. Non-

-16-

Latinos were arrested at a rate of 21.4%. Thus Latinos were actually arrested at a lower rate than non-Latinos. Specifically with arrests for no operator's license, there were only 2 arrests for no operator's license in the sample, and both were Latino. With these very low number of arrests, the difference between 2 arrests for Latinos and 0 arrests for non-Latinos was not statistically significant. These allegations have no factual predicate and do not support the Plaintiff's allegation of ethnic profiling.

G. ACSO DEPUTIES STOP LATINOS AT VEHICLE CHECKPOINTS WHILE ALLOWING SIMILARLY SITUATED NON-LATINO DRIVERS TO PASS THROUGH

The only factual example presented by the Plaintiff for its allegations in this section is one in paragraph 43 of the Complaint. There the Plaintiff alleges that a white man was allowed to go through a checkpoint, and the officer stated "no, I'm here to get us some". The Plaintiff identified the man as Paul Crotts in its response to Defendant's Interrogatories. Mr. Crotts identified the officer as Sara Keller. The checkpoint was located in front of the road leading to Rocky Top Mobile Home Park. After Mr. Crotts stopped the car, he handed his license to the officer, but she did not take it. (Ex. X, Crotts, Tr.p. 12, ln. 10 – p. 13, ln. 8). Mr. Crotts wife, Paula Crotts, was with him in the car and works for Alamance County in its central communications center. She knew Officer Keller from when Officer Keller was high school with her son. She stated that Officer Keller told them, "No. Go on through. We're not looking for you." (Ex. Y, Crotts, Tr.p. 9, ln 22 – p. 11, ln. 25). Officer Keller testified that the only time she

-17-

worked a checkpoint at Rocky Top was when she assisted the gang unit. The checkpoint

was set up to find gang members. While Officer Keller denies ever "waving though"

Paul Crotts, the checkpoint had nothing to do with Latinos versus non-Latinos. (Ex. Z,

Keller, Tr.p. 19, ln. 12 – p. 20, ln. 14; Tr. 25, ln. 4 – 20; Tr.p. 64, ln. 10-19).

## H. ACSO DEPUTIES DISPROPORTIONATELY LOCATE VEHICLE CHECKPOINTS IN PREDOMINATELY LATINO NEIGHBORHOODS

The Plaintiff alleges that an analysis of checkpoint location has been conducted.

As stated in response to interrogatory number 24, this analysis was conducted by

Plaintiff's attorneys. Dr. Banks did an actual analysis of checkpoint locations. This

analysis is found on pages 2 -5 of his report. In short, Dr. Banks concludes that "there is

no statistical evidence that checkpoints were sited in ways that targeted the Latino

population.

## I. ACSO OFFICERS AUTOMATICALLY REFER LATINO ARRESTEES TO ICE INVESTIGATORS AT THE ALAMANCE COUNTY JAIL, WHILE NOT REFERRING SIMILARLY SITUATED NON-LATINOS

These allegations are now moot. Defendant has addressed this issue in its previous

brief, Doc. 11, pp. 7-8. The Defendant requests the Court review its prior argument.

## J. ACSO'S DEFICIENT POLICIES, TRAINING, AND OVERSIGHT PROCEDURES FACILITATE DISCRIMINATORY ENFORCEMENT ACTIVITIES AGAINST LATINOS

The Sheriff's Office collects all checkpoint and traffic stop data. To ensure that

the forms are actually turned in, Captain Wilson compares traffic stop reports to a CAD

-18-

report from Central Communications. If a report is not turned in, then she contacts the officer and has the report turned in. After the reports are turned in, the data is sent to the State once a month and posted to the Sheriff's public web site. Chief Deputy Britt also reviews the report once it is completed. (Ex. AA, Wilson, Tr.p. 32, ln. 3 – p. 36, ln. 6; Tr.p. 43, ln. 1 – 7; Britt, Tr.p. 104, ln. 2 – p. 106, ln. 10). Reporting issues were identified in 2008. The records system was then changed in 2009. (Britt, Tr.p. 104, ln. 12 – 18).

The Sheriff's Office provides extensive training for all its deputies, including the Vice Unit. All officers are required yearly to have a minimum of 24 hours of mandated training, including 4 hours of Juvenile and Minority Sensitivity Training. In addition, since 2009, the Sheriff's Office has provided 50,849 additional hours of training over and above that required by the State. The Vice Unit receives specialized training relating to its duties. (Ex. BB, Dec. of Longamore).

The Vice Unit also has its own Standard Operating Procedures which it is required to follow. (Dec. of Longamore, Ex. 2). All cases require that an incident report be submitted which is reviewed by the Sergeant over Vice as the Unit's supervisor. (Ex. CC, Fortner, Tr.p. 49, ln. 4 – p. 50, ln. 25).

II.    THE DEFENDANT'S SUMMARY JUDGMENT MOTION SHOULD BE GRANTED ON PLAINTIFF'S CLAIM ALLEGING A VIOLATION OF 42 U.S.C. § 14141 AND THE FOURTH AMENDMENT.

In its Second Claim for Relief, the Plaintiff alleges that there have been seizures made by the Defendant based on the ethnicity of the driver. However, even if the traffic

-19-

stops were made based on intentional discrimination, it would not state a claim under the Fourth Amendment. "[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment". *Whren v. U.S.,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed2d 89 (1996). Even though, as shown above, the stops made by the Sheriff's Office were based on probable cause, even if they were based on the drivers being Latino, it would not state a cause of action under the Fourth Amendment.

<u>CONCLUSION</u>

Based on the foregoing, the Defendant asks that his Motion for Summary Judgment be granted as the Defendant has not engaged in a pattern or practice of discriminatory policing.

Respectfully submitted, this the 2nd day of March, 2014.

Turrentine Law Firm, PLLC

by: /s/ Karlene S. Turrentine
Karlene S. Turrentine
N.C. Bar No. 25628
Email: kturrentine@turrentinelaw.com

by: /s/ S. C. Kitchen
S. C. Kitchen
NC Bar No. 9309
920-B Paverstone Dr.
Raleigh, NC 27615
Telephone:    (888) 308-3708
Fax:          (888) 308-3614
Email: ckitchen@turrentinelaw.com

-20-

CERTIFICATE OF SERVICE

I, S. C. Kitchen, hereby certify that on March 2, 2014, I filed this document with

the U.S. District Court's electronic Filing (ECF) system, which will serve a copy by email

to counsel, and further that for counsel who are not listed in the ECF system, I served a

copy of the foregoing document on the counsel in this action by placing the same in the

United States Mail, postage affixed:

> Michael J. Songer
> U. S. Department of Justice
> 950 Pennsylvania Ave., N.W.
> Washington, DC 20530
> Email:  michael.songer@usdoj.gov
>
> C. Amanda Martin
> 1101 Haynes Street, Suite 100
> Raleigh, North Carolina 27604-1455
> Email:  amartin@smvt.com

This the 2nd day of March, 2014.

Turrentine Law Firm, PLLC

by: /s/ S. C. Kitchen
S. C. Kitchen
NC Bar No. 9309
920-B Paverstone Dr.
Raleigh, NC 27615
Telephone:    (888) 308-3708
Fax:             (888) 308-3614
Email: ckitchen@turrentinelaw.com

-21-