## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| United States of America, <br><br>          Plaintiff; <br><br>    v. <br><br> Terry Johnson, in his official capacity as Alamance County Sheriff, <br><br>          Defendant. | No. 12-cv-1349 <br><br> UNITED STATES' BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT |

## UNITED STATES' BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Police officers in the United States may not enforce traffic laws based on the color of a driver's skin. Constitutional protections do not evaporate when individuals "step from their homes onto the public sidewalks," nor "when they step from the sidewalks into their automobiles." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). The Fourth and Fourteenth Amendments thus guarantee the public's right to travel freely on roadways without police interference based on ethnicity.

Latinos in Alamance County do not enjoy these fundamental protections. The Alamance County Sheriff's Office ("ACSO") targets Latinos in its traffic enforcement: Sheriff Terry Johnson expressly ordered his officers to "go get them Mexicans;" "arrest Hispanics" during traffic stops; and "lock up any damn Mexicans that you can" during vehicle checkpoints. *See infra* at 4-6. Other ACSO supervisors reinforce these directives by tolerating anti-Latino slurs and circulating derogatory emails, including an ACSO

captain sending his subordinates a video game premised on shooting Mexican children, pregnant women, and other "wetbacks." *Infra* at 7-9.

These orders have the expected result: Latinos are far more likely to have traffic laws enforced against them. Latino drivers in Alamance County are between 6 and 7.1 times more likely to be stopped and cited than non-Latinos, even after controlling for the rates of traffic violations on specific roadways. *Infra* at 11. After a stop is made, Latinos are 250 percent more likely to receive a citation, 50 percent more likely to face arrest, and 20 percent more likely to be searched than comparable drivers from other ethnic backgrounds. *Infra* at 12. And Latinos comprise 37 percent of drivers stopped at ACSO's checkpoints despite making up less than 9 percent of the driving population.

In short, the undisputed evidence shows that ACSO intends to target Latinos for traffic enforcement and subjects them to this enforcement at a profoundly disproportionate rate. These facts establish that ACSO violates the Equal Protection Clause of the Fourteenth Amendment. ACSO's practice of stopping drivers based on ethnicity rather than individualized suspicion likewise violates the Fourth Amendment's protection from unreasonable seizures. And Defendant separately violates the Fourth Amendment by using vehicle checkpoints for general law enforcement purposes, such as searching for weapons and narcotics.

These unlawful activities have pervaded ACSO's traffic enforcement operations for at least the past six years, constituting a pattern or practice of constitutional violations under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141

2

("Section 14141"), and "threaten[ing] the notion of equal justice upon which our legal system is based." *Martinez v. Vill. of Mount Prospect*, 92 F. Supp. 2d 780, 783 (N.D. Ill. 2000) (affirming settlement in case of discriminatory traffic stops of Latinos). ACSO's discrimination creates fear in the Latino community, discourages residents from reporting crimes, and inhibits effective law enforcement – from delivering a summons to investigating a homicide. *See infra* at 18. For these reasons, the United States respectfully asks the Court to grant its Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS

### A. Background

The Latino population in Alamance County has grown from under one percent of the overall population in 1990 to nearly 12 percent today.[1] ACSO is the largest law enforcement agency in Alamance County. Its enforcement authority extends to all areas of the County, serving approximately 150,000 residents.[2] ACSO is divided into two divisions, both of which are overseen by the elected sheriff, Terry Johnson, and his chief deputy, Timothy Britt. The Patrol Division includes roughly 130 officers who work in 6 districts, while the Detention Division operates the Alamance County Jail. Sheriff Johnson has final authority for all ACSO policies and personnel decisions. Exhibit ("Ex.") 1 at 18, 27-28. Although nearly 12 percent of the Alamance County population is Latino, only 6 of ACSO's 266 employees (2 percent) are Latino, *Id*. at 35, 226, and

---

[1] Pew Hispanic Center, Alamance County, North Carolina Data, *available at* http://www.pewhispanic.org/states/county/37001.

[2] U.S. Census Bureau, Alamance County QuickFacts, http://quickfacts.census.gov/qfd/states/37/37001.html.

3

ACSO has conducted no outreach to attract Latino applicants. Ex. 2 at 247.

In 2006, Sheriff Johnson sought an agreement with the U.S. Immigration and Customs Enforcement ("ICE") allowing ACSO to investigate immigration offenses pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g).[3] Ex. 1 at 197. Sheriff Johnson sought the 287(g) authority when he purportedly discovered that some arrestees from "the Latino population" used multiple names when getting booked into the Alamance County Jail. *Id.* at 39. ACSO obtained a 287(g) agreement in 2007 that permitted certain ACSO officers to investigate immigration offenses when individuals were booked into the Alamance County Jail. Ex. 3. ACSO has never had the authority to investigate immigration violations in the field.[4]

### B. ACSO Leadership Directs Officers To Target Latinos

Sheriff Johnson has repeatedly directed officers to target Latinos with enforcement actions, often using language that displayed racial or ethnic bias. For example, Sheriff Johnson admitted that he ordered two officers to "go get them Mexicans" before an operation at the heavily Latino Rocky Top mobile home park. Ex. 1 at 252. Both officers recall the order: Lieutenant Chris Crain testified that Sheriff Johnson ordered him to "Go get some Mexicans," *see* Ex. 4 at 127; and officer Adam Nicholson recalled the Sheriff instructing him to "get the Mexicans out of there." Ex. 5 at ¶ 9(b). Sheriff

---

[3] The federal government has the exclusive authority to enforce immigration laws, *see Arizona v. U.S.,* 132 S.Ct. 2492, 2506 (2012) ("the removal process is entrusted to the discretion of the Federal Government"), but the Attorney General may grant certain immigration-related authority to specific, trained officers in local agencies through a formal agreement with a local government, *see Id.*

[4] The agreement is no longer in effect, as it was formally revoked by ICE in 2012.

4

Johnson attempted to clarify this directive at his deposition in 2013, contending that his comment referred only to a Mexican gang. Ex. 1 at 252. Even assuming the truth of this explanation, other North Carolina sheriffs designated by Defendant as experts in police practices testified that referring to a gang as "them Mexicans" is inappropriate. *See* Ex. 6 at 76; Ex. 7 at 97; Ex. 8 at 81.

Sheriff Johnson's order to "go get them Mexicans" is not an isolated one. Rather, ACSO officers testified that the Sheriff ordered them to target Latinos in a variety of contexts. During a checkpoint near the predominantly Latino Seamster's mobile home park, Sheriff Johnson ordered officers to arrest all Latinos they encountered. Three officers present at the checkpoint separately testified to this order. *See* Ex. 9 at 59-61; Ex. 10 at 19; Ex. 11 at ¶ 8 (Sheriff stated at checkpoint "I want you to lock up any damn Mexicans that you can.").

Sheriff Johnson repeated his order to arrest Latinos at monthly ACSO supervisors meetings, which are intended to "communicat[e] priorities and expectations" throughout ACSO. Ex. 2 at 217; Ex. 1 at 194. Former supervisors who attended these meetings confirmed that Sheriff Johnson ordered them to arrest Latinos stopped for traffic offenses rather than issuing citations. *See* Ex. 12 at ¶ 8 (Sheriff stated "If you or your people stop a Hispanic and there's a violation, you don't write them a citation. You bring them to jail."); Ex. 9 at 12. In a separate incident, former officer Adam Nicholson testified that Sheriff Johnson told him, "I want every chili-shitter in that park arrested," a reference the officer understood to apply to Latinos in a mobile home park. Ex. 5 at ¶ 9(a). The officer

5

formerly in charge of ACSO's Traffic Unit likewise testified that Sheriff Johnson directed him to "bring me Hispanics" multiple times. Ex. 9 at 18-19, 57-58. And on several occasions, the Sheriff personally selected checkpoint locations near predominantly Latino neighborhoods. *Id*. at 61.

Current Officer Jeff Randleman recalled several incidents in which ACSO leadership asked him to investigate Latino individuals for identity theft despite lacking any basis for suspicion. Ex. 13 at 111-20. For example, the Sheriff ordered an investigation of a Latino driver involved in an auto accident where the only reason for the investigation was the individual's ethnicity; there was not "any other basis to investigate him." *Id*. at 116; *see also* Ex. 1 at 211-14. Similarly, Chief Deputy Britt asked Officer Randleman to investigate 17 Alamance County employees with Latino surnames for possible social security fraud, despite lacking any reason to suspect the individuals.[5] Ex. 13 at 89-90.

Moreover, Sheriff Johnson admitted that he ordered the investigation of an Alamance County employee based solely on her ethnicity. Told that there might be a County employee committing document fraud, Sheriff Johnson examined a list of employees and singled out an individual for investigation solely because he judged her name to be Latino. Ex. 1 at 214; Ex. 13 at 79-87. Sheriff Johnson explained "it's not hard -- you know, how the Latino community's last name is used, it was not hard to figure it out." Ex. 1 at 216.

---

[5] The investigation found that 16 of the 17 individuals had a valid social security number.

6

### C. Sheriff Johnson and his Command Staff Foster a Culture of Bias Towards Latinos

Sheriff Johnson and his leadership created a culture in which bias against Latinos is not just tolerated, it is encouraged. They have done so by: (1) making derogatory comments about Latinos; and (2) failing to discipline officers who make inappropriate jokes about Latinos, send emails mocking Latinos, or use ethnic slurs to describe Latinos.

#### 1. *Sheriff Johnson Makes Anti-Latino Statements*

Sheriff Johnson has made numerous public comments disparaging Latinos, Latino immigrants, and Latino culture. For example, he once told a reporter, "In Mexico, there's nothing wrong with having sex with a 12, 13-year-old girl." Ex. 1 at 251-52. And Sheriff Johnson has made numerous statements suggesting that he views all Latinos as criminals, undocumented immigrants, or something other than "American." For example, when asked by a county commissioner what he would do if he stopped a Hispanic person, he responded, "We do it just like an American," thereby implying that a Hispanic person could not be American. *Id*. at 266-67. Sheriff Johnson repeated this theme during a taped meeting with ACSO's Special Operations Unit, where he assumed that Latinos are non-citizens: "we've had a big drop in Hispanic population here," but "we've still got a lot of citizens in this county dealing dope with them." *Id*. at 177. Finally, a citizen who participated in a ride-along with Sheriff Johnson testified that the Sheriff pulled into a trailer park and said, "We have more trouble here than anywhere, it's full of Hispanics." Ex. 14 at 33-34.

#### 2. *ACSO Leaders Tolerate Bias Against Latinos*

7

ACSO leadership fails to discipline the numerous officers who make derogatory jokes about Latinos or use ethnic slurs to describe them. The total lack of discipline for expressing anti-Latino sentiment persists even where members of ACSO's command staff personally heard inappropriate comments or received derogatory emails.

Most notably, ACSO officers commonly send anti-Latino emails without consequence. Captain Mario Wiley emailed several other ACSO employees a link to a game premised on shooting stereotypical Mexican figures, including pregnant women and children, as they attempt to cross the U.S. border. Ex. 15; Ex. 16 at 63-65. Blood splatters on the screen as the figures are shot, and the final screen of the game shows how many "wetbacks" one has killed. *Id.* Other examples of anti-Latino emails are too numerous to fully document here, but they include:

- Sergeant Darryl Myers and Lieutenant Wesley Anderson each forwarded an email joking that when Davey Crockett saw "hordes of Mexicans" approaching the Alamo, he asked "are we [] having landscaping done today?" Ex. 17;

- ACSO public information officer Randy Jones sent multiple derogatory emails to ACSO senior officers. One joked about a Mexican drug dealer drowning, Ex. 18; Ex. 19 at 159-60; Ex. 2 at 265-67; a second mocked Mexicans trying to cross the United States border, Ex. 20; Ex. 2 at 263-65;

- ACSO training officer Richard Longamore forwarded an email to Sheriff Johnson and Chief Deputy Britt that bemoaned the U-Visa program, asking "What will our society be able to do with young Mesoamerican females who at best are semiliterate in any language and only have experience milking cows and working as captive sex slaves?" Ex. 1 at 245-47;

- Sergeant Charlie Stewart sent an email to several other ACSO sergeants and a lieutenant entitled "Dumbest Illegal Immigrant" that mocked a Latino person's driver's license photograph. Ex. 21; Ex. 16 at 55-57; and

8

- Several ACSO officers sent and received an email urging readers that "if you ever see anyone either standing for or singing the national anthem in Spanish, KICK THEIR ASS!" Ex. 22.

Numerous ACSO officers also testified that their fellow officers use derogatory language to refer to Latinos, including the term "wetback." *See, e.g.*, Ex. 23 at 103-04; Ex. 24 at 15; Ex. 25 at 8-10; Ex. 26 at 166-67; Ex. 27 at 90; Ex. 28 at 102; Ex. 29 at 69-70. ACSO officers have likewise used the terms "beaner," "spic," "taco," or "taco eater." Ex. 25 at 8; Ex. 28 at 104-05; Ex. 30 at 61-62; Ex. 29 at 69-70; Ex. 31 at 133-34. Members of ACSO's command staff heard ACSO officers call Latinos—regardless of their country of origin or immigration status— "Mexicans," "damn Mexicans," or "illegals." *See* Ex. 19 at 150-52; Ex. 32 at 145; Ex. 33 at 113-14; Ex. 34 at 155-56; Ex. 35 at 86; Ex. 30 at 61-63; Ex. 28 at 104-05; Ex. 29 at 70; Ex. 36 at 120; Ex. 37 at 112.

A scene recalled by Alamance County Magistrate Susan Wortinger exemplifies the anti-Latino bias that pervades ACSO. Magistrate Wortinger testified that Officer Troy Anthony maintained a "collection" of IDs that he confiscated from Latinos and showed off around the jail. Ex. 38 at 24-26. Magistrate Wortinger explained that Officer Anthony "showed me a stack of passports and alien registration cards that he had that he told me he was collecting, and I told him that he couldn't do that, that those were federal documents." *Id*. at 25.

Despite the prevalence of anti-Latino sentiments, no ACSO officer has been disciplined during Sheriff Johnson's tenure for making derogatory remarks or jokes, using slang terms, sending inappropriate emails, or otherwise displaying bias against

9

Latinos. *See, e.g.*, Ex. 2 at 263-67. Other North Carolina sheriffs, offered as rebuttal witnesses for Defendant, testified that the anti-Latino behavior described above is inappropriate and warrants discipline. *See, e.g.*, Ex. 6 at 68-76; Ex. 7 at 90-95; Ex. 8 at 76-80; Ex. 39 at 70-71; Ex. 40 at 23-25.

### D. ACSO's Enforcement Activities Disproportionately Impact Latinos

Statistical evidence and specific incidents demonstrate that ACSO's traffic enforcement activities exert a profoundly discriminatory impact on Latinos.

#### 1. *Statistical Analyses Show Large Disparities Based on Ethnicity*

Statistical analyses performed by leading experts in the field of criminology reveal that ACSO's traffic enforcement activities have a dramatic disparate impact on Latinos compared to similarly-situated non-Latinos. The United States retained two experts to examine data on ACSO's enforcement practices: (a) Dr. John Lamberth, a leading expert on analyzing traffic enforcement patterns, examined all traffic citations issued by ACSO officers on certain major roadways since 2008; and (b) Dr. John MacDonald, chair of the Department of Criminology at the University of Pennsylvania, analyzed data on post-stop outcomes from all ACSO traffic stops since 2008. The disparities found in both types of analysis are among the largest ever observed at a law enforcement agency.

Dr. Lamberth compared a benchmark of traffic violators on three major Alamance County roadways to citations given by ACSO deputies at the same times of day, on the

10

same segments of those three roads. Ex. 41.[6] The benchmark was created by Dr. Lamberth's team of trained, professional observers – which included a former police officer using a radar gun – who catalogued the race and ethnicity of drivers violating traffic laws, and the precise time and location of each violation. This method of benchmarking is the most reliable available measure of analyzing traffic stop patterns because it allows researchers to account for the deployment of officers on specific roads as well as traffic patterns and driving habits at different times of the day, creating what is sometimes known as a "risk adjusted measure of exposure." Ex. 42 at 4-5; Ex. 43 at 86-87. On the three surveyed roadways, Dr. Lamberth found that Latinos violating a traffic law were 6.0, 6.5, and 7.13 times more likely to be stopped and cited than non-Latino violators at the same times and locations. Ex. 41 at 2-3. Dr. Lamberth determined that there is "less than 1 chance in a million that these results occurred by chance," and noted that "[t]he observed disparities in ACSO's traffic enforcement are larger than any I have previously observed at a law enforcement agency in the United States." *Id*. at 3.

Defendant's designated statistical expert, Dr. David Banks[7], agreed that the proper method for assessing discriminatory patterns of enforcement activity is to compare ACSO's data to a "risk-adjusted measure of exposure," such as the observational benchmark used by Dr. Lamberth. Ex. 43 at 86-87. Dr. Banks did not, however, attempt

---

[6] This analysis used data on more than 20 percent of all traffic citations issued by ACSO during a five year period.

[7] The United States does not concede that Dr. Banks qualifies as an expert in this case. Dr. Banks has no background in criminology, no prior experience analyzing law enforcement operations, and does not use an accepted methodology in his report.

11

to replicate Dr. Lamberth's method or perform any other analysis based on a statistical benchmark. Indeed, Defendant's expert conceded that his analyses "do not prove that [ACSO is] not guilty" of discriminatory policing. Ex. 43 at 116-17, 132.

Dr. MacDonald's analysis of post-stop outcomes likewise reveals large disparities based on ethnicity. Using ACSO's data on all traffic stops from 2008-2013, Dr. MacDonald analyzed outcomes of traffic stops after controlling for several variables, including officers' stated reason for making each stop. This analysis revealed that, following traffic stops, ACSO officers are nearly 250 percent more likely to issue citations to Latinos, 50 percent more likely to arrest Latinos than non-Latinos, and 20 percent more likely to search them. Ex. 44 at 4. Non-Latinos were nearly twice as likely to receive warnings or have no action taken against them at all. *Id*. at 4-5. All of these differences are statistically significant, occurring by chance less than 1 time in 1000. *Id*. at 5-6. ACSO's disparate search patterns are particularly telling. Latinos are searched at a higher rate than non-Latinos, yet are five times less likely than non-Latinos to have contraband found on them during a search – suggesting "that [ACSO] officers are applying a lower threshold for searching Latinos." *Id*. at 4.

As with traffic stops, post-stop outcomes, and searches, ACSO's checkpoints impact Latinos at significantly disproportionate rates. Latinos comprise 37 percent of all individuals stopped at ACSO checkpoints from 2010 to 2013 despite making up only 8.7 percent of the driving age population of Alamance County. Ex. 44 at 7; Ex. 42 at 6. Defendant's expert conceded that this 4:1 disparity was "a large difference." Ex. 45 at 6.

12

While Dr. Banks offered three hypothetical explanations for this difference, he did not test any of them or suggest how they could account for a disparity of this magnitude. Ex. 43 at 79-81; Ex. 62 at 4-5.

### 2. *Specific Incidents Highlight ACSO's Discrimination Against Latinos*

Specific incidents underscore the statistical analyses described above. Community members, ACSO officers, and a former federal prosecutor testified about ACSO's unlawful stops of Latino drivers. For example, ACSO Officer James Conklin stopped a vehicle occupied by Latinos on the highway solely because it was traveling "too slowly." He then called ICE officials to investigate the immigration status of the vehicle's occupants and detained them for close to an hour. Federal authorities declined to prosecute the case because they had concerns about the basis for the stop, and questioned whether Officer Conklin's charge was valid. Ex. 46 at 33-41; *see also* Ex. 13 at 35-37. This situation is not unique, as former Assistant U.S. Attorney Arnold Husser testified that he also declined prosecutions referred by ACSO because of concerns about the validity of stops of Latino motorists. Ex. 47 at 12-17.

Numerous Latino individuals likewise described stops by ACSO officers based on ethnicity. For example:

- An ACSO officer stopped Jose Luis Arzola on his way home from work even though he was not speeding. Ex. 49 at 12-13. The officer gave Mr. Arzola no reason for the stop, instead asking to see his driver's license and "his papers." *Id*. After Mr. Arzola explained that he was a legal resident, the officer replied "Ok. Just go home." *Id*. at 12. The incident caused Mr. Arzola to ask his father "are they allowed to do that?" *Id*. at 13.
- Three ACSO patrol cars stopped Miguel Salinas Cruz as he was driving to work. Mr. Cruz observed all three ACSO vehicles parked facing the

13

roadway looking at passing drivers.  Ex. 51 at ¶ 4.  After seeing Mr. Cruz, all three cars pulled him over.  *Id*. at ¶ 6.  The officers told Mr. Cruz only that he was stopped because he "looked suspicious," *Id*. at 7, then searched his entire car, including the trunk and glove compartment.  *Id*. at 8.  After the search failed to discover any contraband, the officers gave Mr. Cruz a citation for driving without a license.  *Id*. at ¶ 10.

- An ACSO officer stopped Jessica Flores Rosales shortly after she met her partner at a gas station and began driving the couple home.  The officer conceded that Ms. Rosales had not committed any traffic violation, indicating instead that he wanted to investigate her partner, who had been driving prior to meeting Ms. Rosales.  Ex. 48 at 89.  While the first officer spoke with her partner, a second officer arrested Ms. Rosales for driving without a license and "resisting" an officer.  *Id*. at 89.  Ms. Rosales told the second officer that she had young children at home and asked three times if someone could call to check on them – the officer refused each request and put Ms. Rosales in a patrol car.  *Id*. at 91.  Once in the car, she banged her head on the glass window to get the attention of the first officer, who finally agreed to call someone to check on Ms. Rosales' children.  *Id*.

- Yessenia Cruz testified that she was stopped by an ACSO officer while driving safely within the speed limit.  Ms. Cruz, who was seven months pregnant at the time, testified that the officer yelled at her, refused to let her call her employer to tell them she was running late, and arrested her for not having a driver's license.   Ex. 50 at 11-14, 26-30. The only reason given for her stop – either by the officer or in ACSO paperwork – was that Ms. Cruz was "following too closely."  *Id*.

- An ACSO officer stopped Juan Carlos Reyes Montoya on his way to work.  The officer pulled a U-turn after passing Mr. Montoya and followed him for five minutes before making the stop.  Ex. 52 at ¶ 5. The officer gave no reason for the stop.  *Id*. at ¶ 8.  Following the stop, the officer confiscated Mr. Montoya's Mexican consular ID and arrested him for not having a valid driver's license.  *Id*. at ¶ 8-10.

Other community members observed ACSO's discriminatory targeting of Latinos at checkpoints.  Paul and Paula Crotts, a Caucasian couple, testified to an incident in which they approached an ACSO checkpoint, at which point Mr. Crotts began to retrieve

14

his license to produce to the ACSO officer.  The officer, however, waved the couple through the checkpoint without looking at the license, saying, "We're here to get us some," while motioning in the direction of a predominantly Latino mobile home park. Both Mr. and Mrs. Crotts understood this explanation to refer to "getting some" Latinos. Ex. 14 at 11-13, 20-21, 64-65; Ex. 53 at 10-15.  Similarly, Maria Noemy Gonzalez, a Latina woman, testified that while she had her license checked by ACSO officers at a checkpoint, a white driver was simply waved through.  Ex. 54 at 15-16.

### E.  ACSO Fails To Employ Common Mechanisms To Prevent and Detect Discriminatory Policing

ACSO does not use systems employed by other law enforcement agencies to detect and address discriminatory policing, despite numerous allegations that it discriminates.  As detailed more fully in the expert report of former Major County Sheriff's Association President Margo Frasier, Ex. 55, ACSO has virtually no oversight and accountability mechanisms, including:  no substantive reviews of stops, searches, arrests and other discretionary activities; no officer performance evaluations; and no system for receiving and tracking citizen complaints about traffic enforcement.

1.  *ACSO Employs Few Accountability and Oversight Mechanisms*

"Effective oversight of deputies is at the heart of a well-functioning and accountable law enforcement agency," Ex. 55 at 9, but ACSO conducts no review whatsoever of the legal bases for discretionary activities such as stops, searches, and arrests.  Ex. 19 at 70-73; Ex. 37 at 40-42; Ex. 2 at 110-112.  Indeed, Sheriff Johnson testified that he does not believe it is his place to second-guess officers' reasons for

15

making a stop, because that is the responsibility of the courts.  Ex. 1 at 63-64.  Captain

Wilson conceded that supervisors would have no way to detect if officers were making

stops or arrests without adequate cause, Ex. 37 at 40-41.

Moreover, ACSO did not conduct any reviews of its officers' performance for

several years, Ex. 1 at 58-59; Ex. 2 at 48-49, a practice criticized by Defendant's own

designated rebuttal experts, *see, e.g.,* Ex. 6 at 36-37; Ex. 7 at 64.  Nor does ACSO

employ any system for tracking officer behavior and identifying potential problems.  Ex.

19 at 76.  Indeed, ACSO performs nothing more than a sporadic review of files by its

personnel director.  Ex. 1 at 128.

2. *ACSO Does Not Investigate or Track Discriminatory Policing Complaints*

ACSO also fails to investigate and track complaints about discriminatory policing.

Indeed, ACSO has no formal system for investigating or analyzing complaints about its

traffic enforcement activities.  According to Major Brown, complaints about traffic stops

are not handled formally in writing because they are "no big deal."  Ex. 19 at 30-33; *see*

*also* Ex. 37 at 15-16.  ACSO does not even keep records of complaints arising from

traffic stops, Ex. 1 at 115.  *Id*. at 109.  Further, non-supervisory officers have discretion to

disregard individual complaints rather than referring them for a formal investigation, Ex.

19 at 34-35, and ACSO conducts no analysis of trends or patterns on the few complaints

that are documented. Ex. 2 at 35-37, 121-22; Ex. 1 at 49-50; Ex. 19 at 74.  And because

ACSO has few Spanish-speaking employees, Spanish-speaking individuals may not be

able to make a complaint at all.  Ex. 37 at 16.

16

The inadequacy of ACSO's complaint system is underscored by the systems employed by Defendant's own experts in nearby jurisdictions. *See* Ex. 8 at 54-67 (command staff reviews traffic enforcement complaints, to look for patterns every six months); Ex. 6 at 38-46 (complaints about traffic enforcement are investigated by supervisors, passed up chain of command, documented, and included in review for patterns). Indeed, Defendant's expert Donald Harrison testified that ACSO's practice of allowing direct supervisors to determine not to investigate traffic enforcement complaints "would be a bad system under my command." *Id.* at 44.

\*    \*    \*

ACSO fails to use these oversight and accountability mechanisms despite receiving notice that its officers may be discriminating against Latinos. In 2008, a local community group called Fairness Alamance formed to raise awareness of ACSO's perceived unfair treatment of Latinos. Ex. 56 at 12-13. The U.S. Department of Justice notified Defendant that it was investigating allegations of discriminatory policing in June 2010, Ex. 57, and in September 2012 Sheriff Johnson received notice that ACSO allegedly profiled a local Latino pastor. Ex. 1 at 95-97. Indeed, a current ACSO officer testified that Latinos would complain to him about ACSO's discriminatory policing on an almost daily basis. Ex. 58 at 97-102. Despite this notice, Sheriff Johnson never implemented more robust accountability and review mechanisms or asked anyone at ACSO to review the agency's activities. Ex. 37 at 45-47. ACSO's crime analyst, Mark Dockery, testified that, although his job responsibilities include data collection, no one at

17

ACSO has ever asked him to evaluate whether ACSO disproportionately stops, cites, or arrests any specific ethnic groups. Ex. 59 at 24. Indeed, Captain Wilson discontinued her own cursory analysis of patterns in ACSO's traffic stop data after Sheriff Johnson and Chief Britt "said they really didn't need that information." Ex. 37 at 46.

### F. The Latino Community in Alamance County Fears ACSO

ACSO's discriminatory practices erode trust in law enforcement. *See* Ex. 54 at 12-13 (Latinos at community center are afraid of ACSO); Ex. 48 at 93-94 (Latinos moved out of neighborhood because they fear ACSO checkpoints); Ex. 50 at 30-31. As a result of this fear, Latinos often do not report crimes to ACSO. Ex. 48 at 93-95 (crimes in Latino neighborhood unreported because victims fear ACSO); Ex. 37 at 77 (ACSO captain found that Latina women are reluctant to call ACSO); Ex. 12 at ¶ 22. The fear of ACSO that pervades the Latino community inhibits effective policing. Former chief deputy Kenny Evans was unable to serve a summons on a Latino individual who was afraid to answer the door, *Id.*, and former detective and Traffic Unit supervisor Roger Lloyd testified that ACSO was unable to solve a homicide because a surviving Latino witness was more afraid of ACSO than of the murder suspect. Ex. 9 at 65-66, 90-91.

### G. ACSO Uses Checkpoints for General Enforcement Purposes

ACSO's use of vehicle checkpoints is not limited to checkpoints seeking intoxicated drivers, checking driver's licenses and registration, or looking for suspects who fit a specific description. Instead, ACSO commonly uses checkpoints for general law enforcement purposes. ACSO officers have set up checkpoints for the purpose of

18

finding gang members, Ex. 60 at 30; Ex. 5 at ¶ 6; to look for weapons, Ex. 36 at 61; to

deter breaking and entering, Ex. 35 at 21; to find drugs, Ex. 61 at 112; Ex. 34 at 77-79;

Ex. 1 at 135; and for other general law enforcement purposes, Ex. 46 at 67; Ex. 23 at 54;

Ex. 34 at 77-78.

## ANALYSIS

Summary judgment is appropriate where there are no genuine issues of material

fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When evaluating

summary judgment motions, courts draw all reasonable inferences in favor of the

nonmoving party, but "the mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment."

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010). Rather,

"factual disputes must be both material and genuine." *Id*. Factual disputes are "material"

only where "they might affect the outcome of the case," *The News & Observer Publ'g

Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "mere

scintilla of evidence is not sufficient" to create a factual dispute. *Phillips v. CSX Transp.,

Inc.*, 190 F.3d 285, 287 (4th Cir. 1999).

In the Fourth Circuit, it is well-established that a party's own self-serving

statements, absent objective corroboration, do not create a disputed material fact or defeat

summary judgment. *Harris v. The Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir.

2012) ("We should also not find a genuine dispute of material fact based solely on

19

Harris' self-serving testimony"); *Riley v. Honewell Technology Solutions*, 323 F. App'x 276, 278 n.2 (4th Cir. 2009) (affirming summary judgment in Title VII race discrimination suit where the district court "properly discounted" a party's "self-serving contentions"); *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) ("A self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment."); *Whitlock v. Greenlee,* No. 1:10CV958, 2013 WL 6247259, at *2 (M.D.N.C. Dec. 3, 2013) ("A self-serving affidavit will not be sufficient to defeat a motion for summary judgment. Similarly, genuine disputes of material facts are not demonstrated by the bald statements of a non-moving party in affidavits or depositions.").

Summary judgment is appropriate here, where the evidence demonstrates that ACSO engages in a pattern or practice of discriminatory enforcement activities that violate the Fourth and Fourteenth Amendments. Section 14141, proscribes such activities, authorizing the Attorney General to seek equitable and declaratory relief to remedy a "pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution" or federal law. 42 U.S.C. § 14141. In a related context, the Supreme Court explained that a "pattern or practice" exists "where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 & n.16 (1977) (defining "pattern or practice" in a Title VII discrimination suit).

Here, ACSO violates Section 14141 and the Equal Protection Clause by routinely and intentionally discriminating against Latinos in traffic enforcement. ACSO's leadership orders officers to target Latinos with enforcement actions and fosters anti-Latino bias by making and tolerating derogatory comments about Latinos. This discriminatory culture causes discriminatory outcomes. Statistical analyses of ACSO's enforcement activities show that ACSO officers disproportionately stop, cite, arrest, and search Latinos compared to similarly-situated non-Latinos. *See infra* at 28-31. Indeed, the ethnic disparities found here are among the largest ever observed at a law enforcement agency. *See infra* at 28. Such discrimination violates the Equal Protection Clause and "is anathema to our criminal justice system." *Martinez*, 92 F. Supp. 2d at 782.

For similar reasons, ACSO's pattern of using ethnicity to identify drivers to stop and cite violates the Fourth Amendment's prohibition on unreasonable seizures. ACSO further violates the Seizure Clause through its practice of using vehicle checkpoints for general law enforcement purposes. Multiple ACSO officers admitted to ACSO's use of checkpoints for these purposes, which the Supreme Court has plainly prohibited.

## I. ACSO'S PATTERN OR PRACTICE OF BIASED POLICING VIOLATES THE FOURTEENTH AMENDMENT

ACSO's traffic enforcement practices intentionally discriminate against Latinos in violation of the Fourteenth Amendment's Equal Protection Clause. The Equal Protection Clause prohibits law enforcement practices that (1) are motivated in part by discriminatory animus and (2) have a "disproportionate impact" based on race or

21

ethnicity. *Silvia Dev. Corp. v. Calvert Cnty*, 48 F.3d 810, 818-19 (4th Cir. 1995). Here, the undisputed facts satisfy both prongs of this analysis.

### A. ACSO's Traffic Enforcement Practices Are Motivated by Intent To Target Latinos

ACSO's discriminatory traffic enforcement practices spring from a culture of animosity towards Latinos that flows from Sheriff Johnson and permeates all levels of his agency. The undisputed evidence of ACSO's discriminatory intent meets the standard for proving violations of the Equal Protection Clause, which "does not require Plaintiffs to prove that the challenged action rested solely on racially discriminatory purposes." *Orgain v. City of Salisbury*, 305 F. App'x 90, 98 (4th Cir. 2008); *see also Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (a police activity may violate the Equal Protection Clause where discriminatory intent is not the sole motive). Rather, the United States "need only establish that racial animus was one of several factors that, taken together," motivated the discriminatory acts. *Orgain*, 305 F. App'x at 98.

To assess whether intentional discrimination is one factor animating law enforcement practices, courts examine the totality of the circumstances, with particular attention to factors identified by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). Those pertinent here are: (1) contemporaneous statements from decision makers; (2) evidence of discriminatory impact; and (3) departures from normal procedures. *Id.* at 266-68; *Sylvia Dev. Corp.*, 48 F.3d at 819. Each of these factors militates towards finding anti-Latino animus at ACSO. *First*, Sheriff Johnson and other ACSO leaders have issued

22

discriminatory directives to stop and arrest Latinos, used racial epithets to describe Latinos, and made derogatory comments about Latino culture. Numerous ACSO officers echo these discriminatory sentiments by circulating emails mocking Latinos and using ethnic slurs to describe them. *Second*, unrebutted statistical evidence by the United States' experts shows that ACSO officers are many times more likely to stop, cite, arrest, and search Latinos than similarly-situated non-Latinos. These disparities based on ethnicity are among the largest ever observed by researchers in the field. *Third*, ACSO fails to employ accountability mechanisms used by other law enforcement agencies to detect such disparities, despite ample notice of possible discrimination.

### 1. Statements and Other Direct Evidence of Discriminatory Intent

#### a. *Sheriff Johnson Issues Discriminatory Directives and Makes Derogatory Comments About Latinos*

Sheriff Johnson has made numerous statements exhibiting animus towards Latinos and directing his officers to target them. These "contemporaneous statements from a decision-maker" are highly probative of Defendant's intent to discriminate, *see Vill. of Arlington Heights*, 429 U.S. at 268, particularly where Sheriff Johnson exercises near total control over ACSO personnel and enforcement priorities. *See* Ex. 1 at 18, 27-28. Indeed, this Court has found that a single statement by a high ranking decision maker may suffice to prove discriminatory intent in an equal protection case. *See Eberhart v. Gettys*, 215 F. Supp. 2d 666, 678 (M.D.N.C. 2002). There, the Court rejected the town's summary judgment motion because "it could reasonably be inferred that the Board intended to target Plaintiffs" based on a single epithet the mayor allegedly used, and

23

found "it significant that, in this case, the alleged racially biased statement was made not merely by a Town employee, but by the Town's mayor, who as a high-level official could be seen to have considerable power over the Town's enforcement process." *Id.* at 677-78; *see also Doe v. Mamaroneck*, 462 F. Supp. 2d 520, 550 (S.D.N.Y. 2006) (Plaintiffs "more than met their burden of going forward with evidence that there was a campaign of targeted harassment" where mayor made comments stigmatizing day laborers).

While evidence of even a single discriminatory remark from a top law enforcement official is highly probative of discriminatory intent, here Defendant's anti-Latino directives are legion. Sheriff Johnson admitted that he ordered two officers to "go get them Mexicans" at a heavily Latino mobile home park, Ex. 1 at 252; *see also* Ex. 4 at 127 (Lieutenant Crain remembers Sheriff ordering him to "Go get some Mexicans,"); Ex. 5 at ¶ 9(b) (Officer Nicholson recalled the Sheriff instructing him to "get the Mexicans out of there"), and has voiced similar discriminatory instructions in other contexts. For example, three officers present at a checkpoint near the Seamster's mobile home park testified that Sheriff Johnson ordered them to arrest any Latinos who committed violations, *see* Ex. 9 at 59-61; Ex. 10 at 19; Ex. 11 at ¶ 8. Sheriff Johnson likewise issued discriminatory orders during ACSO supervisors meetings. Multiple officers testified that Sheriff Johnson directed supervisors to instruct officers under their command to arrest Latinos stopped for traffic offenses rather than issuing citations. *See supra* at 4-6. On other occasions, Sheriff Johnson told an officer to arrest Latinos in a mobile home park by saying, "I want every chili-shitter in that park arrested," Ex. 5 at ¶ 9(a), asked the

24

officer in charge of ACSO's Traffic Unit to "bring me Hispanics," Ex. 9 at 18-19, 57-58, and ordered an officer to investigate individuals for document fraud based purely on their Latino ethnicity. Ex. 13 at 111-16 (no "basis to investigate" except that individual was "Hispanic").

Indeed, Sheriff Johnson himself used discriminatory criteria to select Alamance County employees for investigation. The Sheriff admitted that he investigated an individual based solely on the apparent ethnicity of her name, explaining "it's not hard -- you know, how the Latino community's last name is used, it was not hard to figure it out." Ex. 1 at 216. In a similar incident, Chief Deputy Britt asked Officer Randleman to investigate 17 County employees with Latino surnames for possible social security fraud, despite lacking any reason to suspect the individuals. Ex. 13 at 89-90.

Beyond these specific directives to target Latinos, Sheriff Johnson has made statements evidencing his personal bias against them. The Sheriff admitted that he told a reporter, "In Mexico, there's nothing wrong with having sex with a 12, 13-year-old girl," Ex. 1 at 251-52, and made comments about the drinking habits of Mexican criminals: "Q. Did you also say, 'They do a lot of drinking down in Mexico'? A. Absolutely. Go down there and see your drug traffickers, see what I'm talking about." *Id*. Sheriff Johnson likewise admitted to making comments suggesting that all Latinos in Alamance County are illegal immigrants. The Sheriff informed the Alamance County Commissioners that his officers would treat a "Hispanic" driver "just like an American," Ex. 1 at 266-67, and suggested to his Special Operations Unit that Hispanics were

25

criminals and not "citizens" by saying that "we've had a big drop in Hispanic population here," but "we've still got a lot of *citizens* in this county dealing dope with *them*." Ex. 1 at 177.

These statements and directives show Defendant's intent to target Latinos in violation of the Equal Protection Clause. *See, e.g.*, *Eberhart*, 215 F. Supp. 2d at 678. Each of Sheriff's Johnson's discriminatory statements is supported by either Defendant's own admission or the testimony from at least one – and often several – of Defendant's officers. The only evidence contradicting any of Sheriff Johnson's serial directives is Defendant's recent claim that several officers who recounted his discriminatory orders lied under oath. Nowhere does Sheriff Johnson identify any evidence corroborating these denials. Absent corroboration, the Sheriff's denials in the face of overwhelming evidence are precisely the type of self-serving statements that cannot create a factual dispute sufficient to withstand summary judgment. *See, e.g.*, *Harris*, 499 F. App'x at 294 ("we should also not find a genuine dispute of material fact based solely on Harris' self-serving testimony").

    b.    *ACSO Officers Use Racial Epithets and Circulate Derogatory Emails About Latinos with Impunity*

Sheriff Johnson's discriminatory tone echoes throughout ACSO. More than a dozen ACSO officers testified to hearing their fellow officers make jokes about Latinos or use derogatory terms like "wetback" to describe them, *supra* at 9. And officers regularly circulated emails from their County email accounts mocking Latinos, Mexicans, and Latino immigrants. *See supra* at 8-9. Many of these emails were circulated among

26

supervisors or officers directly involved in ACSO's traffic enforcement operations. Among the countless examples of such conduct: ACSO Captain Mario Wiley circulated a game to subordinates that involved killing "wetbacks," including pregnant Mexican women and children; a lieutenant and sergeant forwarded an email joking about Mexican landscapers; and numerous patrol officers exchanged an email urging readers to "kick the ass" of anyone singing the National Anthem in Spanish. *See supra* at 8-9.

These emails are direct evidence of officers' bias, and ACSO allowed them to circulate with impunity – underscoring the agency's tolerance for anti-Latino bias. Indeed, Defendant's own designated experts agreed that several of the emails sent to and from ACSO command staff warrant discipline. *See, e.g.*, Ex. 8 at 76-80; Ex. 6 at 75-76. Even though top ACSO officials were aware of many inappropriate emails, ACSO has never disciplined any officer for sending them. Nor has ACSO disciplined any officer for making derogatory jokes or using ethnic slurs like "wetback." *See* Ex. 2 at 263-67. Defendant's undisputed failure to discipline officers for their hostility towards Latinos is powerful evidence of discriminatory intent.

### 2. ACSO's Enforcement Practices Disparately Impact Latinos

ACSO's traffic enforcement practices exert a profoundly disparate impact on Latino drivers. *See supra* at 10-15. Such disparities further evidence ACSO's intent to discriminate against Latinos, because "people usually intend the natural consequences of their actions." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997); *see also Vill. of Arlington Heights*, 429 U.S. at 266 (disparate impact is "an important starting point" to

Equal Protection analysis); *State v. Soto*, 734 A.2d 350, 360-61 (N.J. Super. Ct. 1996) (finding that statistical evidence of racial disparities submitted by Dr. John Lamberth supported finding of discriminatory intent). The overwhelming ethnic disparities found in ACSO's enforcement actions here are strong evidence of discrimination.

Indeed, Dr. Lamberth's comparison of ACSO's traffic citations to traffic violators on three major roadways in Alamance County found that ACSO officers were between 6 and 7.1 times more likely to stop and cite Latinos compared to non-Latinos engaged in the same behavior – the largest such disparities observed at an American law enforcement agency. Ex. 41 at 3. Dr. Lamberth's findings are strengthened by his use of an observational benchmark, which allowed him to compare actual traffic violators at particular road locations during specific times to citations issued by ACSO at those same times and locations. *See id.* at 6-9. By comparing observed traffic violators to citations issued at precise locations, Dr. Lamberth's analysis accounts for ACSO's deployment of its officers and controls for differences in driving behavior. *See Floyd v. City of New York*, No. 08-civ-1034, -- F. Supp. 2d --, 2013 WL 4046209, at *5 (S.D.N.Y. Aug. 12, 2013) (crediting plaintiff's expert because his benchmark accounted for police deployment). Dr. Lamberth's method is more reliable than comparisons of raw data on County-wide traffic stops to general demographic information – such as the percentage of Latinos in Alamance County recorded by the Census Bureau. Indeed, "Census data can tell us very little about the numbers of Hispanics . . . driving on . . . highways, which is crucial to determining the population of motorists encountered by the [police]." *Chavez*

*v. Illinois State Police*, 251 F.3d 612, 644 (7th Cir. 2001) (citing prior work by Dr.

Lamberth); *see also Soto*, 734 A.2d at 360-61 (relying on observational benchmark

calculated by Dr. Lamberth to support finding of discriminatory traffic enforcement).

Defendant's statistical expert conceded this point: "the correct benchmark is not the

proportion of drivers or the proportion of Hispanics in the community. The correct

benchmark should be a risk-adjusted measure of exposure." Ex. 43 at 81. Dr.

Lamberth's analysis relies on precisely this type of risk adjusted measure of exposure,

making his results highly probative of discriminatory intent.

Dr. MacDonald's analysis of post-stop outcomes from all recorded ACSO traffic

stops from 2008-2013 likewise found large disparities based on ethnicity. After

controlling for various factors, including the reason for the initial stop, Dr. MacDonald

found that during stops of Latino drivers, ACSO was comparatively more likely to issue

citations and make arrests, and comparatively less likely to issue warnings or take no

action at all. *See* Ex. 44 at 4-6. ACSO officers were also more likely to search Latinos

during traffic stops, even though searches of Latinos were five times less likely to find

contraband. This 5:1 "hit rate" disparity for searches is among the largest reported in

criminology literature[8], strongly suggesting that ACSO officers apply a lower threshold

of suspicion when deciding to search Latinos. *See also Floyd*, 2013 WL 4046209 at *3-4

---

[8] *See* Nicola Persico & Petra Todd, 116 THE ECONOMIC JOURNAL, No. 515 (Nov. 2006)
at F351-F367 (Literature review on hit rates from 16 jurisdictions found that the highest
hit rate disparity between Latinos and non-Latinos was roughly 3:1).

29

(finding Equal Protection violation where disparity in hit rates for searches of Latinos versus non-Latinos was 1.35).

These findings are effectively unrebutted. Defendant's statistical expert, Dr. David Banks, did not attempt to replicate any of the analyses performed by Dr. Lamberth or Dr. MacDonald. Instead, Dr. Banks compared ACSO's summary information on traffic stops and checkpoints to Census data on the percentage of Latinos living in Alamance County. Ex. 45 at 8-14. Dr. Banks conceded that these basic comparisons say "nothing" about whether ACSO discriminates against Latinos. Ex. 43 at 88-89. Dr. Banks then contrasted these results with other comparisons of raw data and Census population figures from selected North Carolina counties. Ex. 45 at 8-14. None of these comparisons involved any type of statistical benchmarking, nor did Dr. Banks control for any variables in the selected counties to test their comparability to Alamance. Ex. 43 at 90. Dr. Banks conceded that his comparisons "do not exonerate" ACSO from discriminatory policing, *id*. at 116, and affirmed that his "cross-county comparison based on unadjusted data is not as probative as a risk-adjusted measure of exposure." *Id*. at 92-93. *See also United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996) (rejecting a study focusing on raw numbers of drug arrests because it lacked "an appropriate basis for comparison"). The risk-adjusted measure of exposure suggested by Defendant's own expert is precisely the technique employed by the experts for the United States – and their results show large ethnic disparities in ACSO's enforcement practices.

30

Although Dr. Banks did not attempt to replicate the analyses performed by Dr. Lamberth and Dr. MacDonald, he suggested several hypothetical, non-discriminatory explanations for the disparities they observed. Ex. 43 at 79. But Dr. Banks did not test any of these hypotheticals and conceded that he does not know whether any of them could explain the large ethnic differences found by the United States' experts. Ex. 43 at 79-81. The speculative objections put forth by Dr. Banks are insufficient to rebut the United States' statistical evidence. "Hypothetical objections, without any showing that the alleged deficiency would, in fact, make any difference in the outcome of an otherwise well-prepared and probative study is insufficient rebuttal testimony to lessen the probative value of [a party's] statistical proof." *Coates v. Johnson & Johnson*, No. 78 C 1342, 1982 WL 285, at *41 (N.D. Ill. Apr. 9, 1982).

In short, ACSO cannot meaningfully rebut the statistical analyses presented by the United States' experts. The marked ethnic disparities shown by these analyses are highly probative of Defendant's discriminatory intent.

> **3.** **ACSO Departs From Standard Practices by Failing To Employ Review and Accountability Mechanisms To Prevent Biased Policing**

ACSO's departures from standard police practices further demonstrate that its discriminatory policing is intentional. ACSO has failed to utilize common review and accountability mechanisms to prevent and detect biased policing, even after receiving notice of concerns about discriminatory enforcement from community groups, media outlets, and the U.S. Department of Justice. Unlike most law enforcement agencies of its

size, ACSO employs virtually no internal review mechanisms to detect racial profiling and other misconduct, nor does it have a system for investigating and tracking complaints about biased traffic enforcement. These departures from accepted police practices evidence discriminatory intent. *See, e.g.*, *Vill. of Arlington Heights*, 429 U.S. at 266-67; *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003).

### a. *Internal Review Procedures*

Contrary to widely accepted law enforcement practices, ACSO supervisors conduct virtually no substantive review of the legality of their officers' enforcement activities to ensure they are founded on lawful, non-discriminatory reasons. Undisputed testimony from top command staff indicates that ACSO never reviews the legal justification for stops, searches, or arrests made by its officers. Indeed, ACSO conducted no reviews of its officers' performance for several years prior to this litigation, *see* Ex. 1 at 59; Ex. 2 at 46, a dramatic departure from accepted practice. *See* Ex. 6 at 37 (Sheriff Harrison testified that reviews are necessary to ensure that officers "are conforming with our policy," and without them a law enforcement agency would not "have the knowledge that I'd like to see" to discover officer misconduct.). As a result, "if an officer or a group of officers was consistently making stops that were not justified by reasonable suspicion, no one at the Sheriff's Office would have any way to tell that was going on." Ex. 37 at 42. Nor does ACSO conduct any analysis of its records for patterns or other indicators of discriminatory policing. *See, e.g.*, Ex. 2 at 121. Indeed, ACSO's leadership affirmatively hindered its ability to detect and address discriminatory policing. Shortly after Sheriff

32

Johnson promoted Captain Wilson to lead the Patrol Division, she discontinued her limited analysis of stop data based on ethnicity when Sheriff Johnson and Chief Britt "said they really didn't need that information." Ex. 37 at 46. ACSO's disinterest in investigating potentially discriminatory conduct renders it an outlier in American law enforcement, *see* Ex. 55 at 18, a point highlighted by Defendant's own rebuttal experts. *See* Ex. 8 at 65-67 (Rockingham County Sheriff's Office requires patrol commander to review traffic stop forms to look for patterns based on race and ethnicity).

A particularly egregious example of ACSO's deficient oversight is the agency's failure to address officers' circulation of derogatory emails about Latinos. Not only has ACSO leadership failed to monitor the use of official email accounts, they have declined to take corrective action even when top officials were included on inappropriate email exchanges. *See supra* at 8-9, 27. ACSO's failure to discipline any officer involved in sending derogatory emails sends a clear message that it tolerates discrimination.

> b. *Complaints*

ACSO's system for investigating and tracking complaints likewise fails to meet the standards used by other law enforcement agencies to detect and address discriminatory policing. ACSO does not require officers to document complaints about traffic stops, Ex. 1 at 106; does not perform any analysis to discover patterns or trends of complaints against certain officers or units, Ex. 19 at 76; and does not even keep a record of complaints about traffic enforcement. Ex. 1 at 115. These shortcomings prevent ACSO from detecting officers engaged in discriminatory policing. ACSO's failure to

33

review and track complaints about traffic enforcement departs from accepted practices, including the practices of agencies run by Defendant's own designated experts. *See supra* at 17. Indeed, Sheriff Harrison testified that ACSO's practice of allowing direct supervisors to determine not to investigate traffic enforcement complaints "would be a bad system under my command." Ex. 6 at 44.

*    *    *

ACSO's virtually non-existent systems to detect and address discriminatory policing are especially probative of discriminatory intent here because the agency has persistently refused to modify its deficient review mechanisms despite repeated notice of possible discriminatory conduct. *See Floyd*, 2013 WL 4046209 at *71 (finding municipal liability for NYPD's constitutional violations where "the need for better supervision, monitoring, training, and discipline to protect against constitutional violations was obvious, but senior officials at the NYPD failed to make meaningful efforts to address the risk of harm to plaintiffs"). Since at least 2008, ACSO has been on notice about discriminatory enforcement. *See supra* at 17. Yet ACSO took no steps to investigate; conducted no reviews of data or records; counseled no officers; and made no outreach to the Latino community. *Id*. ACSO's willful blindness to discriminatory conduct in the face of these allegations demonstrates its intent to discriminate.

**B.**     **ACSO's Enforcement Practices Disproportionately Affect Latinos**

As explained above, unrebutted statistical evidence demonstrates that ACSO's enforcement practices have an overwhelming disparate impact on Latinos in Alamance

34

County.  Latino drivers on major Alamance roadways were between 6 and 7.1 times more likely to be cited than non-Latinos engaged in the same behavior, and ACSO officers were more likely to cite, arrest, and search Latinos after stops were made.  *See supra* at 10-12.  These disparities evidence ACSO's discriminatory intent and also satisfy the "effect" prong of the Equal Protection analysis.  *See Silvia Dev. Corp*, 48 F.3d at 818-19.

Statistical evidence is an appropriate mechanism for proving discriminatory effect in cases dealing with patterns of police activity.  *See Chavez*, 251 F.3d at 637 ("The Supreme Court has long noted the importance of statistical analysis in cases in which the existence of discrimination is a disputed issue."); *Bradley v. United States*, 299 F.3d 197, 206, n.11 (3d Cir. 2002); *Floyd*, 2013 WL 4046209 at *4-8 (statistical evidence of ethnic disparities in police stop and frisk practices, including post-stop outcomes, proved Equal Protection violation); *Melendres v. Arpaio*, No. CV-97092513, 2013 WL 2297173 (D. Ariz. May 24, 2013) (statistical evidence proved that certain patrol operations at a sheriff's office violated Equal Protection Clause); *Maryland NAACP v. Maryland State Police*, 454 F. Supp. 2d 339, 349 (D. Md. 2006) (disparities in stops and searches of African Americans constituted "powerful circumstantial evidence of racial profiling").

There is no question that the evidence of large ethnic disparities presented here meets the constitutional standard for showing a discriminatory effect.  *See*, *e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (finding that a section of the Alabama Constitution that disenfranchised 1.7 times more African Americans is "indisputable evidence that the state law had a discriminatory effect"); *see also Floyd*, 2013 WL

35

4046209 at *4 (during stops, African Americans 30 percent more likely to be arrested and 14 percent more likely to have force used against them than whites).  The disparities found by Dr. Lamberth and Dr. MacDonald here are among the largest observed at any law enforcement agency - and far greater than those observed in *Underwood* and *Floyd* – demonstrating that ACSO's enforcement practices have a discriminatory effect.

## II.    ACSO's Enforcement Activities Violate the Fourth Amendment

The Fourth Amendment guarantees "the right of the people to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  ACSO violates this guarantee in at least two respects:  (a) by making traffic stops based on a driver's ethnicity rather than the individualized suspicion the Fourth Amendment prescribes; and (b) by conducting checkpoints for general law enforcement purposes.

### A.    ACSO Officers Make Traffic Stops Based on Drivers' Ethnicity

ACSO officers violate the Fourth Amendment's Seizure Clause by routinely making stops based on drivers' ethnicity.  The temporary detention of an individual by police during a traffic stop constitutes a seizure for Fourth Amendment purposes.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).  Accordingly, the decision to stop a vehicle must be "reasonable," and a stop is reasonable only where an officer has reasonable suspicion that a traffic violation has occurred.  *Whren*, 806 U.S. at 810; *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993).  Statistical and direct evidence demonstrates that ACSO has a

36

practice of making traffic stops that fail this requirement, as they are based on a driver's ethnicity.

Statistical evidence presented by the United States' experts strongly suggests that ACSO officers make stops based on ethnicity. Dr. Lamberth's analysis demonstrates that ACSO officers stop and cite a highly disproportionate number of Latino drivers, despite unrebutted evidence that Latino drivers in Alamance County violate traffic laws at lower rates than non-Latino drivers. Ex. 41 at 10-17. And Defendant's records indicate that ACSO officers recorded only a vague, highly discretionary basis for one-fifth of all traffic stops since 2008. Ex. 63 (22% of stops made for "investigation" or "other motor vehicle violation"). Officers' repeated failure to record the legal basis for an enforcement activity evidences Fourth Amendment violations. *See Floyd*, 2013 WL 4046209 at *4 (officers' tendency to check boxes such as "other" or "suspicious bulge" indicated that "the actual number of [pedestrian] stops lacking reasonable suspicion was likely far higher.").

Direct evidence of stops based on ethnicity underscores these statistical trends. A current ACSO officer and a former federal prosecutor both described cases declined by prosecutors based on concerns over the legality of ACSO's traffic stops. And several Latino individuals described highly suspect stops by ACSO officers. *See supra* at 13-14. ACSO officers: stopped Jose Luis Arzola without giving him a reason for the stop and told him to "go home" after learning that he was a lawful U.S. resident; stopped Yessenia Cruz solely for "driving too slowly"; pulled over Miguel Salinas Cruz because he

37

"looked suspicious"; stopped Jessica Rosales purportedly to investigate her passenger; and refused to give any reason for stopping Juan Carlos Reyes Montoya. *Id*.

Evidence of ACSO officers making traffic stops without any legal justification is amplified by its broader practice of making pretextual stops of Latino drivers. While the subjective motivations of an officer are not relevant to the Fourth Amendment analysis in "the run-of-the-mill case," *Whren* 517 U.S. at 819, the Fourth Amendment does not countenance the broader, programmatic emphasis on pretextual stops of Latinos at issue in this pattern or practice litigation. It is well accepted that "an inquiry into programmatic purpose" of enforcement activities "is sometimes appropriate," *Brigham City v. Stuart* , 547 U.S. 398, 405 (2006), and in the Fourth Circuit, programmatic purposes are relevant where enforcement actions result from "a routine police procedure." *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009); *see also United States v. Freeman*, 209 F.3d 464, 471 (6th Cir. 2000) (Clay, J., concurring) (asserting that pattern of pretextual traffic stops to find narcotics "fail constitutional muster").

Defendant's routine practice of targeting Latinos in traffic enforcement is precisely the situation in which impermissible programmatic purposes belie any objective basis for individual stops – and violate the Fourth Amendment. Indeed, numerous ACSO officers recounted directives to target Latino drivers, *see supra* at 4-6, and statistics presented by the United States' experts confirm the routine nature of ACSO's targeting of Latino drivers. *See supra* at 9-12. Taken together, this evidence demonstrates that ACSO's traffic stop practices violate the Fourth Amendment.

38

## B. ACSO's Practice of Using Checkpoints for General Law Enforcement Purposes Is Unconstitutional

ACSO's practice of conducting checkpoints for general law enforcement purposes separately violates the Fourth Amendment's Seizure Clause. The stop of a vehicle at a checkpoint constitutes a "seizure." *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990). Checkpoints are a "limited exception" to the Seizure Clause's general requirement of individualized suspicion of wrongdoing, and thus are permitted only in narrow circumstances. *See Edmond*, 531 U.S. at 41. The Supreme Court has upheld the use of sobriety checkpoints, *Sitz*, 496 U.S. at 454, and immigration checkpoints near the border, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-67 (1976) – and suggested that driver's license checkpoints are also permissible, *Prouse*, 440 U.S. at 658; *see also United States v. Brugal*, 209 F.3d 353, 356 (4th Cir. 2000).

Unlike these narrow exceptions, checkpoints established for general law enforcement purposes are unconstitutional. The Supreme Court has "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 41 (finding city's pattern of using checkpoints to find narcotics unconstitutional); *Prouse*, 440 U.S. at 659 n.18 (checkpoints not justified by "general interest in crime control").[9]

---

[9] A checkpoint may not function merely as a pretext for an impermissible purpose, such as general crime control. *See U.S. v. Huguenin*, 154 F.3d 547, 555 (6th Cir. 1998); *U.S. v. Morales-Zamora*, 974 F.2d 149, 153 (10th Cir. 1992) (reversing denial of suppression motion where driver's license checkpoint was a pretext for drug searches). It is

39

The undisputed testimony of Sheriff Johnson and his officers demonstrates that ACSO regularly uses checkpoints for the general law enforcement purposes that the Fourth Amendment forbids.  ACSO officers testified that they erect checkpoints for the purpose of combating various unlawful activities, such as finding gang members, looking for weapons, deterring break-ins, and finding drugs.  *See supra* at 18-19.  Indeed, Defendant's Motion for Summary Judgment, ECF No. 87 at 18, concedes that a checkpoint "was set up to find gang members."  This practice is plainly unconstitutional.

*     *     *

In sum, the Alamance County Sheriff's Office has engaged in a pervasive and long-running practice of targeting Latinos for traffic enforcement.  This discrimination violates the Constitution and erodes public trust in law enforcement.  "If we cannot believe that our nation's law enforcement officers will enforce the law in a racially neutral manner, then we will be left with a society where members of the minority community always view the actions of any police officer with great suspicion." *Martinez*, 92 F. Supp. 2d at 782-83.  To stop ACSO's unlawful discrimination and restore public trust, the United States asks this Court to grant summary judgment.


Respectfully submitted,


JOCELYN E. SAMUELS
Acting Assistant Attorney General

---

unnecessary to conduct a pretext analysis here, however, because evidence shows that ACSO conducts checkpoints for general law enforcement purposes.

Case 1:12-cv-01349-TDS-JLW   Document 89   Filed 03/03/14   Page 40 of 42

JONATHAN M. SMITH
Chief
Special Litigation Section

TIMOTHY D. MYGATT
Special Counsel

_s/ Michael J. Songer_
MICHAEL J. SONGER
DC Bar Number: 975029
Aaron Fleisher
Attorneys
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Tel: (202) 514-6255
Fax: (202) 514-4883
michael.songer@usodj.gov

Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Brief in Support of the United States' Motion for Summary Judgment was served through the electronic filing service on March 3, 2014 to the following individual:

S.C. Kitchen
Turrentine Law Firm
920-B Paverstone Dr
Raleigh, NC  27615
ckitchen@turrentinelaw.com


Attorney for Defendant Sheriff Johnson


*s/ Michael J. Songer*
MICHAEL J. SONGER
Attorney for the United States

42