United States of America,

               Plaintiff;

     v.

Terry Johnson, in his official capacity as
Alamance County Sheriff,

              Defendant.

No. 12-cv-1349

UNITED STATES' MOTION FOR
SUMMARY JUDGMENT

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

----------------------------------------

UNITED STATES OF AMERICA,

      Plaintiff,

v

      No. 1:12-CV-1349

TERRY S. JOHNSON, IN HIS OFFICIAL
CAPACITY AS ALAMANCE COUNTY SHERIFF,

      Defendant.

----------------------------------------

**ORIGINAL**


Deposition

of

TERRY S. JOHNSON


In Greensboro, North Carolina
Friday, October 4, 2013
9:25 A.M.




Reported by:

Victoria L. Pittman, BA, CVR-CM-M
for Margaret Powell, CVR-M
Certified Verbatim Reporter
(919) 779-0322

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 2 of 57

1    Q    So as Sheriff of the Alamance County
2    Sheriff's Office, do you have final authority over all
3    of the Sheriff's Office policies?

4         A    When you say "final authority," what exactly
5    do you mean?

6         Q    Do you have the authority to set policies for
7    the Sheriff's Office?

8         A    Sure.

9         Q    And do you have the authority to set sort of
10   the procedures that officers follow when they are
11   carrying out their duties?

12        A    Yes, sir.

13        Q    If you give a directive to officers at the
14   Sheriff's Office, is the officer expected to follow it?

15        A    If I issue a directive -- now, I want to
16   clarify that. Say what you just said again.

17        Q    Sure. If you give a directive or an order to
18   officers at the Sheriff's Office, are the officers
19   expected to follow it?

20        A    Absolutely. And I say that as long as it is
21   not in conflict with state or federal law or the
22   Constitution of United States. I will not give a
23   directive that is in violation of those three areas.

24        Q    Have you ever given a directive that violates
25   the Constitution of the United States?

1   language line service?

2        A    Sure.

3        Q    How do you know that?

4        A    Because I've been down in the detention

5   center a lot of times when people are in the detention

6   center on the language line, prior to when the 287(g)

7   program was there and prior to other people getting,

8   you know, the training.  That's -- you know, you just

9   about have to have a language line in any detention

10  center.

11       Q    Is there any written policy at the Sheriff's

12  Office regarding using the language line?

13       A    You know, as far as -- they know that the

14  individual must have an interpreter or language line or

15  whatever be used.

16       Q    Is there any written policy about it?

17       A    I've had -- I don't think so.

18       Q    Is it correct that as Sheriff you have

19  ultimate responsibility for hiring and firing

20  decisions?

21       A    Absolutely.  The Constitution of North

22  Carolina gives the sheriffs of North Carolina that

23  authority.

24       Q    Okay.  Do you also have authority for all

25  promotion decisions?

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 4 of 57

1       A     Yes, sir.

2       Q     And can you fire officers for any reason at
3  any time?

4       A     Yes, sir.  But I don't.  And I want to say
5  this:  When I come in office in North Carolina, a lot
6  of sheriffs come in and clean house just because of the
7  political affiliations.  When I came in, there was, I
8  think, seven people out of 200-some that left the
9  Sheriff's Office.  And it was not a political issue; it
10 was an integrity issue.  And right now I have more
11 Democrats working in my office than I do Republicans.
12 I could care less about the political affiliation as
13 long as the officers do their job.

14      Q     How many total people have you fired since
15 you became Sheriff -- or asked to resign?

16      A     Actually fired?

17      Q     Fired or told they needed to resign?

18      A     I've never told anybody they needed to
19 resign.  I have called them in.  I think there's a
20 total of eight people that I've actually terminated
21 myself and said, "You are no longer employed by the
22 Alamance County Sheriff's Office."

23      Q     Have other people resigned that you --

24      A     Yes, sir.  My people know the rules of the
25 Alamance County Sheriff's Office.  And there's five

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 5 of 57

1  Department, we certainly try. And certainly it's based

2  on openings at the Sheriff's Department.

3      Q    So what do you do at the BLET school to

4  attract Hispanic applicants?

5      A    I go to every one -- I think I missed one

6  graduation. And I will go up and I will say, "Hey,

7  have you made a commitment to any agency?" That's how

8  we got Rossi. And most of the time, they have.

9  Burlington usually gets the picks simply because they

10 pay a whole lot more salary than the County does. And

11 people have a tendency going to Burlington, going to

12 Guilford County or somewhere, Orange County, where they

13 pay higher salaries. If we can convince them to put in

14 an application, we do the background. And if they pass

15 that background, we certainly try to accommodate their

16 employment if we have a position open.

17     Q    Okay. And how many Latino officers are there

18 at the Sheriff's office?

19     A    Well, you've got Carlos Rossi -- and I --

20 Carlos Rossi. Elmer Rivera. Dan Cubino, did have

21 Latino descent -- or Cuba is where he's from. Golly.

22 That's all I can think of right now. That don't

23 mean --

24     Q    So you can think of three out of the 266

25 officers; is that right?

| 1  | A    I'm saying I'm not sure that that's the total |
| 2  | number. I'm just sitting here -- those are the ones |
| 3  | that I can right off the bat recall. But . . . |
| 4  | Q    As you sit here today, though, you can think |
| 5  | of those three out of the 266 officers? |
| 6  | A    Well, I can't say that. What I'm saying is |
| 7  | I'm sitting here trying to think of how many others we |
| 8  | have -- I mean, that are Latino descent. And I'm not |
| 9  | going to say that, yes, that's the way it is, because |
| 10 | I'm not sure. I can tell you that those three that I |
| 11 | named I know are of Latino descent. |
| 12 | Q    Okay. Sitting here today, can you think of |
| 13 | any others? |
| 14 | A    Right off the bat, no, sir. |
| 15 | Q    You said you had about 266 total officers; is |
| 16 | that right? |
| 17 | A    Yes, sir. That's detention officers and -- |
| 18 |      (Cell phone interruption.) |
| 19 | Q    Do you need to go off the record for a moment |
| 20 | to look at your phone? |
| 21 | A    I'm shutting it down. |
| 22 | Q    Okay. If you need a break, just let me know. |
| 23 | A    No, I don't need one. |
| 24 | Q    Okay. Do you monitor the operations at the |
| 25 | Alamance County Jail? |

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 7 of 57

1  amount of individuals that are in jail.  Some of the
2  times, they -- race breakdown.

3        We have a gang problem in Alamance County.  I
4  want to make sure that we're not mixing gangs,
5  different gang members in the jail cells.  I try to
6  make sure that any possible witnesses in any cases are
7  not in close proximity in the detention center, that
8  may be co-defendants, et cetera.  I mean, I just -- you
9  know, I could go on and on probably, but -- do I know
10  every single thing that's s going on in that jail?  No.

11       Q    Sure.  Do you have access to a report that
12  shows the people who are booked into the jail and shows
13  what agency brought them to the jail, what agency
14  arrested them?

15       A    I know -- we have what we call a jail list,
16  and I can tell usually which agency.  Keeping up with
17  what's going on in the county, you've got the
18  individual's name, the individual's charge, the lawyers
19  and all that stuff on the jail list.  I can pretty much
20  tell from that, you know.

21       Q    Have you ever done any analysis of the people
22  who are booked into the jail by the Alamance County
23  Sheriff's Office to look for any trends relating to
24  race or ethnicity?

25       A    That's noted usually on the jail list, with

Margaret M. Powell, CVR-M - (919)779-0322

1   the exception, Latino population is considered White.
2   That is the way it's done in Raleigh, you know.  They
3   are considered White as far as that.  But you can look
4   at the name, usually, and tell who is Hispanic, and
5   certainly, you know, the African-American population is
6   black male, usually, on tickets, jail lists,
7   everything.

8        Q    Have you done any analysis of those lists
9   looking at trends relating --

10       A    Yes, sir, I've -- I won't say "analysis" --

11       Q    Let me repeat the question and then you can
12  give your answer.

13            Have you done any analysis of that list to
14  look for any trends based on the race or ethnicity?

15       A    In my early stages of Sheriff, when I come
16  in, yes, I did.  That's how I found out that we had a
17  problem there with some of the same people that were --
18  we're talking about the Latino population.  I found
19  that some were being booked in under two or three
20  different names every so often, but the same photograph
21  appeared.  They were being photographed.  And that's
22  when I started looking at getting the 287(g) program,
23  because people were being booked in under one name this
24  time, under another name next time, but the photograph
25  was the same.  But we had no way of finding out who we

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 9 of 57

1    You wouldn't even know he's -- you'd think he's about

2    16 years old, but he's 23.  He's a sworn deputy, went

3    through BLET, but he is a computer whiz.

4         Q    Okay.

5         A    And my -- I'm sorry, I cannot think of his

6    last name right off the bat, because we call him

7    Doogie, because he's a little-bitty guy.

8         Q    Okay.  When did Doogie start working at the

9    Sheriff's Office?

10        A    I brought him on about two years ago.  About

11   two years ago.

12        Q    So was any of this analysis taking place

13   prior to him coming on two years ago?

14        A    Well, we were looking at some stuff, but to

15   have the ability in-house to pull a lot of this

16   information off the computer, I'll be honest with you,

17   we didn't have it.  Our computer people work for the

18   County, and they don't have time to come over to the

19   Sheriff's Department to do that stuff.  We tried crime

20   mapping.  Certainly, we did that.  Crime mapping, to

21   see where our crime trends were going to figure out

22   what resources we wanted to expend in those areas to

23   take care of the crimes occurring in those areas.  I

24   mean, we did that -- I did that weekly.

25        Q    Okay.  Other than sort of crime analysis,

1  though, did you do any analysis to see whether racial
2  profiling was occurring?

3      A      The traffic stop forms were looked at.  The
4  traffic stop forms were looked at, you know, but did we
5  say, okay, 20 percent today was of the
6  African-American, or 20 percent was -- no, sir.  But
7  you could bet that if we saw something that did not
8  look right, I dealt with it.

9      Q      Okay.  But that was just based on you looking
10  at traffic stop reports and seeing if anything jumped
11  out at you?

12      A      Yes, sir.  Pretty much so.

13      Q      Okay.  You didn't do any statistical analysis
14  to test anything?

15      A      No, sir.  But I knew -- I mean, you could see
16  if more of one race was being stopped or whatever than
17  other.  I want you to understand: I'm the Sheriff.  I
18  have to deal with all of the stuff.  And I don't have
19  time to sit down any given month and take a month to
20  look at this stuff.  But, as Sheriff, I try to look at
21  things and stay on top of things the best I could under
22  the circumstances.

23      Q      Okay.  Are you aware of anyone else who was
24  doing any kind of comprehensive statistical analysis
25  prior to Doogie coming on?

 1        A      Well -- prior to Doogie?  Well, certainly.

 2   When we --

 3        Q      I'm sorry.  I don't know his name.

 4        A      I know.  It's funny.  I'm sitting here trying

 5   to --

 6               MR. KITCHEN:  Mark Dockery.

 7        A      Dockery.  That's it.  Mark Dockery.

 8        Q      Mr. Dockery.

 9        A      We've called him Doogie so long because of

10   Doogie Howser.  That's where he got his name from.

11               But we always -- you know, we looked -- I

12   always looked at things to -- basically, as far as the

13   crime trends, you know.  That's -- that's important to

14   me.

15               Alamance County, according to the State

16   Bureau of Investigation, has one of the higher crime

17   rates in the country -- I mean in the state.  And now

18   it's down -- out of the top 25 last year, top 25, we

19   were number 3 for the best crime rate according to SBI.

20               And I'm telling you for any agency not to

21   study -- even the ethnicity makeup of the areas and the

22   crime trend patterns, if you don't look at that stuff,

23   you're not doing what the citizens is paying you to do

24   or put you in office to do.

25               And we have gone into African-American areas

1   with one of our lieutenants.  And I have a standing

2   order that if a car is damaged or an officer is hurt,

3   that I -- one, that I be notified; two, that our Crime

4   Scene Investigative Unit comes out to document damages

5   or injuries.  There was one occasion where one of my

6   lieutenants did not call the Crime Scene Unit out.

7   And, of course, he questioned it and I explained to him

8   in a very harsh way that that is the rules, you know,

9   and I expected him to follow.

10      Q       Who was that lieutenant?

11      A       Lieutenant Mike Hoover.

12      Q       Okay.  Is that the only instance you can

13   remember of somebody questioning one of your

14   directives?

15      A       That I can recall, yes.  There's been several

16   situations where officers will say, "Well, don't you

17   think it's better to do it this way?"  And certainly if

18   it is, I say do it that way.

19      Q       Okay.  But focusing back on reviews --

20   officer reviews, is it right that for at least several

21   years there were not reviews of officers until starting

22   again earlier in 2013?

23      A       I know when the County did away -- we did

24   evaluations until the County did away with their

25   evaluation forms and doing evaluations.  I can't recall

1   exactly when it was, but it was a few years in between

2   there.   When I sent -- I sent Robert Wilborn to the FBI

3   Academy to bring back some things.   He brought back the

4   evaluation form from there and made that work.   We

5   implemented it.   The County, to my knowledge to this

6   day, I don't know if they're doing evaluations now, but

7   we are.

8           So there was a few years in between there,

9   absolutely.

10      Q    A few years where there were no evaluations

11  being done?

12      A    That's correct.

13      Q    Do you remember when that period ended, when

14  the evaluations restarted?

15      A    I do not.  I do not.

16           (Exhibit 1 marked.)

17      Q    Sheriff Johnson, I've just handed you what

18  the court reporter has marked Exhibit Number 1.   This

19  is an email from Alan Miles to a number of people.

20           It's dated January 10, 2013; is that right?

21      A    Yes, sir.   That's what it states.

22      Q    Is Alan Miles the major over the detention

23  center?

24      A    Major over detention center.

25      Q    Okay.   If you would look, please, at the

1  probable cause, and the courts may -- or a judge that
2  you have to go before may say that's not correct, you
3  know, or I don't think it is. I can't second-guess an
4  officer on his probable cause. I can tell you what I,
5  me, myself, would do that would constitute probable
6  cause, but I can't speak for any other officers.

7       Q    Okay. So officers just have -- it's left to
8  the officers' own discretion to decide what constitutes
9  probable cause for them?

10      A    No.  There is a long -- what would you
11  say? -- ruler of what establishes probable cause. One,
12  two, or three of those things coming together may
13  establish probable cause. One may not. It's hard for
14  me to sit here and tell you what establishes probable
15  cause. If you will give me a situation and tell me
16  what happened, then I will tell you if an officer had
17  probable cause. But I don't second-guess my officers
18  on probable cause. That's what a magistrate is there
19  for. That is what a judge is there for in court.

20      Q    Okay. You don't think it's your role as
21  Sheriff to second-guess the decisions that officers
22  make about probable cause?

23      A    No, sir. I'm not out there in the car with
24  them.

25      Q    Okay. Do you ever second-guess officers'

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 15 of 57

1  reasons for making a stop?

2      A    No, sir.

3      Q    Does anyone at the Sheriff's Office ever

4  second-guess officers' reasons for making a stop?

5      A    I think most of the people there feel like I

6  do.  Now, if I was in their shoes at the time it

7  occurred, I could make that deduction.  But when you're

8  not, you can't. And I don't think it's my place to

9  second-guess any of my officers on their decisions if

10  there's probable cause.  And if there's not probable

11  cause, like I say, judge or the magistrate going to say

12  there's no -- there was no probable cause there.

13      Q    Okay.  Aside from a judge or a magistrate

14  making some determination, does anyone in the Sheriff's

15  Office, you know, follow up with officers or review any

16  reports or data to try to figure out whether there was

17  probable cause?

18      A    I'm sure there -- I know lieutenants and

19  sergeants have, and not just on those, but cases in

20  general.  Not just on traffic stop cases; in general.

21  They're the frontline supervision of the Alamance

22  County Sheriff's Department, is your sergeant and

23  lieutenants.

24      Q    Okay.  So what reviews -- let's sort of break

25  it down by category, thinking just about traffic

Margaret M. Powell, CVR-M - (919)779-0322

1 | I don't tell them how to review traffic stop reports.

2 |     Q      So do you know whether lieutenants review

3 | traffic stop reports to assess the adequacy of the

4 | probable cause?

5 |     A      I can't sit here and tell you that it happens

6 | every time. No, sir, I can't tell you that.

7 |     Q      Has any lieutenant at the Sheriff's Office

8 | ever reported to you that there was a problem with the

9 | legal justification for a stop?

10 |    A      No, sir.

11 |    Q      And that's in your entire 11 years as

12 | Sheriff?

13 |    A      Yes, sir.

14 |    Q      When an officer makes an arrest, I understand

15 | that there is an arrest report and an incident report

16 | that is filled out; is that right?

17 |    A      Yes, sir.

18 |    Q      And who at the Sheriff's Office are those

19 | reports turned in to?

20 |    A      Those reports go through their lieutenant or

21 | sergeant. They read the reports. They sign off on the

22 | reports. They are given to a clerk in our office who

23 | enters those reports into the computer.

24 |    Q      Does anyone else in the Sheriff's Office

25 | review them after the clerk enters them into the

Margaret M. Powell, CVR-M - (919)779-0322

1  computer?

2      A      Sometimes the Sheriff does.  You know, I have

3  access to RMS, our Record Management System, and, you

4  know, occasionally -- and I will say this, it's seldom,

5  because I have a whole lot of things going on, but I

6  will try to review records, cases, you know, particular

7  cases, serious cases.  I try to review them.

8      Q      Okay.  How often do you review an arrest

9  report or incident report?

10     A      I couldn't -- I mean, Lord have mercy -- like

11  I say, if it's a particular case or something, I will

12  look at it.

13     Q      When was the last time you remember reviewing

14  an arrest or incident report?

15     A      Well, let's see, I got one the day before

16  yesterday from the secretary to look at.  And it was a

17  breaking and entering, and I wanted to make sure that

18  they had done everything they possibly could as far as

19  the collection of the evidence at the scene.

20     Q      On the occasions that you review the arrest

21  reports or the incident reports, do you review them to

22  see whether the probable cause was adequate?

23     A      Well, certainly, if a warrant was issued,

24  there was probable cause, because like I say, that's

25  what I'm saying.  The magistrate makes that decision.

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 18 of 57

1  The officer knows what his probable cause is and he
2  relates that to the magistrate.  The magistrate issues
3  the paper.

4      Q    Okay.  I guess I'm asking do you ever
5  second-guess the officer's determination of probable
6  cause?

7      A    That's not my -- I mean, that really is not
8  my position unless that officer is a problem officer or
9  has a pattern from previously losing cases in court,
10  et cetera.  And then, yes, I would review it and have
11  reviewed.

12     Q    When have you reviewed an arrest report for
13  probable cause?

14     A    There was -- you know, on some drug cases,
15  and come to find out it wasn't the officer.  The DA
16  just made a plea bargain with the guy that was a honey
17  plea bargain, I considered, you know.  It wasn't even
18  involving probable cause.  I'm thinking, Why in the
19  world it's 10 charges been dropped, but one charge
20  pleading to?  But it wasn't the officer's probable
21  cause; it was the DA's decision on what to do.  And I
22  don't question that.

23     Q    Okay.  And your review in that case occurred
24  after the case had been disposed of by the DA?

25     A    Yes, sir.

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 19 of 57

1      Q     Are there any times that you review the
2   arrest report for probable cause before a case is
3   resolved?

4      A     I'm sure I have, but I couldn't say -- I
5   mean, I'm not looking at probable cause, but looking at
6   the case.  I'm telling you, I feel like 99 percent of
7   my officers are good officers.  They know what probable
8   cause is.  You know, the magistrate determines probable
9   cause if an arrest is made.

10     Q     Let me ask this way:  Have you ever reviewed
11  an arrest report or incident report and found that the
12  officer's basis for probable cause was inadequate?

13     A     No, sir, I have not.

14     Q     You mentioned that lieutenants, I think,
15  also, you know, review arrest and incident reports when
16  they're first completed; is that right?

17     A     They are supposed to, yes, sir.

18     Q     Okay.

19     A     Now, am I there 24/7?  No.

20     Q     Fair enough.  Are you aware of any time that
21  a lieutenant at the Sheriff's Office has found that an
22  officer's basis for probable cause was inadequate?

23     A     No, sir, I have not.  Not that I can recall.

24     Q     When an officer conducts a search of a
25  vehicle at a traffic stop --

Margaret M. Powell, CVR-M - (919)779-0322

1               (Discussion off the record.)

2        Q     If an officer conducts a search of a vehicle

3   at a traffic stop, is that recorded anyplace?

4        A     Yes, sir.  It's on the traffic stop form.  On

5   the back of the traffic stop form, search conducted,

6   was the individual searched?  All of that is on the

7   back of the traffic stop form.

8        Q     Is the search recorded anywhere other than

9   the traffic stop form?

10       A     If evidence is found, absolutely.  There

11  better be a report done.

12       Q     An incident report?

13       A     Do what, now?

14       Q     An incident report?

15       A     An incident report, yes, sir.  Yes, sir.

16       Q     But if there's a search and nothing is found,

17  that would be recorded on the traffic stop report?

18       A     That's correct.  On the back of the traffic

19  stop form it says -- I know you've got one here.

20  You're bound to.  But it says type of search on the

21  back, and all the way down is just different questions.

22  And I can't tell you all of them.

23       Q     Okay.  Is there anyplace on that form for

24  officers to indicate why they searched the vehicle?

25       A     I think there's a narrative on there.

Margaret M. Powell, CVR-M - (919)779-0322

1       Q    Does anyone at the Sheriff's Office review
2   those narratives to see if the search was legally
3   justified?

4       A    Well, I'm sure Captain Wilson, when she looks
5   at traffic stop forms, or an incident report is done,
6   you know, there's got to be probable cause to conduct
7   that search or even to conduct that stop, unless it's
8   an informational stop, you know, trying to get
9   information on other crimes.

10      Q    Is it the policy of the Sheriff's Office for,
11  you know, anyone in the command staff to review those
12  forms to see if searches are legally justified?

13      A    Once again, the lieutenants review those
14  reports.  The lieutenants and the captain will
15  review -- the one captain will review the traffic stop
16  reports.  Like I say, if a search yields, say, drugs,
17  there's going to be an incident report that will be
18  reviewed also.

19      Q    Okay.  Focusing now just on the traffic stop
20  report for searches that don't result in drugs or
21  anything else, those are reviewed by Captain Wilson.
22  Is that what you're saying?

23      A    That's correct.

24      Q    Okay.  Does anyone other than Captain Wilson
25  in the command staff review those?

1        A      When a traffic stop report is done -- and I

2    can't -- I'm not there 24/7, but the lieutenants should

3    review or certainly review all the reports before they

4    come up the ladder.

5        . Q      Are you aware of any case in your time as

6    Sheriff where a lieutenant found that a search was not

7    justified by probable cause?

8        A      No, sir, not to my knowledge.

9        Q      Okay.   Are you aware of any time that Captain

10   Wilson or anyone else in the command staff has reviewed

11   a form and found that a search was not justified by

12   probable cause?

13       A      Not to my knowledge.

14       Q      When a deputy at the Alamance County

15   Sheriff's Office makes a traffic stop and the driver

16   does not have a valid driver's license, what should the

17   driver [sic] do -- what should the deputy do?

18       A      Driver should run.

19       Q      Run as fast as he can; right?

20              (Laughter.)

21       A      I'm glad we have a little humor in this.   The

22   day is long.

23              First of all, when my deputies do a traffic

24   stop, individual has no operator's license, if they

25   have another form of appropriate ID, the officer should

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 23 of 57

UNITED STATES vs. TERRY S. JOHNSON
Banks, David on 01/24/2014

Page 79

1    A.    Yes.

2    Q.    Thanks.  But you did not analyze any of those

3    possible outcomes?

4    A.    No.

5    Q.    And in the Denver case where you testified before,

6    you said that, quote, "You want something that's a

7    statistical summary of the entire situation."  Do you

8    believe that your analysis focusing just on arrests is a -

9    gives you a statistical summary of the entire situation?

10   A.    It does not - it is not a complete summary of the

11   entire situation.  I will agree with that.  I still don't

12   think that I could answer the question of prejudice in a

13   satisfactory way using that data.

14   Q.    Okay.  Dr. Banks, in your report you noted that

15   Hispanics made up slightly over 36 percent of checkpoint

16   stops compared to, I think, 11.6 percent of the population

17   in Alamance County, is that right?

18   A.    Yes.

19   Q.    And your report suggests three reasons for that

20   disparity?

21   A.    Yes.

22   Q.    And those are shown on page 6 of your report,

23   right?

24   A.    Yes.

25   Q.    Did you test any of those three possible

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 24 of 57

UNITED STATES vs. TERRY S. JOHNSON
Banks, David on 01/24/2014

Page 80

1   explanations?

2       A.   No.

3       Q.   So you don't know whether any of the explanations

4   you put forward can explain the threefold disparity in

5   checkpoint stops?

6            MR. KITCHEN:   Objection.

7       A.   No.   I don't know if these are the right

8   explanations.   I note that they're all possible

9   explanations, and with the data available, there's really no

10  way to sort these - most of these out.

11      Q.   But the three explanations in your report, you

12  don't know whether any of those explain the threefold

13  disparity in checkpoint stops?

14      A.   No.

15      Q.   And those are the only possible explanations that

16  you suggest in your report, right?

17      A.   They are examples of three mechanisms that could

18  lead to disparity.

19      Q.   They are the only three mechanisms that you

20  suggested in your report?

21      A.   These are the three that were suggested in the

22  report.   If I were clever, I could probably come up with

23  more.

24      Q.   What other possible reasons could explain a

25  threefold disparity in checkpoint stops?

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 25 of 57

1    A.    It could be that there is a Cinco de Mayo

2    celebration in town on a day when there's a checkpoint.

3        Q.    Would that explain the disparities over a five-

4    year period?

5        A.    No, but I'm - you're asking me to speculate wildly

6    here on mechanisms that could cause this.  If there were -

7    if Hispanics go to church more frequently than Anglos do,

8    then Sunday morning checkpoints, over the course of time,

9    would get many more Hispanics.  This is - I - I'm not sure I

10   understand why you want to pursue this.  One can invent

11   other reasons, but we just - we can't list all the possible

12   reasons.  We don't know what the confounding factors will

13   be.  I will add that Dr. Lamberth and Dr. MacDonald both

14   agreed that the correct benchmark is not the proportion of

15   drivers or the proportion of Hispanics in the community.

16   The correct benchmark should be a risk-adjusted measure of

17   exposure, and - and these don't speak to that.

18       Q.    Okay.

19       A.    These three explanations affect - you know, the

20   first one has to do with increased risk for Latino drivers.

21   The second one says that they have greater exposure because

22   they may be driving on roads that are more heavily patrolled

23   or were going to church on Sunday.  And the last one is,

24   again, a measure of risk.  It may be that for whatever

25   reasons - and I can't begin to guess - economic,

1      A      Yes, sir.

2      Q      If you'll look just at that page, it is Bates

3    number 170637, there on the bottom right.

4      A      Yes, sir.

5      Q      The article talks about a Pastor Otoniel

6    Recinos who says that he was discriminated against by

7    the Alamance County Sheriff's Office.

8            Do you see that?

9      A      Uh-huh.  Yes, sir, I do.  It says he was

10   sitting at a stoplight is what I see, and an officer

11   approached him.

12     Q      And if you would look down at the fourth

13   paragraph, it says, "Recinos said his experience is

14   part of a pattern of discrimination by the Alamance

15   County Sheriff's Office."

16     A      Yes, I see that.

17     Q      Did you or anyone else in the Sheriff's

18   Office make any efforts to contact Mr. Recinos to ask

19   him about what happened?

20     A      Like I said, I really don't remember seeing

21   this email.  I know it says it came to my computer, but

22   I really don't recall seeing this, because I think if I

23   had, I would've certainly tried to call him to find

24   out, because it says at a stoplight.  Our people are in

25   the county.  Do you know what I'm saying?  I was trying

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 27 of 57

1   to find out if it was an Alamance County Deputy or if

2   it was a Graham police or a Burlington police officer.

3       Q      Okay.

4       A      It says Pastor Otoniel Recinos was sitting at

5   a stoplight in Alamance County.  We're out in the

6   county.  Like I said, I don't think our officers would

7   have approached him at a stoplight.  If he said I was

8   stopped or something like that by a deputy, then I

9   could see that.  But this, at a stoplight --

10      Q      Okay.  Are you aware of -- of any action

11  taken by you or Chief Britt or Director Longamore in

12  response to this email?

13      A      I didn't take any action because I really

14  don't recall seeing this.

15      Q      Okay.

16      A      Don't really recall.

17      Q      Are you aware of anything that Mr. Britt or

18  Mr. Longamore did in response to this?

19      A      No, sir, I am not.  I don't recall.

20             (Exhibit 4 marked.)

21      Q      I have now handed you what has been marked as

22  Exhibit 4.  This is an email that you sent to Chief

23  Deputy Britt in July of 2012; is that right?

24      A      Yes, sir, it is.

25      ·Q     It looks like it attaches an audio file; is

1   that right?

2         A    Uh-huh.

3         Q    Do you remember what that audio file is?

4         A    Do you have the file?  I mean, what I'm

5   saying is do you have the file so I can look at it?

6         Q    I'm sorry.  I can only ask questions.  That's

7   how this process works.

8              Do you remember what the audio file is?

9         A    I think I remember this.  It was a woman

10  called to the office, left a message as a result of

11  your investigation of the Alamance County Sheriff's

12  Department.  As I recall, the message that was left

13  was, "You racist, you bigot," all of this stuff on it.

14  And I sent a message to Tim and I said, "Check this

15  idiot out."

16        Q    The woman was accusing you of some kind of

17  racial profiling?

18        A    Yeah -- well, no.  See, what y'all had put in

19  the paper and released to the news media, she was

20  referring to it there in the tape to us and calling me

21  a bigot, an idiot, a racist, because DOJ is

22  investigating.  The call I remember -- and I just sent

23  it to Chief Deputy Britt, said, "Check this out."  She

24  don't -- she didn't even know me, you know.  To base

25  her feelings on me or my character and reputation based

1    the courts?

2        A    No.  You've got -- what I'm saying is if he

3    says, "Well, I was just stopped for no reason at all,"

4    I mean, if he got a ticket, that's a thing for the

5    courts to decide.

6        Q    Okay.

7        A    But if he's, like, "I was just stopped for no

8    reason at all," well, it may be that at that point in

9    time, we were doing an informational stop to obtain

10   information and that maybe the officer didn't relay it

11   to the citizen the way he should have, you know.  And

12   once the citizen finds out, most of the time, that's

13   fine.

14       Q    I'm just asking about the Sheriff's Office

15   process.  So if someone --

16       A    I understand.

17       Q    -- someone got a ticket and complains and

18   says, you know, "I was not speeding.  There wasn't a

19   valid reason to stop me," that complaint would not

20   trigger an internal investigation process that you were

21   discussing earlier; right?

22       A    If the individual -- if he came up to me, I

23   would explain to that individual that that is what the

24   courts are there to decide.  The officer has to put up

25   the probable cause, the evidence.  The courts have to

1  decide that. I'm not going to get involved in taking
2  care of a ticket that my officer justifiably gave.
3  Under no circumstances will I stick my nose in on that.
4      Q    Okay. So just to make sure we're clear, if
5  someone is stopped and given a ticket and says that
6  "There was not a basis to stop me," that's not
7  something that you would get involved with and
8  second-guess.

9      A    Well, I might question the officer, and if
10 the officer convinced me that everything was correct,
11 hey, I'm sorry, the courts is there to settle that one.
12     Q    Have you ever questioned an officer about the
13 basis for a traffic stop?

14     A    Yes, sir, I have.

15     Q    When have you done that?

16     A    Been probably -- I couldn't give you the year
17 or the date, but there was a lady that called and said
18 she was stopped for no reason at all, that the officer
19 was rude to her, cussed her as soon as she got out of
20 the car. But what she didn't know was we had a camera
21 in the car. And everything was on camera, speech and
22 everything. The officer ran her for probably 5 miles
23 before he got her to stop. She jumps out, cussing the
24 officer. I had that.

25          She called and she filed -- you know, she's

1   stuff like that, you will see that they had problems.
2   And that's for the courts to decide then.
3        Q    Okay.  Are you aware of any traffic stop that
4   has been made while you have been Sheriff of Alamance
5   County that was not justified -- that's not legally
6   justified?
7        A    No, sir, I have not -- am not.
8        Q    Have you ever sustained any complaint made by
9   a citizen complaining about a traffic stop?
10       A    11 years, let me think.  No, sir, I don't
11  think so.
12       Q    What are the ways a citizen can make a
13  complaint?  You mentioned they could physically show
14  up --
15       A    I take that back.  I want to correct myself.
16       Q    Okay.
17       A    There was one where an elderly lady, she was
18  like 80-some years old, pulled out of her driveway,
19  went two houses down, didn't have her seat belt on.  I
20  questioned the officer's judgment on that issue.  Yes,
21  a seat belt is supposed to be worn when you're driving,
22  but that lady stopped at her mailbox and then went two
23  doors down to a neighbor.  And, of course, it stood,
24  the DA did what they wanted to, but I questioned the
25  officer's judgment in that situation.

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 32 of 57

1   say, we've got couple of files there, and believe me, I
2   can recall just about every internal investigation
3   that's been done.  I may not be able to recall the
4   details and exactly when on every officer, and I'm sure
5   he's got them on his computer somewhere.

6       Q     But have you given Mr. Longamore any guidance
7   about how to identify a pattern of complaints?

8       A     Yes, sir.  If we have a pattern -- and I'm
9   telling you every complaint comes up to me whether I'm
10  the one going to deal with it or not, and you can bet I
11  know the names if there's a consistent complaint also.

12      Q     So what guidance have you given to
13  Mr. Longamore about how to identify a potential
14  pattern?

15      A     If we see more than one of the same
16  complaints or complaints coming in on an officer, I
17  want to know.

18      Q     Okay.  And is that any kind of complaint?

19      A     Yes, sir.

20      Q     Okay.  So that would include the complaints
21  that -- a complaint about a traffic stop that the
22  lieutenant just quickly disposes of?

23      A     If that record is kept, yes, sir.

24      Q     Is that record kept?

25      A     Well, like I said, on a traffic stop, if it's

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 33 of 57

1    a ticket given, that's for the courts.

2        Q    Okay.

3        A    But if you keep hearing constant complaints

4    on that officer, you're going to look into it.

5        Q    But if there was a complaint about a ticket,

6    that wouldn't be kept?

7        A    No, sir.  I mean, the ticket would always be

8    kept, because that's part of our files.

9        Q    Right, but the complaint about the ticket?

10       A    But you would remember the officer.

11       Q    But there wouldn't be a record of the

12   complaint about the ticket?

13       A    No, sir.  Not unless it was fully

14   investigated by the internal affairs.

15       Q    Okay.  So if there were an officer or group

16   of officers who were getting a number of complaints

17   about their traffic stops and tickets that they were

18   issuing, you wouldn't necessarily know that because

19   there wouldn't be a record of it; right?

20       A    Sir, let me tell you, I can just about tell

21   you every complaint that's come in on an officer at

22   that agency.  And I assure you that when we see a

23   pattern, we deal with the officer.

24       Q    Right.  But the types of complaints I'm

25   talking about, those wouldn't necessarily be reported

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 34 of 57

1   to you; right?

2        A    I'm telling you, every complaint that's

3   filed, I'm usually made aware of or the Chief Deputy is

4   made aware of it and makes me aware of it.

5        Q    Are frontline supervisors required to report

6   up to you all complaints that come in --

7        A    No, sir.  They go up the chain of command.

8        Q    You've got to let me ask the questions.  I'm

9   sorry.

10       A    Okay.  I'm sorry.

11       Q    Are frontline -- I know it's a hard process

12  to remember.

13            Are frontline supervisors required to report

14  all the way up the chain every complaint that comes in,

15  even if it's just one of these minor complaints about a

16  traffic ticket?

17       A    Yes, sir.  They're supposed to send it to the

18  next level.

19       Q    Okay.  Is that written down anywhere?

20       A    It's in the policy and procedure manual.  I

21  mean, I'm sure you've got a copy of it.

22       Q    Okay.  Do you know --

23       A    All complaints are taken and go up the chain

24  of command.

25       Q    Okay.  Even the ones that you said are for

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 35 of 57

1    officer's no longer there -- in the detention center
2    that seemed to be getting himself into more forceful
3    situations than the rest of them, but he is no longer
4    there.  He left.

5         Q    Do you know if the review done by Director
6    Longamore has identified any problematic officers?

7         A    No, sir.  Not -- you know . . .

8         Q    Okay.  I'm going to ask you now a few
9    questions about vehicle checkpoints that are conducted
10   by the Sheriff's Office.

11        A    Yes, sir.

12        Q    About how often does the Sheriff's Office set
13   up a checkpoint?

14        A    I can't tell you how often.  I can tell you
15   how -- you know, sometimes when they were high-crime
16   areas or crimes increasing that I asked for
17   informational checkpoints or checkpoints to be set up.
18   But that comes from the major and captain on down in
19   the Sheriff's Department.

20             But the majority of the checkpoints we have
21   conducted was under a Governor's Crime Control Grant,
22   which was a traffic enforcement grant where most of our
23   checkpoints did occur, looking for DWIs, no operator's
24   license, seat belts, things that the federal government
25   handed money down to the Governor's office to do.

1  really remember being at on 49, I remember a car
2  turning around and running, and Chief Deputy Britt
3  jumped in his car, ran him down, and I went and, of
4  course, they took him to jail.  And that was -- we've
5  always, I'd say 90 percent of the time, found drugs in
6  checkpoints.

7          Also fugitives and people wanted in other
8  areas.

9      Q    Are there certain particular checkpoints,
10  though, where, you know, the purposes is try to find
11  drugs, see -- maybe they're in a high drug area or
12  something like that?

13      A    Only if Drug Enforcement -- I say "only."  If
14  Drug Enforcement -- there's times that Drug Enforcement
15  Administration, because we are a high-intensity drug
16  area, has called us and asked us to set up a checkpoint
17  or to stop a certain vehicle.  And we do it.

18      Q    Do you know if officers of the Sheriff's
19  Office sometimes set up checkpoints to try to look for
20  drugs?

21      A    Oh, I'm sure.  Sure they do.  I'm sure they
22  do.  I mean, that's law enforcement.

23      Q    Are there -- are there certain locations,
24  like specific locations you know of, that are good for
25  checkpoints that officers use frequently?

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 37 of 57

1  want them to understand they are no longer welcome in
2  Alamance County."

3       A     That's talking about the dope, the drug
4  traffickers, and the home invaders -- every criminal
5  there.

6       Q     You didn't say in here that you were talking
7  about the dope and the drug criminals; right?

8       A     Sir, that's what we were talking about, the
9  reason for going into these places, was the crime and
10  the criminals.  And I'll say it today on record.   The
11  criminals are not welcome in Alamance County.

12       Q     I'm going to play -- I guess this is the
13  third clip.

14       A     Okay.

15             (Audio played.)

16             THE WITNESS:  Uh-huh.  Uh-huh.

17       Q     Okay.  Is that also your voice?

18       A     Yes, sir.

19       Q     And did you say, "We've had a big drop in
20  Hispanic population here, but we've still got a lot
21  dealing dope, and we've still got a lot of citizens in
22  this county dealing dope with them"?

23       A     Yes, sir.

24       Q     Did you have a problem with Hispanics in the
25  county dealing dope?

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 38 of 57

1       Q      Have you addressed Seamsters at staff
2    meetings?

3       A      I am sure I have, yes, sir.

4       Q      And are these monthly staff meetings a means
5    of communicating enforcement priorities from you and
6    other top command staff through the ranks?

7       A      Basically, I come in to let them know, yes,
8    "I am proud of what you are doing, guys. Keep up the
9    good work. And I will tell you, don't let DOJ get you
10   down. We're going to do our job the best we can and,
11   you know, just remember as long as you are doing the
12   right thing for the right reason, you are going to be
13   okay."

14            Because I don't mind telling you, some of
15   those officers were tore up over this. And I would be
16   too, if I was a young officer. And -- but we are not
17   going to stop doing our job. And that's what I wanted
18   them to know. We are going to do our job as long as
19   we're doing it right. And if we are doing something
20   wrong, you better get ready.

21      Q      And if you say something at a staff meeting,
22   are the supervisors who are present expected to pass
23   that along to the officers who work under them?

24      A      Certainly. Matter of fact, I think we had
25   one that taped the meetings. And they all supposed to

| | | |
|---|---|---|
| 1 | A | I have no idea what that says up there. |
| 2 | Q | Okay. |

3    A    Cell phones are for business use -- I mean,
4 this is some of the things I would have interest in,
5 but I can't say that I was there.  No, I can't.  We --
6 I think all of these staff meetings was taped by David
7 Farris.

8    Q    Okay.  Well, regardless of whether you were
9 there or not, this is talking about increasing patrol
10 at Seamsters and Rocky Top of Calloway and Tangle
11 Ridge; is that right?

12    A    Yes, sir, it is.

13    Q    And it wasn't uncommon to talk about
14 increasing patrol in those areas at those meetings?

15    A    No, sir, it wasn't, because crimes was, you
16 know, up in those areas.

17    Q    Okay.  Now I'm going to ask you a few
18 questions about the 287(g) program.

19    A    I wasn't trained in it, but I will try to
20 answer them.

21    Q    Fair enough.  I believe you said this morning
22 that you applied for the program or you requested the
23 program; is that right?

24    A    Yes, sir, I did.

25    Q    When did you do that?

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 40 of 57

1      A     I think my signature went on the MOU -- I

2  want to say in November, about the 6th of November

3  2006, November 2006, and it was finally sent off --

4  signed off on by Julie Myers I want to say sometime in

5  January.  And at that point in time, then they had to

6  come in and -- for their agents, set up the equipment

7  and all that stuff to move agents in there to oversee

8  the program.

9      Q     Why did you want Alamance County to get a

10  287(g) program?

11      A     As I told you earlier, when I come into

12  office, we were holding 300 and some inmates in a

13  156-bed facility.  I got to looking at the demographics

14  in the jail.  Some of the same people, as I told you

15  earlier, were coming in under different names but the

16  photographs were the same, which means somebody was not

17  checking, you know, who come in.  They just booked them

18  in under a name and let it go.

19          The 287(g) program, that we were having --

20  excuse me -- we were having fights in the jail with,

21  you know, different gang members, et cetera, both the

22  Caucasian, African-American, Latino.

23          I got into the 287(g) program for two

24  reasons:  One is to know who I had in my jail; second

25  was, is these offenders that were of international

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 41 of 57

1      Q     Do you remember when that happened?

2      A     No, sir, I don't -- like I say, I don't, but

3   he didn't do it long.

4      Q     Do you remember about how long it was?

5      A     I don't know, three, four months, something

6   like that.  Because I found out that he could not be

7   dual certified as a task force officer outside the jail

8   and as 287(g) officer in the jail.  So we brought him

9   back.

10     Q     Okay.  He was still working outside the jail

11  in December of 2008 when there was that meeting that we

12  listened to clips earlier?

13     A     Yeah, he would have been, uh-huh, as a task

14  force.

15     Q     Okay.  During that time when Mr. Randleman

16  was working as a task force officer, did you sometimes

17  give him any assignments directly?

18     A     Certainly.  If there was a case -- I can

19  remember one where a lady come into my office bawling

20  her eyes out.  And I said, "Ma'am, what in the world is

21  wrong?"

22           She said, "Sheriff, I've got cancer.  I've

23  had cancer for three years.  I could not -- I have not

24  been able to work, and I was too proud to ask Social

25  Services for help.  But I finally hit rock bottom, I

1    went to Social Services, told them my problem.  They

2    come back and said, 'You made $60,000 last year, you're

3    not eligible.'"

4            She said, "Sheriff, I ain't worked in three

5    years, and something's wrong.  They said all Social

6    Security showed that I had made $60,000."

7            "Well, ma'am, what's your Social Security

8    number?"  She told me.  We ran it through, found out

9    where the money was being paid.  It was in Asheville,

10   North Carolina.  I told Jeff Randleman, I said, "I want

11   to know who's got that Social Security card.  Head down

12   there, and if there's federal charges that can be

13   brought or state charges, I want it done."

14           He went to Asheville.  The individual was

15   using her Social Security number.  He was a Latino

16   American -- I mean, Latino individual.  Had stolen her

17   Social Security number.  Charges were filed, and I

18   think a conviction was made in federal court.

19       Q    Was that Mrs. Oliver who came into your

20   office?  Kay or Kim Oliver?

21       A    It was an Oliver lady.  Sure was.  Not Kim.

22   Kim's a guy.

23       Q    Kay, I think, maybe is Kim's wife?  I'm not

24   sure.

25       A    Well, I'm not sure if it's his wife or not,

1  but I believe it was an Oliver --

2      Q    Okay.

3      A    -- or someone kin to them.  I'd have to see

4  her face.

5      Q    Okay.  And you found out that some Latino

6  individual had stolen Mrs. Oliver's --

7      A    Identity theft.  Social Security number.

8      Q    And the suspect was in Asheville, North

9  Carolina?

10     A    Is just a little town -- Weaverville.

11 Weaverville.  Right outside of Ashville.

12     Q    I know where that is.

13          And you instructed Mr. Randleman to go to

14 Weaverville and arrest this person?

15     A    I told Mr. Randleman --

16          MR. KITCHEN:  Objection.

17     A    I told Mr. Randleman do the investigation,

18 probable cause existed, charge the person.

19     Q    Okay.  Did you ask Mr. Randleman to go to

20 Weaverville and get the suspect?

21     A    I don't know whether he went to Weaverville

22 himself or ICE went with him or ICE went.  But as a

23 result, they found the individual and the charges were

24 filed, as I recall.

25     Q    Okay.  You don't know whether or not he went

1   to Weaverville himself?

2       A    No, I did not.

3       Q    Okay.  But you were the one who instructed

4   Mr. Randleman to investigate this?

5       A    Yes, sir.  At the time, under the task force,

6   he worked with Gloria -- worked for, technically worked

7   for Gloria Fichou, who is the Resident Agent In Charge

8   of ICE in Winston-Salem, which covers our area.  That's

9   actually who he worked for at that time.

10      Q    But this directive came from you, not from

11  Ms. Fichou?

12      A    Well, I'm sure once they talked -- he had to

13  keep Ms. Fichou informed on everything he did, but once

14  he informed her, I'm sure that's where it went from

15  there.

16      Q    Sure.  But all I'm asking though, is it

17  originated with you; is that right?

18      A    Yes, sir.  The complaint come in to me.  The

19  lady come into my office.

20      Q    Do you remember an investigation involving a

21  Graham librarian named Marxavi Angel Martinez?

22      A    Yes, sir, I do.

23      Q    What do you remember about that case?

24      A    There was a commissioners meeting one night,

25  and I'm telling you, folks -- well, anyway, one of the

1  commissioners asked a question and, of course, I

2  couldn't answer the question, "Do we have any illegal

3  immigrants working in the county?" My answer was that

4  night, I think, "I don't know. I don't hire the people

5  in the county."

6         Well, after that particular meeting, an

7  individual who is a department head come up to me about

8  three days later and said, "Sheriff, I can't tell you

9  everything, but you need to look at the library because

10  I know an individual there has done identity theft and

11  is not a legal resident of the United States. I don't

12  think it's right. I can't give you their name because

13  Raleigh says we can't do it in the position I'm in, but

14  you need to look."

15        Well, it didn't take no genius to go pull the

16  library list and look at the name and Social Security

17  numbers and figure out who it was. And, boom, sure

18  enough, that's how that come about.

19        Q    So did you look at the names and Social

20  Security numbers yourself, or did you ask Officer

21  Randleman to do that?

22        A    I looked at them and I think Officer

23  Randleman looked at them. I think they were turned

24  over to Officer Randleman to look at.

25        Q    So how did you identify the name of the

Margaret M. Powell, CVR-M - (919)779-0322

1   person who you thought was not a US citizen?

2       A    Well, just the surname and last name, it's

3   not hard -- you know, how the Latino community's last

4   name is used, it was not hard to figure it out.

5       Q    It was because she had a Latino surname?

6       A    Yes, sir.

7       Q    Do you remember what ultimately happened to

8   Ms. Angel Martinez?

9       A    I think she was charged and there was a lot

10  of stuff put in the paper, I remember that. But as

11  Sheriff, you know, I have so many duties, when stuff

12  comes to me, I pass it on where it needs to go. A lot

13  of times, I don't -- I'm not able to keep up with

14  what's going on in it. And I do know she was charged,

15  because I remember seeing it in the paper. She was

16  raising all kind of Cain about she'd been in the United

17  States X number of years. But, once again, she had

18  somebody else's Social Security number, and that's a

19  violation of the law.

20      Q    Okay. Shortly after the Angel Martinez

21  librarian case, did you have discussions with -- about

22  other possible county employees who might be in the

23  United States illegally?

24      A    No. I think David Smith at that time was

25  County Manager. He said, "I would like to know how

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 47 of 57

1  or three times over a four- or five-year period.

2       Q    Do you agree with his statement in this email

3  that ACSO has been on the front lines in combating

4  illegal immigration?

5       A    Well, it depends on how you look at it.  You

6  know, we were the second 287(g) in the state of North

7  Carolina.  I don't know if that's what he's referring

8  to.  Plus, we were about the only -- I think there's

9  something like 12 or 14 in the entire nation, if that's

10 what he meant.  I can't tell you what he meant by it.

11      Q    Are you proud of the work that the Sheriff's

12 Office has done to combat illegal immigration?

13      A    I am proud of the work we've done about

14 getting the criminals off the street, yes sir.  If they

15 were immigrants, then so be it.  If they are Americans,

16 so be it.  I am proud of the work the Alamance County

17 Sheriff's Office people have done.  Yes, sir.  Very

18 proud.

19      Q    What about just focusing specifically on the

20 work the Sheriff's Office has done to combat illegal

21 immigration.  Are you proud of that?

22      A    I don't think you can say it those words,

23 "illegal immigration."  We arrest people for criminal

24 violations.  I am proud of what our people have done in

25 arresting those criminals.

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 48 of 57

```
1        Q     When did that happen?

2        A     2000- -- probably '6 or '7.

3        Q     Is there any other time that you have spoken

4   with any Latino group about -- to try to attract

5   applicants to the Sheriff's Office?

6        A     Not just Latinos, no.  I have spoken at

7   several mixed groups, churches and stuff.

8        Q     Has the Sheriff's Office ever had any

9   problems interacting with the Hispanic community

10  because of the lack of Hispanic officers?

11       A     I don't think so.  Like I say, we've got I

12  think it's six -- I mean, if we've a translation

13  problem -- and we're trying to take care of all of that

14  at this time by sending our people to school, because

15  we could not attract -- and I hate to say it, but you

16  folks and Fairness Alamance and people like you -- and

17  I'm not talking about you -- but all of the publicity

18  has scared off some of the possible applicants we could

19  have had.  And that may not be y'all's fault, you

20  understand what I'm saying, it's just the nature of the

21  beast.

22       Q     Did the Sheriff's Office have more than six

23  Latino officers prior to the DOJ investigation?

24       A     We've pretty much kept that number.  I would

25  have to go back and pull our personnel files to tell
```

1  you exactly when.

2      Q    Okay.  So do you think having six Latino

3  officers is enough to effectively police the Hispanic

4  community?

5      A    Like I said, I would love to have more but I

6  don't.  And I have got to do with what I've got.  And

7  humans are humans.  There is only one race, as far as

8  I'm concerned, in this nation, in this country, and

9  that's the human race.

10     Q    Okay.  But if you would like to have more

11 officers, does that mean that you think you could do a

12 better job policing the Hispanic community if you had

13 more Latino officers?

14     A    No.  I think -- you know, our officers has

15 had culture diversity training, we've had all kinds of

16 training trying to understand -- even our teachers is

17 coming from ACC teaches us about the culture and

18 different things of the Latino population, certain

19 things and the way they are said, certain things that

20 maybe one faction of the Latino community may say that

21 means totally different than what this faction has

22 said.  You know, and we're trying to do everything we

23 can to understand and work within the Latino

24 communities.  We don't have a vast majority of, quote,

25 "Latino communities" in the county.  Most of your

1               (Exhibit 14 marked.)

2       Q    Sheriff Johnson, I have handed you

3  Exhibit 14, which is an email from Richard Longamore to

4  you and Tim Britt; is that right?

5       A    Yes, sir.

6       Q    And this looks to be a forward from the email

7  address mmmsois@aol.com.  Do you know who that is?

8       A    If I'm not mistaken, he was an interpreter

9  for the courts in Alamance County, and I can't remember

10 his name, but he -- I'll think of it in just a minute.

11              He also taught -- or was a translator for the

12 courts in Alamance County for a while, for the Latino

13 population.

14              I can't think of his name right off the bat;

15 I can see his face, but I can't think of his name.

16      Q    Did he ever do any work for the Sheriff's

17 Office?

18      A    Not to my knowledge.  He may have taught --

19 because he was real fluent in Spanish, he may have

20 taught some at the community college, but I don't think

21 long, if you can gather.

22      Q    Okay.  He sent this email to Richard

23 Longamore, and Richard Longamore passed -- forwarded it

24 along to you and Tim Britt; is that right?

25      A    Yes, sir, that's what it says.

Margaret M. Powell, CVR-M - (919)779-0322

1    Q    And if you look at -- about halfway down in
2    point Number 2 in the email, do you see that?

3    A    Yes.

4    Q    It says -- referring to some story, an
5    article linked from the BBC. And the first point says,
6    "Why did I become aware of this case via the foreign
7    mainstream media?" And then the second point talks
8    about this -- illegal aliens and the sex trade.

9         And if you look at about halfway down that
10   paragraph, it says, "Eliminate the young male illegal
11   aliens, and a very substantial portion of their
12   co-ethnic prostitutes and sex slaves will self-deport.
13   Unfortunately for the American taxpayer, the 11 female
14   sex slaves in this case (and many others) will get to
15   stay in the US under the 'U' Visa program...What will
16   our society be able to do with young Mesoamerican
17   females who at best are semiliterate in any language
18   and only have experience milking cows and working as
19   captive sex slaves?"

20        Do you see that?

21   A    Yes, sir, I do.

22   Q    Okay.

23   A    I don't -- I'll be honest with you, I don't
24   remember getting this email. But once again, he's sort
25   of like that reporter I told you; you need to research

```
 1  it.

 2      Q    Richard Longamore is a director at the

 3  Sheriff's Office; right?

 4      A    He is Personnel.

 5      Q    Director of Personnel?

 6      A    Uh-huh.

 7      Q    Is that yes?

 8      A    Yes, sir.

 9      Q    Sorry.  Just want to make sure that it would

10  be clear for the record.

11      A    Oh, okay.

12      Q    Is this an appropriate email for the Director

13  of Personnel to send to the Sheriff's Office?

14      A    Under the circumstances -- and this

15  individual being an interpreter for courts until he got

16  terminated, Richard probably -- and I don't know why --

17  I'll be honest with you, I don't remember seeing it

18  even though my name is on there -- but Richard was

19  probably sending it out to Tim and me because he was

20  also an instructor for a short period -- a very short

21  period of time at Alamance County College, and I don't

22  know -- to be honest with you, I don't know the reason

23  he sent it, but I feel like it's probably to let us

24  know a little bit about him, his stance on these

25  issues.
```

Case 1:12-cv-01349-TDS-JLW   Document 89-2   Filed 03/03/14   Page 53 of 57

1  the drug traffickers and the criminal element that we
2  deal with, not the Latino population in general."
3              "Yes, sir, I understand that."
4              And she -- I told her about a young girl that
5  was carried -- she wasn't young now, but she was -- her
6  father traded her for a -- 13 years old, to drug
7  traffickers.  She was brought to the United States.
8  She had lived a great life at that time.  She was like
9  23, 24.  She was kidnapped from a club in Burlington,
10 carried to Seamsters mobile home park, her and her
11 girlfriend, kidnapped by like six gang bangers, and
12 they took her -- took them down there to rape them, and
13 they were able to get away and call us.  And that was
14 the -- what I was referring to there.
15             Their values is much different from -- are
16 much different, excuse me, when you are dealing with
17 your drug traffickers.  There is more alcohol use.
18 There is more sex trafficking with the drug traffickers
19 now because they can find they can make more money and
20 less penalties on these things.
21             And what she said is an absolute lie on --
22 because I told her we were talking in terms of criminal
23 element in the Latino community that we were dealing
24 with in Alamance County, was what I could refer to.
25     Q    Okay.  Did you say the words "in Mexico

1  there's nothing wrong with having sex with a 12,
2  13-year-old girl"?

3      A    And that is what the girl -- I'm telling you,
4  that is what the girl told us.  She wound up being a
5  witness, I think, for DOJ later on in some cases
6  bringing people in here for sex trafficking and labor
7  slavery here for the federal government.

8      Q    But you did say those words; is that right?
9      A    Yes, sir, but I was referring to your drug
10  traffickers, criminal element, not the Latino
11  population in general.

12      Q    Okay.  Did you also say, "They do a lot of
13  drinking down in Mexico"?

14      A    Absolutely.  Go down there and see your drug
15  traffickers, see what I'm talking about.

16      Q    Okay.  Have you ever said to anyone in the
17  Sheriff's Office, "Bring me Mexicans"?

18      A    Absolutely not.

19          There was a situation when there was a
20  discussion with Chris Crain, myself, and somebody else,
21  and it was on the car break-ins.  And they told me that
22  it was a, quote, "It's a Mexican gang that's doing
23  this."  And I said, "Well, then, go get them Mexicans,"
24  referring to the gang members that had done break-ins
25  that had done the graffiti.  That is the only time I've

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 55 of 57

1  guarantee you Brian Allen didn't tell you that.  Brian

2  Allen ain't going to tell you a lie.  He won't tell you

3  nothing before he tells you a lie.

4              THE WITNESS:  I'll slow down.

5              I'm just trying to figure out what all these

6  crazy accusations . . .

7              (Exhibit 15 marked.)

8       Q    Sheriff Johnson, I've handed you Exhibit 15.

9  This is an article from the Alamance News.  It's dated

10  August 7, 2008.

11      A    Yes, sir.

12      Q    If you look, please, at the second page of

13  the exhibit -- it's a page 7A of the Alamance News from

14  that day.

15      A    7A.

16      Q    In looking at the top story, at the

17  second-to-last column --

18      A    You're talking about here (indicating)?

19      Q    Yes.

20      A    Okay.

21      Q    And this looks like --

22      A    I'm totally aware of that, Commissioner Larry

23  Sharpe.

24      Q    Right.  So Commissioner Larry Sharpe asks

25  you, according to this article, "If you stop a person

Case 1:12-cv-01349-TDS-JLW  Document 89-2  Filed 03/03/14  Page 56 of 57

1   and they are Hispanic, what do you do?"

2         And your response is, "We do it just like an

3   American"; is that right?

4         A    Uh-huh.

5         Q    You said that?

6         A    Yes, sir.  If they don't have -- like I say,

7   if they've got identification, write them a ticket,

8   somebody drives the car away.  If they're American, do

9   the same thing.  If not, don't have identification,

10  just like an American, bring them to jail, photograph

11  them and fingerprint them.

12        Q    Okay.  Thanks.

13        We talked briefly at the beginning about some

14  of the work you did with Mike Martin and the SBI?

15        A    Yes, sir.

16        Q    And you said you had investigated the Harry

17  Hopper murder case with him; is that right?

18        A    That's correct.

19        Q    Do you remember, by chance, what kind of car

20  Mr. Martin had or that you and Mr. Martin drove around

21  in during that investigation?

22        A    Man, you're talking about -- it's 42 years

23  ago.  I would say at least 40 years ago.  I had a state

24  car.  Now, I know -- Lord, I couldn't tell you.  I know

25  my first car with the SBI was a '69 Plymouth Fury.  I

Margaret M. Powell, CVR-M - (919)779-0322