IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff;<br><br>   v.<br><br>Terry Johnson, in his official capacity as<br>Alamance County Sheriff,<br><br>        Defendant. | No. 12-cv-1349<br><br>UNITED STATES' MOTION FOR<br>SUMMARY JUDGMENT |

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil No. 1:12CV1349

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **ORIGINAL** |
| | ) |
| TERRY S. JOHNSON, in his | ) |
| official capacity as ALAMANCE | ) |
| COUNTY SHERIFF, | ) |
| | ) |
| Defendant. | ) |

---

## DEPOSITION

### OF

### TIMOTHY JEROME BRITT

---

Greensboro, North Carolina
October 3, 2013
9:23 a.m.

Reported by:
Rebecca P. Scott

1    15 or 20 from another county.  So you have that

2    group of folks.

3         So I've never done a study of race because

4    these people got here by judicial review or being

5    held for the federal government or being held for

6    the State.  I looked at counts and numbers and

7    they're in here charged.  Race didn't play into

8    it.  And you asked me about the jail.

9  Q.  Okay.  Do you have any access to any reports that

10      show which law enforcement agency booked a person

11      into the jail?

12 A.  I do.

13 Q.  Okay.  Have you ever done any analysis of the race

14      or ethnicity of the people who are booked in by

15      the Alamance County Sheriff's Office for any

16      purpose?

17 A.  Well, I've looked at traffic stop reports, and

18      then I've looked at arrests, but I have not done

19      an analysis of race brought in by other agencies,

20      no.

21 Q.  But just people brought in by the Alamance County

22      Sheriff's Office, have you ever looked at the race

23      or ethnicity of those people and done any analysis

24      of that information?

25 A.  Well, certainly since complaints and you guys have

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 3 of 26

1     got involved, I have looked at numbers, and I

2     hadn't seen anything that had any concern.

3   Q.  When you say you looked at numbers, what did you

4     do?

5   A.  I have the ability to look and see who is in jail,

6     who brought in who. You asked me about other

7     agencies. You said other agencies compared to

8     other agencies.

9   Q.  No. I'm sorry. Maybe I'm not being clear. I'm

10    asking just about individuals who are brought to

11    the jail by the Alamance County Sheriff's Office.

12   A.  Okay.

13   Q.  Have you ever looked at the race or ethnicity of

14    those people and done any analysis of that

15    information?

16   A.  I think we're hanging on analysis. I've looked at

17    it to see if there was anything that jumped out at

18    you, anything that looked out of place comparative

19    to our community, no. As far as analysis with

20    percentages, I have not.

21   Q.  You've just looked at to see if anything stood out

22    to you in looking at it?

23   A.  Yes. Yes.

24   Q.  Did anything stand out to you?

25   A.  No.

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 4 of 26

1    Q.   What would stand out to you?  What were you

2         looking for?

3    A.   I wasn't looking really for anything other than

4         you asked me have I ever looked at it, and I said

5         yes, I've looked at it.  Nothing stood out to me.

6         I didn't go in this on a search or a mission to

7         find something.

8    Q.   Okay.  Is it the policy of the Alamance County

9         Sheriff's Office that all arrestees who are

10       brought to the Alamance County Jail should be

11       fingerprinted, photographed, and booked into the

12       jail?

13    A.   If a person is arrested by the Alamance County

14       Sheriff's Office - they are arrested - physically

15       arrested - yes, we photograph and fingerprint

16       those persons.  Not all persons brought to the

17       jail.  I think you asked me all.

18       If Burlington or Graham, Highway Patrol, or

19       any plethora of federal agencies or state

20       agencies - they're responsible for their own

21       printing and photographing.  We're doing those

22       that we arrest.

23       Now if an outside agency brings somebody to

24       the jail, that means they have went before the

25       judge.  A judge has set a bond and they have been

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 5 of 26

1    size of a roll of quarters, maybe about this long

2    (indicating), just a little bit longer than the

3    average hand, and it has a corresponding

4    electronic device in the end of it, and those

5    officers are assigned that.

6        So when they make their rounds, they actually

7    would physically go around and will touch that

8    wand to that spot, and those spots are placed

9    throughout the jail for rounds. Particularly like

10   in the segregated area for medical or suicide or

11   something like that where we're checking them

12   every 15 minutes, they're - they have to

13   physically go in that cell and touch that spot.

14   That lets us know they've been in, they've

15   checked.

16       Same difference with the officers who are

17   assigned rounds, you have officers who are

18   assigned in the kitchen. So you evaluate them by

19   their ability to make sure they're meeting their

20   rounds. That is reviewed daily by supervisors.

21   They're doing their job. They're interacting

22   well.

23   Q.   Okay. Are there any evaluations of officers who

24        work in the Detention Center?

25   A.   Yes.

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 6 of 26

1    Q.  When did those start?

2    A.  There was a time - the County used to have a

3        pay-for-performance system, and you evaluated

4        every year, and then based on those evaluations,

5        the County - an employee could receive up to a two

6        and a half, three percent raise just on

7        performance.  At one time it may have been as much

8        as five.  It varied.  So those were done and were

9        maintained by the County.  The County had the

10       software.

11           So due to budget constraints and all those

12       type things you guys understand, sometime ago the

13       County did away with those - stopped that program.

14       So there was a period of time of a couple to three

15       years where we didn't have that form.  One of our

16       officers went to the FBI National Academy, and as

17       all good officers do, he was able to work and

18       interact with some of those guys up there and

19       developed a new evaluation form, which we provided

20       to you, and that's what we've restarted using.

21           THE WITNESS:  I'm assuming I need my

22       glasses now?

23           MR. SONGER:  Unfortunately I think so.

24   Q.  Chief Britt, I've just handed you what the court

25       reporter has marked Exhibit Number 1.  This

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 7 of 26

1    appears to be an e-mail from Alan Miles to a

2    number of other people dated January 10th, 2013,

3    is that correct?

4              **(Deposition Exhibit Number 1 was marked**

5              **for identification.)**

6    A.   Yes, you're correct.  Can I have time to review

7         the whole thing if you're going to ask me

8         questions?

9    Q.   Please take as much time as you want to review it.

10   A.   Okay.  (Witness reviews document.)  Okay.

11   Q.   It's correct this is an e-mail sent from Alan

12        Miles in January of 2013?

13   A.   That's what it appears to be.

14   Q.   Okay.  And the first sentence of his e-mail

15        states, "Starting January 2013, we need to start

16        doing employee evaluations," is that right?

17   A.   Yes, sir.

18   Q.   So is it correct that prior to January 2013, there

19        were not employee evaluations at the Detention

20        Center?

21   A.   Yes.  We were not using the form, but there was a

22        period before that - like I testified, there was a

23        time period in there - and it was maybe two or

24        three years - that the County ended their program

25        and we went back to one.

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 8 of 26

1    Q.   Okay.  But for two or three years prior to January

2         2013, there were no evaluations of Detention

3         Center employees?

4    A.   As far as a written form, no.

5    Q.   Focusing now on the Operations side of the

6         Sheriff's Office, that includes the patrol

7         operations, right?

8    A.   Yes, sir.

9    Q.   What are the main objectives of the Patrol?

10   A.   The Patrol Division, to be out, to be responsive

11        to calls, to serve the public, calls for

12        assistance.  Also during the course of that,

13        they're patrolling.  They're keeping a check on

14        businesses, residences, looking after the general

15        welfare of our public, interacting with the

16        public.  They are assigned patrol zones and

17        enforce the laws of the State of North Carolina

18        and not necessarily in that order.

19   Q.   What guidance do you give patrol officers at the

20        Sheriff's Office about what they should

21        prioritize?

22   A.   The priority first and foremost is to serve the

23        public, absolute.  They need to be responsive.

24        It's kind of this is all of what we need and this

25        is what we need you to do.  I mean you may very

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 9 of 26

1    of the lieutenants or Major Brown, I have seen.  I

2    haven't seen any officers.  The officer doesn't

3    have the ability to go in and do anything with

4    that tape.

5 Q. How often have you seen a supervisor reviewing

6    video of a traffic stop?

7 A. I have no idea.  Mostly - I've seen a few.  I

8    don't know.

9 Q. Five times?  Ten times?

10 A. In the dozens.  I don't know.

11 Q. Is there any guidance given to supervisors about

12    when they should review video of a stop?

13 A. There again, that would be something that would be

14    handled by the captain and the major of that

15    division.  I don't know.  I'm not aware.

16 Q. There is no, you know, written or unwritten policy

17    at the Sheriff's Office about when supervisors

18    should review stops?

19 A. No.

20        MR. KITCHEN:  Objection.

21 Q. Other than review of video of the stops, is there

22    any other - any other review that takes place to

23    assess whether there was a legal justification for

24    a stop?

25 A. Once again, there are citations, arrests.  Those

1    are reviewed by the magistrate when they bring the

2    charges in.  They are then reviewed by the judge.

3    The DA works with the cases.  I speak with him

4    regularly.  You know, you would hear about problem

5    cases.

6   Q.  But is there any internal review by the Sheriff's

7       Office of the legal justification for the stops?

8   A.  As I said earlier, I do know that some supervisors

9       look at them.  I know that - that I have seen.  I

10      know that the major looks at them.  That's my

11      answer.

12  Q.  When we say "looks at them," what do you mean?

13  A.  Looks at the stops on the video.

14  Q.  At the video.  Okay.  Other than the video, is

15      there any internal review done by anyone at the

16      Sheriff's Office of the legal justification for

17      stops?

18  A.  Well, supervisors show up on traffic stops.  I

19      don't know how other - my answer would be, I don't

20      know how there would be any other review.

21  Q.  Okay.  There is no review of any, like, documents

22      to assess whether a stop was justified?

23  A.  I don't know how a document would tell you it's

24      justified or not.  All the traffic stops have a

25      purpose for the stop:  moving violation,

1    investigative stop, speeding, impaired offense.  I

2    mean that would show that.  I don't know how a

3    piece of paper would tell you anything, so no.

4  Q.  Okay.  Does anyone at the Sheriff's Office ever

5    sample a number of traffic stop reports and follow

6    up with the officers to ask them about the stops?

7  A.  No, there's no sampling and following up.  But,

8    there again, I don't understand how a piece of

9    paper would tell you what the justification was.

10  Q.  Okay.  Are you aware of - during your entire time

11    at the Sheriff's Office, are you aware of a single

12    stop that wasn't justified by reasonable

13    suspicion?

14  A.  Am I aware of one?

15  Q.  Yes.

16  A.  No.

17  Q.  Are you familiar with an incident where Assistant

18    United States Attorney Arnold Husser declined a

19    prosecution based on his concerns about the

20    underlying stop by an ACSO officer?

21  A.  No, I'm not aware of it.

22  Q.  Are you aware that federal prosecutors declined a

23    case based on concerns about a stop made by Jim

24    Conklin?

25  A.  Not aware of it.  I don't know anything about it.

1    supervising their cases. He's supervising their

2    caseload, their cases. He's signing off on all

3    their reports.

4    Q.  During your career at the Sheriff's Office, has

5        any supervisor ever told you about any arrest that

6        was made that might not have been justified by

7        probable cause?

8    A.  No.

9    Q.  Did that cause you to do any follow-up

10       investigations to see whether there might be any

11       cases that were - that might have issues of

12       probable cause?

13   A.  I'm sorry. That didn't make sense to me. You

14       asked me and I said no, and then you said did that

15       cause me to do what?

16   Q.  Sure. It didn't make sense to me either. It was

17       a bad question.

18           You said no one has ever reported up to you

19       that there was an arrest that might have an issue

20       with probable cause, is that right?

21   A.  That's correct.

22   Q.  Okay. Does that cause you any concern, you know,

23       about the adequacy of catching any problems with

24       arrests that might exist?

25   A.  Well, that's assuming that there are problems. I

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 13 of 26

1    think we have a well-trained staff that do a very

2    good job with---

3 Q. Okay. So your assumption is there have not been

4    any arrests during your time at the Sheriff's

5    Office that were not justified by probable cause?

6 A. Not aware of any.

7 Q. Okay. And you haven't taken any additional steps

8    to find out?

9 A. To find out - to go find something that's not

10   there? If nobody has reported to me, why would I

11   go hunt for something they said that there's not a

12   problem?

13 Q. Okay. And the only way you would find out about

14   a questionable arrest would be if one of the

15   front-line supervisors reported it to you?

16 A. Front-line supervisors, magistrate who reviews the

17   case when they're arrested, who finds probable

18   cause. Any arrest made has to be carried before a

19   judicial official who reviews the probable cause

20   and grounds for the arrest. They will then find

21   probable cause and put them - do the release order

22   on them. If the magistrate were to not find

23   probable cause, they would then release them.

24       If it's a misdemeanor, then it would go to

25   District Court where it would be reviewed and

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 14 of 26

1  adjudicated by a District Court Judge. If it was

2  a felony, it goes through a whole another - a

3  probable cause here, grand jury, and subsequently

4  a trial and a jury. All of those are reviews of

5  probable cause on all arrests - not only by us,

6  but outside of us through judicial review. So

7  that is one area. A supervisor is another area.

8  Q. Does the Sheriff's Office have any system of

9  tracking cases where there is a judicial

10  determination that there was not probable cause?

11  A. I'm not aware of any. If we did have one, we

12  would find out - I mean we would certainly look

13  into it. I would look into it.

14  Q. Okay. Has anyone at the Sheriff's Office

15  conducted any analysis of traffic stops to

16  evaluate whether racial profiling is occurring?

17  A. I have not done the statistical analysis, no.

18  Q. Are you aware of anyone at the Sheriff's Office

19  who has done any analysis to evaluate whether

20  deputies are engaged in racial profiling?

21  A. No. Other than just the review every month and

22  looking at the raw numbers and data. I think it

23  would be obvious if you had a problem. I don't

24  see no problem.

25  Q. Okay. Nothing has jumped out at you when you're

Case 1:12-cv-01349-TDS-JLW Document 89-3 Filed 03/03/14 Page 15 of 26

1       reviewed the monthly reports?

2   A.   No, huh-uh.

3   Q.   But other than just sort of looking over those

4        reports, you haven't done any other analysis of

5        whether racial profiling is occurring?

6   A.   No.

7   Q.   You mentioned - we talked a little bit briefly

8        earlier about the Laura Roselle kerfuffle, for

9        lack of a better word?

10  A.   A what?

11              MR. SONGER:  The court reporter looks

12          like she's going to kill me for making her

13          spell that.

14  Q.   But one of the things that Laura Roselle alleged

15       was that there were racial disparities in stops,

16       is that right?  Do you remember that?

17  A.   That there were racial disparities in the stops?

18  Q.   That there were patterns in the traffic stops by

19       the Sheriff's Office that suggested that Hispanics

20       were being disproportionately stopped.  Do you

21       remember her alleging that?

22  A.   My recollection was that she went and counted

23       citations and then said that we were

24       underreporting our stops.  She has said that there

25       as much as she could, as often she could since all

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 16 of 26

1     lieutenants, captains, majors, myself - myself

2     most of the time.

3    Q.   Okay. And you said you sometimes lead that

4        meeting, is that right?

5    A.   If I'm there, I'll get it started, yes, sir.

6    Q.   Is that monthly staff meeting a means of

7        communicating priorities and expectations from

8        supervisors through the ranks?

9    A.   Certainly, and also an opportunity for those

10       supervisors to speak with the command staff

11       regarding any issues or something they may need in

12       order to make their job better, so it's a two-way

13       meeting.

14    Q.   It's a two-way conversation?

15    A.   Sure.

16    Q.   And there is an expectation that supervisors will

17       pass information learned at the meetings to the

18       deputies they supervise?

19    A.   Sure.

20    Q.   What is discussed at those meetings?

21    A.   Everything.

22    Q.   The baseball playoffs?

23    A.   Very well could be a topic before and after

24       anyways. You know, anything that - there again,

25       anything that came up, anything that needs to be

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 17 of 26

1    A.   Yes.

2    Q.   And how many total officers in the Sheriff's

3        Office?

4    A.   Total employees?

5    Q.   Total employees.

6    A.   We got cut a little bit this year. I think it's

7        269 full-time.

8    Q.   Do you think it's important for the diversity of a

9        law enforcement agency to reflect the communities

10       that it polices?

11    A.   Sure.

12    Q.   Is it a problem in your eyes that Alamance County

13       Sheriff's Office only has five Hispanic officers

14       out of 270 or so employees?

15    A.   I think it was 269. No, I think we look for

16       people that were willing to go out and serve their

17       community, and we try to hire the most qualified,

18       best people for the job.

19    Q.   And you don't think it's a problem to only have

20       five Hispanic officers?

21    A.   I don't think it's a problem good or bad.

22    Q.   I'm sorry. I don't know what that means.

23    A.   Well, I mean I don't see it as a problem. You

24       know, what we have is folks that have applied and

25       do a good job, and we're always out wanting more

1   people, when we have an opening, to come in. But

2   I don't know that you sit here and go how many

3   men, how many women, how many black, how many

4   white, how many Hispanic. What you're looking for

5   is good people to serve the citizens of Alamance

6   County.

7       I think it's great that we have five Hispanic

8   officers. I think it would be great to have 265

9   Hispanic officers as long as we had people that

10  were willing to serve the community and serve it

11  with pride, integrity, and dignity.

12  Q.  Okay. So you're saying the number of Hispanic

13      officers doesn't make any difference?

14  A.  I don't think any group makes any difference.

15  Q.  Has the Sheriff's office done any outreach

16      specifically to try to attract Hispanic job

17      applicants?

18  A.  Well, the Sheriff's Office is a patronage job

19      also. Nobody is hired. Everybody is appointed in

20      four-year increments or when a sheriff changes.

21      Every four years, you get resworn in. So you're

22      not hired to begin with. But we do recruit, and

23      pretty much exclusively through ACC through their

24      BLET Program is where we look for our new

25      applicants when we have a job.

Case 1:12-cv-01349-TDS-JLW  Document 89-3  Filed 03/03/14  Page 19 of 26

1             But we don't have a great amount of turnover

2       either, so it's not like we're out recruiting 20

3       new cadets this year.  Also, you're having to

4       recruit people that have their certification, they

5       already have - went through the training and hold

6       their state certification in law enforcement

7       training.  So---

8    Q.  Are you aware of any specific outreach the

9       Sheriff's Office has done to attract applicants

10      that are Hispanic?

11   A.  No more than any other group.

12   Q.  How would you describe the relationship between

13      the Alamance County Sheriff's Office and the

14      Hispanic community?

15   A.  I think it would be fine.  We have Hispanic folks

16      come in every day, look for gun permits, get

17      copies of reports, file - you know, file reports

18      with us, ask for our assistance.  I do think that

19      probably it has been strained in the last three

20      years, I think - you're asking my opinion - in

21      large part because of you-all.

22   Q.  And when you say "you-all," what do you mean?

23   A.  The Department of Justice and some of these

24      advocacy groups that have made allegations against

25      our office and our officers who are out there

1    every day trying to do their job to protect all

2    people and serve all people.

3 Q. Has the Sheriff's Office ever conducted any

4    polling or other analysis to test the views of the

5    Hispanic community about the Sheriff's Office?

6 A. No.

7 Q. Have you ever spoken at any Hispanic community

8    groups?

9 A. Have I?

10 Q. Yes.

11 A. I've spoken - I've spoken at some church groups.

12    I've actually spoken at a couple of church group -

13    church functions that are - have some Hispanic

14    folks there, but just a Hispanic group, no.

15 Q. If you'd look back, please. I think it's Exhibit

16    5. It's an e-mail that you sent to Sheriff

17    Johnson and a couple of other people in May of

18    2011.

19 A. Was that the one - this it? I don't have a number

20    on mine.

21          MR. KITCHEN: That's not - this is 5.

22          MR. SONGER: Okay. It's not Exhibit 5.

23 A. (continuing) Is it this? News and Record?

24 Q. It is attaching an article from the News and

25    Record.

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 21 of 26

1   Office?

2   A.   I don't - I know you want me to say maybe, but I

3        don't have any specific recollection.

4   Q.   Chief Britt, I've just handed you what the court

5        reporter has marked as Exhibit 13.  This is an

6        e-mail from Randy Jones to you, Richard Longamore,

7        Robert Wilborn, and some other address that I

8        don't recognize, is that correct?

9                **(Deposition Exhibit Number 13 was marked**

10               **for identification.)**

11  A.   Yes, that's what it appears to say.  That's what

12       this paper says, yes.

13  Q.   And it's dated June of 2012?

14  A.   June 1st, yes.

15  Q.   And the subject of this e-mail is, "Be on the

16       Lookout for a Red 1951 Chevy," is that right?

17  A.   That's what it says.

18  Q.   If you look at the text of the e-mail on the first

19       page, it says that "The Border Patrol is asking

20       citizens to keep on the lookout for a red 1951

21       Chevy that they suspect is being used to smuggle

22       illegal immigrants across the border from Mexico,"

23       is that right?

24  A.   That's right.

25  Q.   And then if you turn to the second page, the

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 22 of 26

1    picture is the top of an old Chevy with a Spanish

2    road sign and a bunch of brown legs sticking out

3    underneath the car, is that right?

4    A.   I don't know what color the legs are.  The

5    Spanish - the word is in Spanish, but that looks

6    like a stop sign from the United States.  Yeah,

7    that's what it's a picture of.

8    Q.   Yeah.  It's a stop sign with the word "alto" on

9    it?

10   A.   Yeah.  The shape of a stop sign with the word

11   "alto" on it, yes, which means stop.

12   Q.   Right.  So is this a joke about Mexicans trying to

13   sneak into the United States underneath a car?

14   A.   I don't know that it's Mexicans.  All you see is

15   legs.  It says, "border patrol," and it says,

16   "from Mexico," yeah.  I mean it says, you know,

17   "smuggling illegal immigrants across the border."

18   Where are the immigrants from?  Illegal - they

19   could be from anywhere.  It's a picture of a '56

20   Chevy with legs out, yeah.

21   Q.   It's coming from Mexico into the United States?

22   A.   Well, I don't know that that's Mexico.  I don't

23   know where that's at.

24   Q.   Well, that's what the text of the e-mail says,

25   right?

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 23 of 26

1   A.   Yeah.  On the front, sure.

2   Q.   Okay.  So is this a joke about immigrants trying

3        to sneak from Mexico into the United States?

4   A.   Yeah.  I mean you could perceive that as a joke

5        about that, yes.

6   Q.   And this was sent from Randy Jones.  What is his

7        position at the Sheriff's Office?

8   A.   Public information officer.

9   Q.   Thank you.  So this was sent from the public

10       information officer at the Sheriff's Office to

11       several top members of the command staff,

12       including yourself, right?

13  A.   That's what this paper says, yes.

14  Q.   Do you think this is an appropriate e-mail for

15       command staff to exchange at the Sheriff's Office?

16  A.   Well, it's probably not in the best taste.

17  Q.   Was Randy Jones ever disciplined for sending this

18       e-mail?

19  A.   No, not that I know of.

20  Q.   I've just handed you what the court reporter has

21       marked Exhibit 14.  Certainly take as much time as

22       you'd like to read this, and then I'll ask you a

23       couple of questions about it.

24            **(Deposition Exhibit Number 14 was marked**

25                 **for identification.)**

Case 1:12-cv-01349-TDS-JLW   Document 89-3   Filed 03/03/14   Page 24 of 26

1  A.  Okay.

2  Q.  This is also an e-mail from Randy Jones to you,

3      Robert Wilborn, Richard Longamore, and Shelton

4      Brown, is that right?

5  A.  That's what it appears to be, yes.

6  Q.  Okay.  And it's dated July 13th, 2012?

7  A.  Yes, it is.

8  Q.  And the title of the e-mail is "Slow Response,"

9      and if you look at the third paragraph, it says a

10     Mexican was struggling to stay afloat in the Rio

11     Grande River because of a large backpack of drugs

12     that was strapped to his back, and if the person

13     didn't go get help, then the Mexican would drown,

14     isn't that right?

15 A.  Yeah, I think you reversed it.  It says, "Along

16     with him was a Mexican who was also struggling to

17     stay afloat -" it doesn't say anything about the

18     Rio Grande River - "because of a large backpack of

19     drugs that was strapped to his back.  If they

20     didn't get help, they'd surely drown."

21 Q.  I'm sorry.  If you look at the first paragraph, it

22     refers to the Rio Grande River, right?

23 A.  Right.  But I mean you told me to look at the

24     third paragraph, and there wasn't nothing in there

25     about Rio Grande.

1  Q.  Sure.  Okay.  And then if you look at the last

2      paragraph on the page, it says, "It's now 4:00

3      p.m., both have drowned, and neither authority has

4      responded.  I'm starting to think I wasted two

5      stamps."

6          So this is a joke about someone who let a

7      Mexican drug dealer drown in the Rio Grande River

8      essentially by not going for help, is that right?

9  A.  Well, Sam Elliot, I think, is an actor or a cowboy

10     actor, and I think it's letting a terrorist,

11     extremist with guns and bombs and a drug dealer

12     who is Mexican drown in the river.  Sure.

13 Q.  Is this an inappropriate e-mail to send among the

14     top command staff at the Sheriff's Office?

15 A.  I'm sure there are those who won't like it.  I

16     think it speaks to drug dealers and terrorists.

17 Q.  Do you think it's okay to joke about letting

18     Mexican drug dealers drown?

19 A.  It's probably not good to joke about anybody

20     dying.

21 Q.  Was Randy Jones ever disciplined for sending this

22     e-mail?

23 A.  No, he wasn't.

24 Q.  I just handed you what the court reporter has

25     marked Exhibit 14 - 15 - I'm sorry - Exhibit 15.

Case 1:12-cv-01349-TDS-JLW  Document 89-3  Filed 03/03/14  Page 26 of 26