IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

United States of America,

               Plaintiff;

      v.

Terry Johnson, in his official capacity as
Alamance County Sheriff,

             Defendant.

No. 12-cv-1349

UNITED STATES' MOTION FOR
SUMMARY JUDGMENT

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:12-CV-1349

UNITED STATES OF AMERICA,                    )
                                             )
            Plaintiff,                       )
                                             )
                                             )
      vs.                                    )
                                             )
TERRY S. JOHNSON, in his official capacity as )
Alamance County Sheriff,                     )
                                             )
            Defendant.                       )
                                             )

DEPOSITION

OF

DONALD EUGENE HARRISON

    The deposition of DONALD EUGENE HARRISON was taken by

the Plaintiff for the purpose of discovery and for use as

evidence in the above-entitled cause before PAGE CHAMPION

ROBERTS, CVR-CM, Certified Verbatim Reporter and a Notary

Public for the county of Guilford and the state of North

Carolina at large, in the Office of the United States

Attorney, 101 South Edgeworth Street, Fourth Floor,

Greensboro, North Carolina, on the 21st day of January 2014,

beginning at 9:33 a.m.

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 36

1      A.   No, sir.  I don't have a - I don't have a number.

2      Q.   Okay.  Do you have any knowledge about how other

3  law enforcement agencies operate checkpoints?

4      A.   No, sir, I do not.

5           MR. SONGER:  And by the way, if you'd like any

6      water, please help yourself.

7           THE WITNESS:  No, I'm good.  I'm good.  Thank you.

8      If I start drinking water, I may have to go to the

9      bathroom.

10          MR. SONGER:  That's okay too.

11     Q.   Okay.  Sheriff Harrison, does the Wake County

12 Sheriff's Office conduct performance evaluations of its

13 deputies?

14     A.   Yes, it does.  Yes, we do.

15     Q.   How often?

16     A.   At least once a year, but we have inspections

17 every couple of months of the deputies, and that ties back

18 into the performance review also.

19     Q.   And when you say inspections of your deputies,

20 what - what are---?

21     A.   Inspection of the cars, how they look, anything

22 that the sergeant may - we want to make sure they got their

23 equipment, make sure it's all in the car and so forth and so

24 on.

25     Q.   Do you believe regular performance reviews are

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 37

1  important?

2      A.   Oh, I - yes, sir.

3      Q.   Why is that?  Why are they important?

4      A.   To make sure that we know that they are conforming

5  with our policy and that if they have questions or - and are

6  looking for answers, that we make sure they get those.  We

7  have inservice schools, and I try to attend every inservice

8  school just for mainly those purposes.

9      Q.   Do you think if you were not conducting regular -

10  any kind of regular evaluations that you would not be

11  finding out if deputies were doing something wrong?

12      A.   I don't think you'd have the knowledge that I'd

13  like to see, but that's entirely up to the supervisor of

14  whatever sheriff's office or police department, the way they

15  run their office.  They may have another system that they

16  like better.

17      Q.   During your performance evaluations, do you

18  consider complaints that have been filed against deputies as

19  part of your review?

20      A.   It doesn't - it - yes, we do consider it, but to

21  what extent, it's according to what the complaint was and

22  according to what - how it turned out.  In our - we have

23  policy that we go by that determines that.  So the answer to

24  your question is, yes, it does make a difference, but to

25  what extent is according to the complaint and was it verbal,

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 4 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 38

1    was it written, was it suspension.  That may have something

2    to do with it.

3        Q.   Okay.  So tell me more about that.  What type

4    of---?  Well, let me back up.

5            What types of complaints - how can complaints be

6    submitted against an officer in Wake County?

7        A.   Verbal or written.  Anytime someone wants to

8    complain, if they call our office, it doesn't matter who

9    they call, that complaint is taken.  We would prefer it be

10   in writing, but let's say you, for instance, would call and

11   say, "I just had an encounter with one of your deputies.  He

12   issued me a citation" or "He stopped me and was rude," or

13   whatever.  We follow up on it regardless.

14       Q.   My writing is terrible.  You would not want me to

15   submit a written complaint.

16       A.   But it helps us that we can go back when we - we

17   look at it.

18       Q.   Sure.  Okay.  So somebody can just call the

19   Sheriff's Office and lodge a complaint that way?

20       A.   Yes.  Yes.  Every employee knows that they are

21   supposed to accept any complaint, whether it's a walk-in

22   complaint off the street or whether it's by phone or whether

23   it's by mail.

24       Q.   Okay.  How is it that every employee knows that?

25       A.   Because we tell them and it's in our policy.

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 5 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 39

1    Q.   Okay.  Is there any particular, you know, phone

2    number or, like, a box where people can leave complaints?

3        A.   No, we do not have that.  No.

4        Q.   Okay.  So someone making a complaint would just

5    call the main line, I guess, is that right?

6        A.   Any number that comes to the Wake County Sheriff's

7    Office, if they answer "Wake County Sheriff's Office," even

8    our communications.

9        Q.   Okay.  Okay.  And then so if a complaint comes in,

10   you know, what is it - you said everyone knows they just

11   should take the complaint.  What should the person who

12   receives the complaint do with it?

13       A.   They'll pass it along to the supervisor.  And I

14   get most of them, to be honest with you, because I'm in the

15   office and I take all my phone calls, so if someone calls

16   in, more than likely it's me that gets that complaint.

17       Q.   Sure.

18       A.   And then what we do with it then, if it's the

19   Patrol Division, I give it to the patrol major and he

20   follows up on it and reports back to me.  If it's in our

21   Criminal Investigation, any division, the division head

22   that's working.

23       Q.   Okay.  Every complaint that comes in the door gets

24   passed to the supervisor that's over the division that would

25   relate to the complaint?

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 6 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 40

1        A.    That's correct.

2        Q.    And that could be you or it could be the major?

3        A.    Or - or me.  It could come to me first, now.  Make

4    that very - make that understood.  If someone was to call

5    the front desk today and I'm in my office and they say,

6    "Well, I'd like to speak to the Sheriff.  I'd like to lodge

7    a complaint," or whatever their verbiage may be, or they

8    say, "I'd like to lodge a complaint," the girls would

9    probably say, "Well, you want to talk with the Sheriff?"

10   And if they call me, then I make a note of it and decide who

11   needs to do the investigation.

12       Q.    Okay.  And does that - excuse me - does that

13   process apply to all complaints, or does it matter what kind

14   of a complaint it is?

15       A.    No.  All complaints.  Then we decide, you know, is

16   it a frivolous complaint, but we look into it,  And you

17   don't know.  There's two sides to every story.

18       Q.    What do you do to look into it?

19       A.    We have the supervisor or I will call - you'd be

20   surprised how many I call - and get their side, and then I

21   get the supervisor to get the deputy's side, and then I make

22   a decision on how far do we go with it, so we turn it over

23   to Internal Affairs or do we handle it ourselves.  And it's

24   the same thing if I give it to the patrol major or patrol

25   lieutenant.  Then they report back to me.

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 7 of 23

1     Q.   Okay.  So is it right that for every complaint

2  that comes in the door, either you or another supervisor

3  would call the person complaining to investigate?

4           MR. KITCHEN:  Objection.

5     A.   The word "every," I would say yes, but could some

6  be missed?  Maybe, but I don't think so.  To be perfectly

7  honest, they know how we feel about complaints, and I would

8  say yes, but the word "every" scares me a little bit.  It's

9  like the word "never."

10     Q.   Sure, I understand that.  But every one or almost

11  every one, is that fair to say?

12     A.   Yes.  Yes.

13           MR. KITCHEN:  Objection.

14     Q.   Okay.  And then after - after your office contacts

15  the complainant and there's an investigation, do you make

16  some kind of a determination?  How does - how does that

17  process work?

18     A.   We get both sides of the story.  If there's

19  witnesses, we follow up with the witnesses and then we

20  decide is it a valid complaint or is it a nonvalid

21  complaint, and we keep a record of it.

22     Q.   What kind of record do you keep?

23     A.   Well, if it's serious enough, you know, to where

24  the deputy is disciplined for whatever reason - it may be

25  verbal - then the major keeps up with it in that division.

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 8 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 42

1    If it's a little bit worse, then it goes to Internal Affairs

2    and then it's kept in Internal Affairs' copy.

3        Q.    But whether it's sort of kept in the division or

4    in Internal Affairs, there is a written record of every

5    complaint, is that right?

6        A.    The word "every"--- Most. Yes, most. But the

7    word "every," it scares me because I don't want to sit here

8    and tell you that. I would not be truthful if I said every

9    complaint because sometimes it's just hard to keep up with

10   every complaint. But the majority of the complaints, if

11   that's a good word, yes.

12       Q.    Is it the policy in your office that there should

13   be written documentation of the outcome of complaints?

14       A.    Not that I recall. There is a policy, but I don't

15   know that every one has to be written. But we do follow up

16   on them.

17       Q.    Do you encourage officers to make a written record

18   of complaints?

19       A.    I encourage supervisors to make sure they have

20   documentation, yes.

21       Q.    And, again, is that true for all complaints?

22       A.    When you say "all," it's - every one---

23       Q.    I'm sorry. That's a bad question. I meant is

24   that true of all types of complaints.

25       A.    Yeah.

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 43

1    Q.    I understand one might fall through the cracks,

2   but---

3    A.    Yeah.   You know, if it's a frivolous complaint,

4   the supervisor may just make a note of it once he talks to

5   the two parties, three parties, or witnesses, or whatever.

6   But it's - he's got some documentation somewhere in his

7   file, and, you know, if we have a deputy that we get - you

8   know, it's a common denominator, and if that deputy,

9   somebody says he's talking rude and we get several

10  complaints, we know there's probably a problem there we need

11  to address.

12   Q.    Okay.   Do you think it's important to, you know,

13  contact the complainant and fully investigate all the

14  complaints that come in the door?

15       MR. KITCHEN:   Objection.

16   A.    I think it's important because we - we are a law

17  enforcement agency and we follow up.   Like I say, if - I use

18  the example if you call me on a complaint that a deputy

19  talked rude to you - we'll use that - believe me, we're

20  going to follow up, and we'll call the person, you, back and

21  say it's been followed up and it's been handled.   The deputy

22  may have an entire thing---   It's just according to what the

23  complaint is, you know, talking rude, but I can assure you,

24  if the complaint is against Deputy A and it's rude, we'll

25  know it, and if somebody calls up a week or two later and

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 10 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 44

1  Deputy A gets that same type complaint, then that's

2  something that we will make sure that we follow up on again.

3  And that leads to that common denominator that I was talking

4  about.  Then if we have a problem, we'll address it.

5       Q.   So if someone complaints to a deputy, can a deputy

6  just decide that the complaint just doesn't merit---

7       A.   No.

8       Q.   ---any kind of investigation?

9       A.   No.  If they complain to a deputy, they're

10  supposed to give it to a supervisor.

11       Q.   Okay.  Do you think that would be a bad system, to

12  give deputies discretion to not investigate complaints?

13       A.   I don't know that it would be a bad system.  It

14  would be bad system under my command.

15       Q.   Fair enough.  Okay.  So you said a couple of times

16  something along the lines that if, you know, there were sort

17  of multiple complaints coming in against the same deputy,

18  you would know about it.  How would you know about it?  Are

19  the complaints tracked in some way?

20       A.   Well, his supervisor would know about it, whether

21  it be a sergeant, lieutenant, captain.  If Deputy A is

22  having problems, that captain is going to know about it and

23  that major is going to know about it.  And if it's something

24  that they feel like I need to know about, then I will know

25  about it.  We just - you know, it's - it's just a way of

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 45

1  keeping our deputies following policy, is to let them know
2  this is what policy is and this is what we expect out of you
3  and this is the direction it's going in.  It may take some
4  disciplinary action.

5      Q.  So I'm just trying to make sure I understand how
6  the process works.  So how would the major know about it if
7  there were complaints coming in against a certain officer?

8      A.  Because we have supervisors that report back to
9  majors over that division.  The Patrol Division - let's use
10  the Patrol Division.  If Deputy A is in the Patrol Division
11  and he gets a complaint, he's going to know about it.  The
12  sergeant is going to pass it up through the chain of
13  command.  They'll pass it up.  More than likely, I'm the one
14  that's going to know about it.  And so he would have
15  knowledge of it.  I don't know many complaints to come in
16  that the major doesn't know about.  Do some slip through the
17  cracks?  Probably, but very few.

18      Q.  Okay.  So unless it slips through the cracks, a
19  complaint comes in, it's investigated, and it's passed up at
20  least to the major, is that right?

21      A.  That's correct.

22      Q.  All right.  And then does, you know, the major or
23  anyone else sort of look at these complaints that come in to
24  figure out whether there are any, you know, patterns or any
25  problems with certain deputies?

Case 1:12-cv-01349-TDS-JLW  Document 89-7  Filed 03/03/14  Page 12 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 46

1      A.    Yes.    That's why - that's what I say.    Usually

2   there's a common denominator.    If Deputy A gets complained

3   on and it's the same type complaint, then it needs to be

4   addressed.

5      Q.    Do you think that type of review is important to

6   make sure you're identifying any problems that might exist

7   with your deputies?

8      A.    If we're getting complaints, it's important, yes,

9   sir.

10     Q.    Okay.    Turning back to your reviews of the

11  deputies, does your office ever conduct any review of

12  searches that deputies conduct?

13     A.    No.    The deputies have a - that is to say, we have

14  it in policy and they know what the - it's federal and state

15  law.    They know what the policy is.    So their training,

16  that's what we base it on.    If we get a complaint, same as

17  any other complaint, we look into it, but as a normal basis,

18  no.    It's just like writing a citation and arresting people.

19  They are trained, and they know how to perform their job.

20     Q.    Okay.    But say there was a deputy out there who,

21  you know, was conducting a large number of searches and

22  never finding anything.    You know, would there be any way

23  for you to know that?    Do you do any checks to see if that's

24  happening?

25     A.    That goes in - every vehicle, Chapter 20, they

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 13 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 68

1  and that's what we strive for.

2     Q.  Okay.  I'm not really asking about transparency,

3  though.  I'm asking is it important for the command staff to

4  send a message that biased policing is not permissible?

5          MR. KITCHEN:  Objection.

6     A.  We do not---

7     Q.  Go ahead.

8     A.  We do not profile.  We make it very clear that

9  we're not going to be biased for any reason.  We've got a

10  job to do, and that's to treat people the same regardless of

11  who they are.

12     Q.  Yeah.  I'm just asking whether it's important for

13  the command staff to communicate that message to deputies.

14          MR. KITCHEN:  Objection.

15     A.  We do, through policy and through our training.

16     Q.  And is that important to you or is that not

17  something you really care about?

18     A.  It is important.  And as I said, we're - we are -

19  we treat people the same regardless of whoever they may be,

20  and our deputies do the same thing.

21     Q.  Okay.  So would it be appropriate for a supervisor

22  in your office to send an e-mail to some of his or her

23  subordinates that was making fun of Latinos?

24     A.  That wouldn't be appropriate.  And making -

25  regardless of who, if they're making fun of anybody, it

Case 1:12-cv-01349-TDS-JLW  Document 89-7  Filed 03/03/14  Page 14 of 23

Page 69

1  would not be appropriate, not just Latinos.

2     Q.  What would you do if you learned that a supervisor

3  under your command had sent out an e-mail to his

4  subordinates making fund of Latinos?

5     A.  Well, we would look into it, and, you know, what -

6  making fun, to you, may not be making fun to him.  He may

7  take it as - you know, I can't get in people's heads, but if

8  it's something that's against our policy, we would

9  definitely look into it and deal with the action -

10  appropriate action that needed to be done if we found that

11  it's a violation of our policy.

12     Q.  Sure.  If it was something that you looked at and

13  you determined was inappropriately making fun of Latinos,

14  what action would you take?

15         MR. KITCHEN:  Objection.

16     A.  Well, it's according to what it was.  I mean I

17  just can't give you a broad statement.  You know, it's -

18  it's like lying.  Like, you know, we're going to look into

19  it.  It just takes - I'd have to see what was going on.

20     Q.  Is it fair to say you would take some disciplinary

21  action?

22     A.  Probably.

23     Q.  Okay.  Do you think, you know, supervisors sending

24  out discriminatory e-mails to their subordinates would, you

25  know, increase the risk that deputies might, you know, think

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 70

1  that biased policing is okay?

2       A.    Probably.

3       Q.    Is it appropriate for officers to use terms like

4  "wetback" or "spic" to describe Latinos?

5       A.    No.

6       Q.    If officers in your department heard other

7  officers using that kind of language, would they be expected

8  to report it to anyone?

9       A.    Yes.

10      Q.    In a well-run sheriff's office, what would the

11  punishment be for officers who use that kind of language?

12      A.    There again, it's according to the allegation.

13  It's according to what we found, according to his history.

14  I just can't give you a certain thing.

15      Q.    And, again, is it fair to say there would likely

16  be some kind of discipline?

17      A.    Yes, sir.

18            (Thereupon, Deposition Exhibit Number 3 is marked

19      for identification.)

20      Q.    Sheriff Harrison, I've just handed you what the

21  court reporter has marked as Exhibit 3.  I will represent to

22  you that this is four - it's four pages of screen shots from

23  a video game.  You can see on the first page that the title

24  of the game is "Border Patrol" - excuse me - "Border

25  Patrol," and below that it says, "There is one simple

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 71

1  objective to this game, keep them out at any cost." Do you

2  see that?

3      A.    Uh-huh.

4      Q.    And if you look at the second page, it appears to

5  show - there's a sign that says, "Welcome to the United

6  States." It's riddled with bullet holes. Do you see that?

7      A.    Right. Well, I assume it's bullet holes if you

8  say that's what it is. I see what you - the marks on the

9  sign, but I don't know that it is bullet holes.

10     Q.    Okay. There's an individual running across a

11 river holding a Mexican flag. Do you see that?

12     A.    Yes, sir.

13     Q.    And there's a gun sight on the - on the page. Do

14 you see that?

15     A.    If you say it's a gun sight. It could be a

16 compass, for all I know.

17     Q.    Okay. If you turn to the third page, it's the

18 same desert seen with the river and the "Welcome to the

19 United States" sign, and this time it's a - appears to be a

20 Mexican woman and some children running across. Do you see

21 that?

22     A.    Yes, sir.

23     Q.    And there's a gun sight on this page too?

24     A.    If that's what you say it is, yes, sir.

25     Q.    Okay. And if you'd look at the last page, please.

Case 1:12-cv-01349-TDS-JLW  Document 89-7  Filed 03/03/14  Page 17 of 23

1  This is the - a theme from the end of the game.  You can see

2  the sign that says - asking whether you want to play again,

3  and up top it says that the player hit 15 of 88 wetbacks.

4  Do you see that?

5      A.  Yes, sir.

6      Q.  Is this an appropriate video game for officers -

7  for police officers to play at work?

8          MR. KITCHEN:  Objection.

9          MR. MAXFIELD:  Objection.  And unless you're going

10         to tie this up that it somehow came from one of our

11         personnel, I'm going to direct the Sheriff not to

12         answer.  If you want to talk to a judge about it, if

13         you've got one close at hand, we'll be glad to go talk

14         to him.  If somebody else did this at another agency,

15         this is beyond our purview and it's not appropriate for

16         him to give an opinion on that.  If this came from one

17         of our officers, then, yeah, this is something we can

18         talk about; otherwise, I'm going to direct him not to

19         answer.

20         MR. SONGER:  He is testifying in rebuttal to a

21         report in which this game is explicitly mentioned, so

22         this is unquestionably within the scope.  If we need to

23         call the judge, we can call the judge.

24         MR. MAXFIELD:  He is testifying pursuant to a

25         declaration that he made that was prepared by others

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 73

1   and modified by his own lawyers.  I'm not even sure

2   that he read this young lady's report.  So, you know,

3   what we thought we were coming up here to talk about

4   was what he had put in this declaration.  You're going

5   far---

6       MR. SONGER:  He is designated explicitly---

7       MR. MAXFIELD:  You're going far afield.

8       MR. KITCHEN:  Okay.  Let me - let me---

9       MR. SONGER:  Maybe we should talk off the record.

10      MR. KITCHEN:  Yeah.  Let me - well, we need to

11  talk, but just so you know, your question you've just

12  asked does not represent facts that's ever been brought

13  out anywhere, so you might want to reconsider your

14  question.

15      MR. SONGER:  That's - that's fine.

16      MR. KITCHEN:  I don't think you asked what you

17  meant to.

18      MR. SONGER:  I'm happy to recharacterize the

19  question.  Let's go off and make sure - let's go off

20  the record.

21      (Thereupon, a recess is taken from 11:10 a.m. to

22  11:20 a.m.)

23      MR. MAXFIELD:  Based on - based on the sidebar

24  that I've had with cocounsel, I will withdraw my

25  objection, and the Sheriff can answer if he knows.

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 19 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 74

1    A.    Okay.  Now what was the question again, please?

2    Q.    Absolutely.  Before we took a little break, we

3  were looking at what has been marked as Exhibit 3, which is

4  slides from a video game.  And if you'd like to look at it

5  again, Sheriff, take as much time as you'd like.

6    A.    No.

7    Q.    My first question is, would it be appropriate for

8  a law enforcement officer to play this video game?

9          MR. KITCHEN:  Objection.

10   A.    It would be inappropriate to play any kind of

11  games on our computer, but I'd have to look at the totality

12  of everything that was going on at the time and see what it

13  was.  It's just like any other, whether it's this game or

14  whether it's NFL football, or whatever it may be.  That's

15  what I would look at to see was - was he not doing his job

16  at the time he was supposed to be.

17   Q.    Okay.  Leaving aside whether, you know, the

18  officer is doing something other than what he should be

19  doing for his job, from the basis of the content of this

20  game, is this an appropriate game for an officer to play?

21   A.    Well, I can't say the content.  I would just say

22  it's inappropriate to be playing games.  Let me leave it

23  that way.

24   Q.    Okay.  But I'm asking you about the content.  Do

25  you have any view on whether the content of this game is

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 20 of 23

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 75

1  appropriate?

2      A.   I would hope one of my officers wasn't playing

3  this type game.

4      Q.   Okay.  Would it be appropriate for a member of the

5  command staff in your office to distribute this game to his

6  subordinates?

7           MR. KITCHEN:  Objection.

8      A.   In my office?  I can't control what--- I'm sorry.

9           MR. KITCHEN:  Could you define "command staff"?

10     That's my - I'm not sure that the sheriff understands

11     what that might be.

12          MR. SONGER:  Sure.  I'm happy to.

13     Q.   For example, would it be appropriate for a captain

14  in your office to distribute this game to officers who

15  worked under him?

16     A.   In - in an office setting at work, is what I'm

17  getting at.  What they're doing at home, if - you know, if

18  they bought this for the kids, if the kids got this from

19  somewhere else, I can't control that, but in an office

20  setting, it would not be appropriate.

21     Q.   Okay.  Do you think that if a captain distributed

22  a game to his subordinates that talked about killing

23  wetbacks, that that would, you know, create a risk that, you

24  know, officers that worked under him would engage in

25  discriminatory policing?

Case 1:12-cv-01349-TDS-JLW  Document 89-7  Filed 03/03/14  Page 21 of 23

1    A.    I can't answer that.  I mean there's so many games

2    out there now, I don't look at them.  I - you know, as I

3    said earlier, I take the totality of everything that's

4    involved.  It could be - it could be Afro-Americans.  It

5    could be whites.  It could be anything.  I'd have to look at

6    what I'm - what my officer did for me to make that

7    determination.  This piece that you've given me, if it was

8    on office time, no, it would - there would be some

9    disciplinary action taken if I looked at the totality of

10   everything and then deemed it necessary.

11       Q.    Can you imagine any scenario where a captain

12   sending out a game that dealt with killing wetbacks to other

13   officers would be appropriate?

14           MR. KITCHEN:  Objection.

15       A.    I cannot.

16       Q.    Okay.  Okay.  If a--- Put this aside now.  If a

17   sheriff wanted his officers to target a predominately

18   Mexican gang for enforcement activities, would it be

19   appropriate for the Sheriff to tell his officers, quote, "Go

20   get them Mexicans"?

21       A.    I would not say that.  If it's a gang that's

22   causing problems or a gang that needs attention, that's the

23   way I refer to it, I don't care what kind of gang it is.  If

24   it's somebody that's violating the law, that's what I would

25   refer to it as, a gang that we need to look at.

UNITED STATES vs. TERRY S. JOHNSON
Harrison, Donald on 01/21/2014

Page 77

1      Q.   Okay.  Would you consider that - the statement,

2   "Go get them Mexicans" to be a discriminatory statement?

3           MR. KITCHEN:  Objection.

4      A.   I - there again, I can't get into other people's

5   heads.  I would not make that statement.

6      Q.   Fair enough.  And why wouldn't you make that

7   statement?

8      A.   Because that's just not the way I run my office

9   and that's not the way I talk.

10     Q.   Okay.  If a sheriff were looking for individuals

11  who may have committed document fraud because they were not

12  documented immigrants, would it be appropriate for the

13  sheriff to pick names of people to investigate for that

14  crime by selecting the Latino-looking names from a list?

15     A.   Okay.  I don't really understand your question.

16     Q.   Let me ask a better question.

17     A.   Okay.

18     Q.   If you were given a list of people who it was

19  possible may have committed document fraud and you were

20  deciding which of those people to investigate, would it be

21  appropriate to decide who to investigate by picking the

22  Latino-looking names off the list?

23     A.   Let me - let me say how I would do it.  If someone

24  gave me a list and said this - these individuals have

25  committed a crime, document fraud, whatever it may be,

Case 1:12-cv-01349-TDS-JLW   Document 89-7   Filed 03/03/14   Page 23 of 23