IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

--------------------------------------



UNITED STATES OF AMERICA,

        Plaintiff,

v                              No. 1:12-CV-1349

TERRY S. JOHNSON, IN HIS OFFICIAL
CAPACITY AS ALAMANCE COUNTY SHERIFF,

        Defendant.

--------------------------------------

Deposition

of

TERRY S. JOHNSON


In Greensboro, North Carolina
Friday, October 4, 2013
9:25 A.M.




Reported by:

Victoria L. Pittman, BA, CVR-CM-M
for Margaret Powell, CVR-M
Certified Verbatim Reporter
(919) 779-0322

Terry S. Johnson

1      Q    Sheriff, please remember, let me ask the

2  question before you start to answer and then I'll let

3  you say whatever you want.

4      A    Yes, sir.

5      Q    Has the Sheriff's Office itself ever put on

6  any kind of community policing training?

7      A    No, sir, not that I know of at the Sheriff's

8  Office.

9      Q    Have you -- have you required officers to

10 take any training about how to communicate with people

11 who don't speak English well?

12     A    Yes, sir.

13     Q    What's that?

14     A    We have -- for the last three or four years,

15 we've had Spanish instructors coming to -- from the

16 college to our Sheriff's Office.  Our officers -- and

17 you can't put all officers in at one time, but

18 different times during the year, Spanish I is taught,

19 Spanish II is taught, Spanish III is taught, and

20 Spanish IV is taught by Esther -- and I can't remember

21 her last name.  She's a Spanish teacher from the

22 Alamance County Community College.

23     Q    Okay.  When did those Spanish classes at the

24 Sheriff's Office start?

25     A    They've probably been going on for the last

Margaret M. Powell, CVR-M - (919)779-0322

1      Q     Okay.  What guidance have you given officers

2  about how to conduct their traffic enforcement

3  operations?

4      A     The Sheriff's Office is not a primary traffic

5  enforcement division.  I have told my people, "If you

6  see something that is not right in the area that you

7  work, and that car don't belong there and it's a

8  suspicious activity, find out who that individual is.

9  If you meet a person flying, endangering the public,

10 then certainly take action."  DWIs, informational

11 stops.

12          But we're not a "traffic enforcement," quote,

13 department; that's the Highway Patrol.  And, you know,

14 I expect them to have probable cause or a reason for

15 probable cause to stop a vehicle.

16     Q     So what have you told officers about when

17 they should make a stop?

18     A     Exactly what I said.  If they have probable

19 cause or a reason, justifiable reason, you stop the

20 vehicle.

21     Q     Okay.  And have you told officers anything

22 about what constitutes probable cause?

23     A     Certainly.  They went through the training.

24 They know what constitutes probable cause.  I mean, I

25 can sit here and tell you what I think constitutes

Margaret M. Powell, CVR-M - (919)779-0322

1  probable cause, and the courts may -- or a judge that

2  you have to go before may say that's not correct, you

3  know, or I don't think it is.  I can't second-guess an

4  officer on his probable cause.  I can tell you what I,

5  me, myself, would do that would constitute probable

6  cause, but I can't speak for any other officers.

7      Q    Okay.  So officers just have -- it's left to

8  the officers' own discretion to decide what constitutes

9  probable cause for them?

10     A    No.  There is a long -- what would you

11 say? -- ruler of what establishes probable cause.  One,

12 two, or three of those things coming together may

13 establish probable cause.  One may not.  It's hard for

14 me to sit here and tell you what establishes probable

15 cause.  If you will give me a situation and tell me

16 what happened, then I will tell you if an officer had

17 probable cause.  But I don't second-guess my officers

18 on probable cause.  That's what a magistrate is there

19 for.  That is what a judge is there for in court.

20     Q    Okay.  You don't think it's your role as

21 Sheriff to second-guess the decisions that officers

22 make about probable cause?

23     A    No, sir.  I'm not out there in the car with

24 them.

25     Q    Okay.  Do you ever second-guess officers'

Margaret M. Powell, CVR-M - (919)779-0322

Terry S. Johnson

1  reasons for making a stop?

2        A    No, sir.

3        Q    Does anyone at the Sheriff's Office ever

4  second-guess officers' reasons for making a stop?

5        A    I think most of the people there feel like I

6  do.  Now, if I was in their shoes at the time it

7  occurred, I could make that deduction.  But when you're

8  not, you can't.  And I don't think it's my place to

9  second-guess any of my officers on their decisions if

10 there's probable cause.  And if there's not probable

11 cause, like I say, judge or the magistrate going to say

12 there's no -- there was no probable cause there.

13       Q    Okay.  Aside from a judge or a magistrate

14 making some determination, does anyone in the Sheriff's

15 Office, you know, follow up with officers or review any

16 reports or data to try to figure out whether there was

17 probable cause?

18       A    I'm sure there -- I know lieutenants and

19 sergeants have, and not just on those, but cases in

20 general.  Not just on traffic stop cases; in general.

21 They're the frontline supervision of the Alamance

22 County Sheriff's Department, is your sergeant and

23 lieutenants.

24       Q    Okay.  So what reviews -- let's sort of break

25 it down by category, thinking just about traffic

Margaret M. Powell, CVR-M - (919)779-0322

Terry S. Johnson                                    10/4/2013

1   on a traffic stop form that is reviewed by usually a

2   lieutenant, and Captain Wilson when she enters it.

3       Q    Okay.  Is there any policy about what

4   lieutenants should review those traffic stop reports

5   for?  What they should look for?

6       A    Well, certainly.  When you are a lieutenant

7   in any law enforcement agency, you are looking for

8   every -- every possible mistake that could hit that

9   officer in a courtroom setting.  I mean, that's -- you

10  know, that's just a known fact.  That's why you have a

11  lieutenant and sergeant over a shift.

12      Q    Okay.  Have you ever communicated any

13  guidance to lieutenants about what they should look for

14  when they review traffic stop reports?

15      A    They know what to look for because they've

16  been through the training.  They have come up through

17  the ranks.  You know, I mean, that's a known thing as

18  far as the positions you take in any law enforcement

19  agency what you should look for.  And it's to make sure

20  that you adhere to all the laws and the Constitution of

21  the land.

22      Q    I understand that they have had training, but

23  have you given any guidance to lieutenants about how

24  they should review traffic stop reports?

25      A    They have been told to review traffic stops.

Margaret M. Powell, CVR-M - (919)779-0322

1   I don't tell them how to review traffic stop reports.

2        Q    So do you know whether lieutenants review

3   traffic stop reports to assess the adequacy of the

4   probable cause?

5        A    I can't sit here and tell you that it happens

6   every time.  No, sir, I can't tell you that.

7        Q    Has any lieutenant at the Sheriff's Office

8   ever reported to you that there was a problem with the

9   legal justification for a stop?

10       A    No, sir.

11       Q    And that's in your entire 11 years as

12   Sheriff?

13       A    Yes, sir.

14       Q    When an officer makes an arrest, I understand

15   that there is an arrest report and an incident report

16   that is filled out; is that right?

17       A    Yes, sir.

18       Q    And who at the Sheriff's Office are those

19   reports turned in to?

20       A    Those reports go through their lieutenant or

21   sergeant.  They read the reports.  They sign off on the

22   reports.  They are given to a clerk in our office who

23   enters those reports into the computer.

24       Q    Does anyone else in the Sheriff's Office

25   review them after the clerk enters them into the

Margaret M. Powell, CVR-M - (919)779-0322

1   real way to know who you have, if they don't have

2   identification, proper identification identifying who

3   they are, or the officer don't know them, I have

4   instructed my people to bring them in, photograph,

5   fingerprint.  The law permits that under General

6   Statute 15A-502.

7       Q    And is it your policy that when a person is

8   arrested for not having an operator's license, they

9   should be photographed and fingerprinted and fully

10  booked into the jail?

11      A    If we do not --

12           MR. KITCHEN:  Objection.

13      Q    Okay.  Go ahead.  You can answer.

14      A    If we do not know who that individual is,

15  they need to be brought in and fingerprinted and

16  photographed.

17      Q    At a staff meeting at the Sheriff's Office

18  did you instruct officers to arrest all drivers who

19  don't have valid licenses?

20      A    If -- valid licenses?  No operator's license.

21  There's a difference between valid license and no

22  operator's license.

23      Q    Okay.  Let me ask the question more

24  specifically then.  Thanks.

25           At a staff meeting did you instruct officers

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 8 of 43

1   to arrest all drivers with no operator's license?

2        A     No, sir.  Only those that did not present a

3   proper form of ID or those that, you know, didn't have

4   an operator's license or proper form of ID and that if

5   the officer didn't know who they were or couldn't

6   verify who they were.

7        Q     Okay.  So you said a couple of times, I

8   think, that officers should arrest someone when they

9   don't have any kind of appropriate ID or proper ID.

10  What constitutes a proper ID?

11       A     Well, anything that -- and I say

12  "anything" -- that can properly identify that

13  individual.  For instance, they may have a YMCA card.

14  The license tag on that car matches the name on there,

15  I will say that's good enough.  I mean, you know,

16  that's the officer's discretion also.

17           However, if the people cannot produce

18  anything and you don't know who they are, I've

19  instructed my people to arrest them, to bring them to

20  the jail for proper identification.  That's

21  fingerprinting and photographing.

22       Q     What if the driver didn't have an operator's

23  license but had an ID that was issued by a foreign

24  country?

25       A     If it was not a -- what do you call it? -- a

Margaret M. Powell, CVR-M - (919)779-0322

Terry S. Johnson                                      10/4/2013

```
 1  heat back down?
 2       A    Around '9 -- '9, '10, '11, in that area.
 3       Q    Do you remember any more specifically than
 4  that?
 5       A    No, sir, I do not.  I'm telling you there's a
 6  lot of work that goes on as many -- I think 11 trailer
 7  parks in Green Level.  Alamance County has 428 square
 8  miles and there's a ton of trailer parks in Alamance
 9  County.
10       Q    Are there any other major trailer parks that
11  stand out to you as places you had to really turn up
12  the heat and focus on?
13       A    The name's changed, but there was one in Haw
14  River -- not "Riber," River -- that we had a drug
15  dealer in there.  It was a Caucasian drug dealer that
16  was dealing prescription drugs and causing all kinds of
17  problems down there, and we eventually caught him.  And
18  that trailer park straightened out, that I can recall
19  right off the bat.  When you say "turning the heat up",
20  I say "doing our job."
21       Q    Is that the only other one that stands out to
22  you right now?
23       A    Yes, sir.  Let me take that back.  There's
24  one more.  Tangle Ridge mobile home park.  We had --
25  before I come in office -- matter of fact, Deputy Roger
```

Margaret M. Powell, CVR-M - (919)779-0322

Terry S. Johnson                                    10/4/2013

```
 1   Lloyd had the case.  There was two Latinos.  One was
 2   killed.  They took -- it was home invasions, put their
 3   face on the stove, burned their face, then shot one of
 4   them twice, shot the other one and thought he was dead.
 5   It was a home invasion involving narcotics.  And
 6   there's even currently now, we know there's --
 7   somewhere in there, there's people trafficking in that
 8   particular trailer park, drugs.
 9        Q    Okay.  Is that a Latino gang that's
10   trafficking in that trailer park?
11        A    I can't say it's a Latino gang.  To be honest
12   with you, I don't know who it is.  I know one of the
13   individuals that's supposed to be in the organization
14   is Latino.
15        Q    Okay.  Do you know the ethnicity of any of
16   the other individuals in the gang?
17        A    I know one of them is -- he used to be.  He's
18   no longer -- he's in jail now.  But he was
19   African-American.
20        Q    Do you know any others?
21        A    No, sir.
22             (Discussion off the record.)
23             (Recess taken, 11:28 to 11:38 a.m.)
24             (Exhibit 3 marked.)
25        Q    Back on the record.  Sheriff Johnson, I've
```

Margaret M. Powell, CVR-M - (919)779-0322

1    et cetera, placed on probation.  And we want to have

2    a -- what they call a -- basically a pickup of all of

3    these individuals that fit the profile as far as

4    running them through the 287(g) program and put them in

5    the deportation process.

6                That was done by ICE.  They brought their bus

7    up.  That's the only time I'm aware of.  And not saying

8    that they didn't do it previously, but that's the only

9    time that I know for fact that was done.

10       Q    So do you know if officers at the Sheriff's

11   Office ever gave the roundup lists to anyone at ICE or

12   a 287(g) officer at the Sheriff's Office?

13       A    That could happen, yes, sir.  That -- I'm not

14   saying it didn't.  But it would be their decision --

15   I'm talking about if it was given, it was given to a

16   federal ICE officer or got the okay, because we had two

17   in the jail looking after the program.

18       Q    Okay.  You would have no objection to

19   officers passing on the list of people to be rounded up

20   to a federal ICE officer?

21       A    No, sir.  I mean, we work with the federal

22   government -- well, hand in hand on the ICE program.

23       Q    Do you remember a meeting in December of

24   2008, it was a joint meeting between I believe the Vice

25   and Special Ops Unit that you led?

Case 1:12-cv-01349-TDS-JLW  Document 96-10  Filed 04/07/14  Page 12 of 43

1        A     Yes, sir.

2        Q     I'm going play for you a couple of clips from

3   that meeting and ask you to comment on them.

4        A     You may want to play all of them because it's

5   been 2008.

6              MR. KITCHEN:  If you're going to start

7   playing snippets, I'm going to ask that you play the

8   entire meeting.

9              MR. SONGER:  I'm not going to play the entire

10  meeting.

11             MR. KITCHEN:  Then I want my objection on the

12  record that this in violation of the rules of evidence.

13             MR. SONGER:  Okay.

14             THE WITNESS:  Do you have a transcript of it

15  where I can look at it?

16             MR. SONGER:  For right now, at least, I'm

17  just going to play the clips.

18             THE WITNESS:  Okay.  I don't hear good.  I'm

19  going to lean forward.

20             MR. SONGER:  None of us hear good after that

21  siren that just went off.

22       Q     Okay.  This is the first clip.

23             (Audio played.)

24             THE WITNESS:  Uh-huh.  Uh-huh.  Okay.

25       Q     Was that you speaking on the tape?

Margaret M. Powell, CVR-M - (919)779-0322

1  want them to understand they are no longer welcome in

2  Alamance County."

3       A     That's talking about the dope, the drug

4  traffickers, and the home invaders -- every criminal

5  there.

6       Q     You didn't say in here that you were talking

7  about the dope and the drug criminals; right?

8       A     Sir, that's what we were talking about, the

9  reason for going into these places, was the crime and

10  the criminals.  And I'll say it today on record.  The

11  criminals are not welcome in Alamance County.

12      Q     I'm going to play -- I guess this is the

13  third clip.

14      A     Okay.

15            (Audio played.)

16            THE WITNESS:  Uh-huh.  Uh-huh.

17      Q     Okay.  Is that also your voice?

18      A     Yes, sir.

19      Q     And did you say, "We've had a big drop in

20  Hispanic population here, but we've still got a lot

21  dealing dope, and we've still got a lot of citizens in

22  this county dealing dope with them"?

23      A     Yes, sir.

24      Q     Did you have a problem with Hispanics in the

25  county dealing dope?

Margaret M. Powell, CVR-M - (919)779-0322

1        A    I have a problem with anybody dealing dope.

2        Q    But was there a problem in Alamance County

3   with Hispanics dealing dope?

4        A    As I have said previously, 85 -- and it's

5   really more than that, but I think I made a statement

6   where 85 percent of your major drug traffickers that's

7   been arrested in Alamance County or investigations

8   coming out of Alamance County have been of the Latino

9   descent.

10           The dope crossed the Mexican border coming in

11   here.  I think if you'll talk to DEA, they'll say a lot

12   higher percentage than that.

13           I could care less if an individual crossed

14   the border and come to Mexico [sic] to live as long as

15   they don't violate the law.  I could care less.  That's

16   not my jurisdiction.

17           My jurisdiction is to protect the people of

18   Alamance County.  And that's drug trafficking, that's

19   home invasion, that's every crime there is.  And I'm

20   going to as long as I'm sworn in as the Sheriff.

21        Q    Okay.  You think that 85 percent of the

22   people who are dealing dope in Alamance County are

23   is --

24        A    I said major drug traffickers, and that's

25   what I've always said.  And it's higher than that.

1      Q      Is going after drug traffickers a priority

2  for you?

3      A      Absolutely.  Drugs, the killings, the

4  homicides, the home invasions, the shoplifting from the

5  businesses, all as a result of your drug trafficking.

6  And 17 percent of your criminal element is committing

7  about 85 percent of your crime in this nation and in

8  Alamance County.  And if you want to cut your crime

9  rate down, you go after that 17 percent that are

10  habitual felons or habitual drug traffickers or

11  habitual home invaders.

12      Q      And most of those drug traffickers in

13  Alamance County are Latino?

14      A      I can only go by -- tell you what -- since

15  I've been sheriff there.  Yes, sir.  And it's probably

16  more than 85 percent.  Matter of fact, I can only think

17  of one individual that wasn't, and that was last name

18  was Mims, and the rest of the people he was arrested

19  with were of the Latino descent, either Guatemalan --

20  you know, some of the other foreign countries.  But the

21  dope come through Mexico.

22           And of those arrested with him -- it was a

23  big operation of DEA and ours, there were nine Sinoloa

24  cartel members arrested.

25           We got a problem, gentlemen, there.

Margaret M. Powell, CVR-M - (919)779-0322

1       Q       Do you remember when that happened?

2       A       No, sir, I don't -- like I say, I don't, but

3    he didn't do it long.

4       Q       Do you remember about how long it was?

5       A       I don't know, three, four months, something

6    like that.  Because I found out that he could not be

7    dual certified as a task force officer outside the jail

8    and as 287(g) officer in the jail.  So we brought him

9    back.

10      Q       Okay.  He was still working outside the jail

11   in December of 2008 when there was that meeting that we

12   listened to clips earlier?

13      A       Yeah, he would have been, uh-huh, as a task

14   force.

15      Q       Okay.  During that time when Mr. Randleman

16   was working as a task force officer, did you sometimes

17   give him any assignments directly?

18      A       Certainly.  If there was a case -- I can

19   remember one where a lady come into my office bawling

20   her eyes out.  And I said, "Ma'am, what in the world is

21   wrong?"

22              She said, "Sheriff, I've got cancer.  I've

23   had cancer for three years.  I could not -- I have not

24   been able to work, and I was too proud to ask Social

25   Services for help.  But I finally hit rock bottom, I

1  went to Social Services, told them my problem.  They

2  come back and said, 'You made $60,000 last year, you're

3  not eligible.'"

4        She said, "Sheriff, I ain't worked in three

5  years, and something's wrong.  They said all Social

6  Security showed that I had made $60,000."

7        "Well, ma'am, what's your Social Security

8  number?"  She told me.  We ran it through, found out

9  where the money was being paid.  It was in Asheville,

10  North Carolina.  I told Jeff Randleman, I said, "I want

11  to know who's got that Social Security card.  Head down

12  there, and if there's federal charges that can be

13  brought or state charges, I want it done."

14        He went to Asheville.  The individual was

15  using her Social Security number.  He was a Latino

16  American -- I mean, Latino individual.  Had stolen her

17  Social Security number.  Charges were filed, and I

18  think a conviction was made in federal court.

19     Q    Was that Mrs. Oliver who came into your

20  office?  Kay or Kim Oliver?

21     A    It was an Oliver lady.  Sure was.  Not Kim.

22  Kim's a guy.

23     Q    Kay, I think, maybe is Kim's wife?  I'm not

24  sure.

25     A    Well, I'm not sure if it's his wife or not,

Margaret M. Powell, CVR-M - (919)779-0322

1  but I believe it was an Oliver --

2      Q    Okay.

3      A    -- or someone kin to them.  I'd have to see

4  her face.

5      Q    Okay.  And you found out that some Latino

6  individual had stolen Mrs. Oliver's --

7      A    Identity theft.  Social Security number.

8      Q    And the suspect was in Asheville, North

9  Carolina?

10     A    Is just a little town -- Weaverville.

11  Weaverville.  Right outside of Ashville.

12     Q    I know where that is.

13          And you instructed Mr. Randleman to go to

14  Weaverville and arrest this person?

15     A    I told Mr. Randleman --

16          MR. KITCHEN:  Objection.

17     A    I told Mr. Randleman do the investigation,

18  probable cause existed, charge the person.

19     Q    Okay.  Did you ask Mr. Randleman to go to

20  Weaverville and get the suspect?

21     A    I don't know whether he went to Weaverville

22  himself or ICE went with him or ICE went.  But as a

23  result, they found the individual and the charges were

24  filed, as I recall.

25     Q    Okay.  You don't know whether or not he went

Margaret M. Powell, CVR-M - (919)779-0322

1   to Weaverville himself?

2        A     No, I did not.

3        Q     Okay.  But you were the one who instructed

4   Mr. Randleman to investigate this?

5        A     Yes, sir.  At the time, under the task force,

6   he worked with Gloria -- worked for, technically worked

7   for Gloria Fichou, who is the Resident Agent In Charge

8   of ICE in Winston-Salem, which covers our area.  That's

9   actually who he worked for at that time.

10       Q     But this directive came from you, not from

11  Ms. Fichou?

12       A     Well, I'm sure once they talked -- he had to

13  keep Ms. Fichou informed on everything he did, but once

14  he informed her, I'm sure that's where it went from

15  there.

16       Q     Sure.  But all I'm asking though, is it

17  originated with you; is that right?

18       A     Yes, sir.  The complaint come in to me.  The

19  lady come into my office.

20       Q     Do you remember an investigation involving a

21  Graham librarian named Marxavi Angel Martinez?

22       A     Yes, sir, I do.

23       Q     What do you remember about that case?

24       A     There was a commissioners meeting one night,

25  and I'm telling you, folks -- well, anyway, one of the

Margaret M. Powell, CVR-M - (919)779-0322

1  commissioners asked a question and, of course, I

2  couldn't answer the question, "Do we have any illegal

3  immigrants working in the county?"  My answer was that

4  night, I think, "I don't know.  I don't hire the people

5  in the county."

6          Well, after that particular meeting, an

7  individual who is a department head come up to me about

8  three days later and said, "Sheriff, I can't tell you

9  everything, but you need to look at the library because

10 I know an individual there has done identity theft and

11 is not a legal resident of the United States.  I don't

12 think it's right.  I can't give you their name because

13 Raleigh says we can't do it in the position I'm in, but

14 you need to look."

15         Well, it didn't take no genius to go pull the

16 library list and look at the name and Social Security

17 numbers and figure out who it was.  And, boom, sure

18 enough, that's how that come about.

19    Q    So did you look at the names and Social

20 Security numbers yourself, or did you ask Officer

21 Randleman to do that?

22    A    I looked at them and I think Officer

23 Randleman looked at them.  I think they were turned

24 over to Officer Randleman to look at.

25    Q    So how did you identify the name of the

Margaret M. Powell, CVR-M - (919)779-0322

1  person who you thought was not a US citizen?

2      A    Well, just the surname and last name, it's

3  not hard -- you know, how the Latino community's last

4  name is used, it was not hard to figure it out.

5      Q    It was because she had a Latino surname?

6      A    Yes, sir.

7      Q    Do you remember what ultimately happened to

8  Ms. Angel Martinez?

9      A    I think she was charged and there was a lot

10 of stuff put in the paper, I remember that.  But as

11 Sheriff, you know, I have so many duties, when stuff

12 comes to me, I pass it on where it needs to go.  A lot

13 of times, I don't -- I'm not able to keep up with

14 what's going on in it.  And I do know she was charged,

15 because I remember seeing it in the paper.  She was

16 raising all kind of Cain about she'd been in the United

17 States X number of years.  But, once again, she had

18 somebody else's Social Security number, and that's a

19 violation of the law.

20     Q    Okay.  Shortly after the Angel Martinez

21 librarian case, did you have discussions with -- about

22 other possible county employees who might be in the

23 United States illegally?

24     A    No.  I think David Smith at that time was

25 County Manager.  He said, "I would like to know how

Case 1:12-cv-01349-TDS-JLW  Document 96-10  Filed 04/07/14  Page 22 of 43

1  many" -- and I'm not sure if this is the exact time,

2  but "I would like to know how many is registered to

3  vote illegally or not." And a list was given to me.  I

4  told him that I did not have time to go check on these.

5  There was three places checked on, and I remember one

6  was a vacant lot address they had given; one of them

7  was an elderly couple that had lived there 60 or

8  70-something years; and the other one was a vacant

9  house.  And that's all I can tell you.  I don't take

10 voter lists and go run see who is not -- I got too many

11 other duties.

12      Q    Okay.  What I'm referring to, I don't think,

13 is a voter list, but did you ever see, like, just a

14 list of certain county employees that someone put

15 together and gave to Officer Randleman to investigate?

16      A    No, sir, not that I know of.

17      Q    Okay.

18      A    Now, I do know the Martinez was give to me.

19      Q    I'm sorry, the Martinez?

20      A    The lady?

21      Q    The librarian?

22      A    Yeah.

23      Q    So are you aware of Chief Deputy Britt -- I

24 don't know what his title was then -- but are you aware

25 Officer Brit giving Mr. Randleman a list of county

1  employees to investigate?

2      A    No, sir.

3      Q    Are you familiar with an incident where a

4  County Commissioner -- I believe it was Ann Vaughn,

5  although I'm not sure -- was involved in a car accident

6  in Burlington and she came to your office to talk about

7  the driver of the car that she was in an accident with?

8      A    Trying to think.  And for the record, her and

9  I didn't get along to start with.  Secondly, if she

10 come, I was very suspicious of her and probably

11 wouldn't have give her the time of day, just to be

12 honest with you.

13     Q    Well, maybe it was someone else.  Maybe it

14 was Linda Massey or someone else.  I'm not sure.

15          But do you recall --

16     A    I really don't recall that.  I think she was

17 in an accident at one time, but I don't know what --

18     Q    Okay.  Let me ask you this:  Did you ever ask

19 Officer Randleman to investigate -- do like an

20 immigration investigation of the driver of a car who

21 got in an accident with a County Commissioner?  Do you

22 remember that?

23     A    No, sir, I don't.  I don't recall that.

24     Q    Okay.  Are you okay?  Do you need a break or

25 anything?  I'm about to switch gears.  I'm happy to

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 24 of 43

```
 1              (Exhibit 14 marked.)
 2      Q     Sheriff Johnson, I have handed you
 3  Exhibit 14, which is an email from Richard Longamore to
 4  you and Tim Britt; is that right?
 5      A     Yes, sir.
 6      Q     And this looks to be a forward from the email
 7  address mmmsois@aol.com.  Do you know who that is?
 8      A     If I'm not mistaken, he was an interpreter
 9  for the courts in Alamance County, and I can't remember
10  his name, but he -- I'll think of it in just a minute.
11              He also taught -- or was a translator for the
12  courts in Alamance County for a while, for the Latino
13  population.
14              I can't think of his name right off the bat;
15  I can see his face, but I can't think of his name.
16      Q     Did he ever do any work for the Sheriff's
17  Office?
18      A     Not to my knowledge.  He may have taught --
19  because he was real fluent in Spanish, he may have
20  taught some at the community college, but I don't think
21  long, if you can gather.
22      Q     Okay.  He sent this email to Richard
23  Longamore, and Richard Longamore passed -- forwarded it
24  along to you and Tim Britt; is that right?
25      A     Yes, sir, that's what it says.
```

Margaret M. Powell, CVR-M - (919)779-0322

Terry S. Johnson

1    Q    And if you look at -- about halfway down in

2  point Number 2 in the email, do you see that?

3    A    Yes.

4    Q    It says -- referring to some story, an

5  article linked from the BBC.  And the first point says,

6  "Why did I become aware of this case via the foreign

7  mainstream media?"  And then the second point talks

8  about this -- illegal aliens and the sex trade.

9         And if you look at about halfway down that

10  paragraph, it says, "Eliminate the young male illegal

11  aliens, and a very substantial portion of their

12  co-ethnic prostitutes and sex slaves will self-deport.

13  Unfortunately for the American taxpayer, the 11 female

14  sex slaves in this case (and many others) will get to

15  stay in the US under the 'U' Visa program...What will

16  our society be able to do with young Mesoamerican

17  females who at best are semiliterate in any language

18  and only have experience milking cows and working as

19  captive sex slaves?"

20         Do you see that?

21    A    Yes, sir, I do.

22    Q    Okay.

23    A    I don't -- I'll be honest with you, I don't

24  remember getting this email.  But once again, he's sort

25  of like that reporter I told you; you need to research

Margaret M. Powell, CVR-M - (919)779-0322

1   it.

2       Q     Richard Longamore is a director at the

3   Sheriff's Office; right?

4       A     He is Personnel.

5       Q     Director of Personnel?

6       A     Uh-huh.

7       Q     Is that yes?

8       A     Yes, sir.

9       Q     Sorry.  Just want to make sure that it would

10  be clear for the record.

11      A     Oh, okay.

12      Q     Is this an appropriate email for the Director

13  of Personnel to send to the Sheriff's Office?

14      A     Under the circumstances -- and this

15  individual being an interpreter for courts until he got

16  terminated, Richard probably -- and I don't know why --

17  I'll be honest with you, I don't remember seeing it

18  even though my name is on there -- but Richard was

19  probably sending it out to Tim and me because he was

20  also an instructor for a short period -- a very short

21  period of time at Alamance County College, and I don't

22  know -- to be honest with you, I don't know the reason

23  he sent it, but I feel like it's probably to let us

24  know a little bit about him, his stance on these

25  issues.

1  coming into the United States.  I remember talking

2  about -- like I say, the criminal element, also the

3  cost to the taxpayers of what was going on in the

4  United States and saying I think as far as schools,

5  medical, et cetera.

6       Q     Did you say that because of the costs caused

7  by Latino immigrants coming into the United States that

8  taxpayers are losing?

9       A     Well, certainly they are losing.  I may have

10 even stated the amount that I got for this School of

11 Government at the University of North Carolina at

12 Chapel Hill.

13      Q     Sheriff Johnson, did you tell a reporter for

14 the Raleigh News & Observer, quote, "Their values are a

15 lot different, their morals, than what we have here.

16 In Mexico, there's nothing wrong with having sex with a

17 12, 13-year-old girl.  They do a lot of drinking down

18 in Mexico"?

19      A     That is absolutely a blatant lie on the News

20 & Observer's reporter's thing.

21            When she come to Alamance County, she said --

22 Randy Jones was a witness, who is my public information

23 officer.  I can't remember the lady's name, she's a

24 female reporters.  I said, "Ma'am, I want you to

25 understand.  I'm going to be talking to you in terms of

Margaret M. Powell, CVR-M - (919)779-0322

1  the drug traffickers and the criminal element that we

2  deal with, not the Latino population in general."

3          "Yes, sir, I understand that."

4          And she -- I told her about a young girl that

5  was carried -- she wasn't young now, but she was -- her

6  father traded her for a -- 13 years old, to drug

7  traffickers.  She was brought to the United States.

8  She had lived a great life at that time.  She was like

9  23, 24.  She was kidnapped from a club in Burlington,

10  carried to Seamsters mobile home park, her and her

11  girlfriend, kidnapped by like six gang bangers, and

12  they took her -- took them down there to rape them, and

13  they were able to get away and call us.  And that was

14  the -- what I was referring to there.

15          Their values is much different from -- are

16  much different, excuse me, when you are dealing with

17  your drug traffickers.  There is more alcohol use.

18  There is more sex trafficking with the drug traffickers

19  now because they can find they can make more money and

20  less penalties on these things.

21          And what she said is an absolute lie on --

22  because I told her we were talking in terms of criminal

23  element in the Latino community that we were dealing

24  with in Alamance County, was what I could refer to.

25     Q    Okay.  Did you say the words "in Mexico

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 29 of 43

1   there's nothing wrong with having sex with a 12,

2   13-year-old girl"?

3       A     And that is what the girl -- I'm telling you,

4   that is what the girl told us.  She wound up being a

5   witness, I think, for DOJ later on in some cases

6   bringing people in here for sex trafficking and labor

7   slavery here for the federal government.

8       Q     But you did say those words; is that right?

9       A     Yes, sir, but I was referring to your drug

10  traffickers, criminal element, not the Latino

11  population in general.

12      Q     Okay.  Did you also say, "They do a lot of

13  drinking down in Mexico"?

14      A     Absolutely.  Go down there and see your drug

15  traffickers, see what I'm talking about.

16      Q     Okay.  Have you ever said to anyone in the

17  Sheriff's Office, "Bring me Mexicans"?

18      A     Absolutely not.

19            There was a situation when there was a

20  discussion with Chris Crain, myself, and somebody else,

21  and it was on the car break-ins.  And they told me that

22  it was a, quote, "It's a Mexican gang that's doing

23  this."  And I said, "Well, then, go get them Mexicans,"

24  referring to the gang members that had done break-ins

25  that had done the graffiti.  That is the only time I've

Case 1:12-cv-01349-TDS-JLW  Document 96-10  Filed 04/07/14  Page 30 of 43

1  ever come close to saying that.

2       Q    Okay.  You said that to Chris Crain?

3       A    I think Chris Crain and I think that Adam

4  Nicholson was there, because Adam and Chris were -- at

5  that time were in the Gang Unit.

6       Q    Roger Lloyd was a former officer of the

7  Sheriff's Office who was in charge of the Traffic

8  Division for a while; is that right?

9       A    Yes, sir.

10      Q    Did you see Roger Lloyd around the office and

11 instruct him to, quote, "Bring me Mexicans" or "Bring

12 me Hispanics"?

13      A    No, sir, I did not.

14      Q    So your testimony is that if Roger Lloyd says

15 that, he's lying.

16      A    Absolutely.

17      Q    Have you ever told anyone at the Sheriff's

18 Office if they stop a Hispanic person, don't issue a

19 citation, bring them to jail?

20      A    No, sir.  I have said many times, "If you

21 stop an individual that does not have an operator's

22 license nor proper identification, don't care whether

23 they're Black, White, short, tall, fat, or small, you

24 bring them to jail, you process them, we need to know

25 who we've got at our jail and who you have arrested."

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 31 of 43

1              Yes, sir, I have said that.

2      Q      Did you tell Roger Lloyd that if he stopped a

3  Hispanic person, don't arrest them, bring them to jail?

4      A      No, sir, did not.

5      Q      At a staff meeting did you instruct

6  supervisors to arrest Hispanics and bring them to jail

7  rather than issuing citations?

8      A      No, sir.  Once again, the whole gist of the

9  conversation, if they do not -- I don't care whether

10  they're Black, White, or what, if they do not have

11  proper identification, if they do not have a driver's

12  license, and you don't know them, you are to bring them

13  to jail for processing.  Yes, sir.  I issued that

14  order.

15      Q      At a briefing for a checkpoint near the

16  Seamsters mobile home park, did you instruct officers

17  to arrest any Hispanics that they encountered?

18      A      I wasn't involved in a checkpoint at

19  Seamsters mobile home park.  The only checkpoint I was

20  involved in that I recall is 49 and Anderson Road at

21  the edge of Green Level city limits.

22      Q      At that checkpoint, did you instruct officers

23  to arrest any Hispanics that they encountered?

24      A      No, sir.  I instructed them anyone without

25  proper identification or driver's license to be

Margaret M. Powell, CVR-M - (919)779-0322

```
 1   arrested.  Once again, didn't care if they were Black,
 2   White, short, tall, fat, or small.  Including my wife.
 3       Q    Do you know Officer Kenny Evans?
 4       A    Yes, sir, I'm afraid I do.
 5       Q    Afraid you do?
 6       A    Uh-huh.
 7       Q    Why do you say that?
 8       A    Well, Kenny Evans, I should -- when I won
 9   Sheriff, in 2002, he was the Chief Deputy.  And I kept
10   Kenny simply because Kenny had a several years with the
11   Sheriff's Department.  I disagree with sheriffs coming
12   in, Republican sheriffs firing all the Democrats, or
13   vice versa.
14           I went to Kenny at the advice of my Chief
15   Deputy at that time, Morris McPherson, and talked to
16   Kenny, because Morris thought a lot of Kenny.  I asked
17   Kenny, I said, "Kenny, do you want to stay with the
18   Sheriff's Office?"
19           He said, "Yes, I do.  I'd like to stay to get
20   my retirement."
21           I said, "Kenny, can you work, keep your mouth
22   shut, and not stir up trouble within the Sheriff's
23   Department?"  Because he -- a lot of people hated his
24   guts.
25           His wife was terminated by me because of an
```

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 33 of 43

1   ethical issue, and I said, "Kenny, you know I'm not

2   keeping your wife."

3            He said, "I understand."

4            I said, "Can you work here and do your job

5   and not cause problems?"

6            He said, "Yes, sir, if you'll give me a

7   chance, I will."

8            I said, "In that case, you are welcome to

9   stay, you are not going to be chief deputy."

10           I cut his pay by 4 1/2 percent because I

11   dropped him down to a lieutenant.

12           Later on, he come to me, was going to leave

13   the Sheriff's Department because his father was sick.

14   I created a Warrant Squad position so he could come in

15   early in the morning and be with his sick dad during

16   the day.  I let him get his time in, and I found out

17   since then he was stirring stuff in the Sheriff's

18   Department the entire time.

19           I probably shouldn't have kept him, but I can

20   sleep at night.  My question is, can he.  And I know

21   he's a big part of this case for y'all.

22       Q   Why do you say he's a big part of this case

23   for us?

24       A   Because he has talked to people that's come

25   to me.

Margaret M. Powell, CVR-M - (919)779-0322

1  him and gave him a special position, that he is now

2  lying about you?

3      A    Absolutely.  And I will take a polygraph.

4      Q    Okay.  Have you ever in your life referred to

5  Hispanic people as a "chili shitters"?

6      A    No, sir.  You know what the first time I

7  heard about that was in y'all's complaints?  And I

8  laughed about it because I've never heard -- I like

9  chili myself.  But that was the first time I honestly

10  had never heard of it.  And I'm thinking, "Who in the

11  world could even make up that?"

12      Q    Did you instruct Adam Nicholson and Chris

13  Crain to go to Rocky Top and, quote, "Arrest every

14  chili shitter there"?

15      A    Absolutely not.

16      Q    Okay.

17      A    That's a lie.

18      Q    Have you ever instructed anyone at the

19  Sheriff's Office to, quote, "Get the Mexicans out of

20  there"?

21      A    Get the Mexicans what?

22      Q    "Get the Mexicans out of there" in any

23  context?

24      A    No, sir.  "Get the Mexicans out of there"?

25      Q    You've never said that?

 1   your own people in there.  I didn't want to do that.  I

 2   wanted to give the people that were career officers

 3   there an opportunity to display their abilities and

 4   work for the people of Alamance County.  And I had some

 5   problems with him.  I moved him.  I let him stay until

 6   he retired, and that was probably my fault.

 7        Q     Before a vehicle checkpoint did you tell

 8   Mr. Perry, quote, "I want you to lock up any damn

 9   Mexican that you can," and then after Mr. Perry asked

10   you for clarification, did you respond to, quote, "lock

11   their asses up"?

12        A     No, sir, I have ever told Mr. Perry -- of

13   course, Mr. Perry never arrested nobody.

14        Q     Did you ever say anything close to that to

15   Mr. Perry?

16        A     No, sir.

17        Q     So is it your testimony that even though you

18   say Mr. Perry was lazy, but you allowed him to keep his

19   job until retirement, he is now lying about you?

20        A     If he said that, yes, sir, he is lying.

21        Q     Okay.  At a Sheriff's Office staff meeting

22   have you ever said, "Bring me Mexicans," while pounding

23   your fists on the table?

24        A     No, sir, I have not.  Now, I've pounded my

25   fists on the table before, but I have never said,

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 36 of 43

1 | "Bring me Mexicans."

2 |     Q    Okay. Have you ever said, "Bring me Mexican

3 | meat," at a staff meeting?

4 |     A    No, sir. I have said, "Bring me some meat to

5 | the cooler." I've said that several times. And that

6 | was when we were talking about the home invasions, I

7 | said, "Guys, and I talk about -- if you had to chase

8 | one, if you wreck a car -- if you wreck that car,

9 | that's fine, but you better bring some meat back to the

10 | cooler." And that means if you tear up a car chasing

11 | someone, you better be bringing somebody to jail.

12 |     Q    Do you know who Officer Kurt Lankford is?

13 |     A    Oh, do I. Uh-huh. He's another one of those

14 | that I kept that from the day I walked in that office,

15 | that little group that I'm talking to you about, tried

16 | to undercut the Alamance County Sheriff's Office

17 | because I was the first Republican sheriff since I

18 | think 1946. And I'm telling you, it was something

19 | else.

20 |         But I, out of the goodness of my heart, like

21 | I said, once again, I wanted -- I didn't want to be

22 | your typical Sheriff and come in and clean house. I

23 | wanted to give those employees an opportunity to make

24 | something of that Sheriff's Office because they had

25 | been there so long.

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 37 of 43

1      Q      Okay.  Did you say, "Bring me Mexican meat"

2   at a staff meeting that Officer Lankford attended?

3      A      Absolutely not.  Officer Lankford -- and I

4   will honest with you, was nothing but a problem from

5   the day I walked in that office, and he shouldn't have

6   been -- shouldn't be there now, but I'm trying to let

7   him get his time.

8      Q      So is it your testimony that even though he

9   has been, you say, a problem, you've allowed him to

10  stay on, and he is now lying about you?

11            MR. KITCHEN:  Objection.

12      A      Let me say, I busted Kurt Lankford, if you --

13  and I'm sure you've got his personnel file, if you look

14  at it, you'd see problem after problem before I come

15  into office.  I come in office, he shot at an animal

16  and shot a man's air conditioning all to pieces.  And

17  certainly do -- there are several other violations that

18  that man had, and I took and moved from Animal Control

19  over to Social Services building because they wanted

20  security over there, and all he has to do is say, "Hey,

21  there's the door.  You can go in here."  That's all he

22  has to do to get him do his retirement time because

23  they wanted someone over there.

24            And, yes, Mr. Lankford is lying if he said

25  that.

Case 1:12-cv-01349-TDS-JLW  Document 96-10  Filed 04/07/14  Page 38 of 43

1          We went there and ate.  It was Tank, his
2    wife, his son, and the chief, his son, and me.  My wife
3    wasn't even with us.  That's the only time I've had a
4    meal with Tank or his family.
5          Q     Has Tank ever come to you at any point and
6    talked about personal issues that he had?
7          A     No, sir.  Does he have one?  Which is my next
8    question.
9          Q     Do you know that Tank has been arrested for
10   DWI three times?
11         A     Yes, sir.  And he has been found not guilty
12   all three times, according to what our background
13   investigation showed.
14         Q     Okay.  Did you know about those three arrests
15   at the time you hired him?
16         A     Yes, sir.
17         Q     Okay.
18               (Recess taken, 5:33 to 5:38 p.m.)
19         Q     Back on the record.  Sheriff Johnson, in your
20   life, have you ever used the term "wetback"?
21         A     No, sir.
22         Q     Have you ever used the term "illegals"?
23         A     Oh, certainly I've talked about it, but it
24   wasn't just the Latino population.  It was people that
25   come to the United States illegally from Italy and

Margaret M. Powell, CVR-M - (919)779-0322

1    Germany, wherever.  I have.

2          Q      Have you ever used the term "illegals" to

3    refer to Hispanics?

4          A      No, sir, I don't think so.

5          Q      Okay.  Have you ever used --

6          A      Now, let me say, I have said "criminal

7    illegal immigrants."  I have used that, yes, sir.

8          Q      Okay.  And have you used the term "Mexicans"

9    to refer to Hispanics generally?

10         A      Now, I will be honest with you, I probably

11   have, because Americans are Americans, Mexicans are

12   Mexicans.  If you're from Mexico, you're Mexican; if

13   you're from Africa, you're African.  And I probably

14   have, yes, sir.  I'm sure I have.  I just can't tell

15   you when.

16         Q      But have you used the term "Mexicans" to

17   refer to all Hispanics generally?

18         A      No, sir.  Let me tell you something:  Anytime

19   I talked about Mexicans, it was the Mexican drug

20   traffickers bringing the dope over the border coming up

21   to Alamance County.

22         Q      Okay.  Have you ever used the term "beaners"?

23         A      "Beaners"?  No, sir, I haven't.

24         Q      Have you ever used the term "taco eaters"?

25         A      No, sir.  I addressed that with you earlier.

1    First time I ever seen "taco eaters" was on that email.

2         Q     Okay.  Have you ever used the term "Spic"?

3         A     No, sir, have not.

4         Q     Have you ever heard anyone at the Alamance

5    County Sheriff's Office use any of those terms?

6         A     No, sir.  If I had, I would discipline them.

7         Q     Okay.  Have you ever in your life used the

8    term "nigger"?

9         A     I'm sure I have, but I assure you it was

10   probably when I was 10, 11 years old.  I grew up at the

11   time -- and on farms and stuff.  But I have heard them

12   referred to as, I mean, White people as White niggers,

13   you know.  Black folk.

14             But I can tell you I am not a racist.  I

15   admire the African-American population for coming

16   forth, marching for their rights, and getting their

17   rights.

18             And I assure you, in my adult lifetime, no.

19             Have I heard it used in the public?  Yes, I

20   have.

21        Q     Have you ever in your life attended a meeting

22   of the Ku Klux Klan?

23        A     No, sir -- well, I'll take that back.  Yes, I

24   have.  I was in the Greensboro Klan-Nazi Shootout as an

25   SBI agent.  I have done surveillance at Klans meeting

Case 1:12-cv-01349-TDS-JLW   Document 96-10   Filed 04/07/14   Page 41 of 43

1   in an undercover capacity.  But I have never attended

2   as a Ku Klux Klan member, no, sir.

3        Q    Okay.  I think you said a moment ago that

4   Officer Kenny Evans had been a problem when he worked

5   for you at the Sheriff's Office?

6        A    Yes, sir.

7        Q    Did you ever discipline him?

8        A    I didn't.  He was disciplined before I got

9   there.  Kenny was the type -- or Kenny is the type of

10  guy -- and, you know, I let my guard down on him.

11  Probably shouldn't have.  I tried to help him where I

12  could, under the circumstances.

13            Kenny is the type of guy that he's going to

14  do just enough to get him through.  And Kenny is the

15  type that will stir and be what I call a magician out

16  here trying to control everything.  And that's what

17  he's done in this case.  I know he's met with the

18  people.  I know he had people meet with people, Laura

19  Roselle.  He's told it -- he's told people what to say.

20  I know that some people have come to us, some people

21  refuse to bow down to him and go along with what he

22  wants.

23            Kenny wants to be Sheriff of Alamance County.

24  He's told me that to my face.  And that is what a lot

25  of this is all about, is politics.  And y'all have

Margaret M. Powell, CVR-M - (919)779-0322

1  found yourself wound up in the middle of it because of

2  accusations.  And I don't blame you for investigating.

3  I just wish you had looked at all of the facts before

4  you-all made allegations in the paper.

5            Am I a perfect human being?  No.

6            Am I a perfect Sheriff?  No.

7            But I can tell you this:  I know the

8  Constitution and I know what it's like to be gone after

9  unjustly.  And as long as I wear the badge, I'm going

10  to see that that don't happen in my agency or any other

11  agency that I'm a part of.

12     Q    When you were Sheriff, you created a special

13  position to accommodate Mr. Evans?

14     A    I sure did.  His father was sick.  His mother

15  was sick.  His father passed.  He was having to look

16  after them sometime during the day, nobody else could

17  look after them.  I created what is called a Warrant

18  Squad.  He was a lieutenant, put him over the Warrant

19  Squad to serve warrants.  He could come in at 5:00 in

20  the morning.  As long as we got the people in jail on

21  the warrants, I didn't care when he served them, as

22  long as he put in eight hours a day.

23     Q    I think you also mentioned an Officer Steve

24  Perry was -- had been a problem when you were Sheriff.

25     A    Yes, sir.