IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
       v.                           )
                                    )        1:12cv1349
TERRY S. JOHNSON, in his            )
official capacity as Alamance       )
County Sheriff,                     )
                                    )
            Defendant.              )


## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

The United States of America (the "Government") allege that Defendant Terry S. Johnson, in his official capacity as Sheriff of Alamance County, North Carolina, engaged in a pattern or practice of discriminatory law enforcement activities directed against Latinos, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution. The Government brings this action through Section 210401 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141. (Doc. 1.) Before the court are cross-motions for summary judgment. (Docs. 86, 88.) For the reasons set forth below, the Government's motion is denied and Johnson's motion is granted in part and denied in part.

**I.    BACKGROUND**

Alamance County, located in central North Carolina, is home to approximately 154,000 people.    U.S. Census Bureau, *State & County QuickFacts*, http://quickfacts.census.gov/qfd/states/37/37001.html (last revised June 11, 2014).    Of that number, approximately 66.6% are white (non-Hispanic), 19.2% are black, and 11.6% are Hispanic.[1]    Id.    The county's Hispanic population is a recent phenomenon, having grown from 736 in 1990 to almost 17,000 in 2010.  (Doc. 11-3 at 3; Doc. 1 ¶ 12.)

The Alamance County Sheriff's Office ("ACSO") is the largest law enforcement agency in the county and employs 266 total officers.  (Doc. 89-2 at 7.)  Johnson has been the sheriff since 2002.    (Doc. 86-4 at 30.)    On January 10, 2007, U.S. Immigration and Customs Enforcement ("ICE") entered into a Memorandum of Agreement ("MOA") with Johnson, which granted the ACSO limited authority to investigate and enforce immigration violations, pursuant to Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g) ("the 287(g) program"). (Doc. 89-4.)    In June 2010, the Government began investigating Johnson and the ACSO regarding "allegations of discriminatory policing and unconstitutional searches and seizures." (Doc. 89-

---

[1] The parties and their witnesses use the terms "Hispanic" and "Latino" interchangeably.    To the extent there is a difference between the terms, it has not been identified as significant for the purposes of the pending motions, and so the court will use the terms interchangeably.

58 at 2; Doc. 11-3 at 1.)  On September 18, 2012, the Government
issued an 11-page summary of its investigation and detailed
charges of discrimination, and it terminated the 287(g) program.
(Doc. 1 ¶ 15; Doc. 11 at 8; Doc. 11-3.)  This action followed.
(Doc. 1 (filed Dec. 20, 2012).)

Generally, the Government contends that Johnson and the
ACSO target Latinos for law enforcement actions, including
traffic stops, vehicle checkpoints, and immigration referrals;[2]
foster a culture of bias against Latinos; and fail to take
commonly used measures to prevent discriminatory policing.
(Docs. 1, 89.)  The Government argues that such actions violate
the Fourth and Fourteenth Amendments, denying the Latino
population of Alamance County equal protection of the laws.
Johnson denies those allegations, arguing that he and his office
pursue criminals, whether or not they are Latino, and denying
that he has made derogatory statements about Latinos or fostered
a culture of bias against Latinos at the ACSO.  (Docs. 6, 87.)

Both parties have moved for summary judgment.  (Docs. 86,
88.)  Both parties have responded (Docs. 95, 96) and replied
(Docs. 99, 101).  Pursuant to this court's May 8, 2014 order,
the Government also filed a limited surreply on the issue of
statute of limitations.  (Doc. 106.)  A hearing on the pending

---

[2] The Government does not rely on allegations or evidence regarding
immigration referrals in its motion for summary judgment.

3

motions for summary judgment was held on June 13, 2014.  As the case is highly fact-intensive and the parties dispute essentially all of the substantive facts, further factual discussion is not warranted.  Facts will be introduced as needed in the legal analysis and construed in favor of the non-moving party, as appropriate.

## II.  ANALYSIS

### A.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine dispute of material fact remains. Where the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 325 (1986).  For the purposes of these motions, the court regards statements of the non-moving party as true and draws all inferences in the non-moving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  But a non-moving party must establish more than the "mere existence of a scintilla of evidence" to support his position.  Id. at 252.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50.

Ultimately, summary judgment is appropriate where the non-movant fails to offer "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

Both parties focus their motions for summary judgment on the two counts alleged in the Government's complaint – violations of the Fourteenth and Fourth Amendments as brought through § 14141 – but Johnson raises two partial defenses that should be addressed first: statute of limitations and mootness.

**B.    Statute of Limitations**

Johnson asserts that the Government's action is subject to a four-year statute of limitations, 28 U.S.C. § 1658(a), and that the discriminatory acts alleged are discrete incidents rather than a continuing violation. (Doc. 99 at 6-10.) He therefore contends that the Government cannot predicate § 14141 liability on any acts that occurred prior to December 20, 2008.[3] (Id.) The Government argues that no statute of limitations applies to § 14141 (Doc. 106 at 2-3) and, moreover, that its claims seek to remedy an *ongoing* pattern or practice of civil rights violations, for which no limitations period applies (id. at 3-5).

The parties agree that § 14141 contains no statute of limitations. The Government relies on a Magistrate Judge's

---

[3] Johnson articulated his limitations argument late in the briefing, and the issue is not well-developed on this record.

report and recommendation in United States v. City of Columbus, Ohio, Civ. A. No. 2:99CV1097, 2000 WL 1133166 (S.D. Ohio Aug. 3, 2000), which concluded that § 14141 had no limitations period. Id. at *10. The Magistrate Judge rejected an argument that the two-year statute of limitations applicable to claims under 42 U.S.C. § 1983 applied to the § 14141 claims in that case, noting that "in actions brought in its sovereign capacity on behalf of the public interest, the United States is not bound by any limitations period . . . unless Congress explicitly provides otherwise." Id. Finding – without discussion - no express statute otherwise, the court declined to impose any limitation but quickly noted that the motion to dismiss stage was not "the proper vehicle for invoking such principles." Id. Thus, the court's conclusion is dicta and omits any discussion of § 1658's four-year limitations period.

Section 1658 is entitled "Time limitations on the commencement of civil actions arising under Acts of Congress" and provides:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C. § 1658(a). The statute was enacted December 1, 1990, some four years before § 14141's enactment on September 13,

1994.  Therefore, by the plain language of § 1658, it applies to claims under § 14141, unless "otherwise provided by law."

The Government first argues that "[t]he principle that the United States are not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign Government to enforce a public right, or to assert a public interest, is established past all controversy or doubt," citing the dissent in <u>Occidental Life Insurance Co. v. EEOC</u>.  432 U.S. 355, 382 (1977) (quoting <u>United States v. Beebe</u>, 127 U.S. 338, 344 (1888)).  In <u>Occidental Life</u>, the majority held that EEOC enforcement actions are not subject to State statutes of limitations, and the dissent argued that the notion that the Government was suing as sovereign was misplaced because it was not suing to redress *its* injury, but rather the injury of others.  <u>Id.</u> at 383.  Johnson contends that the same could be said here.[4]  Moreover, here, the Government

---

[4] The Government argued at the hearing that it is suing on its own behalf, in its capacity as a sovereign, not on behalf of the Latino residents of Alamance County.  It was unable to provide legal support for that position, other than the text of § 14141 itself, but argued that civil rights violations not only harm the individual victims but also broadly injure the public's trust in law enforcement and the integrity of the criminal justice system.  No party has provided any decision that considers whether the United States is acting in its sovereign capacity in a suit pursuant to § 14141, but there is authority for the proposition that the Government acts in its sovereign capacity when enforcing its laws, even if some of the benefit of the suit inures to private individuals:

> When the United States brings suit in its sovereign capacity, a statute of limitations does not ordinarily apply unless Congress has expressly provided otherwise.

7

must contend with § 1658 – a federal, not State, statute of limitations - which was not enacted at the time of <u>Occidental Life</u>. The Government has failed to consider this development.

Even assuming Johnson is correct and § 1658 limits § 14141 actions, however, it is not clear when a § 14141 claim accrues. Neither party has pointed the court to any case law addressing that question, and the court has found none. In the absence of direct authority, Johnson analogizes § 14141 to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>, which addresses unlawful discrimination in employment. He contends that § 14141's "pattern or practice" requirement is similar to an "unlawful employment practice," which is predicated on a discrete incident or incidents. (Doc. 99 at 8-9.) Under Title VII law, each wrongful act is considered independently from other acts for timeliness purposes, and "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 112 (2002).

---

Where, however, the government's action vindicates a private interest, the defense is typically available.

In this instance, the United States is acting in its sovereign capacity. In suing to enforce the securities laws, the SEC is vindicating public rights and furthering public interests. This is so despite the fact that the relief sought is disgorgement [which may be used to compensate injured victims].

<u>S.E.C. v. Calvo</u>, 378 F.3d 1211, 1218 (11th Cir. 2004) (citations omitted).

The Government responds that Johnson's analogy to an unlawful employment practice is inapt because Congress enacted specific time limitations for Title VII claims but did not for § 14141. (Doc. 106 at 2-3.) It also contends that § 14141's "pattern or practice" is not similar to discrete acts of unlawful employment practices, which accrue when they occur, but instead that a § 14141 claim "'accrues' only after a jurisdiction engages in a pattern or practice of violating federal law." (Id. at 3 n.2.) The Government maintains that each individual discriminatory act it alleges is not a § 14141 claim in and of itself, but rather is "relevant evidence to proving the existence of a larger pattern." (Id.)

The Government further argues that § 1658 is inapplicable because it seeks injunctive relief against an *ongoing* violation. Although the Government presents evidence of conduct and statements reaching back to 2007, some of the evidence is more recent (e.g., Docs. 89-16, 89-21, 89-22 (emails from 2010, 2011, and 2012)) and some of the evidence is not clearly from a specific date or time period (e.g., Doc. 89-27 at 4 ("primarily" the terms "wetback" and "TONC"[5] heard at ACSO, without a specific time period identified for use of those terms)). The statistical reports submitted by the United States' proposed

---

[5] TONC apparently refers to "Travel Outside of Native Country." (See Doc. 89-29 at 4.)

experts include data from as recent as 2013. (<u>See</u> Docs. 89-42, 89-45.) This is consistent with the Government's complaint, which alleges that the ACSO's violations began in "at least January 2007" and continued "to the present." (Doc. 1 ¶ 1.) The Government seeks injunctive relief accordingly. (<u>Id.</u> ¶¶ 80-82.)

When the evidence is viewed in the light most favorable to the Government, as it must be at this stage, the record supports claims of a pattern or practice of unconstitutional behavior occurring through 2013. As a result, summary judgment in favor of Johnson as to certain acts falling outside the four-year period of § 1658 is not warranted. Statutes of limitations apply to claims, not evidence. <u>See</u> <u>Brinkley-Obu v. Hughes Training, Inc.</u>, 36 F.3d 336, 346 (4th Cir. 1994) (stating, regarding a Title VII claim, that "[s]tatutes of limitations do not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action.") Therefore, even assuming application of a statute of limitations, evidence of events or statements occurring in 2007 and 2008 may be considered as long as it informs a proper claim of a pattern or practice of unconstitutional conduct extending through more recent years. Johnson's motion on this ground will therefore be denied.

**C.    Mootness**

The Government's complaint alleges that the ACSO automatically referred Latino arrestees to ICE but did not refer similarly-situated non-Latinos.  (Doc. 1 ¶¶ 47-51.)  The ACSO had the authority to investigate potential immigration violations pursuant to the MOA between ICE and the ACSO.  (Id. ¶¶ 13-14.)  Johnson contends that these allegations are now moot because ICE terminated the MOA on September 18, 2012, and the ACSO no longer has authority to investigate arrestees for immigration violations or to refer them to ICE.  (Doc. 87 at 18 (citing Doc. 11 at 7-8).)  Johnson previously raised this argument in his motion for judgment on the pleadings.  (Doc. 11 at 7-8.)  The Government contends that this court has already rejected Johnson's mootness arguments in its order denying judgment on the pleadings.  (Doc. 95 at 25-26.)  It again asserts, as it did in response to Johnson's motion for judgment on the pleadings, that "[a] fact cannot be moot," and that evidence of how the ACSO handled Latino arrestees while the MOA was in place can still support its larger § 14141 claims.  (Id. at 26.)

As this court previously indicated, "the non-existence of one ground or theory does not render the larger claim moot." (Doc. 19 at 10 (citing Simmons v. United Mtg. & Loan Inv., LLC, 634 F.3d 754, 763 (4th Cir. 2011)).)  Summary judgment applies

11

to claims, not evidence in support of a claim.  See Fed. R. Civ.
P. 56(a).   Had the Government's § 14141 claim been solely
predicated on the ACSO's management of Latino arrestees under a
now-terminated MOA, the claim might now be moot.   But that is
not the case.   The Government's theory of the case[6] simply seeks
to use factual evidence regarding the ACSO's treatment of Latino
arrestees while the MOA was in effect to bolster its broader
evidence regarding the ACSO's treatment of Latinos in an attempt
to prove a pattern or practice of discriminatory law
enforcement.   Therefore, summary judgment in favor of Johnson is
not warranted on mootness grounds.

The court now turns to the two central claims of the
Government's case under § 14141: that Johnson's law enforcement
activities violated the Equal Protection Clause of the
Fourteenth Amendment and the Fourth Amendment.   Both parties
seek summary judgment in their favor on both claims.

**D.   Equal Protection**

**1.   Applicable law**

The Fourteenth Amendment's Equal Protection Clause declares
that "[n]o State shall . . . deny to any person within its
jurisdiction the equal protection of the laws."   U.S. Const.
amend. XIV.   The Clause "is essentially a direction that all
_____
[6] For purposes of its summary judgment motion, the Government has
chosen not to rely on evidence regarding the ACSO's alleged automatic
referrals of Latino arrestees to ICE.   (See Doc. 95 at 26; Docs. 88,
89.)

12

persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It applies to all State action, including the enactment, administration, and enforcement of laws and regulations. *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

The Fourth Circuit has recognized that "[e]ven though a state law is facially neutral, its administration or enforcement can effect an unequal application by favoring one class of persons and disfavoring another." *Id.* at 818-19. In this context, the plaintiff bears the initial burden of proving discriminatory administration or enforcement. *Id.* at 819. To do so, the plaintiff must show more than a disparate impact on a particular racial group; the plaintiff must show that the State action "was motivated, at least in part, by an 'invidiously discriminatory' intent." *Id.* (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). Thus, a plaintiff must prove both discriminatory intent and effect to succeed. *Id.* at 819-20.

Sometimes – but rarely – a pattern is so clear that nothing more than proof of the pattern is needed to find discriminatory intent. *Arlington Heights*, 429 U.S. at 266 (citing *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and *Yick Wo v. Hopkins*, 118 U.S.

356 (1886), as examples).  More often, courts must look to other evidence, including

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

Sylvia, 48 F.3d at 819 (citing Arlington Heights, 429 U.S. at 266-68, and Talbert v. City of Richmond, 648 F.2d 925, 929 (4th Cir. 1981)).

"Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).  Where the difference in treatment is based on ethnicity – as alleged here – the court applies "strict scrutiny."  Fisher v. Univ. of Tex. at Austin, __ U.S. __, __, 133 S. Ct. 2411, 2417 (2013) (government decisions that touch upon an individual's race or ethnic background are subject to strict scrutiny).

### 2.    Challenge to Dr. Lamberth's report

As part of its primary case, the Government has proffered two expert reports, one of which is from John Lamberth, Ph.D. Dr. Lamberth's report purports to show that the ACSO is

"significantly more likely to stop and cite Hispanic motorists
than non-Hispanic motorists on three major roadways in Alamance
County." (Doc. 89-42 at 19.) Johnson argues, in response to
the Government's motion for summary judgment, that the court
should strike the report under <u>Daubert v. Merrell Dow</u>
<u>Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), because it is "junk
science."[7] (Doc. 96 at 25-28.) The Government responds that
Johnson does not ask the court to exclude Dr. Lamberth as an
expert (Doc. 101 at 11 n.4), which is not entirely responsive,
because a successful motion to strike the report would yield the
same result. Indeed, Johnson has followed Local Rule 7.6, which
allows the challenge to a separate piece of evidence within a
summary judgment brief without a separate motion to strike.
Because this is a threshold evidentiary question, it will be
addressed first.

Johnson argues that Dr. Lamberth's method of having
observers identify Hispanic drivers is not generally accepted.
<u>See Daubert</u>, 509 U.S. at 594. Johnson relies on the testimony
of his own expert for this proposition, as well as on a separate
study. (Doc. 96 at 26.) However, the Government notes,
Johnson's expert, a statistician, conceded in deposition that he

---

[7] In interpreting Federal Rule of Evidence 702, <u>Daubert</u> set forth
several factors for considering an expert opinion's validity: the
testability of the hypothesis; its subjection to peer review; the
potential rate of error; whether controls/standards were used; and its
general acceptance in the relevant scientific community. The court
must consider its "fit" to the case. 509 U.S. at 591-95.

is not familiar with the methods of observation that are accepted in the field of criminology or the academic literature on observational benchmarking. (Doc. 101-10 at 18-25.) Dr. Lamberth, in contrast, relies on several peer-reviewed studies to support his observational method (Doc. 101 at 11-12), and the Government cites the decisions of several courts it says have relied on Dr. Lamberth's methods. See, e.g., State v. Soto, 734 A.2d 350, 352-54 (N.J. Super. Ct. Law Div. 1996). Johnson also charges that Dr. Lamberth did not properly train his observers, attacks the controls, if any, over them, and argues that Dr. Lamberth's selection of roads for observation are not representative. (Doc. 96 at 27-28.)

Unfortunately, throughout his argument Johnson fails to cite to the record, and the court will not search it for support. L.R. 7.2(a) ("Each statement of fact should be supported by a reference to a part of the official record."). On this record, the Government has provided evidence to support Dr. Lamberth's methods and results, and Johnson has not properly advanced sufficient evidence that establishes that they are unreliable or invalid. Therefore, while the determination whether Dr. Lamberth's opinions are the product of valid and reliable methods may be the subject of further debate, Johnson's request to strike Dr. Lamberth's report falls short at this time and will be denied.

### 3. Evidence presented

The Government's evidence of an unlawful pattern or practice falls into five general categories: (1) statistical studies and rebuttals purporting to prove a discriminatory pattern of traffic stops, (2) depositions and declarations from current and former ACSO employees, (3) emails among ACSO employees, (4) depositions and declarations from Alamance County residents and others who have interacted with the ACSO, and (5) depositions of other North Carolina sheriffs. To prove a pattern of discriminatory traffic stops and arrests, the Government relies both on statistical studies attempting to capture a broad picture of stops conducted in Alamance County and on specific stops of identified individuals as examples. To prove discriminatory intent, the Government relies on evidence relating to the pattern itself, statements and directives made by ACSO leadership, derogatory terms for Hispanics used at the ACSO, emails and other evidence demonstrating a culture of anti-Latino bias at the ACSO, a lack of training, and a lack of anti-discrimination preventative measures allegedly used commonly by other law enforcement agencies.

Johnson rebuts the charges against him in the complaint and in the Government's summary judgment motion by presenting a statistical study of his own that purports to disprove allegations of anti-Latino bias; by denying, explaining, and in

some cases contextualizing specific examples cited by the Government; by proffering evidence from ACSO leadership and ACSO deputies that contradicts the Government's evidence; and by attacking the credibility of the Government's witnesses.

### a.    Examples of disputed facts

An exhaustive review of the evidence is not warranted at this stage because it is clear that the Government has presented evidence which, if credited, demonstrates both disparate impact and discriminatory intent, but there are genuine disputes over material facts.

For example, the Government alleges that Johnson ordered subordinates to "go get them Mexicans" and told a reporter that "[i]n Mexico, there's nothing wrong with having sex with a 12, 13-year-old girl." (Doc. 89 at 4, 7.) Johnson admits saying "go get them Mexicans" to subordinates but states that it was in the context of a discussion regarding Mexican gang members committing car break-ins and vandalism and that his subordinates understood the directive to mean "go get the people that were responsible for the crimes." (Doc. 96 at 2 (citing Doc. 96-1 at 4-5).) Similarly, Johnson argues that the reporter distorted his statement. Johnson says that he was referring only to "the criminal element" – not Latinos generally (id. at 8) and that it was in reference to a specific case in which a father traded his 13-year-old daughter to drug traffickers (Doc. 87 at 9).

The Government has produced evidence that Johnson used derogatory terms to describe Latinos and instructed his subordinates to arrest Latinos indiscriminately. For example, former ACSO officer Adam Nicholson stated that after the owner of the Rocky Top mobile home park complained to Johnson about "Mexicans" in the park, Johnson told him: "I want every chili-shitter in that park arrested." (Doc. 89 at 5 (citing Doc. 89-6 ¶ 9).) In response, Johnson denies ever saying that (Doc. 96 at 5 (citing Doc. 96-10 at 35)) and attacks Nicholson's credibility, stating that he had a sexual harassment complaint filed against him, that he was demoted and moved to patrol, and that he actively supported Johnson's electoral opponent (id. at 6). Similarly, the Government has produced other evidence that ACSO officers used derogatory terms, including "wetback," "beaner," "spic," "taco," and "taco eater." (Doc. 89 at 9.) In response, Johnson proffers evidence from deputies who claim never to have heard such terms used at the ACSO and contends that the Government's evidence does not specifically relate to the time during which Johnson was Sheriff. (Doc. 96 at 11-13.)

The Government also presented evidence of several individual traffic stops, which are allegedly indicative of the ACSO's pattern of discriminatory law enforcement. Johnson disputes them. The notable development here is that in the complaint, the Government alleged five specific stops it

contended were made without legal basis – either articulable suspicion or probable cause. (Doc. 1 ¶ 37.) However, Johnson has now produced evidence of a legal basis for each of these stops except one - which Johnson claims he cannot investigate because the complainant fails to provide sufficient facts to do so. (Doc. 87 at 13-16.)[8]  In response, the Government identified three more alleged incidents of illegal stops, but Johnson has again provided evidence demonstrating a legal basis for each of them. (Doc. 96 at 19-20.)  Consequently, Johnson contends the ACSO is entitled to summary judgment against the Government because the ACSO had a legal basis for each of the Government's incidents. Even assuming no Fourth Amendment violations, however, the stops all involved Latinos and may be some evidence

---

[8]  For example, in 2011, Juan Carlos Reyes Montoya was stopped by an ACSO deputy in a marked car. (Doc. 1 ¶ 37(b); Doc. 89 at 14; Doc. 89-53 ¶¶ 1-5.)  According to Montoya, the deputy saw him as he passed him on Highway 54, made a U-turn, and followed him for five minutes before initiating the stop. (Doc. 89-53 ¶¶ 2-5.)  Montoya says he was unaware of any observable violation or other reason why the deputy would have pulled him over, and the deputy never told him why. (Id. ¶¶ 6, 8.)  Upon request, Montoya provided his consular ID in lieu of a driver's license; he was arrested and cited for not having an operator's license. (Id. ¶¶ 8-10.)  In response, ACSO officer Troy Anthony admits to the stop but states he never saw the driver of the vehicle and alleges several reasons why he initiated the stop: Montoya was driving slowly in a neighborhood that had experienced several break-ins, and Anthony had run a license plate check and determined that the car was registered to an out-of-state driver with a revoked license. (Doc. 87 at 14; Doc. 86-27.)  Johnson argues that, on these facts, Anthony had reasonable suspicion to initiate the traffic stop. At the hearing, the Government contended that it was unaware of any evidence that the deputy investigated the license issue *before* making the stop. Certainly, a fair reading of the deputy's declaration is that he did so. (Doc. 86-27 ¶¶ 4-5.)  Legality of the stop aside, the Government argues that it is some evidence of selective enforcement against Latinos.

of discriminatory enforcement in violation of the Fourteenth Amendment if other additional evidence – e.g., the statistical studies – is believed.

Other disputed incidents involve stops at checkpoints. The Government proffered evidence that a white Alamance County driver, Paul Crotts, was waved through a checkpoint near a predominately Hispanic mobile home park. (Doc. 89-15 at 4-5.) When Crotts attempted to produce his license, ACSO officer Sara Keller allegedly waved him through and stated, "No, we're here to get us some." (Id.) Crotts understood Keller to be referring to Hispanics. (Id. at 9.) Crotts' wife, Paula Crotts, who was also in the car, confirmed this account. (Doc. 89-54 at 7.) Keller, on the other hand, denies ever waving anyone through a checkpoint (Doc. 86-34 at 4), and Johnson contends that the checkpoint at issue was not intended to target Latinos, but instead was meant to find gang members (Doc. 87 at 17-18).

### b. Disputed statistical studies

The validity and reliability of both parties' statistical studies is also contested. The Government's Dr. Lamberth conducted an observational study of three roads in Alamance County to create a benchmark of traffic violators and compared that benchmark to a database of approximately 10,000 citations from 2008 to 2013. (Doc. 89-42.) He found that the "ACSO is

significantly more likely to stop and cite Hispanic motorists than non-Hispanic motorists on three major roadways in Alamance County." (Id. at 19.) John MacDonald, Ph.D., the Government's other proposed expert, focused on three databases (stops, citations, and arrests) to determine likely outcomes of stops based on ethnicity and to identify individual ACSO officers who stopped, cited, and arrested Latinos at higher rates than their colleagues. (Doc. 89-45.) He found that Latinos were more likely than non-Latinos to be arrested following a stop, more likely to be searched, and less likely to be found carrying contraband during a search, which "suggest[s] that a lower threshold of suspicion is being applied to Latinos." (Id. at 13.) He also found "a large number of outlier officers . . . who are stopping, citing, and arresting Latinos at a higher rate" than other ACSO officers. (Id.)

Johnson challenges the validity of both studies. As discussed earlier, he argues that Dr. Lamberth's method of observational benchmarking is inaccurate because race/ethnicity is difficult to determine visually and that Dr. Lamberth's method is "not accepted as valid in the scientific community." (Doc. 96 at 16.) He also faults the study for its choice of roadways, its Hispanic surname analysis, and its failure to consider written or verbal warnings given in lieu of a citation. (Id. at 14-18.) He challenges Dr. MacDonald's study on the

basis that it does not support the allegation that ACSO deputies are stopping Latinos at a higher rate than non-Latinos. (Id. at 18.) He contends that a better method of analysis would be to compare Alamance County to comparable nearby counties, like Randolph and Orange Counties. (Id. at 18-19.)

Johnson also proffers his own proposed expert, David Banks, Ph.D., who submitted a statistical study. (Doc. 86-16.) Dr. Banks focused on checkpoint siting, checkpoint outcomes, and non-checkpoint traffic stops, using data from 2009 to 2012. (Id.) He found "no statistical evidence that checkpoints were sited in ways that targeted the Latino population" and that non-checkpoint traffic "stop rates [for Latinos] match the population rates" of Latinos, suggesting that the ACSO is not targeting Hispanic motorists. (Id. at 6, 13-14.) He also found that, while there were differences between Hispanic and non-Hispanic drivers' arrest rates, those differences were not statistically significant. (Id. at 10.)

The Government challenges Dr. Banks' study on several grounds. In particular, it faults the study for using unadjusted census data from Alamance and other counties. (Doc. 95 at 17-19.) The Government contends that unadjusted census data do not "account for the driving age population of various ethnic groups, the rate at which drivers from various ethnic groups violate traffic laws, variations in traffic patterns and

driving habits on particular roadways, [or] deployment of officers" and are therefore an unreliable comparator. (Id. at 18.) The Government has submitted an additional report from Dr. Lamberth, identifying problems with, and rebutting, Dr. Banks' report. (Doc. 89-43.)

### c. The Government's "uncontested" evidence

At the June 13, 2014 hearing, the Government claimed to have three categories of uncontested evidence that entitle it to summary judgment on the issue of discriminatory intent: discriminatory directives from ACSO leadership, a failure to take remedial steps after receiving notice of alleged discrimination, and a failure to discipline any ACSO officers for discriminatory conduct.

Much of the evidence the Government points to in its first category is contested, however. For example, counsel for the Government characterized the incident in which Johnson directed three officers to "go get Mexicans" as uncontested. To reach this conclusion, however, the Government makes the ambitious, and in this context extraordinary, argument that this court should disregard Johnson's testimony to the contrary because it is "self-serving." (Doc. 89 at 19-20.) In support of that position, which it claims is "well-established" in the Fourth Circuit (id. at 19), the Government cites Williams v. Giant Food, Inc., 370 F.3d 423 (4th Cir. 2004). But there, the Fourth

24

Circuit held that an employee's testimony that her job performance evaluations were "unfair and untrue and incorrect" was insufficient to create a genuine dispute of material fact on the issue whether it would have been futile for her to apply for a promotion. Id. at 433. The court characterized that testimony as a "self-serving *opinion*" and stated that "absent objective corroboration, [it cannot] defeat summary judgment." Id. (emphasis added). However, the court credited the employee's other testimony regarding *facts*, even if the testimony was in her interest as a party.[9] See, e.g., id. at 432 (crediting the reasonable inference from employee's testimony that job postings did not appear in her store).

Here, Johnson's denials, though in his interest as a party, are factual: he testified that he did not use anti-Hispanic derogatory terms or order deputies to target Hispanics. This

---

[9] The Government also cites three non-binding cases, one of which is a Magistrate Judge's recommendation. (Doc. 89 at 19-20.) To the extent these cases are inconsistent with Williams and Anderson, they are not persuasive authority, especially in the context raised here. See Harris v. Home Sales Co., 499 F. App'x 285, 294 (4th Cir. 2012) (rejecting employee's statement that he did not return to work because his boss allegedly told him to take the week off, when employee conceded he had already completed paperwork for new job); Riley v. Honeywell Tech. Solutions, Inc., 323 F. App'x 276, 277 n.2 (4th Cir. 2009) (rejecting employee's claims that job candidate was "preselected" and of alleged "inconsistencies" in the promotion process as lacking viable evidentiary support and nevertheless insufficient to constitute pretext); Whitlock v. Greenlee, Civ. A. No. 1:10CV958, 2013 WL 6247259, at *2 (M.D.N.C. Dec. 3, 2013) (stating only general rule that self-serving statement will not defeat claim, citing Nat'l Enter., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000), which rejected self-serving statement of a party as to the alleged contents of sales documents when the party failed to produce the actual documents)).

court *must* credit that testimony at the summary judgment stage. See Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Additionally, in this particular incident, Johnson provided further context for the directive "go get Mexicans," which, if believed, casts doubt on the Government's case. (See Doc. 96-1 at 4-5.) These disputes present classic credibility battles, and the Government cannot have it its way simply because it concludes that the deputies are more believable in this context.

The Government's second category of "uncontested" evidence – the ACSO's failure to take remedial steps after receiving notice of alleged discrimination from a community group, the federal investigation itself, and resident complaints (Doc. 89 at 17-18) – depends in large part on its first category and on other contested evidence, such as the statistical studies. If no discrimination was occurring, then the ACSO could hardly be faulted for failing to take remedial steps. This category may take on more significance if discrimination is proven at trial, but it cannot stand alone to support summary judgment.

The Government's third category – the ACSO's alleged failure to discipline officers for discriminatory conduct or statements – is factually underdeveloped. For example, the Government points to ACSO officer Mario Wiley's 2010 email to

colleagues, forwarding a video game, in which the goal is to kill "Mexican Nationalist[s]," "Drug Smuggler[s]," and "Breeder[s]" coming over the U.S.-Mexico border, and the final screen of the game tells the player how many "wetbacks" have been hit. (Doc. 89-16.) However, Wiley was a detention officer who did not conduct stops and arrests but apparently worked only at the jail. There is no evidence that Johnson himself knew of the game until after Wiley's deposition in this litigation, and it is unclear from the record whether any of the ACSO leadership knew of it. Without knowledge of the alleged actions, ACSO leadership could not have disciplined the officers. Moreover, it is unclear from the record whether the email was ever sent to any ACSO deputy responsible for conducting traffic stops or influenced deputies' law enforcement practices. Thus, while this is some evidence of intent, its import is not clear on this record.

### 4. Conclusion

Credibility is questioned, facts are disputed, and dueling statistical studies purporting to show divergent truths are presented. Viewing the evidence in the light most favorable to Johnson, the Government has not produced undisputed facts demonstrating disparate impact and discriminatory intent as a matter of law. And yet, the Government has presented evidence, which, when regarded in the light most favorable to it, prevents

Johnson from obtaining summary judgment in his favor. A trial is necessary to resolve these disputes over material facts.

### E. Fourth Amendment

The sum and substance of the Government's claims under the Fourth Amendment are stated thinly in the complaint's second claim for relief as follows:

> 75. Defendant and his agents, including ACSO deputies, have unreasonably seized numerous persons in Alamance County. These unreasonable seizures include seizures made without probable cause or reasonable suspicion.

> 76. Moreover, Defendant and his agents engage in a pattern of making pretextual traffic stops motivated by the ethnicity of the driver rather than a traffic infraction.

> 77. The unreasonable seizures made by Defendant and his agents constitute a pattern or practice by law enforcement officers that deprives persons of their rights under the Fourth and Fourteenth Amendments, in violation of 42 U.S.C. § 14141(a).

(Doc. 1 ¶¶ 75-77.) The Government now argues that this claim encompasses the ACSO's alleged discrimination on the basis of ethnicity in initiating traffic stops and use of vehicular checkpoints for general law enforcement purposes. (Doc. 89 at 36-40.) Johnson contends that the first does not state a claim under the Fourth Amendment, but rather under the Equal Protection Clause of the Fourteenth Amendment. (Doc. 96 at 36-38.) He contends that the second was not properly pleaded in the Government's complaint and is being unfairly raised at this

28

late stage, without proper notice.  (Id. at 38-40.)  He further
maintains that the "investigational checkpoints" the ACSO
conducts are legal.  (Id. at 38.)  The court will address each
claim in turn.

### 1.  Discriminatory pattern of traffic stops

The Fourth Amendment protects against "unreasonable
searches and seizures" by the Government – from brief,
investigatory stops of persons or vehicles to traditional
arrest.  U.S. Const. amend. IV.; see United States v. Arvizu,
534 U.S. 266, 273 (2002).  "[T]he Constitution prohibits
selective enforcement of the law based on considerations such as
race," including investigatory stops and arrests protected by
the Fourth Amendment.  Whren v. United States, 517 U.S. 806, 813
(1996).  However, "the constitutional basis for objecting to
intentionally discriminatory application of [such] laws is the
Equal Protection Clause, not the Fourth Amendment."  Id.

The Government argues that it has a Fourth Amendment claim
independent of its Equal Protection claim because "judges may
still consider the 'programmatic purpose' of law enforcement
practices" under the Fourth Amendment.  (Doc. 101 at 18.)  The
Government relies in part on Brigham City, Utah v. Stuart, in
which the Supreme Court noted that it had "held in the context
of programmatic searches conducted without individualized
suspicion – such as checkpoints to combat drunk driving or drug

trafficking – that an inquiry into *programmatic* purpose is sometimes appropriate." 547 U.S. 398, 405 (2006) (emphasis in original) (citations and internal quotation marks omitted). The Fourth Circuit read Stuart and other Supreme Court cases to suggest that "when analyzing a search made as the result of a routine police procedure, such as the policy of locating weapons in towed cars . . . , the court should examine the programmatic purpose of the policy." Hunsberger v. Wood, 570 F.3d 546, 554 (4th Cir. 2009). In Hunsberger, the court specifically did not inquire into programmatic purpose because "a standardized procedure" was not at issue. Id.

Individual traffic stops are not suspicionless, standardized procedures. They are justified on the basis of individualized, reasonable suspicion or probable cause, which is assessed using objective facts known to the officer; an inquiry into the subjective motivations of the officer conducting the stop, even if the officer was motivated by ethnicity, is not warranted. Whren, 517 U.S. at 813. Specific individual stops relied on by the Government as examples of a broader pattern of discriminatory law enforcement are analyzed applying Fourth Amendment principles. To be sure, any lack of a legal basis for a stop may be evidence of unlawful ethnic targeting under the Fourteenth Amendment. However, to the extent the Government is challenging a *pattern* of allegedly discriminatory individual

traffic stops on the basis of ethnicity, Johnson is correct that the Equal Protection Clause, not the Fourth Amendment, applies. See, e.g., Floyd v. City of New York, 959 F. Supp. 2d 540, 565-72 (S.D.N.Y. 2013) (race matters to Equal Protection Clause jurisprudence, but not Fourth Amendment jurisprudence).[10]   To this limited extent, therefore, Johnson's motion will be granted.

### 2.   Checkpoints for general law enforcement purposes

The Government asserts that the ACSO uses checkpoints for general law enforcement purposes, which is unconstitutional. (Doc. 89 at 39-40; Doc. 101 at 19-21.)  Johnson denies that the ACSO's use of checkpoints is improper but argues that this claim was not part of the complaint and therefore is not properly before the court.  (Doc. 96 at 38-40.)

---

[10] Although Melendres v. Arpaio at times appears to consider a stop based on race as a violation of the Fourth Amendment, the court clarified that race matters only to the Equal Protection Clause:

> To the extent that there was a legitimate, pretextual traffic basis for the original stop that does not involve race, it does not matter to Fourth Amendment analysis that the officer's underlying decision to make the stop may have subjectively been based on considerations of race. Further, to the extent that other factors in combination, and excluding race as a consideration, were sufficient to justify reasonable suspicion for the stops, there is no Fourth Amendment violation.  As discussed below, however, such motivations do make a difference to the equal protection analysis.

Melendres v. Arpaio, No. PHX-CV-07-02513-GMS, 2013 WL 2297173, at *66 (D. Ariz. May 24, 2013) (citations omitted).

Although the Government refers to deposition testimony and questions as evidence that the claim was part of its case, "it is the complaint – not depositions or interrogatories – that provides 'fair notice' to defendants of the allegations against them." Stevenson v. City of Seat Pleasant, Md., 743 F.3d 411, 420 (4th Cir. 2014) (affirming district court's post-trial ruling that a particular claim was sufficiently pleaded). The complaint need not "use any precise or magical words" or "connect the dots" of its factual allegations in order to assert a particular claim. Id. at 418. It must simply allege sufficient facts to support the claim in order to put the defendant on fair notice. Id. at 417-20.

Here, the broad language of paragraphs 75 through 77 of the complaint must be read in the context of the facts that precede them. The Government's second claim for relief re-alleges and incorporates the complaint's previous factual allegations (Doc. 1 ¶ 73), but at no point does the complaint assert facts regarding checkpoints being used improperly for general law enforcement purposes apart from any alleged Latino targeting. The Government argues that the complaint is "replete with allegations that ACSO employs checkpoints for improper

purposes," pointing to several paragraphs.[11]  (Doc. 101 at 19.)
But the question is not whether the Government alleged the ACSO
used checkpoints improperly.  Clearly it alleged numerous times
that the ACSO used checkpoints improperly on the basis of
ethnicity (both in choosing locations and in choosing which
vehicles to stop).  The question is whether it alleged that the
ACSO used checkpoints improperly *for general law enforcement
purposes* – separate from the ethnicity-based claim.  It did not.

"Specific facts are not necessary" in a complaint, but the
complaint must at least "'give the defendant fair notice of what
the . . . claim is and the grounds upon which it rests.'"
Erickson v. Pardus, 551 U.S. 89, 93 (2007) (quoting Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Even

---

[11]  At the hearing, the Government highlighted paragraph 30 of its
complaint in support of its position.  Paragraph 30 provides a case in
point.  It states, in its entirety:

> Defendant Johnson likewise directs his deputies to target
> predominantly Latino neighborhoods for increased
> enforcement.  Defendant Johnson often voices his assumption
> that Latinos are responsible for Alamance County's drug
> trade despite evidence that ACSO's rate of arrests for drug
> crimes has declined as the County's Latino population has
> increased.  Defendant Johnson orders checkpoints and other
> enforcement activities in predominantly Latino areas under
> the pretext of drug interdiction.  At a December 2008 staff
> meeting Defendant Johnson stated, "We've had a big drop in
> the Hispanic population, but we still got a lot dealing
> dope and we still got a lot of citizens in this country
> dealing dope with them."

(Doc. 1 ¶ 30.)  The entire paragraph, even the sentence mentioning
drug interdiction, is focused on Johnson's alleged anti-Latino
actions.  This paragraph gives Johnson no notice of a claim based on
checkpoints for general law enforcement purposes.

viewed liberally in favor of the Government, the complaint simply fails to allege facts that would put Johnson on notice of such a claim, nor did it state the claim itself with any specificity. At all times in this dispute, the Government's theory has been discriminatory law enforcement against Latinos. (<u>See, e.g.</u>, Doc. 1 ¶ 3 in case 1:11cv507; Doc. 19 at 4 in case 1:11cv507 ("[The Department of Justice's] investigation centers on allegations that ACSO has engaged in a pattern or practice of discriminatory policing and unconstitutional searches and seizures against Latinos."); Doc. 11-3 at 2 (which is also Doc. 52-1 at 3 in case 1:11cv507) (summary of findings in Government's 11-page public letter of grievances to the ACSO begins thus: "Based on our careful review of the evidence, we have concluded that ACSO engages in a pattern or practice of discriminatory policing against Latinos.");[12] Doc. 1 ¶ 1.)

Had the Government not been aware of the alleged behavior that gave rise to the claim at the time of the complaint but instead unearthed it in discovery, it could have sought to amend its complaint. But it has not done so. And while this court should "freely give leave" to amend a complaint (again, relief the Government has not requested), such leave should be denied

---

[12] The Government's grievance letter that spawned this lawsuit is extensive and specific in its charges and relief demanded. Nowhere in the 11-page document does the Assistant Attorney General address the claim the Government now seeks to raise. Rather, all charges relate to the "ACSO's practice of targeting Latino drivers via traffic enforcement and vehicle checkpoints." (Doc. 11-3 at 9.)

if the non-moving party shows undue prejudice. Fed. R. Civ. P. 15(a)(2); <u>see also</u> <u>Laber v. Harvey</u>, 438 F.3d 404, 426-27 (4th Cir. 2006). In that regard, Johnson's counsel stated at the June 13, 2014 hearing that he had no actual notice of the Government's intent to bring this claim until it was revealed in the Government's summary judgment briefing and that, if it is allowed to proceed, he would need to conduct further investigation and discovery in order to defend himself and the ACSO.

The court concludes, therefore, that the complaint raises a proper Fourth Amendment challenge to the extent it contends that the ACSO, *as part of its alleged targeting of Latinos*, has conducted checkpoints with a programmatic purpose that violates the Fourth Amendment. <u>See, e.g.</u>, <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32 (2000) (holding that checkpoints for drug interdiction are prohibited); <u>Texas v. Brown</u>, 460 U.S. 730, 743 (1983) (suggesting in *dicta* that roadblocks with a pretextual lawful purpose that are in fact for an unlawful purpose are prohibited); <u>cf.</u> <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543 (1976) (holding that "reasonably located" checkpoints for illegal immigrants are allowed); <u>Delaware v. Prouse</u>, 440 U.S. 648, 663 (1979) (suggesting in *dicta* that checkpoints for driver's licenses are allowed); <u>Mich. Dep't of State Police v. Sitz</u>, 496 U.S. 444 (1990) (holding that checkpoints for

35

insobriety are allowed); <u>Illinois v. Lidster</u>, 540 U.S. 419 (2004) (holding that checkpoints seeking information about a specific crime committed by another are allowed). And, the Government has presented evidence on that score sufficient to create a dispute of material fact. (<u>See, e.g.</u>, Doc. 89-10 at 11 (checkpoint locations selected to target Hispanics), Doc. 89-35 at 6 (checkpoints set up to find illegal drugs). But after eighteen months of litigation, with discovery long since completed and the scheduled trial term less than two weeks away, allowing the Government to proceed as to claims of generalized unlawful checkpoints untethered to the abiding central claim of this case would unduly prejudice Johnson. Therefore, Johnson's motion will be granted to this extent.[13]

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Johnson's motion for summary judgment (Doc. 86) is GRANTED as to the Government's Fourth Amendment claims in the second claim for relief regarding (1) the pattern of individual traffic stops, to the extent noted herein, and (2) the use of checkpoints for general law

---

[13] The Government notes that some ACSO deputies testified to setting up checkpoints to find illegal drugs as part of general law enforcement. (<u>See, e.g.</u>, Doc. 89-62 at 3, Doc. 89-35 at 6.) If this testimony is to be believed, the Supreme Court has condemned such checkpoints as unconstitutional. <u>See</u> <u>City of Indianapolis</u>, 531 U.S. at 41-42 (stating that checkpoints set up "to uncover evidence of general criminal wrongdoing," including drug interdiction, are prohibited by the Fourth Amendment).

enforcement purposes unrelated to any alleged targeting of Latinos. In all other respects, the parties' motions for summary judgment (Docs. 86, 88) are DENIED. Johnson's motion to strike Dr. Lamberth's report (Doc. 96 at 25-28) is DENIED. The Government's remaining claims pursuant to § 14141 for violations of the Fourth and Fourteenth Amendments will proceed to trial.

/s/  Thomas D. Schroeder
United States District Judge

June 20, 2014