# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### File No. 1:12-CV-1349

UNITED STATES OF AMERICA,
Plaintiff

v.

TERRY S. JOHNSON, in his official
capacity as Alamance County Sheriff,
Defendant

**DEFENDANT'S PRETRIAL BRIEF**
**(Pursuant to L.R. 40.1(c))**

**NOW COMES** Defendant Terry S. Johnson, in his official capacity as Alamance

County Sheriff, pursuant to L.R. 40.1(c), advising the Court of his position, issues and

supporting law to be offered at trial in the above-entitled action.  To that end, Defendant

submits the following:

## I.  ISSUE

Whether Defendant violated the equal protection clause of the Fourteenth Amendment or
the Fourth Amendment as it relates to policing Latinos in his jurisdiction:  Plaintiff
alleges Defendant engaged in a pattern or practice of discriminatory law enforcement
activities directed against Latinos, and; such pattern or practice was motivated by an
intentionally discriminatory purpose.

## II.  ARGUMENT

Plaintiff attempts to support its claim by alleging:  1) Defendant orders law

enforcement activities targeting Latinos; 2) Defendant makes and tolerates statements

evidencing bias; 3) ACSO deputies target Latinos for traffic stops; 4) Deputies arrest

Latinos for committing minor traffic infractions, while issuing citations or warnings to

similarly situated non-Latinos; 5) Deputies stop Latinos at vehicle checkpoints while

allowing similarly situated non-Latinos to pass through; 6) Deputies locate vehicle

checkpoints in predominately Latino neighborhoods; 7) Officers automatically referred

Latino arrestees to US Immigration and Customs Enforcement ("ICE") at the Alamance

County Jail while not referring similarly situated non-Latinos; 8) ACSO's policies,

training, and oversight procedures facilitate discriminatory enforcement activities against

Latinos.

A.  ELEMENTS OF CAUSE OF ACTION.

The United States has brought this action pursuant to 42 U.S.C. § 14141.  As

stated in *U.S. v. Maricopa County*, 915 F.Supp.2d 1073, 1079 (Ariz. 2012), this section

prohibits law enforcement officers from "engaging in a pattern or practice 'that deprives

persons of rights, privileges, or immunities secured or protected by the Constitution'..."

In order to show a "pattern or practice", the United States must show "the denial of rights

consists of something more than an isolated, sporadic incident, but is repeated, routine, or

of a generalized nature..."  *U.S. v. State of North Carolina*, 914 F.Supp. 1257 (E.D.N.C.

1996), *quoting*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S. Ct. 1843

n. 16, 1855, 52 L. Ed. 2d 396 (1977).

"To succeed on an equal protection claim, [Plaintiff] must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001); *see also, Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). Further, in alleging she has been subject to a discriminatory policy, pattern or practice, a plaintiff asserting a Fourteenth Amendment equal protection claim must demonstrate that the challenged law enforcement policy, pattern or practice "had a discriminatory effect" and "was motivated by a discriminatory purpose." *Wayte v. United States,* 470 U.S. 598, 608 (1985). *See also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-74 (1979); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977). "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). "[T]he invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Id*. at 241 (emphasis added); *see also Alexander v. Louisiana*, 405 U.S. 625, 628-29 (1972) (the state may "not deliberately and systemically" use race); *Wright v. Rockefeller*, 376 U.S. 52 (1964) (challengers failed to prove that legislature "was either motivated by racial considerations or in fact drew the [congressional] districts on racial lines"; the plaintiffs had not shown that the statute "was the product of a state

contrivance to segregate on the basis of race or place of origin.")  Thus, "a long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent or motive." *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995).

The burden of proof is on the Plaintiff to show that discrimination based on administrative action was "clear and intentional."  *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995).  Further, "where a classification ... is not officially stated as a reason for administrative action, the plaintiff has the burden of proving that the classification was actually utilized in the administrative action and that its use was intentional and purposeful." *Id.* at 820.

The second cause of action which is present is whether the Defendant, as part of its alleged targeting of Latinos, has conducted checkpoints with a programmatic purpose that violates the Fourth Amendment.  "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' U.S. Const. amend. IV." *Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009). Even with a claim based on a programmatic purpose of a checkpoint, the inquiry "has nothing to do with discerning what is in the mind of the individual officer conducting the search". *Brigham City, Utah v. Stuart*, 547 U.S. 398, 405, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650 (2006).  The inquiry would then be to determine if the checkpoint was set up with the purpose of targeting Hispanics as opposed to being set up to check for motor vehicle violations.

-4-

B.  DEFENDANT ORDERS LAW ENFORCEMENT ACTIVITIES TARGETING LATINOS.

As shown above, intent must be shown, and not just disparate impact.  In order to try to show intent, the Plaintiff alleges several acts by the Sheriff.  These acts are by and large denied, or the acts can be explained on non-biased grounds.  Below are listed the apparent instances which the Plaintiff has argued in its Motion for Summary Judgment to constitute evidence of bias.  Should additional claims be made at trial, the Defendant will address those in due course.

The Sheriff has not directed his officers to "target" Latinos as alleged by the Plaintiff.  One of the principal allegations is that Sheriff Johnson told Lt. Chris Crain and Deputy Adam Nicholson to arrest Mexican gang members was in 2007.  There had been reports of car break-ins and vandalism in a mobile home park by a Mexican gang.  The Sheriff upon hearing that Mexican gang members were committing the crimes, instructed his two officers, "well, then, go get them Mexicans".  Lt. Crain understood the Sheriff to mean, "to go get the people that were responsible for the crimes".  Other Officers will testify that Sheriff Johnson did not direct them to "target" or arrest Latinos.  A second allegation of the Plaintiff is that the Sheriff ordered deputies to arrest Latinos at a checkpoint in the Town of Green Level near the Seamsters Mobile Home Park.  There were two checkpoints in Green Level near Seamsters Mobile Home Park.  The first checkpoint was alleged by the Plaintiff to occur in 2008. This checkpoint in Green Level actually occurred April 15, 2009.  Sheriff Johnson was not present at this

-5-

checkpoint. This first checkpoint was solely to gather information on break-ins which were occurring in the area.

There was a multi-jurisdictional checkpoint in 2008 in Haw River. This checkpoint was not near the Seamsters mobile home park as alleged by the Plaintiff. As indicated in the Plaintiff's response to Interrogatory number 13, one of the officers participating in the 2008 checkpoint was Bobby Culler. Officer Culler was the First Sergeant for the Highway Patrol in Alamance County at that time. He will testify that he has never heard Sheriff Johnson direct that Hispanics should be arrested instead of being given citations.

The second checkpoint in Green Level was held on June 15, 2011, and was for the primary purpose of checking for valid drivers' licenses. Twelve arrests were made at the checkpoint, and fifteen citations were issued. Several of the citations were issued to individuals with names who likely are Latinos.

The Plaintiff also alleges that during 2007 or 2008 the Sheriff made the same statements at staff meetings. Sheriff Johnson has denied these allegations, and his position is that officers should arrest any individual who does not have a valid driver's license if the person does not have other proper identification, and the officer doesn't know them, or can't verify who they are. This position of the Sheriff will be confirmed by deputies in the department. The Sheriff has stated on numerous occasions that "Whether they're white, black, green, Hispanic, if they

-6-

do not have a driver's license and you cannot positively say who they are, they you can bring them to jail.  If they do and you know who they are, you can say - then you can cite them."

Two of the deputies who have made allegations concerning statements made by the Sheriff are Kenneth Evans and Roger Lloyd.

Kenneth Evans was a former chief deputy until Sheriff Johnson took office.  When Sheriff Johnson was elected, he terminated Kenneth Evans' wife, reduced Evans pay by 4½ percent, and demoted him to lieutenant.  At the time of his deposition, Evans was considering running for Sheriff against Sheriff Johnson.  Evans further testified that he did not "support the management" of the Sheriff's Office.

The former deputy making these allegations, Roger Lloyd, was terminated by the Sheriff's Office on October 27, 2009.  The termination was based on findings that Lloyd misled a member of the District Attorney's staff which resulted in charges against a woman being dismissed.  The termination was further based on an alleged sexual assault committed by Lloyd.

The Plaintiff, based on a declaration by Adam Nicholson, alleges that the Sheriff stated that "I want every chili-shitter in that park arrested".  The declaration itself indicates that this took place in 2007 when "the owner of the Rocky Top mobile home park came to the Sheriff's Office to complain about the "Mexicans" living in the park.  The remark was allegedly directed to deputies Chris Crain and Adam Nicholson.  The Sheriff has testified that he has never used the term "chili-shitter", and further that he never instructed deputies Nicholson and Crain to

"Arrest every chili-shitter there". Deputy Crain likewise has testified that he has never heard the term "chilli-shitter" used at the Sheriff's Office. Adam Nicholson also disavowed portions of the Declaration in his deposition; including portions of the paragraph regarding the use of the term "chilli-shitter". While his Declaration states that the owner of the mobile home park came in to complain about the "Mexicans" living in the mobile home park, Nicholson testified that he did not know what the owner of the park was complaining about, but there had been car break-ins and vandalism in the park. Further, in paragraph 8 of the Declaration, it states that "numerous checkpoints" were set up around Seamsters mobile home park and Rocky Top mobile home park. Nicholson testified that over a four-year period, two checkpoints were set up at Seamsters, and two checkpoints were set up at Rocky Top.

Adam Nicholson is a former deputy with the Alamance County Sheriff's Office. Nicholson had a sexual harassment complaint filed against him. He was demoted as a result of the complaint. Nicholson had been moved from the Gang Unit to patrol, which he resented. Because of his perceived treatment at the Sheriff's Office he supported, made contributions to, and worked for the Sheriff's opponent at the last election. He then resigned on December 22, 2009.

On July 23, 2008, a woman came to the Sheriff's Office and asked for assistance as her identity had been stolen. She and her husband had determined that a person was working in a mill in Weaverville, North Carolina and using the woman's social security number. Sheriff

Johnson had the woman give him her social security number. He then gave the number to Deputy Randleman to investigate. Deputy Randleman determined the identity of the person. Deputy Randleman subsequently filed charges against him for the identity theft.

Deputy Randleman testified that in 2008 he was called to the Sheriff's office. County Commissioner Vaughn was present, and complained that she had been in an automobile accident in the City of Burlington. No ticket had been written. The Sheriff directed Deputy Randleman to "follow up on it". The Sheriff did not give Randleman any specific instructions. Deputy Randleman decided to run the individual's name through the Social Security database on his own.

Deputy Britt was requested by the County Manager to determine if the Social Security numbers of 17 county employees were valid. Deputy Britt was not the Chief Deputy at that time. He passed the request on to Deputy Randleman who, with the help of I.C.E., e-mailed a request to the Social Security administration to verify the Social Security numbers. One of the employees was arrested for identity theft. This is not a targeting of Latinos by the Sheriff's Office. It was instead assisting the County with complying with its duties to ensure proper social security numbers. The Sheriff did not choose the individual numbers to check; however, once a criminal violation was apparent, it was the duty of the Sheriff's Office to investigate the violation.

Before June 2008, the Sheriff was asked by one of the commissioners at a County Commissioner's Meeting "Do we have any illegal immigrants working in the county?" After the meeting, the Sheriff was approached by a department head that informed him that he needed to look at the library. The department head further indicated that the employee was Hispanic and was not a legal resident of the United States. Based on a review of the names of the library employees, Angel Martinez's Social Security number was checked. She was charged with using another person's Social Security number.

C.  DEFENDANT MAKES AND TOLERATES STATEMENTS EVIDENCING BIAS.

The Sheriff denies making or tolerating statements which evidence bias against Latinos. It should however be noted that a single racially derogatory comment cannot establish racial animus. *Eberhart v. Gettys,* 215 F.Supp.2d 666, 678 (M.D.N.C. 2002). This Court in *Eberhart* further quoted with approval the decision in *Helton v. Dornan,* 1999 WL 58641, *8 (N.D.Ill. 1999) which held that a plaintiff could not establish an equal protection violation based solely on allegations that officers used racial epithets when he was arrested. *Id.* In accordance with the holding in *Sylvia Dev. Corp., supra,* it is incumbent on the Plaintiff to prove that the use of inappropriate statements actually resulted in unconstitutional actions taken in stopping Hispanics or in setting up checkpoints. *Id.* at 820.

Some of the individual instances cited by the Plaintiff are explained hereafter.  Sheriff Johnson did tell a reporter that in reference to drug traffickers and the criminal element, not the Latino population in general, that drug traffickers do not believe that there is anything wrong with having sex with a 12 or 13-year old girl.  The article was published on April 22, 2007.

In August 2008, in response to a question from a County Commissioner, Sheriff Johnson explained that all Hispanic people stopped are treated the same regardless if they are American citizens, or not.  The Sheriff did not imply that Hispanics could not be Americans.

In December 2008, there was a joint meeting of the Vice and Special Ops Units of the Sheriff's Office.   The DEA had arrested approximately 23 Hispanics for drug trafficking, including nine members of the Sinoloa drug cartel.  The Sheriff, in referring to the arrested drug traffickers, stated that there had been a big drop in the Hispanic population in the mobile home park, but there was still a stash house in the mobile home park.  Both parties to this action have listed the actual transcript of the meeting in their Exhibit Lists.  Drug traffickers in Alamance County are more than 90% Mexican according to the DEA.  I.C.E. puts the number of drug and money couriers at 100% illegal Mexicans.

The Plaintiff also attempts to prove bias against Latinos by using e-mails and by officers stating that they have heard certain ethnic terms used at the Sheriff's Office or in the Jail.  The e-mails do not show a pervasive anti-Latino bias by the deputies at the Sheriff's Office.  The subject e-mails listed in the Plaintiff's Exhibit List consist of primarily four types: e-mails

-11-

expressing a political viewpoint, e-mails sent for informational purposes, e-mails from outside sources, and inappropriate e-mails referencing Latinos. Of the inappropriate e-mails, the majority were sent by detention officers or the part-time public information officer. While apparently, the Plaintiff views e-mails stating political positions opposing those of the current Administration as evidence of bias, the Defendant's position is that this type of e-mail shows nothing more than a person's political beliefs, and says nothing about bias. The primary example of such an e-mail is US exhibit number 20. (Doc. 113). This e-mail has an attachment which opposes the National Anthem being sung in Spanish. This political position being a subset of English being the official language of the United States. The Republican Party has made this political position part of its National Platform in previous years. The Plaintiff would ask the Court to label all Republicans who agree with the National Platform as biased against Latinos.

However, while being a part of the Republican Platform, it is not the policy of the Sheriff's Office. In fact, employees of the Sheriff are required to take a mandatory Spanish class. One of the exercises in some of the classes is to learn the National Anthem in Spanish.

E-mails sent for informational purposes do not show bias on the part of the Sheriff or his staff. An example of one such e-mail is listed as Exhibit 49 on the Plaintiff's Exhibit List. This is an e-mail sent to the Sheriff and Chief Deputy by Richard Longamore as information about the biased attitude of a former translator for the Alamance County Court system.

-12-

Likewise, e-mails sent by individuals from outside the Sheriff's Office do not show bias on the part of the Sheriff. The Sheriff is an elected official and makes his e-mail available to the public. The Sheriff has no control over the beliefs of others in the community, nor over what e-mails they might send to him.

Of the inappropriate e-mails the majority are sent by detention officers in the Jail and by the Public Information Officer. It is not clear at this time why the Public Information Officer sent the e-mails, but for argument assuming it was not for a proper purpose, the Public Information Officer is not in a supervisory role in the Officer. He is in fact a part-time officer who works two or three days a week. He has no responsibility for traffic stops or checkpoints. Any potential bias on his part does not indicate anything about traffic stops or checkpoints.

Likewise with detention officers, the Sheriff does not read their e-mails, and any bias on their part has nothing to do with traffic stops or checkpoints. One particular e-mail containing an inappropriate video game was sent to detention officers by Mario Wiley. Mario Wiley is an African-American who was a lieutenant in the Alamance County Jail when he sent the e-mail complained of by the Plaintiff, and was a Captain at the time of his deposition. He was not a sworn deputy, and did not exercise any authority outside of the Detention Center. The Sheriff was unaware that the e-mail had been sent, or that video games were being played by staff. The Sheriff learned of the game during discovery. Mario Wiley has been demoted to the rank of detention officer. The Sheriff has now terminated all access to video games in the jail so that no

-13-

video games can be played, and he has implemented a system to block inappropriate e-mails from being sent within his Office, including the Jail.

The Plaintiff has argued that derogatory terms for Latinos are used in the Alamance County Sheriff's Office. Two of the terms, "Mexican" and "illegal", are not normally considered to be terms showing bias. The common terms of Hispanic and Latino are terms which are American in origin. Outside of the United States, a person from Mexico is referred to as a Mexican. Likewise, calling someone who is in the United States illegally an "illegal" is not improper. It was a term which is used by ICE to describe someone who is in the United States illegally. Further, the Plaintiff has failed to indicate which officers are using inappropriate ethnic terms, and when the inappropriate terms were used.

D. ACSO DEPUTIES TARGET LATINOS FOR TRAFFIC STOPS.

It is not clear how the Plaintiff intends to prove this allegation. The Plaintiff has retained two "expert witnesses". The first, Dr. Lamberth, examined one road, and parts of two others in Alamance County to determine the number of citations given. The second "expert", Dr. MacDonald, compared the outcomes of searches on individuals who had already been stopped. He also did an analysis of officers to determine "outliners". The outliners were officers who stopped more Hispanics than their fellow officers. Neither of the "experts" actually did a study showing the percentage of Latinos stopped in comparison to the number of non-Latinos

-14-

stopped. In fact, when stops at checkpoints are removed, as shown by the report of Dr. Banks, Latinos are actually less likely to be stopped than non-Latinos.

Even though the two reports of the Plaintiff's "experts" do not prove the Plaintiff's case, there are additional significant issues with their reports. Dr. John Lamberth is a psychologist who is the head of his own consulting firm. The individual roads used in the study were not selected at random, and therefore are not representative of the remainder of the County. The three roads selected were all of U.S. 70, and portions of Hwy. 49 and Hwy. 87. The study attempted to determine the number of Hispanics driving on these three roadways who were violating a traffic law. This was done by establishing observation sites on the three roadways. In a case earlier this year involving alleged disparate impact, the Sixth Circuit rejected race based identification using drivers' license photographs. This decision rested on the identification according to race being "unreliable", and on the failure of the expert to use a sample that was representative of the "entire pool". *See, E.E.O.C. v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 750 (6th Cir. 2014). In the current case, as well as in *Kaplan,* the purported expert was a psychologist. The purported benchmark established by Dr. Lamberth is likewise unreliable and is not representative of the "entire pool" of roads patrolled by the Sheriff's Office.

The study by Dr. Lamberth attempted to determine the number of Hispanics driving on these three roadways who were violating a traffic law. As shown by Lamberth's Expert Report,

-15-

this was done by establishing observation sites on the three roadways. 13 of the 22 observation sites were located within the city limits of towns in Alamance County. Further, 16 of the 22 observation sites were located at intersections with traffic lights, a flashing light or with a four-way stop. Many of the observation sites were also clustered in the city limits of these towns. The Sheriff's Office is not the primary law enforcement agency in these towns. Dr. Lamberth did not take into account how the Sheriff's Office deploys its deputies, and Dr. Lamberth did not know where the city limits of the towns were located. The study was not therefore representative of the roads patrolled by the Sheriff's Office.

The study utilized an observer and a recorder to visually identify the driver of the vehicle as Hispanic or non-Hispanic. The observer and recorder were not given any training by Dr. Lamberth on how to recognize an Hispanic from a non-Hispanic. In fact, Dr. Lamberth was unable to describe how an individual can identify an Hispanic person. He testified in his deposition that skin color or clothing were not dispositive.

The observer and recorder were given an inter-rater reliability test by Dr. Lamberth. The two individuals each observed the same ten cars, and each agreed where or not the drivers looked Hispanic. Dr. Lamberth did not know the ethnicity of the drivers, and therefore, it was not known if the observer and recorder were actually correct in their identifications. Dr. Lamberth explained in his deposition that he could not tell if blacks were Hispanic or non-Hispanic, and they were part of the "error rate". The expert witness for the Defendant, Dr.

David Banks, indicated in his Expert Rebuttal Report that the method of visual identification used by Dr. Lamberth was not accepted as valid in the scientific community. This was also the conclusion of the Alpert Group. In their study, the Alpert Group acknowledges that it is "uncomplicated" to distinguish between a Black and a White person, but that "it is highly unlikely that an observer can distinguish an 'Hispanic' from a member of another ethnic group. To make this type of identification on a person driving by an observer at varying speeds is "virtually impossible". The Alpert Group also cites to a Bureau of Justice Statistics study in which in which the Bureau of Justice Statistics used Border Patrol checkpoints and in airports. The observers agreed 50% of the time on whether or not someone was Hispanic. Therefore, the error rate for identifying Hispanics was 50% in the study.

The observer also attempted to identify whether or not the driver was violating some law which could result in the driver being stopped. The most common violation was speeding. However, since the vast majority of the observation sites were at intersection with traffic control devices, only 39.6% of the drivers were violating the traffic laws using his observations. Of that 39.6% of drivers, 4.2% on Hwy. 70 and N.C. 87 and 4.7% on N.C. 49 of the violators were Hispanic drivers who were speeding or violating some other law. Dr. Lamberth then used the percentage of Hispanic drivers violating a traffic law to get the benchmark of Hispanic violators.

The number of Hispanic drivers on the three roadways as determined by Dr. Lamberth was compared with the number of citations written with an address on the three roadways

within a one and a half mile distance of each of the observation sites. The citations included citations for traffic and non-traffic offenses such as trespass and assault. Dr. Lamberth did not consider if the driver had been arrested or had received a verbal or written warning. Dr. Lamberth used an Hispanic names index to determine if the citations were written to Hispanic individuals even though the actual ethnicity was available to Dr. Lamberth by comparing traffic stop forms to citations. The exact error rate for this method is unknown. Black individuals with Hispanic names were counted as Hispanic for purposes of determining the number of citations written to Hispanics even though they were not counted for purposes of determining the number of Hispanic drivers.

In short, the Lamberth study did not attempt to determine if Hispanics were being stopped more often on roads patrolled by the Sheriff. It is not representative of the pool of roads, and the study uses a benchmark that is highly suspect, and not accepted in the scientific community.

The second study presented by the Plaintiff is that of Dr. MacDonald. Dr. MacDonald performed an analysis for the Plaintiff. Dr. MacDonald fails to consider that Hispanics and non-Hispanics do not offend at the same rate or for the same offenses. MacDonald's analysis also looks only at post-stop outcomes, and does not consider if Latinos are being stopped as a result of profiling as has been alleged in the Complaint. In doing so, MacDonald does not consider other factors such as Latinos being searched more often as an incident to arrest as they are

unable to obtain drivers' licenses. Once search incident to arrest is removed, Hispanics are searched less often than non-Hispanics for the same stop reason. For example, non-Hispanics are 76.75% more likely to be searched at checkpoints than Hispanics. Non-Hispanics are 30.62% more likely to be searched for investigatory stops than Hispanics. This part of the Expert Report by Dr. MacDonald tells you nothing about whether or not Hispanics are being targeted by the Alamance County Sheriff's Office.

Dr. MacDonald also attempted to do a study looking at "outliers" in the Sheriff's Office. This involved comparing officers to determine if they stopped Hispanics more often than their fellow officers. However, Dr. MacDonald did not know the job duties or focus of those duties of the various officers. This resulted in officers from specialized units, such as special ops., being compared with patrol officers. In considering a statistical study in a case where a stop was being challenged as selective enforcement, the Court in *United States v. Hare,* 308 F.Supp.2d 955, 966 (D.Neb. 2004) stated:

> Therefore, without a comparison of troopers whose work, focus, area, and time of patrol were similar to Pelster's, the defendants much more general statistics for troop (geographic) areas, rather than similarly situated troopers, prove almost nothing.

The same can be said of Dr. MacDonald's Expert Report. Without comparing deputies with similar jobs and duties, the Expert Report of Dr. MacDonald and any testimony he would give says almost nothing.

The Defendant had an expert witness, Dr. Banks, who also performed a study to determine if the Alamance County Sheriff's Office was targeting Latinos for traffic stops. His analysis covered the entire county, not just parts of three roads which were deliberately selected for comparison. He found that Latinos in Alamance County make up 11.6% of the population according to the 2010 census, and that 11.5% of non-checkpoint traffic stops were of Latinos. (Banks' Expert Report, p. 12). Dr. Banks discusses the appropriateness of using unadjusted census numbers as a benchmark in his report. (Banks' Expert Report, pp. 11-12). Even though Latinos are stopped at numbers less than their population would indicate, Dr. Banks went further and compared Alamance County to other counties in the Piedmont. As shown by Table 2 and Figure 2 in the Report, Latinos are less likely to be stopped in Alamance County than all of its adjoining counties. Latinos are much more likely to be stopped in Orange County, which had the highest disparity rate of all counties tested. (Banks' Expert Report, pp. 13-14). Dr. Banks concludes that "I am confident that there is no evidence that Hispanic drivers are more likely to be stopped than non-Hispanic drivers".

Following this Court's ruling on Summary Judgment, it is not clear whether or not the Plaintiff will try to introduce any particular traffic stops to attempt to show that Latinos are stopped more frequently than non-Latinos. The Defendant is unaware of any such evidence, except for the testimony of Jose Luis Arzola. Mr. Arzola indicates that he was stopped by a deputy in a marked car. He also alleges that the officer asked him if he had papers. When he

-20-

stated he was in the United States legally, the officer said, "Okay. Just go home." Mr. Arzola did not make a complaint at the time. Mr. Arzola did not ask the deputy his name or his badge number as alleged in the Complaint. Mr. Arzola cannot give a date for the stop. As no complaint was made at the time, and as there was no citation given, the Defendant has been unable to determine who the deputy might have been, or the reason for the stop.

Should the Plaintiff introduce any other stops of Latinos, the Defendant will show non-discriminatory reasons for the stops.

Further, Defendant will offer testimony from outside agencies that the Defendant does not use discriminatory policing. This will include DEA, ICE, the former first sergeant of the Highway Patrol, and the District Attorney.

E.  DEPUTIES STOP LATINOS AT VEHICLE CHECKPOINTS WHILE ALLOWING SIMILARLY SITUATED NON-LATINOS TO PASS THROUGH.

There are only two factual examples presented by the Plaintiff for its allegations in this section of which Defendant is aware. In the first, the Plaintiff alleges that a white man was allowed to go through a checkpoint, and the officer stated "no, I'm here to get us some". The Plaintiff identified the man as Paul Crotts in its response to Defendant's Interrogatories. Mr. Crotts identified the officer as Sara Keller. The checkpoint was located in front of the road leading to Rocky Top Mobile Home Park. After Mr. Crotts stopped the car, he handed his license to the officer, but she did not take it. Mr. Crotts wife, Paula Crotts, was with him in the

-21-

car and works for Alamance County in its central communications center. She knew Officer Keller from when Officer Keller was high school with her son. She stated that Officer Keller told them, "No. Go on through. We're not looking for you." Officer Keller testified that the only time she worked a checkpoint at Rocky Top was when she assisted the gang unit. The checkpoint was an investigational checkpoint set up to identify gang members. This is entirely consistent with not asking for a driver's license. While Officer Keller denies ever "waving though" Paul Crotts, the checkpoint had nothing to do with Latinos versus non-Latinos.

In the second, the Plaintiff cites in its brief to the deposition of Maria Noemy Gonzalez. She alleges that she was stopped at a license checkpoint, and a white driver was waved through. However, this testimony is meaningless without knowing the plan for the checkpoint. Some checkpoints check every other vehicle. The second vehicle is then waved through without being stopped. Therefore, the testimony of Ms. Gonzalez does not indicate racial profiling; it simply describes the normal operation of a vehicle checkpoint.

There is simply no evidence to support this claim.

F. DEPUTIES LOCATE VEHICLE CHECKPOINTS IN PREDOMINATELY LATINO NEIGHBORHOODS.

The Plaintiff alleges that an analysis of checkpoint locations has been conducted. As stated in response to interrogatory number 24, this analysis was conducted by Plaintiff's attorneys. Dr. Banks did an actual analysis of checkpoint locations. This analysis is found on

-22-

pages 2 -5 of his report. In short, Dr. Banks concludes that "there is no statistical evidence that checkpoints were sited in ways that targeted the Latino population". The Sheriff is unaware of any statistical evidence presented by the Plaintiff to the contrary. There is no basis for this allegation.

    G.   OFFICERS AUTOMATICALLY REFERRED LATINO ARRESTEES TO US IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE") AT THE ALAMANCE COUNTY JAIL WHILE NOT REFERRING SIMILARLY SITUATED NON-LATINOS.

    It is undisputed that for the entire period to which Plaintiff points, Defendant was bound by a 287(g) contract with the Immigration and Customs Enforcement Agency ["ICE"]. In an official White House communication, Tony Snow, Assistant to the President and Press Secretary briefed the press on President George W. Bush's then soon-to-be given speech regarding immigration, stating the "…real[] breakthrough, as far as timing, was last week's agreement between the leadership—the Democrat and Republican leadership in the Senate to have the debate go forward." Press Briefing on the President's Speech on Immigration, 2006 WL 1316617 (White House, May 15, 2006), 1. The briefing went on to outline that the issue of immigration reform is about: 1) border security; 2) interior enforcement; 3) a temporary worker program; 4) dealing with the current illegal immigration population in our country—the 11 or 12 million that are here [at that time]; and 5) "assimilation and the responsibilities of every citizen of our country and those who want to be citizens of our country, and that is basically the

-23-

fact that you do have to meet the requirements of a citizen. That means learning English, assimilating, be law abiding, and other aspects of what has made America unique and the fact that people from all walks of life can come together under one fabric of the United States of America and do so in a way that we've out-performed any other country in the world when it comes to assimilation." *Id.* at 2.

Lastly, Mr. Snow addressed the issue of local enforcement stating:

"There will also be -- the [ICE] Agency will establish task forces to participate in the border enforcement and security task forces, document and benefit fraud task forces, and human trafficking task forces. Immigration and Customs Enforcement is projecting to train approximately 1,500 **additional state and local law enforcement officers, using this 287G delegation of authority program**."

*Id.* at 4 *(Emphasis added)*.  Thus, the issue of when a foreign-born defendant could be released from the jail was a matter to be decided under this authority and pursuant to the 287(g) directives that Defendant and his officers contractually worked.

This Court has previously considered the constitutionality of the process by which inmates are administratively processed in the Alamance County Jail.  *United States v. Rosas-Herrera*, 816 F. Supp. 2d 273, 281 n.9 (M.D.N.C. 2011), *aff'd,* 499 F. App'x 249 (4th Cir. 2012), *cert. denied,* ___ U.S. ___, 133 S.Ct. 1303, 185 L.Ed.2d 228 (2013).  In that case, the United States argued that the processing of inmates by the 287(g) deputy was constitutional. The Court agreed with the United States that the processing was constitutional, and this decision was upheld by the Fourth Circuit.

-24-

Moreover, the Sheriff's deputies "w[ere] designated at the Alamance County jail as the "287G" deputy charged with collecting information in Government Exhibit 2 from all defendants who identified themselves as foreign born[,]" as directed. *Id.* Jill Arndt, the former supervisory detention and deportation officer for ICE in Alamance County will testify that although fifteen (15) of Defendant's officers/deputies were authorized with cross-designated immigration authority to assist with the program, the ACSO 287(g) jail operation was supervised by an ICE DRO supervisory detention and deportation officer ["SSDO"] located at the Jail. She reviewed, approved, and monitored the 287(g) deputies in the Jail. Further, all actions taken by the Sheriff's officers in the 287(g) program were in accordance with ICE policy. If there were any improprieties in the 287(g) program, they were at the direction and control of the United States.

H. ACSO'S POLICIES, TRAINING, AND OVERSIGHT PROCEDURES FACILITATE DISCRIMINATORY ENFORCEMENT ACTIVITIES AGAINST LATINOS.

The Plaintiff has retained an expert, Margo Frasier, in support of its allegations concerning training and oversight. Ms. Frasier was a two-term sheriff in Travis County, Texas. The population of Travis County, including Austin, is approximately one million people. While Ms. Frasier in her Expert Witness Report states that the Sheriff's Office does not employ the types of systems she believes is appropriate, the North Carolina sheriffs in the counties surrounding Alamance County employ similar systems as Alamance. However, Ms. Frasier did

not find any problems with the Alamance Sheriff's Harassment policy which prohibits harassment based on national origin is prohibited. Likewise, Ms. Frasier did not have any concerns with the Sheriff's Internal Affairs/Citizens Complaints Policy. Even though Ms. Frasier found that the North Carolina standard practices of sheriffs do not live up to her expectations, she stated in her deposition that she did not know of any discriminatory policing actually occurring in Alamance County.

Sheriff Johnson relies on the training of his officers to provide guidance on probable cause and reasonable suspicion on making vehicle stops. The Sheriff's Office has provided more than 50,000 hours of training over and above the state-mandated training since 2008. Together with this training, the lieutenant, who servers as the supervisor of each shift, reviews the reports of the deputies regarding probable cause and general supervision. In reviewing the operation of the Sheriff's Office and coming to her conclusions, Ms. Frasier was not furnished with the training records of the Sheriff's Office, and saw them for the first time at her deposition.

The Sheriff's Office does conduct employee evaluations. For two to three years, employee evaluations were not done in the Sheriff's Office due to budget cuts. However, one of the officers developed an employee evaluation tool. Evaluations are currently being performed of the deputies on an ongoing basis.

The Sheriff's Office does receive and track complaints from the public. The Office has a formal policy on how complaints are handled. The public may make a complaint by phone, by coming into the Sheriff's Office, by e-mail, or by internet. Pursuant to the Sheriff's policy, all serious complaints are referred to Internal Affairs for investigation. Routine citizen complaints are handled by the supervisor. Since 2008, Internal Affairs has investigated 71 incidents. Included in this number are 10 complaints relating to traffic stops. Files are maintained on all Internal Affairs investigations. A summary of the findings are placed in the deputy's personnel file. Captain Longamore is the officer in charge of the complaint process. He speaks Spanish, and would be the person most likely to interact with a complainant.

I. STATUTE OF LIMITATIONS.

In its decision on summary judgment, this Court did not determine if the Statute of Limitations bars this action, or any part of it as the United States had alleged a continuing violation of Federal law. The Defendant submits that following the evidence in this trial, that it will be apparent that there is no continuing violation of Federal law. Further, even if there had been, which is denied, a violation of the Fourteenth or Fourth Amendments more than four years prior to the filing of the action, the Plaintiff cannot prove a continuing violation.

Plaintiff filed its Complaint on December 20, 2012 in which all of its asserted claims are raised pursuant to 42 U.S.C. § 14141, an Act of Congress first-enacted in 1994. Further, the Complaint plainly reveals that almost all of its recitations of Defendant's alleged racial and

ethnic slurs occurred prior to 2008 and some occurring many years before 2008. Thus, because: a) § 1658 was enacted four (4) years before § 14141, and; b) § 1658 does not specifically exempt the United States from its reach, the 4-year SOL must be applied to Plaintiff's causes of action against Defendant.

Furthermore, in addressing what constitutes an unlawful practice and when that practice has occurred, the Supreme Court held:

> "A discrete retaliatory or discriminatory act 'occurred' on the day that is 'happened.' …[Further, t]here is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing.
>
> We have repeatedly interpreted the term 'practice' to apply to a discrete act or single 'occurrence', even when it has a connection to other acts.
>
> …[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period. In *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885 (1977), United forced Evans to resign after she married because of its policy against married female flight attendants. Although Evans failed to file a timely charge following her initial separation, she nonetheless claimed that United was guilty of a present, continuing violation of Title VII because its seniority system failed to give her credit for her prior service once she was rehired. The Court disagreed, concluding that 'United was entitled to treat [Evans's resignation] as lawful after [she] failed to file a charge of discrimination with the' charge filing period then allowed by the statute. *Id.* at 558. At the same time, however, the Court noted that '[i]t may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.' *Ibid.* **The emphasis, however, 'should not be placed on mere continuity' but on 'whether any present *violation* exist[ed].**

*Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 110-112, 122 S.Ct. 2061, 2070-72 (2002)(*Some emphasis in original, some added*).

Therefore, Plaintiff must prove a continuing violation. That is to say that Plaintiff must prove that there is a continuing violation of the Fourth and Fourteenth Amendments based on existing ethnic animus and discriminatory policing. Evidence of actions taken beyond the statute of limitations period will not suffice.

Respectfully submitted, this the 27th day of June, 2014.

TURRENTINE LAW FIRM, PLLC

/s/ Karlene S. Turrentine
Karlene S. Turrentine, NC Bar No. 25628
920-B Paverstone Drive
Raleigh, NC 27615
P: (888) 308-3708; F: (888) 308-3614
kturrentine@turrentinelaw.com

/s/ S.C. Kitchen
S. C. Kitchen, NC Bar No.: 9309
920-B Paverstone Drive
Raleigh, NC 27615
P: (888) 308-3708; F: (888) 308-3614
ckitchen@turrentinelaw.com

Attorneys for Defendant Sheriff Johnson

CERTIFICATE OF SERVICE

I, S. C. Kitchen, hereby certify that on June 27, 2014, I filed this document with the U.S.

District Court's electronic Filing (ECF) system, which will serve a copy by email to counsel,

and further that for counsel who are not listed in the ECF system, I served a copy of the

foregoing document on the counsel in this action by placing the same in the United States Mail,

postage affixed:

> Michael J. Songer
> U. S. Department of Justice
> 950 Pennsylvania Ave., N.W.
> Washington, DC 20530
> Email:  michael.songer@usdoj.gov
>
> C. Amanda Martin
> 1101 Haynes Street, Suite 100
> Raleigh, North Carolina 27604-1455
> Email:  amartin@smvt.com

This the 27th day of June, 2014.

Turrentine Law Firm, PLLC


by: /s/ S. C. Kitchen
S. C. Kitchen
NC Bar No. 9309
920-B Paverstone Dr.
Raleigh, NC 27615
Telephone:     (888) 308-3708
Fax:             (888) 308-3614
Email: ckitchen@turrentinelaw.com

-30-