IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12-cv-1349 |
| | ) | |
| TERRY S. JOHNSON, in his official capacity as Alamance County Sheriff, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

THOMAS D. SCHROEDER, District Judge.

The United States ("the Government") brought this action against Defendant Terry S. Johnson, in his official capacity as Sheriff of Alamance County, North Carolina, alleging that the Alamance County Sheriff's Office ("ACSO") had engaged in a pattern or practice of discriminating against Hispanics, in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Following trial, the court denied the Government's claims and entered judgment for Sheriff Johnson. United States v. Johnson, No. 12cv1349, 2015 WL 4715312, at *1 (M.D.N.C. Aug. 7, 2015). Before the court now is Sheriff Johnson's motion for statutory attorneys' fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, and costs as a prevailing party (Doc. 161), as well as the Government's motion to stay consideration of an award of fees and costs pending appeal of this court's decision

on the merits (Doc. 164). The motions have been fully briefed and are ready for resolution. For the reasons explained below, the court finds it in the interest of judicial economy to resolve these issues now, will award costs, but will deny Sheriff Johnson's motion for attorneys' fees.

I. BACKGROUND

The Government filed this action on December 20, 2012. This court denied Sheriff Johnson's motion for judgment on the pleadings (Doc. 19), and, following discovery, granted in part and denied in part cross-motions for summary judgment.[1] United States v. Johnson, 28 F. Supp. 3d 499, 502 (M.D.N.C. June 20, 2014). After a nearly two-week trial in which the Government presented twenty-nine fact witnesses and three expert witnesses and Sheriff Johnson presented sixteen fact witnesses and one expert witness, this court entered judgment in favor of Sheriff Johnson. United States v. Johnson, 2015 WL 4715312, at *1.

Within thirty days of the entry of judgment, Sheriff Johnson moved for costs and attorneys' fees under the EAJA. (Doc. 161.) The Government subsequently moved to stay Sheriff Johnson's motion for fees and costs. (Doc. 164.) At the time the motion to stay

---

[1] Summary judgment was granted as to the Government's Fourth Amendment claim to the extent the Government sought to show that ACSO used vehicular checkpoints for general law enforcement purposes for all county residents, not just Hispanics, because the Government's complaint and litigation strategy had not provided Sheriff Johnson with sufficient notice of that claim. United States v. Johnson, 28 F. Supp. 3d 499, 515-17 (M.D.N.C. June 20, 2014).

2

was filed, the Government had not decided whether to appeal this court's decision on the merits. Accordingly, at the Government's request, the court stayed further action on Sheriff Johnson's motion for fees and costs until the deadline for the Government to file its notice of appeal passed. (Doc. 169.) The court also reset the deadlines for the Government to respond to Sheriff Johnson's motion for fees and costs. (Id.) On October 2, 2015, the Government filed its notice of appeal (Doc. 170), and the parties have now fully briefed all of the issues.

**II. ANALYSIS**

Even though the Government has filed its notice of appeal, neither party claims this court lacks jurisdiction to decide the costs and attorneys' fees issues. But this court has an independent obligation to ensure that jurisdiction exists. Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006). The filing of a notice of appeal transfers jurisdiction over all questions presented in the appeal from the district court to the court of appeals. Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982); Jankovich v. Bowen, 868 F.2d 867, 871 (6th Cir. 1989). The purpose of this judicially-created doctrine is to "avoid the confusion and inefficiency of two courts considering the same issues simultaneously." Jankovich, 868 F.2d at 871. Accordingly, notwithstanding the filing of a notice of appeal, district courts retain jurisdiction to determine collateral and ancillary matters

3

that do not affect the questions presented on appeal. Langham-Hill Petroleum, Inc. v. S. Fuels Co., 813 F.2d 1327, 1330—31 (4th Cir. 1987); Weaver v. Fl. Power & Light Co., 172 F.3d 771, 773 (11th Cir. 1999). The award of costs and attorneys' fees have generally been recognized as collateral issues appropriate for resolution by the trial court when an appeal has been taken. See Buchanan v. Stanships, Inc., 485 U.S. 265, 268 (1988); Langham-Hill Petroleum, 813 F.2d at 1331 ("[T]he request for attorney's fees raised issues collateral to the main cause of action. Attorney's fees are not compensation for the injury giving rise to the action and thus are not an element of relief." (citing White v. N.H. Dep't of Emp't Sec., 455 U.S. 445, 452 (1982))).

Under the EAJA, a prevailing party is entitled to attorneys' fees "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Even though the question of whether the Government's suit was "substantially justified" turns upon the same nucleus of facts as the substantive questions that have been appealed, the legal issue is distinct. The Government's appeal does not place the issue of substantial justification before the Fourth Circuit, and, accordingly, this court retains jurisdiction to determine it. See United States v. $12,248.00 in U.S. Currency, No. 86cv6768, 1989 WL 205820, at *14-15 (N.D. Cal. Oct. 30, 1989) ("The question of whether claimant is

4

entitled to . . . attorney's fees was not decided by the Court's . . . judgment and [cannot] properly be considered as aspects of the case involved in plaintiff's appeal.").

Finally, neither party has addressed whether consideration of the fee petition at this time is premature in a jurisdictional sense. Under the EAJA, a prevailing party must apply for an award of attorneys' fees and other expenses within thirty days of final judgment. 28 U.S.C. § 2412(d)(1)(B). The EAJA defines final judgment as a judgment that "is final and not appealable, and includes an order of settlement." Id. § 2412(d)(2)(G). Notwithstanding this language, courts have treated fee petitions made prior to the entry of a non-appealable judgment as timely. McDonald v. Schweiker, 726 F.2d 311, 314 (7th Cir. 1983) ("[T]he 30-day provision in [the EAJA] was meant to establish a deadline, not a starting point."); Cervantez v. Sullivan, 739 F. Supp. 517, 520 (E.D. Cal. 1990) ("[T]he 30-day period was intended to operate as a statute of limitations rather than as a jurisdictional bar to consideration of EAJA fee applications."). In addition, courts have held that fee petitions "can be granted before final judgment is entered." Hunter v. Crocetti, No. 00cv2189, 2000 WL 33249939, at *2 (D. Md. Sept. 28, 2000) (citing Gonzalez v. United States, 44 Fed. Cl. 764, 767-68 (Fed. Cl. 1999)); see, e.g., Cervantez, 739 F. Supp. at 518-520; League for Coastal Prot. v. Kempthorne, No. 05cv0991, 2006 WL 3797911, at *4-5 (N.D. Cal. Dec. 22, 2006).

5

This approach is consistent with the legislative history of the EAJA, which contemplates interim fee awards. H.R. Rep. No. 99-120(I), at 18 n.26 (1985), reprinted in 1985 U.S.C.C.A.N. 132, 146 n.26 ("A similar analysis applies in direct appeal cases. Fee petitions may be filed before a 'final judgment.' If the Court determines that an award of interim fees is inappropriate the petition should be treated as if it were filed during the thirty-day period following the final decision.") Accordingly, this court has jurisdiction to consider Sheriff Johnson's fee petition at this time. See Cervantez, 739 F. Supp. at 519-20.

**A.   The Government's Motion to Stay**

The Government argues that staying consideration of Sheriff Johnson's request for costs and fees pending appeal would promote judicial economy. However, the opposite appears to be the case here, as a stay would create a risk of piecemeal litigation. Langham-Hill Petroleum, 813 F.2d at 1331 ("Piece-meal appeals will be avoided if district courts promptly hear and decide claims to attorney's fees. Such practice normally will permit appeals from fee awards to be considered together with any appeal from a final judgment on the merits."). By considering the substantially justified question at this time, the Fourth Circuit will have the opportunity to consolidate any appeal from this order with the pending appeal of this court's judgment on the merits. This would permit a single panel of the Fourth Circuit to rule on the entire

6

matter at once and would greatly promote judicial economy given that the EAJA's substantially justified question turns on the entire record under the totality of the circumstances. See Cervantez, 739 F. Supp. at 520-21. It will also permit this court to consider the cost and fee issues while the relevant circumstances are fresher in the court's mind. See Masalosalo by Masalosalo v. Stonewall Ins. Co., 718 F.2d 955, 957 (9th Cir. 1983). Accordingly, the Government's motion to stay Sheriff Johnson's petition for fees and costs will be denied.

**B. Sheriff Johnson's Motion for Costs**

The Government does not contest that Sheriff Johnson is entitled to $23,297.20 in costs under 28 U.S.C. § 2412(a)(1). Its lone argument is that Sheriff Johnson may not be the prevailing party after appeal. (Doc. 173 at 2.) But it is true that in every appeal the prevailing party may change. Federal Rule of Civil Procedure 54(d) creates a presumption in favor of taxation of costs, and "'a district court deciding not to award costs at the customary stage must provide a valid reason.'" Shipman v. United Parcel Serv., Inc., No. 5:12-cv-589-F, 2013 WL 6622944, at *2 (E.D.N.C. Dec. 16, 2013) (quoting Singleton v. Dep't of Corr. Educ., No. 1:03-cv-00004, 2003 WL 22299039, at *1 (W.D. Va. Oct. 3, 2003)). The Government has not provided any reason why costs awarded under the EAJA should be treated differently. Accordingly, Sheriff Johnson will be awarded $23,297.20 in costs.

7

**C. Sheriff Johnson's Motion for Attorneys' Fees**

As stated above, Sheriff Johnson is entitled to an award of attorneys' fees unless "the government can demonstrate that its position was 'substantially justified,' or that special circumstances make an award unjust." Hyatt v. Barnhart, 315 F.3d 239, 244 (4th Cir. 2002) (citations omitted). The meaning of substantially justified has been "an issue of considerable conceptual and practical difficulty, given the open-endedness of the statutory language and, no doubt, the delicacy of the question." United States v. Paisley, 957 F.2d 1161, 1165 (4th Cir. 1992). In Pierce v. Underwood, 487 U.S. 552 (1988), the Supreme Court examined whether, in the context of the EAJA, the modifier "substantially" means "'considerable' (to a high degree) or 'in the main' (to a reasonable degree)." Paisley, 957 F.2d at 1165 (quoting Pierce, 487 U.S. at 565). The Court settled on the latter interpretation, id., and, as a result, substantially justified means "justified to a degree that could satisfy a reasonable person or having a reasonable basis both in law and fact." Hyatt, 315 F.3d at 244 (citations and internal quotation marks omitted). "There is no 'presumption that the Government position was not substantially justified, simply because it lost the case.'" Crawford v. Sullivan, 935 F.2d 655, 657 (4th Cir. 1991) (quoting Tyler v. Bus. Servs., Inc. v. NLRB, 695 F.2d 73, 75 (4th Cir. 1982)); Roanoke River Basin Ass'n v. Hudson, 991 F.2d

8

132, 139 (4th Cir. 1993) ("The focus when determining whether a petitioner is a prevailing party is aimed at the degree of success obtained by the petitioner. Whether the government's 'position in the litigation' is substantially justified, in contrast, focuses, not on the government's success or failure, but on the reasonableness of its position in bringing about or continuing the litigation."). Nevertheless, "[t]o be 'substantially justified' means, of course, more than merely undeserving of sanctions for frivolousness." Pierce, 487 U.S. at 566.

"[W]hether the government acted reasonably in causing the litigation or taking a stance during the litigation," is to be determined under the totality of the circumstances and based on the underlying record in the action. Hyatt, 315 F.3d at 244–45. Rather than "atomize" the case, Crawford, 935 F.2d at 660 n.6, courts look to "the government's position in the case as a whole," Roanoke, 991 F.2d at 138-39. In addition, courts consider objective indicia of reasonableness and make an "independent assessment of the merits of the Government's position." Paisley, 957 F.2d at 1166 (discussing the analytical framework from Pierce). Objective indicia, including the stage at which the merits were decided, are some evidence of the strength of the Government's case. Id. For example, a fairly lengthy opinion may at times "demonstrate[] a perception by the author that the issue was one whose resolution required significant intellectual effort . . . ."

9

Id. at 1168. However, the stage at which the government lost its case "does not conclusively establish the strength or weakness of the position." Nat'l Org. for Marriage, Inc., v. United States, No. 14-2363, slip op. at 11 (4th Cir. Dec. 2, 2015).

The Government alleged that Sheriff Johnson and the ACSO violated the Fourth and Fourteenth Amendments to the United States Constitution by engaging in a pattern or practice of discriminatory law enforcement activities directed against Hispanics. Johnson, 2015 WL 4715312, at *1. Sheriff Johnson argues that the Government's action was not substantially justified because the Government's legal theories lacked a reasonable basis in fact. (See Doc. 162 at 4—6 (challenging the factual support offered by the Government); Doc. 178 at 2—7.) Beyond a bare conclusion, Sheriff Johnson does not claim that the Government's legal theories lacked a reasonable basis in law. (See Doc. 162 at 4—6; Doc. 178 at 2—7.)

The court gave the Government's claims extensive consideration. It considered and denied Sheriff Johnson's motion for summary judgment in substantial part, finding that "the Government has presented evidence which, if credited, demonstrates both disparate impact and discriminatory intent, but there are genuine disputes over material facts." (Doc. 118 at 18.) It also held a nine-day trial and reviewed the record for almost a year before issuing a nearly 250-page decision of findings of fact and

conclusions of law.  Johnson, 2015 WL 4715312.  Those findings are lengthy and detailed and cannot be repeated here without substantially repeating the full opinion.  So, the court refers to them and the analysis of that decision and will highlight below some of the principal reasons for the resolution of the current motion.  In doing so, the court does not intend to alter any conclusion of its merits opinion.

Having considered the record in the totality of the circumstances, the court finds that, while the court was not persuaded by the Government's evidence and arguments, the Government's claims under the Fourth and Fourteenth Amendments were nevertheless substantially justified within the meaning of the EAJA.

The Government's case was based principally on fact witness testimony and statistical evidence presented by two experts.

As to the fact witnesses, the Government's evidence included instances of ethnic slurs by certain ACSO deputies, but this evidence was limited primarily to the ACSO jail (where employees did not have any involvement in any decision-making to stop or detain anyone) and to a handful of inappropriate email jokes.  Id. at *35-38.  In addition, a few ACSO officers testified that they had been ordered to arrest or detain Hispanics.  Id. at *16.  Again, this was disputed.  Those very deputies ultimately denied ever targeting anyone or knowing anyone who did, and there was

11

evidence that these witnesses had reason to hold a grudge against the sheriff. Id. at *17-18. Sheriff Johnson testified and denied the statements attributed to him, and the testimony of the Government's witnesses was rebutted or placed into a lawful context by Sheriff Johnson's witnesses.

Further, the Government's case also rested on disputed testimony on ACSO's policy for arrest. The Government asserted that ACSO targeted Hispanics for arrest rather than citation, on the theory that they could be processed through the Government's 287(g) program at the ACSO jail for possible Immigration and Customs Enforcement ("ICE") detention, and the Government relied on the testimony referred to above as well as on that of a local magistrate who testified to seeing more Hispanics at the jail after ACSO instituted the 287(g) program.[2] But Sheriff's Johnson's witnesses testified that the policy was that a deputy was authorized (but not directed) to arrest anyone committing an arrestable offense who could not otherwise be identified, id. at *15, and the persuasive evidence showed that the vast majority of those the magistrate saw at the jail were likely from ICE arrests as well as from the eleven other "contributing" law enforcement agencies who used the ACSO jail for booking arrestees, id. at *12.

---

[2] The 287(g) program refers to the Government's use, through ICE, of the ACSO jail as a facility to book and house ICE detainees under 8 U.S.C. § 1357(g). Under the program, ACSO provided a certain number of deputies to be cross-certified as ICE agents to work in, and to be supervised by ICE employees at, the ACSO jail. Id. at *4-*5.

12

The Government relied on evidence that ACSO discharged its statutory obligation to check gun permit applicants' backgrounds in a fashion suggesting that only Hispanics were cleared by ACSO through the ICE database. This was weak, however, because there was no evidence as to whether or not other applicants had been cleared because they provided valid evidence of citizenship, nor did the Government claim that confirming citizenship through the ICE database was in itself wrong (only the claim that ACSO did this for Hispanics and that ICE, not the ACSO deputies assigned to the ICE unit, should have actually accessed the ICE database).[3]

As to checkpoint siting, the Government provided evidence of ACSO checkpoints in or near predominantly Hispanic areas. But the testimony of Sheriff Johnson's expert supported the conclusion that ACSO distributed its checkpoints equally across the county. Id. at *18-19, *58. And, as to the Fourth Amendment claim, the Government relied on evidence, by ACSO's Deputy Conklin and Lieutenant Hoover, who described their use of traffic checkpoints as being for "general law enforcement" purposes.[4] Id. at *19. However, other evidence showed that, by that, they meant

---

[3] In any event, there was evidence that while ICE had initially approved the practice, the practice nevertheless ceased in 2011, well before the 287(g) program was discontinued. Id. at *9-*10.

[4] As noted above, given the notice problems in its complaint, the Government was required to link its Fourth Amendment claim to Hispanics. Johnson, 28 F. Supp. 3d at 515-17. Consequently, the Government sought to tie the officers' "general law enforcement" statements to its claims relating to checkpoints near predominantly Hispanic areas.

13

permissible license checks, and that the testimony was not considered fully in context. Id.

Thus, credibility and context were critical to these witnesses' testimony. Ultimately, when considered in the context of all the evidence, the court was not persuaded by key parts of the Government's witnesses' testimony or the inferences the Government drew from what those witnesses claim to have been told or instructed. See id. at *94. This does not mean that the Government could not have reasonably believed its witnesses, however.

The Government also relied heavily on vehicle stop data and statistical analysis from two expert witnesses, Dr. John Lamberth and Dr. John MacDonald, to demonstrate that ACSO's traffic enforcement discriminated against Hispanics. Id. at *22-29. Both experts conducted extensive analysis. However, upon closer examination, both suffered from various flaws.

Dr. Lamberth provided testimony of an estimated "benchmark" for Hispanic drivers who violate traffic laws in Alamance County, based on his method of having assistants attempt to observe the ethnicity of drivers and traffic violations of moving vehicles from the roadside at a distance. Dr. Lamberth's study was based on a modified version of the methodology he used in prior instances studying principally African Americans. His qualifications were not challenged, but the court found his method and results as

14

applied in this case unreliable under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1999). 2015 WL 4715312, at *47. The Government was aware that at least one court had admitted a study by Dr. Lamberth. Id. But, as this court noted in its opinion, the Government was also aware that Dr. Lamberth's testimony was subject to challenge because some courts have excluded his studies as "suspect" and unreliable; in fact, the Government itself had challenged his testimony in many of those cases. Id. at *53. Nevertheless, while this court was not persuaded by his method and evidence, even novel opinions and techniques may provide a sufficient factual basis for reliable expert opinions, especially where the expert has been permitted to testify in other cases. See Shock v. United States, 254 F.3d 1, 5 (1st Cir. 2001) ("When the issue is a novel one on which there is little precedent, courts have been reluctant to find the government's position was not substantially justified.").

In addition to finding Dr. Lamberth's study unreliable, this court also did not find Dr. Lamberth to be a credible witness. 2015 WL 4715312, at *53-54. He relied on the work of two assistants whom he directed to observe drivers on active roadways from a distance and record their ethnicity and traffic violations. Dr. Lamberth had performed such a study before, but it is a difficult task at best - one Dr. Lamberth, himself, and others criticized previously, but one that was essential to his conclusions. Id.

15

The Government's proof was weakened by its failure to offer either assistant at trial to provide any indication of the standard they used to identify Hispanics so that they could be cross-examined and their conclusions probed and tested. Instead, Dr. Lamberth testified that his assistants classified anyone as "Hispanic" if the assistant thought the person looked Hispanic – an undertaking as to which another Government expert, Margo Frasier, cast serious doubt. Id. at *54 ("I don't think you can assume that you can recognize an Hispanic."). Had Dr. Lamberth's assistants testified, however, it is possible that they *might* have provided the court with additional information about their methods and ability to observe to render Dr. Lamberth's study more credible. In any event, the presence of credibility determinations does not render the Government's case unreasonable.

Finally, Dr. MacDonald was presented to address ACSO's law enforcement practices after traffic stops and opined that ACSO disparately treated Hispanics in stop outcomes and search outcomes. His statistics did show that in certain categories, Hispanics were disproportionately represented. The court found Dr. MacDonald to be credible but declined to accept certain inferences urged by the Government. Notably, Dr. MacDonald's analysis relied on statistical analysis that failed to sufficiently compare the treatment of Hispanics to others who were similarly situated. Id. at *27. One problem was not marshalling

enough of the right evidence and not ruling out obvious non-discriminatory explanations for the ACSO's actions. For example, Dr. MacDonald's statistical analysis claimed to control for the "stop reason" but critically failed to control for either the stop outcome or search outcome, even though those were the very things he claimed to be measuring. Id. at *76-83. Dr. MacDonald's conclusions were also rebutted in part by one of Sheriff Johnson's fact witnesses, Officer Mark Dockery, who provided ACSO data that further indicated that the inferences the Government wished to draw from the statistical data were not persuasive. Id. at *20-30. Finally, Dr. Lamberth's failure to provide a reliable benchmark of Hispanic drivers further undermined Dr. MacDonald's ability to testify as to alleged discriminatory checkpoint stops. Id. at *76.

To be sure, the court was troubled by aspects of the Government's attempt to urge characterizations of the evidence that were not supported. For example, the Government attributed much of the impetus for Sheriff Johnson's alleged misconduct to the Government's own 287(g) immigration program. But at trial, it became apparent that, assuming the Government's witnesses were to be believed, the Government nevertheless overstated the role of the 287(g) program in its case, and ICE officials in charge of that program who testified at trial took personal responsibility for conduct that the Government wished to place at the feet of

17

ACSO (e.g., the authority to permit an ACSO officer to work as a 287(g) Task Force Officer for ICE outside the jail).

In the end, resolution of this case required significant effort and careful analysis. See Paisley, 957 F.2d at 1168. The Government survived summary judgment in substantial part, and this court spent one year and 250 pages resolving the complex issues presented. The persuasiveness of the Government's fact witness testimony ultimately depended upon inferences drawn from credibility determinations and other contextual evidence. See Mortensen v. Astrue, 428 Fed. App'x 248, 250-51 (4th Cir. 2011).[5] Although this court was not persuaded by the Government's evidence to establish a pattern or practice of unlawful conduct, it concludes that there was nevertheless a sufficient factual and legal basis for the Government to have made the decision to bring the action. This conclusion is bolstered by the fact that this appears to have been the first such pattern or practice case to actually reach trial. See Abramson v. United States, 45 Fed. Cl. 149, 152 (Fed. Cl. 1999) (noting that courts are hesitant to find the Government's position to not be substantially justified where a question is presented for the first time); cf. Hyatt v. Shalala, 6 F.3d 250, 256 (4th Cir. 1993) (finding Government justified in litigating unsettled issue on appeal).

---

[5] Non-binding unpublished decisions are cited only for the persuasive value of their reasoning.

18

Case 1:12-cv-01349-TDS-JLW   Document 180   Filed 12/08/15   Page 18 of 19

For all these reasons, and those stated in this court's opinion on the merits, although the Government failed to prevail in its case, its claims had a reasonable basis in law and fact. Sheriff Johnson's motion for an award of attorneys' fees under the EAJA will therefore be denied.

**III. CONCLUSION**

For the reasons stated, the Government's motion to stay Sheriff Johnson's petition for fees and costs under the EAJA is denied, as a stay would not promote judicial economy. Sheriff Johnson's entitlement to $23,297.20 in costs is undisputed. However, because the Government's claims were substantially justified, Sheriff Johnson is not entitled to attorneys' fees and expenses under the EAJA.

IT IS THEREFORE ORDERED as follows:

1. The Government's motion to stay Defendant's petition for fees and costs (Doc. 164) is DENIED;

2. The Clerk's order staying consideration of bill of costs is LIFTED, Defendant's motion for costs (Doc. 161) is GRANTED, and Defendant shall be awarded $23,297.20 in costs; and

3. Defendant's motion for attorneys' fees (Doc. 161) is DENIED.

                                                      /s/ Thomas D. Schroeder
                                                  United States District Judge

December 8, 2015